Case No. 25-3032

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

AMANDA MIRACLE, et al.,
*Plaintiffs-Appellees,*

v.

KEN HUSH, et al.,
*Defendants-Appellants.*

---

## APPELLANTS' APPENDIX VOLUME I

---

Appeal from the United States District Court for the District of Kansas
Honorable Julie A. Robinson, Senior District Court Judge
District Court Case No. 23-CV-4056-JAR-GEB

---

OFFICE OF KANSAS ATTORNEY
GENERAL KRIS W. KOBACH

120 SW 10th Avenue, 2nd Floor          Dwight R. Carswell
Topeka, Kansas 66612-1597               *Deputy Solicitor General*
(785) 296-2215                          Matthew L. Shoger
dwight.carswell@ag.ks.gov                *Assistant Attorney General*
matt.shoger@ag.ks.gov

                                        *Attorneys for Defendants-*
                                        *Appellants*

# TABLE OF CONTENTS

## VOLUME I

Docket ........................................................................................................... 1

ECF 41 Amended Complaint ........................................................................ 23

ECF 41-1 Exhibit 1 ...................................................................................... 78

ECF 41-2 Exhibit 2 ...................................................................................... 85

ECF 41-3 Exhibit 3 .................................................................................... 133

ECF 41-4 Exhibit 4 .................................................................................... 150

ECF 41-5 Exhibit 5 .................................................................................... 172

ECF 41-6 Exhibit 6 .................................................................................... 179

ECF 41-7 Exhibit 7 .................................................................................... 215

ECF 41-8 Exhibit 8 .................................................................................... 246

ECF 41-9 Exhibit 9 .................................................................................... 250

ECF 41-10 Exhibit 10 ................................................................................ 272

ECF 41-11 Exhibit 11 ................................................................................ 277

ECF 41-12 Exhibit 12 ................................................................................ 287

## VOLUME II

ECF 45 Motion to Dismiss ............................................................................ 1

ECF 45-1 Exhibit A ...................................................................................... 31

ECF 45-2 Exhibit B ...................................................................................... 55

ECF 45-3 Exhibit C ...................................................................................... 80

ECF 45-4 Exhibit D .................................................................................... 103

ECF 45-5 Exhibit E .................................................................................... 127

ECF 45-6 Exhibit F .................................................................................... 138

ECF 45-7 Exhibit G .................................................................................... 145

ECF 45-8 Exhibit H .................................................................................... 152

ECF 45-9 Exhibit I ..................................................................................... 163

ECF 45-10 Exhibit J ................................................................................. 187

ECF 45-11 Exhibit K ................................................................................ 213

ECF 49 Memorandum in Opposition to Motion to Dismiss .................................. 242

ECF 52 Reply in Support of Motion to Dismiss ............................................... 272

## VOLUME III

ECF 54 Memorandum and Order on Motion to Dismiss ......................................... 1

ECF 55 Motion to Reconsider ...................................................................... 37

ECF 56 Response in Opposition to Motion to Reconsider ..................................... 42

ECF 57 Reply in Support of Motion to Reconsider ............................................ 48

ECF 58 Memorandum and Order on Motion to Reconsider .................................... 55

ECF 60 Notice of Interlocutory Appeal .......................................................... 66

**Query    Reports    Utilities    Help    Log Out**

ETT-20D,INTERLOCUTORYAPPEAL,MEDIATION,PROTO

# U.S. District Court
## DISTRICT OF KANSAS (Topeka)
## CIVIL DOCKET FOR CASE #: 5:23-cv-04056-JAR-GEB

Miracle et al v. Hush et al                          Date Filed: 07/12/2023
Assigned to: District Judge Julie A. Robinson        Jury Demand: Plaintiff
Referred to: Magistrate Judge Gwynne E. Birzer       Nature of Suit: 442 Civil Rights: Jobs
Demand: $75,000                                      Jurisdiction: Federal Question
Case in other court: 10CCA, 25-03032
Cause: 18:241 Conspiracy Against Citizen Rights

**Plaintiff**

**Amanda Miracle**                represented by    **Amanda S. Vogelsberg**
                                                   Henson, Hutton, Mudrick, Gragson &
                                                   Vogelsberg, LLP
                                                   3649 SW Burlingame Road, Suite 200
                                                   Topeka, KS 66611-21558
                                                   785-232-2200
                                                   Fax: 785-232-3344
                                                   Email: avogelsberg@hhmglaw.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **James Phillip Gragson**
                                                   Henson, Hutton, Mudrick, Gragson &
                                                   Vogelsberg, LLP
                                                   3649 SW Burlingame Road, Suite 200
                                                   Topeka, KS 66611-21558
                                                   785-232-2200
                                                   Email: jpgragson@hhmglaw.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **John H. Hutton**
                                                   Henson, Hutton, Mudrick, Gragson &
                                                   Vogelsberg, LLP
                                                   3649 SW Burlingame Road, Suite 200
                                                   Topeka, KS 66611-21558
                                                   785-232-2200 ext 213
                                                   Fax: 785-232-3344
                                                   Email: jhutton@hhmglaw.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Kara Eisenhut**
                                                   Henson, Hutton, Mudrick, Gragson &
                                                   Vogelsberg, LLP

Appendix Vol. 1, Pg. 1

3649 SW Burlingame Road, Suite 200
Topeka, KS 66611-21558
785-232-2200
Fax: 785-232-3344
Email: keisenhut@hhmglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Christopher Lovett**                    represented by  **Amanda S. Vogelsberg**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James Phillip Gragson**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **John H. Hutton**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kara Eisenhut**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Behrens**                       represented by  **Amanda S. Vogelsberg**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James Phillip Gragson**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **John H. Hutton**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kara Eisenhut**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rob Catlett**                           represented by  **Amanda S. Vogelsberg**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*

Appendix Vol. 1, Pg. 2

*ATTORNEY TO BE NOTICED*

**James Phillip Gragson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Hutton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kara Eisenhut**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dan Colson**                    represented by    **Amanda S. Vogelsberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Phillip Gragson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Hutton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kara Eisenhut**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles Emmer**                 represented by    **Amanda S. Vogelsberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Phillip Gragson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Hutton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kara Eisenhut**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brenda Koerner**                    represented by   **Amanda S. Vogelsberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Phillip Gragson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Hutton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kara Eisenhut**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sheryl Lidzy**                      represented by   **Amanda S. Vogelsberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Phillip Gragson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Hutton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kara Eisenhut**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Max McCoy**                         represented by   **Amanda S. Vogelsberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Phillip Gragson**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Hutton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kara Eisenhut**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Morales**                     represented by   **Amanda S. Vogelsberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Phillip Gragson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Hutton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kara Eisenhut**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lynnette Sievert**                     represented by   **Amanda S. Vogelsberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Phillip Gragson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Hutton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kara Eisenhut**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ken Hush**                               represented by   **Matthew Lee Shoger**
*President*                                                 Kansas Attorney General
                                                           Legal Services
                                                           120 SW 10th Avenue, 2nd Floor
                                                           Topeka, KS 66612
                                                           785-296-2215
                                                           Fax: 785-291-3767
                                                           Email: matt.shoger@ag.ks.gov
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Stanley R. Parker**
                                                           Kansas Attorney General - Topeka
                                                           120 SW 10th Avenue, 2nd Floor
                                                           Topeka, KS 66612
                                                           785-368-8423
                                                           Fax: 785-291-3767
                                                           Email: stanley.parker@ag.ks.gov
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Shon Dennis Qualseth**
                                                           Kansas Department of Health and
                                                           Environment
                                                           Legal Services
                                                           1000 SW Jackson
                                                           Suite 560
                                                           Topeka, KS 66612
                                                           785-296-0696
                                                           Fax: 785-559-4272
                                                           Email: shon.qualseth@kdhe.ks.gov
                                                           *TERMINATED: 11/21/2024*

**Defendant**

**Emporia State University**               represented by   **Matthew Lee Shoger**
*TERMINATED: 04/10/2024*                                    (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Stanley R. Parker**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Shon Dennis Qualseth**
                                                           (See above for address)
                                                           *TERMINATED: 11/21/2024*

**Defendant**

**Kansas Board of Regents, The**
*TERMINATED: 04/10/2024*

represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Brent Thomas**
*Provost and Vice President of Academic Affairs*

represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Kevin Johnson**
*General Counsel*

represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Steven Lovett**

represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Julene Miller**                              represented by   **Matthew Lee Shoger**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Stanley R. Parker**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Shon Dennis Qualseth**
                                                                (See above for address)
                                                                *TERMINATED: 11/21/2024*

**Defendant**

**Bill Feuerborn**                             represented by   **Matthew Lee Shoger**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Stanley R. Parker**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Shon Dennis Qualseth**
                                                                (See above for address)
                                                                *TERMINATED: 11/21/2024*

**Defendant**

**Cheryl Harrison-Lee**                        represented by   **Matthew Lee Shoger**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Stanley R. Parker**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Shon Dennis Qualseth**
                                                                (See above for address)
                                                                *TERMINATED: 11/21/2024*

**Defendant**

**Shane Bangerter**

represented by  **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Ann Brandau**

represented by  **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Mark Hutton**

represented by  **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Shellaine Kiblinger**

represented by  **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Jon Rolph**                        represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Allen Schmidt**                    represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Helen Van Etten**                  represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Carl Ice**                                        represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Cynthia Lane**                                    represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Blake Benson**                                    represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Diana Mendoza**                                   represented by **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**Wint Winter**                              represented by  **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley R. Parker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**John Doe**                                 represented by  **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

**Defendant**

**John Dicus**                               represented by  **Matthew Lee Shoger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shon Dennis Qualseth**
(See above for address)
*TERMINATED: 11/21/2024*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/12/2023 | 1 | COMPLAINT with trial location of Topeka (Filing fee $402, Internet Payment Receipt Number AKSDC-6104001.), filed by Brenda Koerner, Christopher Lovett, Amanda Miracle, Michael Morales, Lynnette Sievert, Charles Emmer, Michael Behrens, Max McCoy, Sheryl Lidzy, Rob Catlett, Dan Colson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12)(Gragson, James) (Entered: 07/12/2023) |
| 07/12/2023 | 2 | CIVIL COVER SHEET by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, |

Appendix Vol. 1, Pg. 12

| | | |
|---|---|---|
| | | Michael Morales, Lynnette Sievert. (Gragson, James) (Entered: 07/12/2023) |
| 07/13/2023 | | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge Daniel D. Crabtree and Magistrate Judge Gwynne E. Birzer for all proceedings. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)<br><br>**NOTICE OF MAGISTRATE JUDGE AVAILABILITY: A United States magistrate judge is available to conduct all proceedings in this civil action if all parties voluntarily consent. Information & consent forms are available at https://www.uscourts.gov/file/459/download. (nao) (Entered: 07/13/2023)** |
| 08/04/2023 | | SUMMONS ISSUED as to Shane Bangerter, Blake Benson, Ann Brandau, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kansas Board of Regents, The, Shellaine Kiblinger, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Summonses issued to Attorney for service.) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge Form provided to counsel for service with complaint. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (nao) (Entered: 08/04/2023) |
| 08/04/2023 | | SUMMONS ISSUED as to Kevin Johnson. (Summons issued to Attorney for service.) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge Form provided to counsel for service with complaint. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (nao) (Entered: 08/04/2023) |
| 08/07/2023 | | ALIAS SUMMONS ISSUED as to Brent Thomas. (Summons issued to Attorney for service.) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge Form provided to counsel for service with complaint. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jk) (Entered: 08/07/2023) |
| 08/11/2023 | 3 | ENTRY OF APPEARANCE by Shon D. Qualseth on behalf of Shane Bangerter, Blake Benson, Ann Brandau, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Qualseth, Shon) (Entered: 08/11/2023) |
| 08/11/2023 | 4 | ENTRY OF APPEARANCE by Stanley R. Parker on behalf of Shane Bangerter, Blake Benson, Ann Brandau, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Parker, Stanley) (Entered: 08/11/2023) |
| 08/15/2023 | | SUMMONS ISSUED as to Cynthia Lane. (Summons issued to Attorney for service.) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge Form provided to counsel for service with complaint. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jsh) (Entered: 08/15/2023) |
| 09/28/2023 | 5 | ENTRY OF APPEARANCE by Shon D. Qualseth on behalf of All Defendants. (Qualseth, Shon) (Entered: 09/28/2023) |
| 09/28/2023 | 6 | ENTRY OF APPEARANCE by Matthew L. Shoger on behalf of All Defendants. (Shoger, Matthew) Modified on 9/29/2023 to correct attorney of record to match filing. (nac) (Entered: 09/28/2023) |
| 09/29/2023 | 7 | ANSWER to Complaint by Shane Bangerter, Blake Benson, John Doe, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin |

Appendix Vol. 1, Pg. 13

| | | Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Qualseth, Shon) (Entered: 09/29/2023) |
|---|---|---|
| 10/11/2023 | 8 | INITIAL ORDER REGARDING PLANNING AND SCHEDULING: Scheduling Conference set for 11/28/2023 at 10:00 AM by telephone before Magistrate Judge Gwynne E. Birzer. Participants shall dial into the conference call at 888-363-4749, enter access code 9686294#, and follow the prompts to join the call. Rule 26 Initial Disclosures and Proposed Scheduling Order due 11/21/2023. Signed by Magistrate Judge Gwynne E. Birzer on 10/11/23. (ala) (Entered: 10/11/2023) |
| 11/13/2023 | 9 | MOTION to Stay Discovery by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Doe, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Qualseth, Shon) (Entered: 11/13/2023) |
| 11/16/2023 | 10 | MOTION to Exceed Page Limit by Defendants Shane Bangerter, Blake Benson, Ann Brandau, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Qualseth, Shon) (Entered: 11/16/2023) |
| 11/20/2023 | 11 | RESPONSE MEMORANDUM IN OPPOSITION by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert re 9 Motion to Stay Discovery. (Gragson, James) (Entered: 11/20/2023) |
| 11/20/2023 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to 10 Motion to Exceed Page Limit. The motion will be resolved by the District Judge. (kf)** (Entered: 11/20/2023) |
| 11/20/2023 | 12 | ORDER granting 10 Motion to Exceed Page Limit. Defendants may exceed the page limit under D. Kan. Rule 7.1(d)(3) and file up to 30 pages with their Motion for Judgment on the Pleadings. Signed by District Judge Daniel D. Crabtree on 11/20/2023. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 11/20/2023) |
| 11/20/2023 | 13 | MOTION for Judgment on the Pleadings by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Doe, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Qualseth, Shon) (Entered: 11/20/2023) |
| 11/21/2023 | 14 | NOTICE OF CANCELLED HEARING: Due to a pending Motion to Stay Discovery (ECF No. 9 ) which is not ripe, the Scheduling Conference on 11/28/2023 at 10:00 a.m. is CANCELLED. The Scheduling Conference will be rescheduled after decision on the motion, as necessary. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 11/21/2023) |
| 11/27/2023 | 15 | REPLY TO RESPONSE TO MOTION by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Doe, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon |

| | | |
|---|---|---|
| | | Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter re 9 Motion to Stay Discovery. (Qualseth, Shon) (Entered: 11/27/2023) |
| 12/06/2023 | 16 | UNOPPOSED MOTION for Extension of Time to File Response as to 13 Motion for Judgment on the Pleadings by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Gragson, James) (Entered: 12/06/2023) |
| 12/06/2023 | 17 | MOTION to Exceed Page Limit by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Gragson, James) (Entered: 12/06/2023) |
| 12/06/2023 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to 16 Unopposed Motion for Extension of Time to File Response as to 13 Motion for Judgment on the Pleadings and 17 Motion to Exceed Page Limit. The motions will be resolved by the District Judge. (kf)** (Entered: 12/06/2023) |
| 12/07/2023 | 18 | ORDER granting 16 Unopposed Motion for Extension of Time to Respond to Defendant's Motion for Judgment on the Pleadings (Doc. 13 ) and 17 Motion to Exceed Page Limit. Plaintiffs' response deadline is extended to December 26, 2023. The Response may contain 30 pages. Signed by District Judge Daniel D. Crabtree on 12/07/2023. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 12/07/2023) |
| 12/11/2023 | 19 | ORDER OF RECUSAL. District Judge Daniel D. Crabtree recused. Case reassigned to District Judge Julie A. Robinson for all further proceedings. Signed by deputy clerk on 12/11/2023. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(mig) (Entered: 12/11/2023) |
| 12/26/2023 | 20 | MOTION for Leave to File Amended Complaint by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Gragson, James) (Entered: 12/26/2023) |
| 12/26/2023 | 21 | MEMORANDUM IN SUPPORT of 20 Motion for Leave to File Amended Complaint by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Gragson, James) (Entered: 12/26/2023) |
| 12/26/2023 | 22 | RESPONSE MEMORANDUM IN OPPOSITION by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert re 13 Motion for Judgment on the Pleadings. (Gragson, James) (Entered: 12/26/2023) |
| 01/08/2024 | 23 | ORDER. After corresponding with counsel, the Court finds this motion is unopposed. The Court grants 20 Plaintiffs' Motion for Leave to Amend Complaint. Plaintiffs shall file their amended complaint no later than 1/12/2024. Signed by Magistrate Judge Gwynne E. Birzer on 1/8/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 01/08/2024) |
| 01/09/2024 | 24 | FIRST AMENDED COMPLAINT against All Defendants, filed by Brenda Koerner, Christopher Lovett, Amanda Miracle, Michael Morales, Lynnette Sievert, Charles Emmer, Michael Behrens, Max McCoy, Sheryl Lidzy, Rob Catlett, Dan Colson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12) (Gragson, James) Modified on 1/9/2024 to remove repeated word "exhibit". (ca) (Entered: 01/09/2024) |

Appendix Vol. 1, Pg. 15

| 01/09/2024 | [25] | FIRST AMENDED COMPLAINT against All Defendants, filed by Brenda Koerner, Christopher Lovett, Amanda Miracle, Michael Morales, Lynnette Sievert, Charles Emmer, Michael Behrens, Max McCoy, Sheryl Lidzy, Rob Catlett, Dan Colson. (Attachments: # [1] Exhibit 1, # [2] Exhibit 2, # [3] Exhibit 3, # [4] Exhibit 4, # [5] Exhibit 5, # [6] Exhibit 6, # [7] Exhibit 7, # [8] Exhibit 8, # [9] Exhibit 9, # [10] Exhibit 10, # [11] Exhibit 11, # [12] Exhibit 12) (Gragson, James) (Entered: 01/09/2024) |
|---|---|---|
| 01/10/2024 | 26 | ORDER finding as moot [13] Defendants' Motion for Judgment on the Pleadings. In light of the subsequently-filed Amended Complaint, this motion is moot. Signed by District Judge Julie A. Robinson on 1/10/2023. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ams) (Entered: 01/10/2024) |
| 01/11/2024 | 27 | ORDER finding as moot [9] Defendants' Motion to Stay Discovery ("Motion"). Defendants' Motion was based upon the filing of their Motion for Judgment on the Pleadings (ECF No. 12) which has since been found moot (ECF No. 26) following Plaintiffs filing an Amended Complaint (ECF No. [25] ). Defendants shall contact the undersigned's chambers to request a conference prior to refiling any motion to stay. IT IS SO ORDERED. Signed by Magistrate Judge Gwynne E. Birzer on 1/11/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 01/11/2024) |
| 01/18/2024 | [28] | MOTION to Exceed Page Limit by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Qualseth, Shon) (Entered: 01/18/2024) |
| 01/18/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to [28] Motion to Exceed Page Limit. The motion will be resolved by the District Judge. (kf)** (Entered: 01/18/2024) |
| 01/19/2024 | 29 | ORDER granting as unopposed and for good cause shown [28] Defendants' Motion for Leave to File Excess Pages. Defendants' forthcoming brief in support of their motion to dismiss shall not exceed thirty (30) pages. Signed by District Judge Julie A. Robinson on 1/19/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ams) (Entered: 01/19/2024) |
| 01/22/2024 | [30] | CLERKS ORDER EXTENDING TIME until 2/6/2024 for Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, John Doe, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter to answer or otherwise plead. Signed by deputy clerk on 1/22/2024. (nac) (Entered: 01/22/2024) |
| 02/06/2024 | [31] | MOTION to Dismiss by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Emporia State University, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Kansas Board of Regents, The, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Attachments: # [1] Exhibit A, # [2] Exhibit B, # [3] Exhibit C, # [4] Exhibit D, # [5] Exhibit E, # [6] Exhibit F, # [7] Exhibit G, # [8] Exhibit H, # [9] Exhibit I, # [10] Exhibit J, # [11] Exhibit K) (Qualseth, Shon) (Entered: 02/06/2024) |
| 02/15/2024 | [32] | MOTION to Exceed Page Limit <u>AND</u> Motion for Extension of Time to Respond to [31] Motion to Dismiss by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Gragson, James) (Entered: 02/15/2024) |

| 02/15/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to 32 Motion to Exceed Page Limit and Motion for Extension of Time to Respond to 31 Motion to Dismiss. The motion will be resolved by the District Judge.** (kf) (Entered: 02/15/2024) |
|---|---|---|
| 02/15/2024 | 33 | ORDER granting Plaintiff's Unopposed 32 Motion for Leave to File Excess Pages and Extension of Time to Respond to Motion to Dismiss 31 . Response deadline is extended to 3/5/24. Plaintiff may exceed the page limit from 15 pages to 30 pages. Signed by District Judge Julie A. Robinson on 2/15/24. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ss) (Entered: 02/15/2024) |
| 03/05/2024 | 34 | RESPONSE MEMORANDUM IN OPPOSITION by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert re 31 Motion to Dismiss. (Gragson, James) (Entered: 03/05/2024) |
| 03/18/2024 | 35 | ORDER. The undersigned Magistrate Judge communicated with counsel, via letter dated 2/29/2024, regarding deferred scheduling in this case. Having received no response, the Rule 16 conference will be postponed until after the pending Motion to Dismiss (ECF No. 31) has been decided by the District Judge. IT IS SO ORDERED. Signed by Magistrate Judge Gwynne E. Birzer on 3/18/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 03/18/2024) |
| 03/26/2024 | 36 | JOINT MOTION Regarding Scheduling Motion to Amend Complaint and Anticipated Motion to Dismiss by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Gragson, James) (Entered: 03/26/2024) |
| 03/26/2024 | 37 | ORDER granting 36 Joint Motion for Order Regarding Scheduling Motion to Amend Complaint and Anticipated Motion to Dismiss. Plaintiffs shall file their Unopposed Motion for Leave to File Second Amended Complaint no later than 4/5/2024. Signed by Magistrate Judge Gwynne E. Birzer on 3/26/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 03/26/2024) |
| 04/05/2024 | 38 | MOTION for Leave to File Second Amended Complaint by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Gragson, James) (Entered: 04/05/2024) |
| 04/05/2024 | 39 | MEMORANDUM IN SUPPORT of 38 Motion for Leave to File Second Amended Complaint by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Attachments: # 1 Exhibit A, # 2 Exhbit B)(Gragson, James) (Entered: 04/05/2024) |
| 04/08/2024 | 40 | ORDER. After corresponding with counsel, the Court finds this motion is unopposed. The Court grants 38 Plaintiffs' Motion for Leave to File Second Amended Complaint. Plaintiffs shall file their Second Amended Complaint no later than 4/12/2024. Signed by Magistrate Judge Gwynne E. Birzer on 4/8/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 04/08/2024) |
| 04/10/2024 | 41 | SECOND AMENDED COMPLAINT against All Defendants, filed by Brenda Koerner, Christopher Lovett, Amanda Miracle, Michael Morales, Lynnette Sievert, Charles Emmer, Michael Behrens, Max McCoy, Sheryl Lidzy, Rob Catlett, Dan Colson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12) (Gragson, James) (Entered: 04/10/2024) |

| 04/10/2024 | 42 | ORDER finding as moot 31 Motion to Dismiss based on the filing of the Amended Complaint Doc. 41 . Signed by District Judge Julie A. Robinson on 4/10/24. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ss) (Entered: 04/10/2024) |
| 04/23/2024 | 43 | MOTION to Exceed Page Limit by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Shoger, Matthew) (Entered: 04/23/2024) |
| 04/23/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to 43 Motion to Exceed Page Limit. The motion will be resolved by the District Judge. (kf)** (Entered: 04/23/2024) |
| 04/24/2024 | 44 | ORDER granting as unopposed and for good cause shown 43 Motion for Leave to File Excess Pages. Defendants' forthcoming brief in support of their motion to dismiss shall not exceed thirty (30) pages. Signed by District Judge Julie A. Robinson on 4/24/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ams) (Entered: 04/24/2024) |
| 04/24/2024 | 45 | MOTION to Dismiss by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Qualseth, Shon) (Entered: 04/24/2024) |
| 04/30/2024 | 46 | ORDER. Upon review of 45 Defendants' Motion to Dismiss, the Court continues to defer scheduling in this case. The Rule 16 conference will be postponed until after the Motion to Dismiss has been decided by the District Judge. IT IS SO ORDERED. Signed by Magistrate Judge Gwynne E. Birzer on 4/30/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 04/30/2024) |
| 05/03/2024 | 47 | MOTION for Extension of Time to File Response and Motion to Exceed Page Limit as to 45 Motion to Dismiss by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Gragson, James). Added Motion to Exceed Page Limit. (kao) (Entered: 05/03/2024) |
| 05/06/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to 47 Motion for Extension of Time to File Response and Motion to Exceed Page Limit as to 45 Motion to Dismiss. The motion will be resolved by the District Judge. (kf)** (Entered: 05/06/2024) |
| 05/08/2024 | 48 | ORDER granting as unopposed and for good cause shown 47 Motion for Extension of Time to File Response and Motion for Leave to File Excess Pages as to 45 Motion to Dismiss for Lack of Jurisdiction and Motion to Dismiss for Failure to State a Claim. Plaintiffs' response deadline is extended to 5/29/2024. Plaintiffs' response may exceed the page limit by 15 pages, for a total page limit of 30 pages. Signed by District Judge Julie A. Robinson on 5/8/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ams) (Entered: 05/08/2024) |
| 05/29/2024 | 49 | RESPONSE MEMORANDUM IN OPPOSITION by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, |

| | | Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert re [45](#) Motion to Dismiss. (Gragson, James) (Entered: 05/29/2024) |
|---|---|---|
| 06/06/2024 | [50](#) | MOTION to Exceed Page Limit by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Shoger, Matthew) (Entered: 06/06/2024) |
| 06/06/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to [50](#) Motion to Exceed Page Limit. The motion will be resolved by the District Judge. (kf)** (Entered: 06/06/2024) |
| 06/07/2024 | 51 | ORDER granting [50](#) Defendant's Unopposed Motion for Leave to File Excess Pages. Defendant's reply shall not exceed 10 pages. Signed by District Judge Julie A. Robinson on 6/7/24. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ss) (Entered: 06/07/2024) |
| 06/12/2024 | [52](#) | REPLY TO RESPONSE TO MOTION by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter re [45](#) Motion to Dismiss. (Qualseth, Shon) Modified on 2/26/2025 to remove Emporia State University and Kansas Board of Regents, The as filers. (mam) (Entered: 06/12/2024) |
| 11/21/2024 | [53](#) | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Shon D. Qualseth as to All Defendants. (Qualseth, Shon) (Entered: 11/21/2024) |
| 12/05/2024 | [54](#) | MEMORANDUM AND ORDER. Defendants' Motion to Dismiss (Doc. [45](#) ) is granted in part and denied in part. Defendants' motion is granted as to Counts V, VII, and IX. Defendants' motion to dismiss Defendants Thomas, Miller, Harrison-Lee, Kiblinger, Ice, Lane, Winter, Feuerborn, Bangerter, Hutton, Rolph, Schmidt, Brandau, Van Etten, Benson, Mendoza, and Dicus on Count IV is also granted. Defendants' motion to dismiss is otherwise denied. Signed by District Judge Julie A. Robinson on 12/5/2024. (mam) (Entered: 12/05/2024) |
| 12/12/2024 | [55](#) | MOTION to Reconsider [54](#) Memorandum and Order by Defendants Ken Hush, Brent Thomas, Kevin Johnson, Steven Lovett, Julene Miller, Bill Feuerborn, Cheryl Harrison-Lee, Shane Bangerter, John Dicus, Ann Brandau, Mark Hutton, Shellaine Kiblinger, Jon Rolph, Allen Schmidt, Helen Van Etten, Carl Ice, Cynthia Lane, Blake Benson, Diana Mendoza, Wint Winter, John Doe. (Shoger, Matthew) Modified on 2/26/2025 to remove Emporia State University and Kansas Board of Regents, The as filers. (mam) (Entered: 12/12/2024) |
| 12/18/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to [55](#) Motion to Reconsider [54](#) Memorandum and Order. The motion will be resolved by the District Judge. (ss)** (Entered: 12/18/2024) |
| 12/26/2024 | [56](#) | RESPONSE IN OPPOSITION by Plaintiffs Michael Morales, Lynnette Sievert, Amanda Miracle, Christopher Lovett, Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Max McCoy re [55](#) Motion to Reconsider [54](#) Memorandum and Order. (Gragson, James) (Entered: 12/26/2024) |
| 01/02/2025 | [57](#) | REPLY TO RESPONSE TO MOTION by Defendants Ken Hush, Brent Thomas, Kevin Johnson, Steven Lovett, Julene Miller, Bill Feuerborn, Cheryl Harrison-Lee, Shane Bangerter, John Dicus, Ann Brandau, Mark Hutton, Shellaine Kiblinger, Jon Rolph, Allen Schmidt, Helen Van Etten, Carl Ice, Cynthia Lane, Blake Benson, Diana Mendoza, Wint |

Appendix Vol. 1, Pg. 19

| | | |
|---|---|---|
| | | Winter, re 55 Motion to Reconsider 54 Memorandum and Order. (Shoger, Matthew) Modified on 1/3/2025 to correct filer names. (nac) Modified on 2/26/2025 to remove Emporia State University and Kansas Board of Regents, The as filers. (mam) (Entered: 01/02/2025) |
| 02/11/2025 | 58 | MEMORANDUM AND ORDER. Defendants' Motion to Reconsider (Doc. 55 ) is granted in part to the limited extent Defendants seek clarification of the court's property-right ruling, and a correction to the court's reference to "leave without pay" on page 22 of its December 5 Order. The motion is otherwise denied. Signed by District Judge Julie A. Robinson on 2/11/2025. (mam) (Entered: 02/11/2025) |
| 02/25/2025 | 59 | SECOND INITIAL ORDER REGARDING PLANNING AND SCHEDULING: Fed. R. Civ. P. 1 mandates the "just, speedy, and inexpensive" determination of this action. With this goal in mind, U.S. Magistrate Judge, Gwynne E. Birzer, will conduct a Fed. R. Civ. P. 16 scheduling conference on 4/18/2025 at 11:00 AM. The conference will be held by telephone. Participants shall dial into the conference call at 316-402-0044, enter conference ID 220 054 263#, and follow the prompts to join the call. The parties, in person and/or through counsel, must confer as required by Fed. R. Civ. P. 26(f) by 3/28/2025. By 4/11/2025, plaintiffs must submit a red-lined version of the proposed scheduling order that shows all changes to the court's form proposed scheduling order and a clean version of the proposed scheduling order. Both versions of the document must be submitted in Word format as an attachment to an e-mail sent to ksd_birzer_chambers@ksd.uscourts.gov. The parties must serve their Rule 26(a)(1)(A) initial disclosures by 4/11/2025, and email copies of the initial disclosures to the undersigned judge's chambers with the proposed scheduling order. Signed by Magistrate Judge Gwynne E. Birzer on 2/25/2025. (mam) (Entered: 02/25/2025) |
| 02/25/2025 | 60 | NOTICE OF INTERLOCUTORY APPEAL as to 54 and 58 Memorandums and Orders by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Shoger, Matthew) (Entered: 02/25/2025) |
| 02/26/2025 | | APPEAL FEE STATUS: Filing fee not paid re 60 Notice of Interlocutory Appeal on behalf of Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (This is a text entry only. There is no.pdf document associated with this entry.)(mam) (Entered: 02/26/2025) |
| 02/26/2025 | 61 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 60 Notice of Interlocutory Appeal. (Attachments: # 1 Preliminary Record) (mam) (Entered: 02/26/2025) |
| 02/26/2025 | 62 | APPEAL DOCKETED in 10CCA on 2/26/2025 and assigned Appeal No. 25-3032 re 60 Notice of Interlocutory Appeal filed by John Dicus, Cheryl Harrison-Lee, Shellaine Kiblinger, Ann Brandau, Bill Feuerborn, Ken Hush, Wint Winter, Brent Thomas, Helen Van Etten, Diana Mendoza, Jon Rolph, Steven Lovett, Allen Schmidt, Julene Miller, Carl Ice, Kevin Johnson, Mark Hutton, Blake Benson, Shane Bangerter, Cynthia Lane. (mam) (Entered: 02/26/2025) |
| 02/27/2025 | | APPEAL FEE PAID in the amount of $605 ($405 under receipt #AKSDC-6593662 and $200 under receipt #600006466) re 60 Notice of Interlocutory Appeal filed by John Dicus, Cheryl Harrison-Lee, Shellaine Kiblinger, Ann Brandau, Bill Feuerborn, Ken Hush, Wint Winter, Brent Thomas, Helen Van Etten, Diana Mendoza, Jon Rolph, Steven Lovett, Allen Schmidt, Julene Miller, Carl Ice, Kevin Johnson, Mark Hutton, Blake Benson, Shane |

| | | |
|---|---|---|
| | | Bangerter, Cynthia Lane. (This is a text entry only. There is no.pdf document associated with this entry.) (Appeal No. 25-3032) (mam) (Entered: 02/27/2025) |
| 03/11/2025 | 63 | TRANSCRIPT ORDER FORM: No Transcript Required filed by Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter re 60 Notice of Interlocutory Appeal. (Shoger, Matthew) (Entered: 03/11/2025) |
| 03/11/2025 | 64 | MOTION to Stay Discovery by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Shoger, Matthew) (Entered: 03/11/2025) |
| 03/12/2025 | 65 | LETTER TO 10CCA stating record is complete re 60 Notice of Interlocutory Appeal. (Appeal No. 25-3032) (mam) (Entered: 03/12/2025) |
| 03/18/2025 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 64 Motion to Stay Discovery. The motion will be resolved by the District Judge. (kf)** (Entered: 03/18/2025) |
| 03/25/2025 | 66 | RESPONSE by Plaintiffs Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert re 64 Motion to Stay Discovery, (Gragson, James) (Entered: 03/25/2025) |
| 03/28/2025 | 67 | UNOPPOSED MOTION for Leave to File Excess Pages by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter. (Shoger, Matthew) (Entered: 03/28/2025) |
| 03/31/2025 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 67 Unopposed MOTION for Leave to File Excess Pages. The motion will be resolved by the District Judge. (kf)** (Entered: 03/31/2025) |
| 04/01/2025 | 68 | ORDER granting 67 Defendant's Unopposed Motion for Leave to File Excess Pages. Signed by District Judge Julie A. Robinson on 4/1/25. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ss) (Entered: 04/01/2025) |
| 04/01/2025 | 69 | REPLY TO RESPONSE TO MOTION by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter re: 64 Motion to Stay Discovery, (Attachments: # 1 Exhibit 1 (Docketing Statement))(Shoger, Matthew) (Entered: 04/01/2025) |
| 04/14/2025 | 70 | Joint Oral MOTION for Protective Order (referred to Magistrate Judge Gwynne E. Birzer) (kf) (Entered: 04/14/2025) |
| 04/14/2025 | 71 | NOTICE OF SERVICE by Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert of Plaintiffs' Initial Disclosures (Gragson, James) (Entered: 04/14/2025) |
| 04/14/2025 | 72 | PROTECTIVE ORDER. Signed by Magistrate Judge Gwynne E. Birzer on 4/14/2025. (sz) (Entered: 04/14/2025) |

| 04/17/2025 | 73 | MOTION to Continue Scheduling Conference by Defendants Shane Bangerter, Blake Benson, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Ken Hush, Mark Hutton, Carl Ice, Kevin Johnson, Shellaine Kiblinger, Cynthia Lane, Steven Lovett, Diana Mendoza, Julene Miller, Jon Rolph, Allen Schmidt, Brent Thomas, Helen Van Etten, Wint Winter (referred to Magistrate Judge Gwynne E. Birzer) (Shoger, Matthew) (Entered: 04/17/2025) |
| 04/21/2025 | 74 | MINUTE ENTRY for proceedings held before Magistrate Judge Gwynne E. Birzer: SCHEDULING CONFERENCE held on 4/18/2025. (Tape #11:05-12:00.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 04/21/2025) |
| 04/23/2025 | 75 | ORDER denying 73 Motion to Continue. Signed by Magistrate Judge Gwynne E. Birzer on 4/23/2025. (sz) (Entered: 04/23/2025) |
| 04/23/2025 | 76 | SCHEDULING ORDER: Mediation Notice or Confidential Settlement Report Due to Magistrate Judge on 10/17/2025. Mediation deadline 11/7/2025. Discovery deadline 3/6/2026. Proposed Pretrial Order due by 3/18/2026. Final Pretrial Conference set for 4/3/2026 at 10:00 AM by Video Conference - Zoom before Magistrate Judge Gwynne E. Birzer. Estimated trial time 15-20 days. Signed by Magistrate Judge Gwynne E. Birzer on 4/23/2025. (sz) (Entered: 04/23/2025) |
| 04/23/2025 | | **Status Conference set for 9/11/2025 at 11:00 AM by Video Conference - Zoom before Magistrate Judge Gwynne E. Birzer per 76 . (sz)** (Entered: 04/23/2025) |
| 04/23/2025 | 77 | CERTIFICATE OF SERVICE of discovery requests by Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Christopher Lovett, Max McCoy, Amanda Miracle, Michael Morales, Lynnette Sievert. (Gragson, James) (Entered: 04/23/2025) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/28/2025 14:29:12 | | |
| **PACER Login:** | agsoldiv | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:23-cv-04056-JAR-GEB |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

AMANDA MIRACLE,                                     )
CHRISTOPHER LOVETT,                                 )
MICHAEL BEHRENS,                                    )
ROB CATLETT,                                        )
DAN COLSON,                                         )
CHARLES EMMER,                                      )
BRENDA KOERNER,                                     )
SHERYL LIDZY,                                       )
MAX MCCOY,                                          )
MICHAEL MORALES,                                    )
AND LYNNETTE SIEVERT.                               )
                              Plaintiffs,           )
                                                    )
v.                                                  )   Case No. 23-4056-JAR -GEB
                                                    )
PRESIDENT KEN HUSH,                                 )
PROVOST AND VICE PRESIDENT OF                       )
ACADEMIC AFFAIRS BRENT THOMAS,                      )
GENERAL COUNSEL                                     )
KEVIN JOHNSON,                                      )
STEVEN LOVETT,                                      )
JULENE MILLER,                                      )
BILL FEUERBORN,                                     )
CHERYL HARRISON-LEE,                                )
SHANE BANGERTER,                                    )
ANN BRANDAU,                                        )
MARK HUTTON,                                        )
SHELLAINE KIBLINGER,                                )
JON ROLPH,                                          )
ALLEN SCHMIDT,                                      )
HELEN VAN ETTEN,                                    )
CARL ICE,                                           )
CYNTHIA LANE,                                       )
BLAKE BENSON,                                       )
DIANA MENDOZA,                                      )
WINT WINTER, JOHN DICUS, AND                        )
JOHN DOE                                            )
                              Defendants.           )

## SECOND AMENDED COMPLAINT

Comes now Plaintiffs Christopher Lovett, Amanda Miracle, Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Max McCoy, Michael Morales, and Lynnette Sievert, ("Plaintiffs") and for their claims against Defendants named above, state and allege as follows:

### NATURE OF ACTION

This action is brought pursuant to 42 U.S.C. § 1983, 1985 and 1988 to redress violations of Plaintiffs' constitutional rights by the Individual Defendants. Specifically, Plaintiffs in this action possess the property right in tenure in connection with their employment at the Emporia State University ("ESU"). The Individual Defendants, each of them, participated in a multitude of conspiracies to terminate Plaintiffs, and others of similar background and status as tenure, and denial of Due Process Right under the Fourteenth Amendment. Plaintiffs also assert claims against

### JURISDICTION AND VENUE

1. This Court possesses subject matter jurisdiction to hear these claims pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 1331.

2. The amount in controversy exceeds $75,000.00 exclusive of costs and interests for each Plaintiff.

3. Venue is proper as all claims occurred in the State of Kansas and the conduct of some of the Defendants occurred in Shawnee County, Kansas.

4. All conditions precedent to the filing of this Amended Complaint have been satisfied.

## PARTIES

5.      Plaintiff Christopher Lovett is a resident of Shawnee County, Kansas. Plaintiff Daniel ("Dan") Colson is a resident of Butler County, Kansas. The remaining Plaintiffs are residents of Lyon County, Kansas.

6.      Plaintiff Max McCoy is an alumnus of Emporia State University ("ESU") and was hired by ESU in 2006. Professor McCoy was awarded tenure in 2011 and became a full professor in 2017. Professor McCoy was a Professor of Journalism and is over the age of forty (40).

7.      Plaintiff Rob Catlett was hired by Emporia Kansas State College (EKSC), now ESU, in August 1976 and earned tenure in 1984 in the Division of Social Science. He was promoted to Associate Professor in the Department of Mathematics and Economics in 2018. In 1977 and 1978, ESU invited him to apply as part of ESU's national search for an economist for a tenure-track position and is over the age of forty (40).

8.      Plaintiff Michael Behrens was hired by ESU in August 2014 and was awarded tenure and promoted to Associate Professor in the department of English, Modern Languages and Journalism in 2020 and is over the age of forty (40).

9.      Plaintiff Sheryl Lidzy was hired by ESU in August 2006 and became tenured as an Associate Professor in the Department of Communication & Theatre in 2011 and is over the age of forty (40).

10.     Plaintiff Amanda Miracle was hired by ESU in August 2009 and earned tenure in 2015. She was an Associate Professor in the department of Social Sciences, Sociology and Criminology and is over the age of forty (40).

11. Plaintiff Dan Colson was hired by ESU in August 2012 and received tenure in 2018. He was promoted to full professor after he received notice of his termination. Provost Thomas and President Hush approved his promotion after September 2022 and is over the age of forty (40).

12. Plaintiff Christopher Lovett was hired by ESU in December 1995 and became tenured and was awarded to full professorship in 2006. He was employed in the Department of Social Sciences, Sociology and Criminology and is over the age of forty (40).

13. Plaintiff Lynnette Sievert was hired by ESU in 1996, granted tenure and promoted to associate professor in 1999, and became a full professor in 2005. Upon hire, ESU recognized three years of her experience toward tenure. Dr. Sievert was employed as a Professor of Biology and is over the age of forty (40).

14. Plaintiff Charles Emmer was employed by ESU in May 2005 and earned tenure with his promotion to associate professor in August 2012. Professor Emmer was promoted to full professor in 2017. He was employed in the Department of Social Sciences, Sociology, and Criminology and is over the age of forty (40).

15. Plaintiff Brenda Koerner was hired by ESU in August 2005 and became an associate professor in 2014. Dr. Koerner worked in the Department of Biological Sciences and is over the age of forty (40).

16. Plaintiff Michael Morales was hired by ESU in or about August 1997 and became tenured as an Associate Professor of Physical Sciences on or about January 2004 and is over the age of forty (40).

17. Defendant Ken Hush at all times relevant to this action was the interim president and or president of Emporia State University ("ESU"). As such, he was a duly appointed agent authorized to act under authority of the laws of the State of Kansas and so acted under the color of

law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity and also in his official capacity only to the extent Plaintiffs seek prospective injunctive relief for a continuing violation of law. He may be served with process at Emporia State University, 1 Kellogg Circle, Plumb Hall, Room 202K, Box 4001, Emporia KS 66801.

18.     Defendant Brent Thomas at all times relevant to this action was Dean of the College of Liberal Arts & Sciences, and/or Provost and Vice President for Academic Affairs at ESU. As such, he was a duly appointed agent authorized to act under the authority of the laws of the State of Kansas and so acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at Emporia State University, 1 Kellogg Circle, Box 4010, Emporia KS 66801.

19.     Defendant Kevin Johnson at all times relevant to this action was General Counsel for ESU, as well as a tenured member of the ESU School of Business faculty with the academic rank of professor. As such, he was a duly appointed agent authorized to act under the laws of the State of Kansas and so acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at Emporia State University, 1 Kellogg Circle, Plumb Hall, Room 202D, Box 4001, Emporia KS 66801.

20.     Defendant Steven Lovett at all times relevant to this action was the Associate General Counsel (later reclassified as the Associate General Counsel for Academic Affairs in 2022) and an Associate Professor of Business Law and Ethics at ESU. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his

individual capacity. He may be served with process at Emporia State University, 1 Kellogg Circle, Cremer Hall, Room 404, Campus Box 4039, Emporia KS 66801.

21.     Defendant Cheryl Harrison-Lee at all times relevant to this action was a member of the Kansas Board of Regents. As such, she was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of her employment at all times relevant to this action. She is sued in her individual capacity. She may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

22.     Defendant Shellaine Kiblinger at all times relevant to this action was a member of the Kansas Board of Regents. As such, she was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of her employment at all times relevant to this action. She is sued in her individual capacity. She may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

23.     Defendant Carl Ice at all times relevant to this action was a member of the Kansas Board of Regents. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

24.     Defendant Cynthia Lane at all times relevant to this action was a member of the Kansas Board of Regents. As such, she was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of her employment at all times relevant to this action. She is sued in her individual capacity. She may be served with

process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

25.     Defendant Wint Winter at all times relevant to this action was a member of the Kansas Board of Regents. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

26.     Defendant Julene Miller at all times relevant to this action was general counsel for the Kansas Board of Regents. As such, she was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of her employment at all times relevant to this action. She is sued in her individual capacity. She may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

27.     Defendant Bill Feuerborn at all times relevant to this action was a member of the Kansas Board of Regents. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

28.     Defendant Shane Bangerter at all times relevant to this action was a member of the Kansas Board of Regents. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of his employment at

all times relevant to this action. He is sued in his individual capacity. He may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

29.     Defendant Mark Hutton at all times relevant to this action was a member of the Kansas Board of Regents. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

30.     Defendant Jon Rolph at all times relevant to this action was a member of the Kansas Board of Regents. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

31.     Defendant Allen Schmidt at all times relevant to this action was a member of the Kansas Board of Regents. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

32.     Defendant Ann Brandau, formerly Ann Brandau-Murguia, at all times relevant to this action was a member of the Kansas Board of Regents. As such, she was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the

authority of her employment at all times relevant to this action. She is sued in her individual capacity. She may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

33.    Defendant Helen Van Etten at all times relevant to this action was a member of the Kansas Board of Regents. As such, she was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of her employment at all times relevant to this action. She is sued in her individual capacity. She may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

34.    Defendant Blake Benson at all times relevant to this action was a member of the Kansas Board of Regents. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and acted under the color of law under the authority of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

35.    Defendant Diana Mendoza at all times relevant to this action was a member of the Kansas Board of Regents. As such, she was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of her employment at all times relevant to this action. She is sued in her individual capacity. She may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

36.    Defendant John Dicus at all times relevant to this action was a member of the Kansas Board of Regents. As such, he was a duly appointed agent authorized to enact the laws of the State of Kansas and so acted under the color of law under the authority of his employment at

all times relevant to this action.  He is sued in her individual capacity. He may be served with process at the Kansas Board of Regents, 1000 SW Jackson Street, Suite 520, Topeka, KS 66612-1368.

37.     Defendants John Doe at all times relevant to this action were involved in the drafting of the amendment to the Kansas Board of Regents' temporary amendment to the Suspension, Terminations and Dismissals policy ("Workforce Management Policy" or "WMP") or ESU's Framework for Workforce Management. Discovery is needed to determine the creators of KBOR's WMP and ESU's Framework.

38.     For purposes of this Complaint, all Individual Defendants who acted on behalf of, in the capacity of a member or employees of KBOR will be hereinafter referred to as KBOR Individual Defendants. The KBOR Individual Defendants include: Shane Bangerter, Ann Brandau, John Dicus, Bill Feuerborn, Cheryl Harrison-Lee, Mark Hutton, Carl Ice, Shelly Kiblinger, Cynthia Lane, Diana Mendoza, Blake Benson, Julene Miller, Jon Rolph, Allen Schmidt, Helen Van Etten, Wint Winter and John Doe unless otherwise expressly stated.

39.     For purposes of this Complaint, all Individual Defendants who acted on behalf of or as employees of ESU will be referred to as ESU Individual Defendants herein. The ESU Individual Defendants include: Ken Hush, Brent Thomas, Kevin Johnson, Steven Lovett, and John Doe unless otherwise expressly stated. The KBOR Individual Defendants and the ESU Individual Defendants are also collectively referred to as Individual Defendants herein.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

40.     The Kansas Board of Regents ("KBOR"), 1000 SW Jackson St, Topeka, KS 66612, is an official body of the state of Kansas charged with supervising and administering to postsecondary education institutions, including ESU, in the Kansas Regents System under

established law pursuant to the Kansas Higher Education Coordination Act, K.S.A. § 74-3201a, et seq.

41.     Defendant, Emporia State University ("ESU"), 1 Kellogg Circle, Emporia, KS 66801, is a state educational institution overseen by KBOR and is the present or former employer of Plaintiffs.

42.     Before January 20, 2021, the clearly established law regarding tenure under Kansas law was that it was a property right. This is subject to procedural and substantive due process protections under the Fifth through Fourteenth Amendments to the United States Constitution. See *Gorham v. City of Kansas City*, 225 Kan. 369; *Kosik v. Cloud County Community College,* 250 Kan. 507, 512 (1992). The Kansas Supreme Court recognized in *Kosik*:

> To be entitled to due process Dr. Kosik must have a property interest in his continued employment with CCCC. State law rather than the United States Constitution must provide the source of this property interest. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Once the State has conferred a property interest, ***the property interest cannot be taken without constitutional, procedural due process***. 470 U.S. at 541, 105 S.Ct. at 1492. In Kansas, a public employee who may be discharged only "for cause" has a property interest in continued employment. *Gorham v. City of Kansas City*, 225 Kan. 369, Syl. ¶ 1, 590 P.2d 1051 (1979).
>
> The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *Citing Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). (Emphasis added.) *Id. at* 513

See also, *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504 (1998), wherein the Court said:

> Because Professor Tonkovich was a tenured professor, he possessed a property interest deserving of procedural due process protections. *Brenna v. Southern Colo. State College*, 589 F.2d 475, 476 (10th Cir.1978); see also *Board of Regents v. Roth*, 408 U.S. 564, 576–77, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 535, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court examined the issue of "what pretermination process must be accorded a public employee who can be discharged only for cause." In deciding this issue, the Court balanced the competing interests at stake: "the private interest

in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." *Id*. at 542–43, 105 S.Ct. 1487 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). The Court concluded that prior to termination, something less than a full evidentiary hearing is sufficient. *Id*. at 545, 105 S.Ct. 1487. Thus, the Court held that a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. at 546, 105 S.Ct. 1487.

Because Professor Tonkovich was a tenured professor, the law in this Circuit is that he possessed "a property interest deserving of ... substantive protections of the Fourteenth Amendment." *Brenna*, 589 F.2d at 476. Substantive due process requires that the termination of a tenured professor's property interest not be "arbitrary, capricious, or without a rational basis." *Id*. at 477. The Supreme Court has "emphasized time and again that [t]he touchstone of due process is protection of the individual against arbitrary action of government...." *Lewis*, 118 S.Ct. at 1716 (quotation omitted).

*Id*. at 528.

43.　　The *Tonkovich* Court made it very clear, "[t]he federal courts, and not the University of Kansas, are responsible for establishing the contours of the Due Process Clause of the Fourteenth Amendment." *Id*. at 522.

44.　　These Due Process protections for the property interest of tenure in Kansas require a *pre-termination hearing* before the deprivation of tenure as a property right. See *Tonkovich* above and *Kosik* at 512-13, recognizing:

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, the United States Supreme Court discussed due process requirements in terms of terminating public employees who had property interests in continued employment under applicable Ohio statutes. The Court stated: "An essential principle of due process is that a deprivation of life, liberty, or property '***be preceded by notice and opportunity for hearing appropriate to the nature of the case***.' " 470 U.S. at 542, 105 S.Ct. at 1493. (Emphasis added).

45.　　The Kansas Board of Regents and ESU's sister institution, Kansas University, were parties in *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504 (1998), and KBOR's members are charged with actual knowledge of the clearly established law set forth in *Tonkovich.*

46.     On or about February 12, 2015, Defendant Kevin Johnson, ESU's general counsel, co-wrote a paper entitled: "Social Media and Public Higher Education Employment," relevant portions attached hereto as Exhibit 1, which states, in part:

> A government employee is entitled to constitutional procedural due process only when the employee has been deprived of a protected property or liberty interest. See *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548, 556 (1972). Public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process. *Gilbert v. Homar*, 520 U.S. 924, 929, 117 S.Ct. 1807, 1811, 138 L.Ed.2d 120, 126 (1997). Property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. Exhibit 1 at 26-27.

> Tenured faculty members of any academic rank also have a clear expectation of continued employment based on both university policy and the policies of the university's governing board…. *Id.* at 24.

> The termination of employment of a member of the faculty of an institution of higher education does require an examination of a faculty employee's due process rights in their employment. Tenured faculty members, as the Professor in the model case, do have procedural due process rights in their employment…. *Id.*

> Tenure is an academic status granted by a university to one of its own faculty members…. Once granted, tenure gives a faculty member an expectation of continued employment at the institution that conferred tenure. (See Section 4, Number 3 At-Will Employment and Number 4 Constitutional Due Process Requirements, supra. Inserted in Exhibit 1) For purposes of this article, the only issue with regard to tenure is whether or not the faculty member has tenure at the time they are given notice of termination. ***A tenured faculty member at any institution of higher education clearly has an expectation of continued employment and is entitled to procedural due process rights as a condition of termination of employment….*** *(emphasis added). Id.* at 33.

47.     Before January 21, 2022, KBOR policy mandated that "[f]aculty who have been awarded tenure may be terminated only for adequate cause, except in the case of program or unit discontinuance or under extraordinary circumstances because of financial exigency." KBOR Policy Manual at p. 1-13, attached as Exhibit 2.

48.     All Plaintiffs earned tenure under ESU's policies before January 21, 2022, which

provides, in part:

> 1A. 0102 Academic Tenure
> An academic tenure appointment is a continuous, full-time, academic position for faculty
> with tenure. Tenured appointments will be annually renewed. Termination of a tenured
> faculty member must follow appropriate policies and procedures.

Exhibit 2 at p. 1-1.

> …
> 1B.0805.01 Board of Regents Policy for Tenure (revised 2/05)
> 1.   After the expiration of a probationary period, teachers or instructors should have
> permanent or continuous tenure, and their services should be terminated only for
> adequate cause, except in the case of program or unit discontinuance or under
> extraordinary circumstances because of financial exigency. (2/19/97)

Exhibit 2 at p. 1-13.

> 1B.0805.02 University Policies and Procedures for Tenure (FSB 80004 approved
> by President 12/9/80; FSB 88001 approved by President 10/28/88; FSB 05007
> approved by President 5/3/06; FSB 07003 approved by President 2/4/08; FSB
> 19001 approved by President 10/15/2019)
> Emporia State University shall award permanent status to faculty members who
> have been judged, on the basis of academic credentials and systematic annual
> evaluation as stipulated in this document, worthy of continuous appointment. . . .

Exhibit 2 at p 1-14.

49.     To terminate a tenured professor for cause under ESU's long-standing policy, ESU

must provide the following rights:

> ***
> 4. Rights of the parties to the hearing shall include but are not limited to the
> following:
>
> > a. To be represented by an attorney
> > b. To present supporting witnesses
> > c. To question opposing witnesses
> > d. To make closing statements
> > e. To receive written findings and recommendations of the committee and written
> > notice of the President's decision and a full explanation of the reasons
> > f. To obtain and/or examine the record of the proceedings

*Id.* at 1-36.

50.     Since approximately March, 2003 and through the date of this filing, ESU's policy manual has contained some version of the current policy 1B.07 Academic Freedom, which provides: "Emporia State University believes the policies and guidelines developed by the American Association of University Professors, in its *1940 Statement of Principles on Academic Freedom and Faculty Tenure with 1970 Interpretive Comments*, are reasonable and prudent. The University endorses them insofar as they are compatible with the laws of the state of Kansas and the policies of the Kansas Board of Regents in decisions and actions that are pertinent." ESU policy 1B.07 Academic Freedom was not amended by the KBOR WMP.

51.     For purposes of the terminations of Plaintiffs, KBOR was Plaintiffs' de facto joint employer along with ESU by virtue of KBOR's exertion of control over the terms and conditions of Plaintiffs' employment up to and including altering and approving the terms of Plaintiffs' terminations.

52.     Hush, as ESU's President did not have the authority to terminate Plaintiffs under the WPM without KBOR adopting the WPM and approving ESU's Framework resulting in their termination, KBOR was therefore a joint employer of Plaintiffs for purposes of the allegations made herein.

53.     Plaintiffs did rely, to their detriment, on the terms and conditions of tenure in the KBOR and ESU policies in undertaking the arduous process of attaining tenure, thus creating a contract and or implied contract right to not be terminated without good cause and accompanying substantive and procedural due process rights.

## THE CONSPIRACY

54.     Before January 20, 2021, upon information and belief, unknown John Doe Defendants and Individual Defendants (hereinafter "Individual Defendants") conspired in a movement to undermine tenure without due process through the vehicle of anti-tenure rhetoric and in the creation, adoption and implementation of the WMP and ESU's Framework.  They reached an understanding to deprive Plaintiffs of their constitutional rights protected by the Due Process Clause of the Fourteenth Amendment, and specifically to deprive Plaintiffs of their clearly recognized property right in continued employment by suspending policies that adequately protected them from termination without due process of law.

55.     Upon information and belief, the Individual Defendants promoted a belief that tenure among regent universities in the state of Kansas should be minimized or eliminated without having to comply with the constraints of due process mandated because tenure is a constitutionally protected property right clearly established by law. The Individual Defendants saw tenure as an impediment to terminating tenured faculty who were "problematic" concerning issues disfavored by the ESU Administration. These issues included being members or former members of the Faculty Senate Committee, being perceived to or having friction with the Administration, policy sticklers, liberals, advocates, unionizers, and department or campus leaders (hereinafter "issues disfavored by the ESU Administration").

56.     On January 20, 2021, KBOR General Counsel Julene Miller proposed the temporary amendment to the Suspensions, Terminations and Dismissals policy ("Workforce management Policy" or "WMP") to KBOR members. In discussing the WMP, according to approved meeting minutes, Defendant Hutton stated: "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure

was put in place to ensure academic freedom, which the Board highly values, and handcuffing a

university's ability to ensure financial strength in the name of tenure is counter to its purpose."

Regent Hutton stated that he believes that the financial challenges are going to continue beyond

2021, and he suggested changing the expiration date in the policy to December 31, 2022, which

will allow the Board and the universities additional time to evaluate financial ramifications related

to the pandemic."

57.     On January 20, 2021, Defendant Hutton moved to approve the WMP and Defendant

Van Etten seconded the motion. The motion was carried by voting members Defendants Hutton,

Van Etten, Bangerter, Brandau-Murguia, Feuerborn, Harrison-Lee, Kiblinger, Rolph and Schmidt.

58.     Thus, on or about January 20, 2021, KBOR, without prior notice to the tenured

professors in the State of Kansas or an opportunity to comment, adopted the WMP, attached hereto

as Exhibit 3 at labeled pp. 14-17.  The WMP "suspended" tenure rights of professors employed by

regent universities in the state of Kansas without any type of due process whatsoever as follows:

> ***
> ii. In light of the extreme financial pressures placed on the state universities due to
> the COVID-19 pandemic, decreased program and university enrollment, and state
> fiscal issues, effective immediately through December 31, 2022 and
> notwithstanding any other Board or institutional policy, any state university
> employee, including a tenured faculty member, may be suspended, dismissed, or
> terminated from employment by their respective university. Such terminations,
> suspensions, or dismissals shall follow the procedure set forth below. Declaration
> of financial exigency and the processes associated with declaration of financial
> exigency shall not be a prerequisite to any suspension, dismissal, or termination
> authorized by this provision, and no existing university policy hearing procedures
> shall apply to such decisions.
>
> The chief executive officer of any state university, before making any suspensions,
> dismissals or terminations under this provision and within 45 days of the effective
> date of this provision, shall present to the Board for approval a framework for the
> university's decision-making under this provision. Once approved, that framework
> shall be used for any suspension, dismissal, or termination under this provision.
> Frameworks for decision-making shall be determined by each state university's
> chief executive officer and may be based on factors such as, but not limited to,

performance evaluations, teaching and research productivity, low service productivity, low enrollment, cost of operations, or reduction in revenues for specific departments or schools.

(1) The university chief executive officer shall provide no less than 30 days' written notice of the suspension, dismissal, or termination to the affected employee, including the reasons for the action.

(2) Any employee given notice of a suspension, dismissal, or termination that expressly invokes the authorization of this provision may submit an appeal of the action of the university chief executive officer, through the Board of Regents office as provided below, to the Office of Administrative Hearings. Suspension, dismissal, or termination not invoking this policy shall have solely those appeal rights provided by existing university policy or other applicable existing procedures.

(3) The employee must submit the appeal to the Board office within 30 days of receiving notice of the employment action. The initial submission must include a copy of the notice of the action being appealed and a written statement, including any relevant supporting evidence or documentation, setting forth the reasons the employee believes the decision to suspend, dismiss, or terminate the employee (a) is substantially inconsistent with the university's decision-making framework approved by the Board, (b) was the result of unlawful bias or discrimination; or (c) was otherwise unreasonable, arbitrary or capricious. These shall be the only grounds for reversing the state university chief executive officer's decision. The employee shall provide a copy of the appeal and supporting evidence and documentation to the university's chief executive officer at the time the appeal is submitted.

(4) The university chief executive officer shall have 30 days from receipt to respond in writing to the appeal, including any supporting evidence or documentation, and shall provide a copy of the response and any supporting evidence and documentation to the employee at the time the response is submitted. This 30-day period may be extended for good cause as determined by the Board President and Chief Executive Officer.

(5) Within 10 days of receiving the university chief executive officer's response, the Board office shall refer the appeal to the Office of Administrative Hearings, which shall provide a hearing and decide the case based on the standards stated in this policy and in the university's Board-approved framework. The Board shall provide a copy of the submissions to the Office of Administrative Hearings, along with a copy of this policy and the decision making framework approved by the Board. The state university shall be responsible for fees charged by the Office of Administrative Hearings.

(6) The burden of proof in any appeal shall be on the employee. There shall be no right of discovery. The review shall be based on the written submissions, and the

hearing shall allow oral presentation to the administrative hearing officer by the employee and the university, each of whom may be represented by counsel.

 (7) Decisions of the administrative hearing officer shall be final and are not subject to further administrative review by any officer or committee of the university or by the Board of Regents.

 (8) An appeal under this policy will not stay the effective date of the suspension, dismissal, or termination. Employees who prevail in their appeal under this policy shall be entitled to reinstatement, back pay and restoration of other lost benefits.

Exhibit 3.

59.     On February 17, 2021, KBOR Defendant Bangerter moved to extend the deadline for universities to submit a framework under WMP to July 1, 2021, and Defendant Van Etten seconded his motion. Defendants Bangerter, Brandau, Feuerborn, Harrison-Lee, Hutton, Kiblinger, Rolph, Schmidt and Van Etten approved the extension. See KBOR Minutes dated February 17, 2021, attached hereto as Exhibit 4.

60.     Just a month later, on or about March 17, 2021, one year after Governor Laura Kelly declared "State of Emergency", ESU officials presented a document entitled "ESU Strategic Program Alignment Reviews" to KBOR pursuant to a program review or strategic alignment review.  See KBOR Minutes dated March 17-18, 2021, the relevant portion of that document is attached hereto as Exhibit 5.  The ESU Strategic Program Alignment Review reflects on page number 29 as follows:

….The ESU Office of Institutional Effectiveness recognized the program [history] by awarding it the "With Excellence" designation for student outcomes assessment in 2019. History faculty members are highly productive scholars. Their accolades and honors include the following examples:

• Dr. Chris Lovett won the 2019 Edgar Langsdorf Award for Excellence from the Kansas State Historical Society for his work on Samuel Crumbine.
. . .

• Dr. Amanda Miracle won the Schillinger award for service to ESU women in 2017.

. . .
The History program's faculty and students are highly engaged with the university and the broader public. The ESU Veterans' Roundtable is hosted by the History faculty, and at this time the leadership of the Student Veterans Association are all students in the Department of Social Sciences. The Department's annual Constitution Day celebration draws over 500 students from across Kansas, and to our knowledge is one of the largest Constitution Day celebrations in the U.S.

Recommendation: Continue the program.

Justification for Recommendation:  With only five full-time faculty members, the History program operates efficiently and produces net revenue for the university. Approximately one half of the faculty's teaching assignments comprise general education courses.  The program's upper-division core and elective courses serve not only History majors, but also BSE-Social Sciences Education majors and Interdisciplinary Studies majors, while graduate courses taught by these same faculty members serve the online MA in History program. If the undergraduate major in History were discontinued, most of these courses would still have to be offered.  As noted above, enrollment in the History program is actually quite healthy in BSE students, counted separately for technical reasons, are taken into account.

See KBOR Meeting Agenda, Discussion Agenda and Reports (partial), dated March 17-18, 2021 at p. 35, attached as Exhibit 6.

61.    During the Board of Regents meeting on March 17-18, 2021, KBOR through defendants Harrison-Lee, Bangerter, Murguia (k.n.a. Brandau), Hutton, Kiblinger, Rolph, Schmidt, Van Etten and Feuerborn approved and adopted ESU's recommendation to keep its History Program, including the employment of Petitioners. See Exhibit 5 at pp. 9-10.

62.    According to approved KBOR March 17-18, 2021 meeting minutes, Dr. Aleks Sternfeld-Dunn of Wichita State University told KBOR members Feuerborn, Harrison-Lee, Bangerter, Brandau, Hutton, Kiblinger, Rolph, Schmidt and Van Etten that the faculty are still concerned that the Board's policy does not require a shared governance structure, and they would like shared governance officials to be part of the decision-making process when it comes to terminating faculty and staff, which is the process used when a university declares financial

exigency. However, no amendments to require any of the financial exigency criteria were made to the WMP. See Exhibit 5 at pp. 12-13.

63.     Based on information and belief, sometime in or about 2021-2022, Defendant Steven Lovett presented to an ESU Leadership Committee (and possibly others including members of KBOR) about tenure and possibly advocated against it. Mr. Lovett was not retained to represent ESU or the Academic Affairs Office until September 2022.

64.     During KBOR's May 18-19, 2022 meeting, KBOR attorney Miller introduced a proposed amendment to eliminate the deadline for universities to propose a framework for its implementation of the WMP, and KBOR defendants Lane (who moved for the amendment), Schmidt (seconded the motion), Harrison-Lee, Rolph, Feuerborn, Hutton, Ice, Kiblinger, and Winter removed the deadline of July 21, 2021, for Universities to "propose a framework for [the WMP] implementation," while at the same time acknowledging, "[w]hile the Board was successful in obtaining state funding increases during the current Session, the enrollment and financial challenges at the universities are still a concern." See partial May 18-19, 2022 Board Minutes, labeled pp. 19-20, attached as Exhibit 10.

65.     For the 2022-2023 academic year, ESU was funded 100%.

66.     In the months preceding KBOR's September 14-15, 2022 meeting and ESU's termination of 33 employees, including about 30 faculty a majority of which were tenured, several Plaintiffs attended organizational meetings to discuss the WMP, and several worked on obtaining signatures for unionization. Based on information and belief, Defendant Brent Thomas and some ESU administrators also attended some of these meetings.

67.     Plaintiff McCoy spoke openly in favor of faculty unionizing. Plaintiffs Behrens and Lidzy signed unionization interest cards and collected signatures. Plaintiffs Lovett, Colson,

Morales, Catlett, and Koerner attended organizational meetings and took actions to organize. Plaintiffs Sievert, Catlett, and others signed union interest cards.

68.     Based on information and belief, the ESU Individual Defendants and some or all of the KBOR Individual Defendants were aware that Plaintiffs McCoy, Behrens, Lidzy, Koerner, Christopher Lovett, Sievert, Morales, Catlett, and Colson were advocates or perceived to be advocates for unionization.

69.     Based on information and belief, the ESU Individual Defendants and some or all of the KBOR Individual Defendants were aware that Plaintiffs were not members of the Republican party and were thought to be members of or allies of other political parties opposed to the Republican party.

70.     On September 13, 2022, two days before Plaintiff McCoy was notified of his termination, the Kansas Reflector, a nonprofit news operation, published his column titled, "Emporia State University is about to suspend tenure. Here's why you should care." In it, Plaintiff McCoy predicted his firing under ESU's Framework, and expressed concern that ESU's Framework did not require a specific reason for termination of tenured faculty. He also raised the alarm that the WMP and ESU's Framework "would effectively suspend tenure for the fall 2022 semester." Plaintiff McCoy opined that he would be fired for exercising his First Amendment rights as an outspoken university professor.

71.     During KBOR's September 14-15, 2022, meeting, Defendant Ken Hush presented ESU's Framework for the WMP, and KBOR members Ice, Benson, Dicus, Harrison-Lee, Kiblinger, Lane, Mendoza, Rolph and Winter were provided a copy of the Framework. Hush requested that KBOR approve it. Defendant Thomas discussed ESU's operations and budget with

KBOR members. See partial copy of KBOR's September 14-15, 2022 Minutes attached as Exhibit 11 and a copy of ESU's Framework for the WMP, attached as Exhibit 12.

72.     The ESU Framework provides a "Rationale for why the Framework must be Implemented" which quotes verbatim from KBOR's WMP, paragraph C.6.b.ii. The WMP and the ESU Framework allow tenured faculty to be terminated based on a list of factors that are non-conclusive and have a negative connotation such as:  "performance evaluations, teaching and research productivity, low service productivity." The WMP and ESU Framework use the language "but not limited to" to incorporate other factors that may be considered to terminate faculty and both policies fail to prevent consideration of illegal factors such as race, gender, age, political party affiliation, rights protected by the National Labor Relations Act and other laws. Both policies lack a requirement to provide a pre-termination hearing.

73.     According to KBOR September 14-15, 2022, meeting minutes, Defendant Carl Ice asked about the estimated impact and Defendant Hush stated that about seven percent of ESU's employees will be impacted. Defendant Lane moved to approve ESU's Framework while noting that it should be used sparingly, and Defendant Winter seconded the motion. Defendants Benson, Dicus, Harrison-Lee, Ice, Kiblinger, Lane, Mendoza, Rolph and Winter approved ESU's Framework during the September 14-15, 2022 meeting.

74.     Neither ESU nor KBOR nor any individual defendants acting on their behalf submitted the WMP or ESU Framework to the Kansas Secretary of State for adoption or publication.

75.     On September 15, 2022, without prior notice or being provided a pretermination hearing, ESU terminated Plaintiffs by providing them with substantively identical form letters (hereinafter "Termination Letter") that read in common to all letters:

Dear [Name]:

I regret to inform you that your appointment as Professor [Name], with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
• Low enrollment.
• Cost of operations.
• Restructuring of a program, department, or school as determined to be necessary by the university.

Secondary considerations may include:
• Reduction in revenues for specific departments or schools.
• Current or future market considerations as to the need for a program or department.
• Realignment of resources.
• Performance evaluations.
• Teaching and research productivity.
• Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:
• Pay you three (3) months severance pay.
• The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.

• You may be eligible to retire from the university in lieu of being laid off. If you choose to retire, you will still receive three (3) months severance pay.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:  Personnel File

Parts of these Termination Letters mirror language that Individual KBOR Defendants approved in

the ESU Framework on September 14-15, 2022. These Termination Letters are attached hereto as

Exhibit 9, along with a copy of ESU's Framework to the WMP (Exhibit 12 hereto) setting forth

the "allowable" administrative appeal procedures.

76.     Despite the unconstitutional procedures under the WMP and ESU Framework, all

Plaintiffs timely filed appeals in writing to the Kansas Office of Administrative Hearings.

77.     Kevin Johnson and President Hush submitted formal written Responses to the appeals.  Included in most of the Responses, as quoted from the Response to Plaintiff Lovett's appeal was:

> Dr. Lovett's appeal does not state any provable claim that President Hush's decision was arbitrary or capricious, i.e., that President Hush's decision was not based on a reasonable foundation of fact.  Instead, Dr. Lovett's appeal asserts a sweeping declaration that "…not to renew my contract at Emporia State after 16 May 2023 … [is] 'unreasonable, arbitrary, and capricious.'" *His appeal appears to rationalize that claim primarily because of Dr. Lovett's view of tenure as a "property right[,]" the taking of which violated his "constitutional rights under the Fifth and Fourteenth Amendments."*
>
> However, as noted above, President Hush's decision and the use of the University's Workforce Management policy is not in contravention to Dr. Lovett's status as a tenured faculty member, nor the tenured status of any other faculty member at ESU. As a matter of Board policy, "[t]enure is a privilege that must be affirmatively granted by the institution in recognition of the meritorious performance." ***Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members.[1]*** Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause.
>
> . . .
>
> Each issue raised by Dr. Lovett in support of his appeal has been addressed herein and shown to be unsupported by controlling legal authority, including the Kansas Constitution, Board policy, ESU policy, other applicable statutes and regulations, ***controlling or persuasive caselaw***, or the body of relevant facts. Accordingly, Dr. Lovett has failed to meet his burden of proof.

(internal citations omitted).

78.     ESU and Defendants Hush, Johnson and Steven Lovett made similar arguments about tenure in response to several Plaintiffs' appeals to OAH, namely that: "Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property

interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest." See ESU's Resp. to: Sievert, n.13 (p.8); Miracle, n.13 (p. 3); Lidzy, n. 13 (p.13) and n. 123 (p. 16); Koerner, n. 14 (pp. 22-3); Catlett, n. 14 (p. 28-9) and n. 105 (p. 31); Colson, n. 12 (p.19), and Behrens, n. 14 relevant portions attached as Exhibit 7.

79.     In ESU's and Defendant Hush's response to Dr. Koerner's petition for review to OAH, it acknowledged that "the appointment status of tenure acknowledges a faculty member's achievement of performance requirements and a tenured faculty member's right to additional employment protections in the event of a "for cause" termination based on teaching, scholarship, or service." ESU's Resp. to Koerner [at p. 29], attached as Exhibit 7, p. 25.

80.     All Plaintiffs participated in their respective "hearings" with OAH and all asked ESU for the basic reasons why they were chosen for termination in order to provide a meaningful response.  In most, if not all the hearings either or both Defendants Kevin Johnson or Steven Lovett represented ESU in these hearings and argued that "tenure is a privilege." Defendants Johnson and Lovett failed to admit that the plaintiffs had already been given tenure or that at that point, it was a property right. Through Defendants Johnson and Lovett, ESU did not tell Plaintiffs the specific reason they were terminated and denied them the opportunity to obtain the information.

81.     The table below shows when the Plaintiffs' appeals of their terminations before

OAH were held, whether each Plaintiff received a decision, and if they were reinstated. Some

Plaintiffs were reinstated, or the hearing officer found that ESU's decision was reversed while

others were not. For Plaintiffs who were "reinstated," ESU and Defendant Hush have denied all

reinstatements and filed a petition for review in Lyon County District Court of Kansas in those

individual cases.

| 82. | OAH Hearing Date | Hearing Officer Decision Date | Reinstated or ESU decision reversed? |
|---|---|---|---|
| Behrens, Michael | 02-24-2023 | 4-27-2023 | Yes |
| Catlett, Rob | 02-15-2023 | 4-19-2023 | Yes |
| Colson, Dan | 01-18-2023 | 5-2-2023 | Yes |
| Emmer, Charles | 02-17-2023 | 7-25-2023 | Yes |
| Koerner, Brenda | 03-02-2023 | 11-08-2023 | No |
| Lidzy, Sheryl | 02-22-2023 | 5-10-2023 | No |
| Lovett, Christopher | 02-28-2023 | 5-17-2023 | No |
| McCoy, Max | 01-24-2023 | 11-08-2023 | No |
| Miracle, Amanda | 02-10-2023 | 4-23-2023 | Yes |
| Morales, Michael | 02-01-2023 | 09-27-2023 | Yes |
| Sievert, Lynnette | 02-07-2023 | 5-5-2023 | Yes |

83.     Plaintiff Lovett filed a formal motion to conduct discovery and call witnesses in his

OAH case, before Hearing Officer Sandra Sharon. However, ESU and the ESU Individual

Defendants objected to any discovery and the hearing officer refused to even rule on the motion,

which constituted a de facto denial of the motion.

84.     Plaintiff Miracle also filed a formal request to conduct discovery and call witnesses,

but the request was denied by ESU Individual defendants, as did most if not all the Plaintiffs

(including but not limited to Morales, Sievert, Lidzy, Emmer and Catlett) in their appeals to OAH.

85.     On February 24, 2023, Plaintiffs Miracle and Lovett filed a Petition for Mandamus

against ESU, KBOR and OAH with the Kansas Supreme Court identifying the legal basis for the

unconstitutional conduct of each.

86.     Through the Mandamus proceedings, ESU and KBOR and the Individual Defendants were again provided notice of *Tonkovich* and other supporting law, which clearly holds that Plaintiffs have a property right in tenure and that they are entitled to procedural and substantive due process, but both institutional Defendants and the Individual Defendants have continued to willfully violate Plaintiffs' Constitutional rights.

87.     ESU and KBOR responded to the Mandamus Petition and again intentionally and wrongfully denied tenure is a property right but ***clearly stated that if tenure was a property right, the WMP took it away.***

88.     ESU and KBOR responded to the Mandamus stating:

Petitioner's due process claim "depends on their having had a property right in continued employment." *Cleveland Bd. Of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985). Because they lacked such a right under the circumstances, their constitutional challenge to the KBOR procedures fails.

Petitioners also rely on the Tenth Circuit's decision in *Tonkovich v. Kansas Board of Regents*, 159 F.3d 504 (10th Cir. 1998), for the proposition that tenure is a property right. But "tenure" in this sense means "entitlement to continued employment unless sufficient 'cause' is shown." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *see also Tonkovich*, 159 F.3d at 157 (noting that in *Loudermill*, "the Supreme Court examined the issue of 'what pretermination process must be accorded a public employee *who can be discharged only for cause*." (emphasis added)). It is debatable whether Petitioners had a property right to continued employment even before adoption of the Workforce Management Policy because KBOR policies have long provided for termination of tenured faculty for reasons other than cause.

But even if Petitioners had a property right under normal KBOR policies, they certainly had none under KBOR's Workforce Management Policy.

89.     As a result of the Individual Defendants' conduct in adopting and implementing the WMP and ESU Framework, Plaintiffs were precluded from obtaining information from ESU to even determine whether ESU's stated "financial pressure but not a financial exigency" basis for their overall action is even true.

90. Some Plaintiffs also presented materials in the OAH proceedings that reflect the stated financial reasons are not legitimate. Attached are exhibits presented to OAH reflecting that over the relevant period, overall enrollment (online and in person) has increased, operating revenues by source 2017 – 2021 have increased (not including millions granted in Covid Relief funds); and operating expenditures have gone down, attached as Exhibit 8.

91. Despite this credible evidence contradicting ESU's stated financial condition on the decision to terminate Plaintiffs, as a result of the Individual Defendants' conduct in adopting and implementing the WMP and ESU Framework, Plaintiffs were still denied the opportunity to call witnesses and request discovery in order to determine the reason they were selected for termination and respond to said reason.

92. ESU and KBOR Individual Defendants intentionally drafted, approved, or implemented policies that avoided the bare minimum due process procedures and requirements set forth in the Kansas Administrative Procedures Act ("KAPA"), which is the law that applies in most if not all proceedings before OAH. The WMP and Framework provided for no deadline for when a hearing officer had to issue a decision and intentionally precluded discovery, calling witnesses, and cross examining them, such as is allowed under KAPA.

93. Further in the OAH cases, ESU, through Defendants Lovett and/or Johnson took the position that KAPA did not apply and the hearing officers agreed by not allowing for discovery or following any procedural deadlines as required under KAPA.

94. On February 28, 2023, during Dr. Christopher Lovett's OAH hearing, Defendant Kevin Johnson called the American Association of University Professors (AAUP), a "union", while dismissing information provided by AAUP.

95.     After each OAH order of reinstatement or order reversing ESU's decision to terminate, ESU and its Individual Defendants filed petitions for review pursuant to the Kansas Judicial Review Act. ESU and its Individual Defendants then took action against the reinstated Plaintiffs Miracle, Behrens, Catlett, Colson, Emmer, Morales and Sievert  by placing them on leave with pay and benefits pending the outcome of the state court's review of ESU's petition for review.

96.     ESU and the Individual ESU Defendants' action in placing the reinstated Plaintiffs included relieving them "of all employment responsibilities including but not limited to teaching, scholarship and service...."[Y] And, "responsibilities related to students are also relieved." Other than email, "self-service banner," and OneDrive, the reinstated Plaintiffs' access to all other electronic tools have been suspended. Their ESU ID cards to enter certain electronic door access on ESU's campus and building keys have also been collected or requested. This is an ongoing violation of federal law.

97.     Each Plaintiff, whether reinstated or not,  was required by ESU and ESU Individual Defendants to pack up and remove personal materials from their campus offices regardless of whether students needed them, are restricted from  access to merit pay increases, the ability to continue progress towards promotion (if applicable), access to conduct or continue research or other scholarly projects, the ability to maintain their tenure, or proper notification informing them if their services were required for grants that had been given to ESU. This is an ongoing violation of federal law.

98.     On or about December 25, 2022, ESU paid approximately $137,741.00 in bonuses to 68 faculty members, many of whom are not tenured or are adjunct professors for unspecified

performance reasons, excluding Plaintiffs. Based on information and belief, the award of performance bonuses has never been given to faculty members.

99.    On or about June 15, 2023, KBOR approved a pay increase for Defendant Hush from $275,000.00 to $286,000.00 per year – a 4% increase.

100.    In 2023, the Kansas Legislature rewarded ESU with 9 million dollars for implementing the "ESU Model," which was a plan to "right-size" or terminate tenured faculty including Plaintiffs without having to provide due process. President Husch acknowledged the reward and accolades from the Kansas Legislature in an email to all faculty sent on or about February 7, 2023. The email included a quote from Hush's former ESU classmate and the then-Kansas Speaker of the House, Dan Hawkins, a Republican, who applauded ESU for right-sizing its tenured workforce and said that such right-sizing was "part of the Republican Better Way Plan."

101.    At no material time to the allegations in this matter were Plaintiffs able to askor learn why they were selected for termination. None of them were able to determine why they were selected for termination over less experienced or qualified adjunct faculty, younger faculty, non-tenured faculty, faculty who do not teach controversial racial and social issues, faculty who are not thought to be liberal and/or union organizers/sympathizers.

102.    None of the Plaintiffs were able to challenge the legitimacy of KBOR's WMP and ESU's Framework basis, which was "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support" because they were not allowed to conduct discovery, and due to the narrow reasons provided in these policies for which a hearing officer was allowed to even reconsider ESU's decision.

103.     None of the Plaintiffs were able to maintain their tenure status during the pendency of their OAH hearings, administrative leaves, or as a result of the extended WMP and ESU framework processes, which denies them the ability to complete requirements necessary to maintain tenure. This is an ongoing violation of federal law by Individual Defendants.

104.     Even though in or about 2022, Defendant Hush told some Plaintiffs that he was working to find employment opportunities for terminated ESU faculty at other "regent partners," some Plaintiffs have applied at KBOR regent universities and have not been hired.

105.     All Individual Defendants knew or reasonably should have known the clearly established laws cited herein as KBOR was a party in the *Tonkovich* case and Kevin Johnson, while general counsel for ESU, drafted the above-referenced paper, admitting knowledge of Plaintiffs' property rights and due process rights. As such, the Individual Defendants are not entitled to qualified immunity in defense of Plaintiffs' 42 U.S.C. § 1983 claim and related claims.

106.     All Individual Defendants, by their adoption, implementation and execution of the WMP and Framework, termination of Plaintiffs and prevention of Plaintiffs to maintain tenure and access resources to do so have committed and continue to commit an ongoing violation of federal law, not only in the deprivation of Due Process under the Fourteenth Amendment, but also in loss of rights in the Fifth through Fourteenth Amendments as set forth herein.

### COUNT I:  VIOLATION OF PROCEDURAL DUE PROCESS UNDER THE FIFTH THROUGH FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

107.     Plaintiffs restate, reallege and incorporate by reference the allegations set forth in paragraphs 1-106 as if fully set forth herein.

108.     The Individual Defendants, each of them, as employees or agents of the State of Kansas, undertook the actions described herein under the color and authority of State Law.

109.    The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. 14, § 1.

110.    The Individual Defendants in their respective roles in creating, adopting or implementing the WMP and ESU Framework engaged in the deprivation of Plaintiffs' constitutionally protected property right in tenure without appropriate procedural due process by: 1) denying the existence of Plaintiffs' property right in tenure – See, *Kosik* and *Tonkovich*; 2) denying Plaintiffs the right to a pretermination hearing contrary to clearly established law--See *Tonkovich*; 3) denying Plaintiffs the right to receive a reason for the deprivation of their property right in tenure with sufficient specificity as to allow a meaningful response – see, *Kosik* and *Tonkovich*; and 4) denying Plaintiffs the right to obtain information from ESU regarding their terminations through discovery and the calling of witnesses in order to provide a meaningful response – see, *Kosik* and *Tonkovich*.

111.    The Individual Defendants engaged in said conduct with knowledge of, and of which a reasonable person similarly situated would have known was and is contrary to clearly established law and they did so for the purpose of depriving Plaintiffs of tenure without due process. Defendants otherwise acted arbitrarily, capriciously and without a rational basis.

112.    The Individual Defendants did not provide Plaintiffs with due process remotely close to meeting the standards of the Fifth through Fourteenth Amendments and as a result of Defendants' conduct, each of the individual Plaintiffs have been damaged monetarily in an amount in excess of $75,000.00 and have endured and suffered mental anguish, humiliation, mental pain and suffering.

113.    The Individual Defendants' conduct constitutes willful violations of Plaintiffs' constitutional rights under 42 U.S.C. § 1983, for which Plaintiffs are entitled to recover nominal,

actual, compensatory, or punitive damages as well as reasonable attorney's fees under 42 U.S.C.

§ 1988, and reinstatement.

WHEREFORE, Plaintiffs pray for judgment against all the Individual  Defendants in an

amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as

available by law; against Defendant Hush, in his official capacity, only  for prospective injunctive

relief in the form of reinstatement of each Plaintiff and return of all benefits, conditions, duties and

responsibilities of employment each enjoyed and maintained prior to termination;  and pursuant to

42 U.S.C. § 1988,  Plaintiffs seek and request recovery of attorneys' fees and such further and

additional relief as the court deems just and equitable.

### COUNT II - VIOLATION OF SUBSTITIVE DUE PROCESS UNDER THE FIFTH THROUGH FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

114.    Plaintiffs restate, reallege, and incorporate by reference the allegations set forth in

paragraphs 1-113 as if fully set forth herein.

115.    The Individual Defendants, each of them, as employees and or agents of the State

of Kansas, undertook the actions described herein under the color and authority of State Law.

116.    The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life,

liberty, or property, without due process of law." U.S. Const., amend. 14, § 1.

117.    As clearly established by United States Supreme Court:

…the Due Process Clause "guarantees more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The Clause "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quotation omitted). In its substantive mode, the Fourteenth Amendment provides protection against arbitrary and oppressive government action, even when taken to further a legitimate governmental objective. *Id.* at 845–46, 118 S.Ct. 1708.

*Seegmiller v. LaVerkin City*, 528 F.3d 762 (10th Cir. 2008)

118.    The Individual Defendants in their respective roles in creating, adopting or implementing the WMP and ESU Framework engaged in the deprivation of Plaintiffs' fundamental and constitutionally protected property right in tenure without substantive due process by: 1) denying the existence of Plaintiffs' property right in tenure; 2) denying Plaintiffs the right to a pretermination hearing contrary to clearly established law; 3) denying Plaintiffs the right to receive a reason for the deprivation of their property right in tenure with sufficient specificity as to allow a meaningful response; 4) denying Plaintiffs the right to obtain or compel information from ESU regarding their respective terminations through discovery and the calling of witnesses in order to provide a meaningful response; and 5) the taking of tenure without due process.

119.    The Individual Defendants' respective conduct through the creation, adoption and administration of the WMP and ESU's Framework is so devoid of basic due process rights related to a fundamental property right in tenure that their conduct shocks the conscience of the Court and is patently arbitrary and capricious.

120.    The Individual Defendants engaged in said conduct with knowledge that clearly established law was and is contrary to their conduct, and they did so for the purpose of depriving Plaintiffs' property right of tenure without due process and their conduct was otherwise arbitrary, capricious and without a rational basis.

121.    As a result of the Individual  Defendants' conduct, Plaintiffs have been damaged monetarily in an amount in excess of $75,000.00 and have endured and suffered mental anguish, humiliation, mental pain and suffering.

122.    The Individual Defendants' conduct constitutes willful violations of Plaintiffs' constitutional rights under 42 U.S.C. § 1983 for which Plaintiffs are entitled to recover nominal,

actual, compensatory, and/or punitive damages as well as reasonable attorney fees under 42 U.S.C. § 1988, and are entitled to reinstatement by Defendant Hush in his official capacity.

WHEREFORE, Plaintiffs pray for judgment against all Individual Defendants in an amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as available by law; against Defendant Hush in his official capacity, only for prospective injunctive relief in the form of reinstatement of each Plaintiff and return of all benefits, conditions, duties and responsibilities of employment each enjoyed and maintained before termination; and pursuant to 42 U.S.C. § 1988, Plaintiffs seek and request recovery of attorneys' fees and such further and additional relief as the Court deems just and equitable.

### COUNT III - CIVIL CONSPIRACY UNDER 42 U.S.C. § 1983

123.    Plaintiffs restate, reallege and incorporate by reference the allegations set forth in paragraphs 1-122 as if fully set forth herein.

124.    The Individual Defendants, each of them, undertook under the color of State Law, the deprivation of Plaintiffs' constitutionally protected property right in tenure.

125.    Upon information and belief, one or more of the Individual Defendants and John Doe (also referred to as "Conspirators") conspired in a movement to deprive tenured professors employed under the Regents system of their property right in tenure without substantive or procedural due process of law by the creation, adoption and implementation of the WMP & ESU's Framework.

126.    The Individual KBOR Defendants took action in furtherance of the conspiracy by, including but not limited to, drafting, voting for adopting, or in extending or modifying the WPM thereafter, thereby "suspending" or continuing the suspension of tenure rights and in approving the ESU Framework.

127.    The Individual ESU Defendants took action in furtherance of the conspiracy by creating and obtaining approval for the ESU Framework from KBOR and in implementing and processing terminations of Plaintiffs' under the WPM and ESU Framework.

128.    The Individual Defendants conspiracy and acts in furtherance of the conspiracy to intentionally deprive Plaintiffs of their property right in tenure without due process by creating, adopting, and implementing the WMP and ESU's Framework in KBOR meetings, discussions among KBOR members and ESU officials. Each action of each co-conspirator in furtherance of the conspiracy is imputed to all others in the conspiracy.

129.    The Individual Defendants' conduct in furtherance of their conspiracy constitutes a violation of Plaintiffs' procedural and substantive due process as described in Counts I and II, in violation of 42 U.S.C. § 1983.

130.    The Individual Defendants engaged in the deprivation of property rights without appropriate due process with knowledge that tenure was a clearly established property right and that the clearly established law required procedural due process prior to the deprivation and post deprivation.  The Individual Defendants provided Plaintiffs no adequate due process meeting the standards of the Fifth through Fourteenth Amendments through the date of filing of this First Amended Complaint.  As the result of the Individual Defendants' conduct, each of them, Plaintiffs have been damaged monetarily in an amount in excess of $75,000.00 and have endured and suffered mental anguish, humiliation, mental pain and suffering.

131.    The Individual Defendants' conduct constitutes a willful violation of Plaintiffs' rights under 42 U.S.C. § 1983 for which Plaintiffs are entitled to recover nominal, actual, compensatory and punitive damages, and are entitled to reinstatement by Defendant Hush in his official capacity.

WHEREFORE, Plaintiffs pray for judgment against all the Individual   Defendants in an amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as available by law; against Defendant Hush in his official capacity, only for prospective injunctive relief in the form of reinstatement of each Plaintiff and return of all benefits, conditions, duties and responsibilities of employment each enjoyed and maintained before termination;   and pursuant to 42 U.S.C. § 1988,  Plaintiffs seek and request recovery of attorneys' fees and such further and additional relief as the court deems just and equitable.

## COUNT IV – VIOLATION OF LIBERTY INTEREST IN VIOLATION OF THE FOURTEENTH AMENDMENT

132.    Plaintiffs restate, reallege and incorporate by reference the allegations set forth in paragraphs 1-131 as if fully set forth herein.

133.    The Individual Defendants, each of them, undertook under the color of State Law, the deprivation of Plaintiffs' constitutionally protected property right in tenure.

134.    Plaintiffs, as tenured public employees, have a liberty interest in their reputations and careers in the context of their employment where termination is accompanied by false and stigmatizing statements (*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972)).

135.    Defendant Hush's Termination Letter, which contains language that mirrors the ESU Framework which was approved by those individual KBOR members on the Board at the time, and based upon information and belief, aided by Defendants Kevin Johnson and Steven Lovett, lacked specific reasons for termination by including the following as part of potentially nine criteria for Plaintiffs' terminations: "performance evaluations," "teaching and research productivity," "low service productivity, and using the phrase "including but not limited to."

136.     The Termination Letter was "published" and thus created a pejorative imputation that each Plaintiff had performance issues, teaching and/or productivity issues, all of which is false and or not the reason they were terminated, and therefor infringes upon Plaintiffs' good names and reputations and negatively impacted Plaintiffs' future employment and career progress.

137.     The Individual Defendants engaged in the deprivation of property rights without appropriate due process with knowledge that Plaintiffs' liberty interest is a clearly established right and that the clearly established law required procedural and substantive due process to allow Plaintiffs the opportunity to engage in a meaningful, fair hearing with some level of discovery to address the pejorative imputations from the Termination Letter.

138.     The Individual Defendants provided Plaintiffs no adequate due process meeting the standards of the Fifth through Fourteenth Amendments to protect their liberty interests and were denied the ability to a "name-clearing" hearing.

139.     In creating and advocating for the WMP, Defendants John Doe and Miller, and other individual Defendants prevented Plaintiffs, each of them, from even being able to ask which of the purported nine (9) reasons applied to them by virtue of no discovery and no calling of witnesses.

140.     In creating, adopting and or implementing the WMP,  Defendants Hush, Thomas, Johnson, Lovett, Miller, Feuerborn, Harrison-Lee, Bangerter, Brandau, Hutton, Kiblinger, Rolph, Schmidt, Van Etten, Ice, Lane and Winter did prevent Plaintiffs, each of them, from even being able to ask which of the purported nine (9) reasons applied to them by virtue of no discovery and no calling of witnesses.

141.     In creating, adopting and or implementing ESU's Framework to the WMP, KBOR Defendants Benson, Harrison-Lee, Dicus, Ice, Kiblinger, Lane, Mendoza, Rolph, and Winter

prevented Plaintiffs, each of them, from being able to determine why they were terminated, i.e. ask which of the purported nine (9) reasons applied to them by virtue of no discovery and no calling of witnesses.

142.    In creating, advocating, seeking approval and or implementing of ESU's Framework, the Individual ESU Defendants and Defendant Hush in his official capacity prevented Plaintiffs, each of them, from being able to determine why they were terminated, i.e., ask which of the purported nine (9) reasons applied to them by virtue of no discovery and no calling of witnesses.

143.    By terminating Plaintiffs pursuant to the WMP and ESU's Framework, the Individual ESU Defendants prevented each Plaintiff from being able to ask which of the purported nine (9) reasons applied to them by virtue of no discovery and no calling of witnesses.

144.    As the result of the Individual Defendants' conduct, each of them, Plaintiffs have been damaged monetarily in an amount in excess of $75,000.00 and have endured and suffered mental anguish, humiliation, mental pain and suffering.

145.    Defendants' conduct constitutes a willful violation of Plaintiffs' rights under 42 U.S.C. § 1983 for which Plaintiffs are entitled to recover nominal, actual, compensatory and punitive damages and are entitled to reinstatement by Defendant Hush in his official capacity.

WHEREFORE, Plaintiffs pray for judgment against all individual Defendants in an amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as available by law; against Defendant Hush, in his official capacity, only  for prospective injunctive relief in the form of reinstatement of each Plaintiff and return of all benefits, conditions, duties and responsibilities of employment each enjoyed and maintained prior to termination;   and pursuant

to 42 U.S.C. § 1988,  Plaintiffs seek and request recovery of attorneys' fees and such further and additional relief as the court deems just and equitable.

## COUNT V – CIVIL CONSPIRACY UNDER 42 U.S.C. § 1985 FOR VIOLATION OF LIBERTY INTEREST IN VIOLATION OF THE FOURTEENTH AMENDMENT

146.    Plaintiffs restate, reallege and incorporate by reference the allegations set forth in paragraphs 1-145 as if fully set forth herein.

147.    The Individual Defendants, each of them, undertook under the color of State Law, the deprivation of Plaintiffs' constitutionally protected property right in tenure.

148.    In the course of carrying out their Conspiracy described in Count III above Individual Defendants and John Doe,  either drafted, voting for  or  otherwise approved of the use of the language of the Termination Letter that created a pejorative public perception as to reasons for the terminations. p.

149.    The Individual Defendants had no rational basis in creating, adopting and implementing the WMP and ESU Framework other than for an unlawful purpose.

150.    The Individual Defendants' conduct in furtherance of their conspiracy resulted in a violation of Plaintiffs' liberty interest in their good name and careers without substantive or procedural due process, in violation of 42 U.S.C. § 1983.

151.    ESU Individual Defendants and KBOR Individual Defendants engaged in the deprivation of Plaintiffs' liberty interest without appropriate due process with knowledge that tenure was a clearly established property right, that the clearly established law required procedural due process before the deprivation and post deprivation, and that Plaintiffs' have a liberty interest in their good name and careers.

152.    The Individual Defendants provided Plaintiffs no adequate due process meeting the standards of the Fifth through Fourteenth Amendments through the date of filing of this Second Amended Complaint to allow redress of the harm to their liberty interest.

153.    Each action of each co-conspirator in furtherance of the conspiracy is imputed to all others in the conspiracy.

154.    As the result of the individual Defendants' conduct, each of them, Plaintiffs have been damaged in a monetary amount in excess of $75,000.00 and have endured and suffered mental anguish, humiliation, mental pain and suffering.

155.    The Individual Defendants' collective conduct constitutes a willful violation of Plaintiffs' rights under 42 U.S.C. § 1983 for which Plaintiffs are entitled to recover nominal, actual, compensatory, and punitive damages.

156.    The Individual Defendants' conduct in furtherance of their conspiracy constitutes a violation of Plaintiffs' liberty interest and failure to provide adequate procedural and substantive due process as described herein, in violation of 42 U.S.C. § 1983 and are entitled to reinstatement by Defendant Hush in his official capacity.

WHEREFORE, Plaintiffs pray for judgment against all Individual Defendants in an amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as available by law; against Defendant Hush in his official capacity, only   for prospective injunctive relief in the form of reinstatement of each Plaintiff and return of all benefits, conditions, duties and responsibilities of employment each enjoyed and maintained prior to termination;   and pursuant to 42 U.S.C. § 1988,  Plaintiffs seek and request recovery of attorneys' fees and such further and additional relief as the court deems just and equitable.

## COUNT VI - VIOLATION OF EQUAL PROTECTION RIGHTS IN VIOLATION OF THE FOURTEENTH AMENDMENT

157.    Plaintiffs restate, reallege and incorporate by reference the allegations set forth in paragraphs 1-156 as if fully set forth herein.

158.    The Equal Protection Clause of the Fourteenth Amendment guarantees all persons in the United States, including prisoners, "the equal protection of the laws." U.S. Const. amend. XIV.

159.    The Individual Defendants, each of them, as employees and or agents of the State of Kansas, undertook the actions described herein under the color and authority of State Law.

160.    Upon information and belief, Individual KBOR and ESU Defendants and John Doe, Conspirators, conspired in a movement to undermine tenure without due process through the vehicle of anti-tenure rhetoric and in the creation, adoption, and implementation of the WMP & ESU's Framework.

161.    Plaintiffs share a common classification as "tenured," and people who were, or were perceived to, be "problematic" to the ESU Administration.

162.    Plaintiffs Catlett, Koerner, and Lidzy have served as past presidents of the Faculty. Plaintiffs Catlett, Catlett, Morales, and Lidzy served as Faculty Senate Committee Chairs. Plaintiffs Behrens, Colson, Emmer, Lovett, and Morales served on committees of the Faculty Senate or otherwise served on the Faculty Senate.

163.    All plaintiffs were known as leaders in their department and/or on campus and were known to raise concerns with the ESU administration.

164.    Some Plaintiffs were known as or believed to be "liberal" or have "Democratic" views.

165.    The Conspirators were motivated by Plaintiffs' common classification as "tenured," and within that class one or more of the conspirators had personal animus against Plaintiffs.

166.    One or more of the Conspirators believed Plaintiffs were "problematic" for advocating issues disfavored by the ESU Administration.

167.    The WMP and ESU Framework was used by ESU individual Defendants to terminate the Targeted Tenured.

168.    The Individual Defendants' respective conduct in the creation, adoption, and implementation of the WMP and ESU's Framework resulting in the termination of Plaintiffs as opposed to other similarly situated faculty (tenured faculty who were not deemed problematic) at ESU violates Plaintiffs' Equal Protection Rights under the Fourteenth Amendment to the United States Constitution.

169.    The Individual Defendants engaged in the violation of Plaintiffs' Equal Protection Rights without appropriate due process and with knowledge that Plaintiffs' Equal Protection Rights are clearly established and that the clearly established law required procedural and substantive due process to allow Plaintiffs the opportunity to engage in a meaningful hearing with some level of discovery in order to address the unequal treatment of the Plaintiffs relative to other similarly situated professors. One or more defendants intentionally treated the Targeted Tenured differently from other similarly situated and having no rational basis for the disparate treatment.

170.    The Individual Defendants provided Plaintiffs no adequate due process meeting the standards of the Fifth through Fourteenth Amendments to protect their Equal Protection Rights and were denied the ability to a hearing sufficient to protect those rights.

171.     In creating, adopting, and implementing the WMP and ESU Framework, and terminating Plaintiffs, Defendants did infringe upon Plaintiffs' Equal Protection Rights in violation of 42 U.S.C. § 1983.

172.     As the result of the individual Defendants' conduct, each of them, Plaintiffs have been damaged monetarily in an amount in excess of $75,000.00 and have endured and suffered mental anguish, humiliation, mental pain and suffering, loss of job.

173.     Defendants' conduct constitutes a willful violation of Plaintiffs' rights under 42 U.S.C. § 1983 for which Plaintiffs are entitled to recover nominal, actual, compensatory and or punitive damages, and are entitled to reinstatement by Defendant Hush in his official capacity.

WHEREFORE, Plaintiffs pray for judgment against all individual Defendants in an amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as available by law; against Defendant Hush in his official capacity, only,  for prospective injunctive relief in the form of reinstatement of each Plaintiff and return of all benefits, conditions, duties and responsibilities of employment each enjoyed and maintained prior to termination;   and pursuant to 42 U.S.C. § 1988,  Plaintiffs seek and request recovery of attorneys' fees and such further and additional relief as the court deems just and equitable.

### COUNT VII - CIVIL CONSPIRACY
### UNDER 42 U.S.C. § 1985 FOR COUNT VI VIOLATION OF EQUAL PROTECTION RIGHTS IN VIOLATION OF THE FOURTEENTH AMENDMENT

174.     Plaintiffs restate, reallege and incorporate by reference the allegations set forth in paragraphs 1-173  as if fully set forth herein.

175.     The Individual Defendants, each of them, undertook under the color of State Law, the deprivation of Plaintiffs' constitutionally protected property right in tenure.

176.    The Individual Defendants engaged in the deprivation of Plaintiffs' Equal Protection Rights under the Fourteenth Amendment to the United States Constitution without appropriate due process with knowledge that clearly established law required procedural due process prior to the deprivation of Equal Protection Rights.

177.    The Individual Defendants provided Plaintiffs no adequate due process meeting the standards of the Fifth through Fourteenth Amendments through the date of filing of this Complaint.

178.    Upon information and belief, Individual KBOR and ESU Defendants and John Doe, Conspirators, conspired in a movement to undermine tenure without due process through the vehicle of anti-tenure rhetoric and in the creation, adoption, and implementation of the WMP & ESU's Framework.

179.    Plaintiffs share a common classification as "tenured," and people who were, or were perceived to, be "problematic" to ESU Administration.

180.    Plaintiffs Catlett, Koerner, and Lidzy have served as past presidents of the Faculty. Plaintiffs Catlett, Morales, and Lidzy served as Faculty Senate Committee Chairs. Plaintiffs Behrens, Colson, Emmer, Lovett, Miracle, and Morales served on committees of the Faculty Senate or otherwise served on the Faculty Senate.

181.    All Plaintiffs were known as leaders in their department and/or on campus and were known to raise concerns with the ESU administration.

182.    Some Plaintiffs were known as or believed to be "liberal" or have "Democratic" views.

183.    The Conspirators were motivated by Plaintiffs' common classification as "tenured," and within that class one or more of the conspirators had personal animus against Plaintiffs.

184.    One or more of the Conspirators believed Plaintiffs were "problematic" for advocating issues disfavored by the ESU Administration.

185.    The WMP and ESU's Framework was used by ESU Individual Defendants to terminate the Targeted Tenured.

186.    The Individual Defendants conspired and acted in furtherance of the conspiracy to deprive Plaintiffs of their liberty interest in their reputation and careers by creating, adopting, and implementing the WMP and ESU's Framework in KBOR meetings, among KBOR members and ESU officials, ultimately resulting in the publication of the Termination Letters, and the termination of Plaintiffs.

187.    Each action of each co-conspirator in furtherance of the conspiracy is imputed to all others in the conspiracy.

188.    The Individual Defendants' conduct in furtherance of their conspiracy constitutes a violation of Plaintiffs' Equal Protection Rights and failure to provide adequate procedural and substantive due process as described herein, in violation of 42 U.S.C. § 1983.

189.    As the result of the individual Defendants' conduct, each of them, Plaintiffs have been damaged in a monetary amount in excess of $75,000.00 and have endured and suffered mental anguish, humiliation, mental pain and suffering.

190.    The individual Defendants' collective conduct constitutes a willful violation of Plaintiffs' rights under 42 U.S.C. § 1983 for which Plaintiffs are entitled to recover nominal, actual, compensatory and or punitive damages, and are entitled to reinstatement by Defendant Hush in his official capacity.

WHEREFORE, Plaintiffs pray for judgment against all individual Defendants in an amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as available

by law; Defendant Hush in his official capacity, only  for prospective injunctive relief in the form

of reinstatement of each Plaintiff and return of all benefits, conditions, duties and responsibilities

of employment each enjoyed and maintained prior to termination;   and pursuant to 42 U.S.C. §

1988,  Plaintiffs seek and request recovery of attorneys' fees and such further and additional relief

as the court deems just and equitable.

### COUNT VIII - VIOLATION OF FREEDOM OF ASSOCIATION RIGHTS IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

191.    Plaintiffs restate, reallege and incorporate by reference the allegations set forth in

paragraphs 1-190 as if fully set forth herein.

192.    The First Amendment to the United States Constitution guarantees the freedom of

individuals to associate both for the purely private purpose of forming and preserving personal and

social relationships, and as a collective means of engaging in political expression, religious

worship, or other activities independently protected by the Constitution.

193.    Plaintiffs are in a unique association of "tenured" professors similarly situated to

other tenured professors at ESU who were not terminated, and otherwise share a common

classification as Targeted Tenured. Plaintiffs Rob Catlett, Christopher Lovett, Max McCoy,

Michael Behrens, Lynnette Sievert, Sheryl Lidzy, Brenda Koerner, Amanda Miracle, Charles

Emmer,  Michael Morales, and Dan Colson share a common classification as tenured and

advocates for issues disfavored by the ESU Administration.

194.    These associations and views are protected by the First Amendment's guarantee of

association and speech.

195.    The Individual Defendants were substantially motivated by Plaintiffs' associations with and in the above groups and activities in their decisions to terminate Plaintiffs such that Plaintiffs would not have been terminated but for the referenced associations.

196.    The Individual Defendants, each of them, as employees and or agents of the State of Kansas, undertook the actions described herein under the color and authority of State Law.

197.    The Individual Defendants' conduct in the creation, adoption and implementation of the WMP and ESU's Framework resulting in the termination of Plaintiffs as opposed to other tenured professors at ESU because of Plaintiffs' associations, violates Plaintiffs' freedom of association rights under the First Amendment to the United States Constitution.

198.    In creating, adopting, and implementing the WMP and ESU Framework, and terminating Plaintiffs, Defendants did retaliate against Plaintiffs based upon their associations in violation of their First Amendment rights of association, all in violation of 42 U.S.C. 1983.

199.    As the result of the Individual Defendants' conduct, each of them, Plaintiffs' have been damaged monetarily in an amount in excess of $75,000.00 and have endured and suffered mental anguish, humiliation, mental pain and suffering, loss of job.

200.    Defendants' conduct constitutes a willful violation of Plaintiffs' rights under 42 U.S.C. 1983 for which Plaintiffs are entitled to recover nominal, actual, compensatory, and punitive damages and are entitled to reinstatement by Defendant Hush, in his official capacity.

WHEREFORE, Plaintiffs pray for judgment against all Individual Defendants in an amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as available by law; against Defendant Hush in his official capacity, only  for prospective injunctive relief in the form of reinstatement of each Plaintiff and return of all benefits, conditions, duties and responsibilities of employment each enjoyed and maintained prior to termination;   and pursuant

to 42 U.S.C. 1988,  Plaintiffs seek and request recovery of attorneys' fees and such further and additional relief as the court deems just and equitable.

### COUNT IX - CIVIL CONSPIRACY
### UNDER 42 U.S.C. § 1985 TO RETALIATE FOR ASSOCIATIONS AND SPEECH IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

201.    Plaintiffs restate, reallege and incorporate by reference the allegations set forth in paragraphs 1-200 as if fully set forth herein.

202.     The Individual Defendants, each of them, undertook under the color of State Law, the deprivation of Plaintiffs' Constitutionally protected property right in tenure.

203.    The Individual Defendants and John Doe, Conspirators (hereinafter "Conspirators" or "Individual Defendants") conspired and took action in furtherance of the conspiracy to retaliate against Plaintiffs for their associations creating, adopting and implementing the WMP in KBOR meetings, among KBOR members and ESU officials, ultimately resulting in the termination of Plaintiffs in violation of Plaintiffs' association rights protected by First Amendment guarantee of association and speech.

204.    Each action of each co-conspirator in furtherance of the conspiracy is imputed to all others in the conspiracy.

205.    The Individual Defendants' conduct in furtherance of their conspiracy constitutes a violation of Plaintiffs' First Amendment Rights of association as described herein, in violation of 42 U.S.C. §1983 for which Plaintiffs are entitled to recover nominal, actual, compensatory, and punitive damages and are entitled to reinstatement by Defendant Hush, in his official capacity.

WHEREFORE, Plaintiffs pray for judgment against all Individual Defendants in an amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as available by law; against Defendant Hush in his official capacity, only  for prospective injunctive

relief in the form of reinstatement of each Plaintiff and return of all benefits, conditions, duties and responsibilities of employment each enjoyed and maintained prior to termination;   and pursuant to 42 U.S.C. § 1988,  Plaintiffs seek and request recovery of attorneys' fees and such further and additional relief as the court deems just and equitable.

## COUNT X - CIVIL CONSPIRACY TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS UNDER THE UNITED STATES CONSTITUTION CONSTITUTING AN INDEPENDENT VIOLATION OF 42 U.S.C. § 1983

206.    Plaintiffs restate, reallege and incorporate by reference the allegations set forth in paragraphs 1-205 as if fully set forth herein.

207.    The Individual Defendants, each of them, undertook under the color of State Law, the deprivation of Plaintiffs' constitutionally protected property right in tenure.

208.    Upon information and belief, the Individual KBOR and Individual ESU Defendants and John Doe, Conspirators (hereinafter "Conspirators" or "Individual Defendants"), conspired to violate Section 1983 in the manner alleged in Counts I, II, IV and VI of this First Amended complaint.

209.    The Individual Defendants provided Plaintiffs no adequate due process meeting the standards of the Fifth through Fourteenth Amendments through the date of filing of this Complaint.

210.    The Individual Defendants are more than two people and were motivated to accomplish the taking of Plaintiffs' property right in tenure, liberty right in their good names, reputation in employment and their Equal protection in tenure without due process.

211.    The Individual Defendants conspired and took overt action to accomplish their deprivation of Plaintiffs' Constitutional rights by creating, adopting, and implementing the WMP and ESU's Framework.

212.     The Individual Defendants conspired, had a meeting of the minds,  and took action in furtherance of the conspiracy to deprive Plaintiffs of their property right in tenure, liberty right in their good names, reputation in employment and their Equal Protection Rights, without due process by adopting and implementing the WMP and ESU's Framework in KBOR meetings, among KBOR members and ESU officials, ultimately resulting in the publication of the Termination Letter, and termination of Plaintiffs without due process as opposed to similarly situated tenured faculty who were not terminated under the WMP and ESU Framework.

213.     Each action of each co-conspirator in furtherance of the conspiracy is imputed to all others in the conspiracy.

214.     As the result of the individual Defendants' conduct, each of them, Plaintiffs have been damaged in a monetary amount in excess of $75,000.00 and have endured and suffered mental anguish, humiliation, mental pain and suffering.

215.     The Individual Defendants' conspiracy and  collective conduct in engaging in a conspiratorial agreement to deprive Plaintiffs of a constitutionally protected property right, a liberty interest and Equal protection rights without due process  constitute a violation, and a willful violation, of Plaintiffs' rights under 42 U.S.C. § 1983 for which Plaintiffs are entitled to recover nominal, actual, compensatory and or punitive damages, and are entitled to reinstatement by Defendant Hush in his official capacity.

216.     The Individual Defendants' conduct in furtherance of their conspiracy constitutes a violation of Plaintiffs' property right in tenure, liberty right in their good names, reputation in employment and their Equal Protection Rights without due process and failure to provide adequate procedural and substantive due process as described herein above, in violation of 42 U.S.C. § 1983

for which Plaintiffs are entitled to recover nominal, actual, compensatory and or punitive damages, and are entitled to reinstatement by Defendant Hush in his official capacity.

WHEREFORE, Plaintiffs pray for judgment against all Individual Defendants in an amount in excess of $75,000.00 for nominal, actual, compensatory and/or punitive damages as available by law; Defendant Hush in his official capacity, only  for prospective injunctive relief in the form of reinstatement of each Plaintiff and return of all benefits, conditions, duties and responsibilities of employment each enjoyed and maintained prior to termination;   and pursuant to 42 U.S.C. § 1988,  Plaintiffs seek and request recovery of attorneys' fees and such further and additional relief as the court deems just and equitable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs designate Topeka, Kansas as the place of trial of this action.

## JURY TRIAL REQUESTED

Plaintiffs request a jury trial on issues triable before a jury.

Respectfully submitted,
/s/ J. Phillip Gragson
J. Phillip Gragson, #16103
Amanda S. Vogelsberg, #23360
John H. Hutton, #16573
Kara L. Eisenhut, #27055
Henson, Hutton, Mudrick, Gragson
& Vogelsberg, LLP
3649 SW Burlingame Rd., Ste. 200
Topeka, KS  66611-2155
785.232.2200 (phone); 785.232.3344 (fax)
jpgragson@hhmglaw.com
avogelsberg@hhmglaw.com
jhutton@hhmglaw.com
keisenhut@hhmglaw.com
*Attorneys For Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a true and correct copy of the foregoing was filed on this 10th day of April, 2024 with the clerk using the EM-ECF system which will send notice to all parties of record.

<u>/s/ J. Phillip Gragson</u>
*Attorneys For Plaintiffs*

**SOCIAL MEDIA AND PUBLIC HIGHER EDUCATION EMPLOYMENT**

by Jack Peggs and Kevin B. Johnson

Jack Peggs is in the private practice of law in Wichita, Kansas. He received his B.A. degree from Creighton University and his J.D. from Washburn University School of Law. He is a member of the Kansas and United States Supreme Court Bars. He served as Special Assistant to the State Attorney General and as Assistant District Attorney where he was Chief of the Appellate Section. He is the past chair of the Wichita Bar Association's Medico-Legal Committee. He served as an adjunct professor at Wichita State University, and, has written and co-authored numerous legal articles and papers, principally in medically related fields. He is admitted to practice before all Kansas Courts, the U.S. Federal District Court, and the 10th Circuit Court of Appeals. Jack Peggs practices in several areas of law, however, with an emphasis on commercial and personal injury litigation.

Kevin B. Johnson has practiced law in Wichita and Emporia, Kansas and is General Counsel for Emporia State University. He received his B.A. from Wichita State University and his J.D. from Washburn University School of Law. He is admitted to practice before all Kansas Courts, the 10th Circuit Court of Appeals, and the U.S. Supreme Court. Mr. Johnson has authored several books on business and employment law issues, as well as a number of articles on business relationships and healthcare-legal issues. He also teaches courses in business law and business ethics as a tenured faculty member of the School of Business at Emporia State University (an AACSB accredited business school).

1

SOCIAL MEDIA AND PUBLIC HIGHER EDUCATION EMPLOYMENT

I.  INTRODUCTION

    § 1.    In General

    § 2.    Scope of Article

    § 3.    Model Trial Factual Situation

II.  LEGAL BACKGROUND

    § 4.    Public Higher Education Employment

        @[NUM]  (1). Overview

        @[NUM]  (2). At-Will Employment

        @[NUM]  (3). Constitutional Due Process Rights

        @[NUM]  (4). Employment Contracts

        @[NUM]  (5). Collective Bargaining Agreements

        @[NUM]  (6). Institutional Policies and Procedures

        @[NUM]  (7). Tenure

    § 5.    Social Media and Public Employment

        @[NUM]  (1). First Amendment

        @[NUM] (2). Academic Freedom

        @[NUM]  (3). Social Media

    § 6.    Remedies

        @[NUM]  (1). Exhaustion of Administrative Remedies

        @[NUM]  (2). Reinstatement

        @[NUM]  (3). Damages

        @[NUM]  (4). Proper Defendant

III.    INVESTIGATION AND PREFILING CONSIDERATIONS

   § 8.    The Initial Client Interview

        @[NUM]  (1). Speech Protected by the First Amendment (Intent of the Messages

                Posted to Social Media)

        @[NUM]  (2). Speaking as a Private Citizen on a Matter of Public Concern

        @[NUM]  (3). Speaking for Oneself or as a University Representative

   § 9.    Obtaining Written Evidence

   § 10.   Interviewing Witnesses

   § 11.   Developing the Case Theory

IV.    THE PLEADINGS

   § 12.   The Complaint

        @[NUM]  (1). Sample Complaint

   § 13.   Defenses and Cross-Claims

        @[NUM] (2)  Sample Answer

V.    DISCOVERY

   § 14.   In General

   § 15.   Conducting Discovery

        @[NUM]  (1). Paper Discovery

        @[NUM]  (2). Depositions

   § 16.   Summary Judgment

VI.    TRIAL

   § 17.   *Voir Dire*

   § 18.   Opening Statement

3

Employees in public higher education with a clear expectation of continued employment include any employee working pursuant to a collective bargaining agreement or to an individual contract (at least to the extent described in the applicable contract). Tenured faculty members of any academic rank also have a clear expectation of continued employment based on both university policy and the policies of the university's governing board. Non-tenured faculty members, including those faculty who are in a tenure-track position but have not yet been granted tenure, as well as many (if not all at some institutions) in administration, particularly in senior positions do not have an expectation of continued employment. Others without an expectation of continued employment include student employees, part time, temporary, or probationary employees, and various staff positions not covered by a collective bargaining agreement. The Professor in the model fact situation, as a tenured faculty member, has an expectation of continued employment.

@[NUM]  (3) Constitutional Due Process Rights

The termination of employment of a member of the faculty of an institution of higher education does require an examination of a faculty employee's due process rights in their employment. Tenured faculty members, as the Professor in the model case, do have procedural due process rights in their employment. Probationary faculty (indeed, any probationary public employee) do not have procedural due process rights in their employee. Probationary faculty includes a faculty member in a tenure-track position who has not yet been awarded tenure. The right of procedural due process is met when terminating a tenured faculty member when the employee is given notice of the reason for the decision to terminate and the opportunity to challenge, or to defend against, the termination decision before the effective date of the

24

such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' <Papadopoulos v. Oregon State Bd. of Higher Educ., 14 Or. App. 130, 165-66, 511 P.2d 854, 870-71 (1973)>

A tenured faculty member who is being terminated is typically given notice of the termination and that the effective date of the termination will be at a future time specified by date or by condition (such as the final decision in a grievance) During this time between notice and actual termination the faculty member may continue teaching, research, and other duties or, at the discretion of the university, may be placed on paid leave with no requirement to meet the university's normal expectations for research, instruction, or service. Whether the faculty member continues to be actively engaged as a faculty member or is on paid leave, this is the time period during which the employee has the opportunity to request a hearing regarding the decision to terminate employment. In other situations, a tenured faculty member may have been accused of some violation of policy (such as harassment or of whether the professor "unreasonably obstructed teaching, research and learning," as in the model fact situation). During an investigation of the accusation the faculty member may be placed on administrative or paid leave. The question arises, therefore, of whether the faculty member placed on paid leave is entitled to a hearing before being placed on paid leave.

A government employee is entitled to constitutional procedural due process only when the employee has been deprived of a protected property or liberty interest. <See Board of Regents v. Roth, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548, 556 (1972)> Public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process. <Gilbert v. Homar, 520 U.S. 924, 929, 117 S.Ct. 1807, 1811, 138 L.Ed.2d 120, 126 (1997)> Property interests are

26

created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. A property interest typically arises from contractual or statutory limitations on the employer's ability to terminate an employee or can also be created by implied contract, arising out of customs, practices, and de facto policies. Thus, to determine whether a public employee has a property interest in continued employment, we look to state law and any contractual rights Simonson may have. Some jurisdictions have concluded that a government employee has no constitutionally protected property interest in actually performing his or her job and thus an employee's due process rights are not implicated so long as he or she continues to receive pay and benefits. <See Harris v. Board of Educ., 105 F.3d 591, 596–97 (11th Cir.1997)> <City of Annapolis v. Rowe, 123 Md.App. 267, 717 A.2d 976, 988 (1998)> Other jurisdictions have held, however, that even though the employee is not deprived of the economic benefits of the job, an employee has a constitutionally protected property right in continuous employment by virtue of certain statutorily created procedural rules concerning suspension or demotion. <See Wedges/Ledges of Cal., Inc. v. City of Phoenix, 24 F.3d 56, 62 (9th Cir.1994)> <Division of Family Servs. v. Cade, 939 S.W.2d 546, 553 (Mo.Ct.App.1997)> <Arneson v. Jezwinski, 225 Wis.2d 371, 592 N.W.2d 606, 618–19 (1999)>

There is a significant distinction between those cases finding that a protected property interest exists which warrants procedural due process protections over paid leave and those that do not. It is only when the paid leave, itself, is the disciplinary measure taken against the employee that the due process issue becomes relevant. When the employee is placed on paid leave pending the results of an investigation to determine whether cause exists for termination or other applicable employment action, or pending the results of a grievance by the employee

individual candidate. Lower levels of review are not binding upon the CEO. Instead, they are merely recommendations and are therefore advisory in nature. In fact, unless the CEO exercised bad faith in a tenure decision, or the reason for denying tenure constituted a pretext for unlawful discrimination, there is little if anything an unsuccessful candidate for tenure can do (other than have the decision reviewed through the university's own tenure decision review process). <Univ. of Baltimore v. Iz, 123 Md. App. 135, 167-69, 716 A.2d 1107, 1123-24 (1998)>

Tenure is an academic status granted by a university to one of its own faculty members. Tenure is not necessarily transferrable when a tenured faculty member takes a faculty position with a different university than the one that conferred tenure to the faculty member. Whether or not a university will agree to start a new faculty member in his or her position with tenure, or whether they will need to apply for tenure at the new university are matters to be negotiated when a job offer is made. The reason for this is that different institutions of higher education have different standards for the granting of tenure.

Once granted, tenure gives a faculty member an expectation of continued employment at institution that conferred tenure. (See Section 4, Number 3 At-Will Employment and Number 4 Constitutional Due Process Requirements, supra.) For purposes of this article, the only issue with regard to tenure is whether or not the faculty member has tenure at the time they are given notice of termination. A tenured faculty member at any institution of higher education clearly has an expectation of continued employment and is entitled to procedural due process rights as a condition of termination of employment.

33

**Exhibit 2**

1



## UNIVERSITY POLICY MANUAL

## TABLE OF CONTENTS

### GUIDING FRAMEWORK

University Mission Statement ................................................................................ 1

Equal Employment Opportunity, Equal Educational Opportunity and
Non- Discrimination Policy ................................................................................... 1

Affirmation of Values Statement .......................................................................... 1

Positioning Statement ........................................................................................... 3

Organizational Chart ............................................................................................. 3

### CHAPTER 1 UNCLASSIFIED PERSONNEL

**1A. Categories Of Unclassified Appointments** ....................................................... **1-1**

1A.01 Academic Appointments .............................................................................. 1-1

    1A. 0102 Academic Tenure ................................................................................ 1-1

    1A.0103 Non-Tenure Track Academic .............................................................. 1-1

    1A.0104 Academic Temporary .......................................................................... 1-2

1A.02 Administrative Appointments ...................................................................... 1-2

    1A.0201 Administrative Probationary ................................................................ 1-2

    1A.0202 Administrative Regular ........................................................................ 1-3

    1A.0203 Administrative Temporary ................................................................... 1-3

    1A.0204 Administrative Athletics ...................................................................... 1-3

    1A.0205 Limited Appointment .......................................................................... 1-3

**1B. Academic Appointment Policies And Procedures**.................................................................1-3

1B.01 Notices Of Appointment ...........................................................................................1-3

1B.02 Appointment Terms....................................................................................................1-4

    1B.0201 Academic Year Appointments .........................................................................1-4

    1B.0202 12 Month Appointments....................................................................................1-4

    1B.0203 Summer Session Appointments .......................................................................1-4

1B.03 Faculty Ranks.............................................................................................................1-4

    1B.0301 Professor..............................................................................................................1-4

    1B.0302 Associate Professor ............................................................................................1-4

    1B.0303 Assistant Professor .............................................................................................1-5

    1B.0304 Instructor .............................................................................................................1-5

    1B.0305 Lecturer ...............................................................................................................1-5

1B.04 Faculty Titles..............................................................................................................1-5

    1B.0401 Adjunct ...............................................................................................................1-5

    1B.0402 Distinguished Professor....................................................................................1-5

    1B.0403 Clinical Instructor.............................................................................................1-5

1B.05 Minimum Faculty Qualifications .............................................................................1-5

1B.06 Graduate Faculty .......................................................................................................1-7

    1B.0601 Membership in Graduate Faculty ...................................................................1-7

1B.07 Academic Freedom ...................................................................................................1-7

1B.08 Faculty Performance And Recognition ..................................................................1-7

    1B.0801 Notification of Faculty Performance and Recognition Policies.....................1-7

    1B.0802 Faculty Recognition Policy .............................................................................1-8

    1B.0803 Annual Faculty Evaluation............................................................................1-10

        1B.0803.01 Training Of Department Chairs...................................................1-11

        1B.0803.02 Student Rating Of Teaching.......................................................1-11

    1B.0804 Evaluation of the Chair by Faculty ...............................................................1-12

    1B.0805 Policies and Procedures for Tenure................................................................1-13

        1B.0805.01 Board of Regents Policy for Tenure..............................................1-13

        1B.0805.02 University Policies and Procedures for Tenure............................1-14

        1B.0805.03 Reappointment during the Probationary Period............................1-18

1B.0806 Policies and Procedures for Promotion .......................................................1-20

1B.0806.02 University Criteria for Promotion ................................................................ 1-20

1B.0806.03 Procedures for Faculty Promotion.............................................................. 1-22

1B.0807 Faculty Performance and Recognition Decisions when Interdepartmental
Transfers of Faculty Members or Departmental Mergers are Involved ........................ 1-24

1B.09 Policies On Termination Of Employment......................................................................... 1-26

1B.0901 Resignation..................................................................................................... 1-26

1B.0902 Non-Reappointment ....................................................................................... 1-26

1B.0903 Program Discontinuance ................................................................................ 1-26

1B.0904 Post Tenure Review ....................................................................................... 1-26

1B.0905 Chronic Low Performance and Corrective Faculty Development .................. 1-28

1B.0906 Procedure For Faculty Review Prior To Dismissal For Cause Of Tenured
Faculty.......................................................................................................................... 1-34

1B.10 Implementation Of The Kansas Board Of Regents' Policy On Social Media ................ 1-39

1B.11 Faculty Enrollment At Esu ............................................................................................. 1-40

1B.12 Faculty Referendum ....................................................................................................... 1-41


**1C. ADMINISTRATIVE APPOINTMENT POLICIES AND PROCEDURES ............... 1-42**


1C.01 APPOINTMENT, EVALUATION, RETENTION AND TERMINATION .................. 1-42

1C.0101 Introduction .................................................................................................... 1-42

1C.0102 Administrative Probationary .......................................................................... 1-43

1C.0102.01 Administrative Probationary Status with Cause (for employees with
prior permanent status) ...................................................................................... 1-44

1C.0102.02 Administrative Probationary Status without Cause ....................... 1-45

1C.0103 Administrative Regular ................................................................................. 1-45

1C.0103.01 Administrative Regular Status without Cause ........................................... 1-45

1C.0104 Administrative Temporary ............................................................................. 1-46

1C.0105 Administrative Athletic .................................................................................. 1-46

1C.0106 Limited Term.................................................................................................. 1-47

1C.02 Procedures For Faculty/Staff Evaluation Of Administrators ......................................... 1-47

1C.03 Board Of Regents Evaluation Of The President ........................................................... 1-51

**1D. Unclassified Personnel With Administrative And Academic Responsibilities............ 1-52**

1D.01 Introduction.......................................................................................................... 1-52

1D.02 Existing Tenure/Rank ........................................................................................... 1-52

1D.03 Evaluations.......................................................................................................... 1-52

**1E.   Other Unclassified Personnel Policies ......................................................... 1-53**

1E.01 Dispute Resolution, Mediation, And Grievance Policy ................................... 1-53

1E.02 Grievance Policy for Administrators............................................................... 1-63

1E.03 Commitment of Time, Conflict of Interest, Consulting and Other Employment........... 1-63

       1E.0301 Conflict of Interest and Conflict of Time Reporting Procedure..................... 1-68

# CHAPTER 2 UNIVERSITY SUPPORT STAFF

**2A.   University Support Staff Employment........................................................... 2-1**

2A.01 Appointment Notice ............................................................................................ 2-1

2A.02 Appointment Type ............................................................................................... 2-1

       2A.0202 Temporary Appointment................................................................... 2-2

       2A.0203 Limited Term Appointment .............................................................. 2-2

       2A.0204 Acting Appointment.......................................................................... 2-2

2A.03 Supervisory Training............................................................................................ 2-3

2A.04 Return To Work Policy ........................................................................................ 2-3

2A.05 Furloughs And Layoffs ........................................................................................ 2-4

       2A.0501 Furloughs .......................................................................................... 2-4

       2A.0502 Layoff And Reemployment .............................................................. 2-4

2A.06 Personal Property ................................................................................................. 2-5

**2B.   Other Employment ......................................................................................... 2-5**

**2C.   Personal Business** ........................................................................................ **2-5**


**2D.   Work Schedule** ............................................................................................. **2-6**


2D.01 Punctuality ....................................................................................................... 2-6
2D.02 Portal To Portal Act ......................................................................................... 2-6
2D.03 Overtime............................................................................................................ 2-6
    2D.0301 Compensatory Time Policy........................................................... 2-7
2D.04 Break Periods .................................................................................................... 2-8
2D.05 Meals ................................................................................................................. 2-8
2D.06 Call-In And Call-Back ...................................................................................... 2-9
2D.07 Travel Away From Home .................................................................................. 2-9
2D.08 Shift Differential ............................................................................................... 2-9
2D.09 Stand-By Compensation .................................................................................. 2-10


**2E.   Probationary Period  And Performance Evaluations** ................................. **2-10**


2E.01 Performance Review System........................................................................... **2-10**
    2E.0101 Probationary Period Review......................................................... 2-10
2E.02 Annual Performance Evaluation...................................................................... 2-11
    2E.0201 Initial Planning ............................................................................ 2-11
    2E.0202 Mid-Year And Annual Review Discussions ................................. 2-12
    2E.0203 Performance Factors .................................................................... 2-12
    2E.0204 Overall Performance...................................................................... 2-13
2E.03 Demotion – Involuntary .................................................................................. 2-13


**2F. Disciplinary Action And Grievance Procedures**.............................................. **2-13**


2F.01 Areas Covered By University Support Staff Policies...................................... 2-13
2F.02 Progressive Discipline Policy ......................................................................... 2-13
    2F.0201 General Policy ................................................................................ 2-14

4B.04 Concurrent Undergraduate Students ................................................................................. 4-4

4B.05 Seniors Earning Graduate Credit..................................................................................... 4-5

**4C. Academic Requirements And Regulations ....................................................................... 4-5**

4C.01 Graduation Requirements................................................................................................. 4-5

    4C.0101 Undergraduate ......................................................................................................... 4-5

    4C.0101.03 Time Limit Policy ............................................................................................. 4-6

    4C.0102 Graduate ................................................................................................................. 4-7

    4C.0102.01 Master's Degree ................................................................................................. 4-7

    4C.0102.01.01 Thesis ........................................................................................................... 4-7

    4C.0102.02 Specialist In Education Degree ........................................................................... 4-8

    4C.0102.03 Doctoral Degree ................................................................................................. 4-8

4C.02 Application For A Degree ................................................................................................. 4-9

    4C.0201 Undergraduate ......................................................................................................... 4-9

    4C.0202 Graduate ................................................................................................................. 4-9

        4C.0202.01 Degree Candidacy.......................................................................................... 4-9

    4C.0203 Second Bachelor's Degree ....................................................................................... 4-10

    4C.0204 Second Master's Degree........................................................................................... 4-11

    4C.0205 Posthumous Degree ................................................................................................. 4-11

        4C.0205.01 Posthumous Recognition............................................................................... 4-12

4C.03 Resident Academic Credit................................................................................................ 4-12

4C.04 External Academic Credit ................................................................................................ 4-13

    4C.0401 Transfer  Credit – Undergraduate............................................................................. 4-13

        4C.0401.01 Student Transfer Appeals Process................................................................. 4-13

        4C.0401.02 Articulation (Transfer) Agreement................................................................. 4-14

    4C.0402 Transfer Credit – Graduate....................................................................................... 4-14

    4C.0403 Correspondence Study............................................................................................. 4-15

    4C.0404 Credit Offerings In Cooperation With Organizations Outside The
University................................................................................................................................. 4-15

4C.05 Life Experience Credit ..................................................................................................... 4-16

4C.06 Military Service Credit..................................................................................................... 4-16

1-1

# Chapter 1 UNCLASSIFIED PERSONNEL

## 1A.   CATEGORIES OF UNCLASSIFIED APPOINTMENTS

Unclassified appointments apply to all University employees except those who have civil service classification or those who are student employees. An unclassified appointment is either an academic or an administrative appointment. The appointment category may include both academic and administrative responsibilities. Policies and procedures pertinent to each appointment category are included in this chapter.

## 1A.01   ACADEMIC APPOINTMENTS

### 1A. 0101 Academic Probationary

An academic probationary appointment is for a full-time, tenure-track teaching position. The number of years required toward tenure is included in the Notice of Appointment. Probationary appointments may, on the basis of continuing satisfactory performance, lead to review for the award of tenure. However, probationary appointments carry no promise that tenure will be awarded. Probationary appointments are reviewed on an annual basis. The standards of non- reappointment apply to this appointment.

### 1A. 0102 Academic Tenure

An academic tenure appointment is a continuous, full-time, academic position for faculty with tenure. Tenured appointments will be annually renewed. Termination of a tenured faculty member must follow appropriate policies and procedures.

### 1A.0103 Non-Tenure Track Academic (FSB 18028 passed by Faculty Senate 5/7/2019; approved by President 6/5/2019)

1.  Emporia State University may employ and appoint qualified personnel to full-time or part- time, non-tenure track academic appointments as determined to be in the best interest of the university. The primary responsibility for persons on these appointments could be any of the following areas: teaching, clinical service, research, outreach and service, or other creative endeavors in academic departments. Assignment of titles and ranks shall be determined by the academic unit in accordance with university policy.
2.  Contracts for such appointments shall not exceed 3 years, may be renewable but may not be rolling. At the end of each contract period, the appointment is subject to review to determine whether the appointment shall be renewed for an additional period, which may be up to 3 years. Notice of non-reappointment of non-tenure track faculty

with multiple year appointments (i.e., those addressed by this policy) shall require the same notification timeline as non-reappointment of academic probationary faculty members. This appointment type only applies to benefits eligible positions. Potential increases in salary shall be determined each year by availability of funds and by merit, which includes, but is not limited to, productivity. Criteria for promotion (if available or applicable) shall be determined by the university.

3. Contracts for appointments made pursuant to paragraph (1) of this subsection may be terminated by mutual agreement of the faculty member and Emporia State University. Prior to the expiration of the appointment, ESU may only terminate the contract for financial exigency or for cause in accordance with Board or university policy, including loss of clinical privileges, if any, or loss of clinical employment with practice corporation or  foundation, if any.

### 1A.0104 Academic Temporary

An academic temporary appointment is for a temporary teaching position and may not exceed 1 year. The Notice of Appointment is renewable annually. The appointment carries no expectation of continued employment. Employment is considered to be at-will and may be terminated at any time, without cause, prior to the end date specified in the notice of appointment. The standards of non-reappointment do not apply. There is no consideration for tenure.

Academic temporary appointments which are made for at least a half-time and for at least a 9-month basis will be eligible for benefits and are subject to the 5-year stipulation. The 5-year stipulation is defined as employment which should not exceed 5 years of consecutive appointments. Multiple simultaneous appointments of less than half-time may make an employee eligible for benefits even when the individual appointments do not.

An academic temporary appointment that is less than half-time is a non-benefits eligible appointment. An academic temporary appointment that is less than half-time is not subject to the 5-year stipulation.

## 1A.02   ADMINISTRATIVE APPOINTMENTS

### 1A.0201 Administrative Probationary

An administrative probationary appointment is for a full-time, non-teaching position. The number of probationary years is specified in the probationary Notice of Appointment and may be modified by the appropriate vice president in conjunction with the performance evaluation. The expectation is for continuing employment subject to the provisions specified in the personnel policies and procedures for administrative appointments. At the end of this service, the individual moves either to administrative regular status or is no

longer employed, in accordance with the personnel policies and procedures for administrative appointments.

### 1A.0202 Administrative Regular

An administrative regular appointment is for a full-time, non-teaching position after being in administrative probationary status for no less than 2 years. Expectation is for continuous employment subject to the requirements stated in the personnel policies and procedures for administrative regular appointments.

### 1A.0203 Administrative Temporary

An administrative temporary appointment is at least half-time and may not exceed 1 year. The appointment is renewable annually and is subject to the 5-year stipulation. The 5-year stipulation is defined as employment which should not exceed 5 years of consecutive appointments. Such appointment carries no expectation of continued employment. Employment is considered to be at-will and may be terminated at any time, without cause, prior to the end date specified in the Notice of Appointment. Temporary appointments which are made for at least a half-time and for at least a 9-month basis will be eligible for benefits. Multiple simultaneous appointments of less than half-time may make an employee eligible for benefits even when the individual appointments do not. A non-benefits eligible appointment is defined as less than half-time and is not subject to the 5-year stipulation.

### 1A.0204 Administrative Athletics

An administrative athletics appointment may be full-time or less and is for coaches and trainers. This status requires annual review for reappointment with no expectation of continuing employment. The Athletic Director has an administrative probationary or administrative regular appointment.

### 1A.0205 Limited Appointment (revised 5/09)

A limited appointment is for an individual hired in a benefits-eligible position to fulfill requirements under a contract agreement, a federal or state grant, or a specific project or role and is subject to annual review. The appointment is for the period as outlined in the Notice of Appointment or no longer than the period for which the funds are available. Inasmuch as this is a limited appointment, this appointment carries with it no expectation of continuing employment. This appointment may involve an academic component but would not be eligible for tenure.

# 1B.   ACADEMIC APPOINTMENT POLICIES AND PROCEDURES

## 1B.01   NOTICES OF APPOINTMENT (approved by President as revised 4/18/08)

Faculty notices of appointment as approved by the President, or designee on behalf of the President, are sent from the Provost and Vice President of Academic Affairs after the legislature and the Board of Regents have acted on the fiscal year budget. The Notice of Appointment, when signed by all parties, constitutes an agreement indicating the term of employment, salary, faculty rank, and appointment status.

Federal law requires ESU to verify employment eligibility of all individuals hired after November 6, 1986. The I-9 Form must be completed in Human Resources within 3 days of hire, or the employee may forfeit their position. Documentation is most easily provided by a driver's license and social security card. Other documents may be substituted. The I-9 form will be retained in the employee's personnel file located in Human Resources, and once completed, may need to be completed again for ESU employment if documentation expires.

## 1B.02   APPOINTMENT TERMS

### 1B.0201 Academic Year Appointments (BOR Council of Presidents, 2/16/78)

Academic year appointments are for a period of approximately 9 months beginning just prior to fall registration and extending through spring commencement. Faculty duties include teaching, advising and counseling, research, scholarly activities, other University duties, and community and public service. Periods when classes are not in session are normally devoted to the above listed non-teaching functions or to other specially scheduled activities.

### 1B.0202 12 Month Appointments

Some faculty and most administrative personnel receive 12-month appointments, including vacation and holidays.

### 1B.0203 Summer Session Appointments

Summer session appointments are for specified periods of time and duties. The appointments are handled on a separate budget and through separate notices of appointment. Most departments have employment for only a portion of the staff and base teaching assignments on department assessment of student needs in the summer program.

## 1B.03 FACULTY RANKS

The principal ranks granted by the University to academic faculty are those normally bestowed by institutions of higher education: professor, associate professor, assistant professor, instructor, and lecturer.

### 1B.0301 Professor (Refer to University Criteria for Promotion for definitions and expectations for the rank of professor.)

### 1B.0302 Associate Professor (Refer to University Criteria for Promotion for definitions and expectations for the rank of associate professor.)

**1B.0303 Assistant Professor** (Refer to University Criteria for Promotion for definitions and expectations for the rank of assistant professor.)

**1B.0304 Instructor**

An instructor is a faculty member with a full-time appointment who may continue in the position in accordance with appointment and re-appointment policies consistent with the appointment category. An instructor is on a non-tenure track, and a maximum of 3 years of service as instructor may count toward tenure if the person moves to the tenure track.

**1B.0305 Lecturer**

A lecturer is a faculty member with an academic temporary appointment that is less than full- time (part-time). The faculty member is not expected to continue to teach more than 1 semester or 1 year. Tenure or credit toward tenure does not apply with this rank.

## 1B.04   FACULTY TITLES

**1B.0401 Adjunct**

The title of adjunct faculty is for qualified individuals who contribute without remuneration to the University's academic efforts. Such appointments are made for a specified term but may be renewed, carry no stipends, and do not imply eligibility for tenure or other such faculty benefits. An adjunct faculty appointee has an opportunity to use the University name and designated laboratory, library, and study facilities.

**1B.0402 Distinguished Professor**

The title of distinguished professor may be given to qualified individuals. Remuneration is commensurate with expectations.

**1B.0403 Clinical Instructor (approved by Vice Presidents' Council and the President, 5/09)**

The title of clinical instructor is for an instructional faculty member with at least a part-time appointment (benefits-eligible position) and is renewable annually. Employment is considered to be at-will and may be terminated at any time, without cause. Tenure or credit toward tenure does not apply with this title. This title would begin after the 5-year academic temporary appointment has expired. This title would then be eligible for the appointment type of Limited Appointment.

## 1B.05   MINIMUM FACULTY QUALIFICATIONS (FSB 15001 approved by Interim President 12/09/2015)

Institutions accredited by the Higher Learning Commission identify qualified faculty members primarily by degree credentials appropriate to the academic discipline and level of the courses

taught. In instances where the normally-expected degree is not held, faculty employment can also be based on equivalent experience.

Each full-time faculty member's qualifications, whether by degree credentials or by equivalent experience, shall be established and documented at the time of initial hire. The evaluation of these qualifications shall be completed by the Search Committee at the time of hire. If no Search Committee is convened, the hiring department chair or dean shall evaluate the faculty member's qualifications.

Each part-time faculty member's qualifications, whether by degree credentials or by equivalent experience, shall be established and documented at the time of initial hire. The evaluation of these qualifications shall be completed by the Search Committee if any is convened. If no Search Committee is convened, the hiring department chair or dean shall evaluate the faculty member's qualifications. Qualifications for part-time faculty must be re-established after a lapse of employment of more than 5 years. Any part-time faculty member who receives a teaching assignment requiring substantively different qualifications will have their qualifications re-evaluated by the appropriate department chair or dean at the time of said teaching assignment.

To be qualified on the basis of credentials, instructors (excluding for this requirements teaching assistants enrolled in a graduate program and supervised by faculty) must possess an academic degree relevant to what they are teaching and at least 1 level above the level at which they teach, except in programs for terminal degrees, where they must possess the same level of degree:

- Undergraduate level: A master's degree or higher in the discipline or subfield of the courses taught OR a master's degree or higher in a different discipline or subfield plus a minimum of 18 graduate credit hours in the discipline or subfield of the courses taught.

- Graduate level: The terminal degree determined by the discipline and a record of research and scholarship appropriate for the graduate program.

- Doctoral level: The terminal degree determined by the discipline and a record of recognized research and scholarship commensurate with doctoral expectations.

Teaching qualifications – when established by equivalent experience – are determined by disciplinary standards and faculty members within the discipline or department. Thus, department chairs and deans, when evaluating faculty qualifications–especially for part-time faculty–should consult appropriate faculty in the discipline and/or department.

To be qualified on the basis of equivalent experience, instructors must have a documented record of discipline-related practice at a level that ensures mastery of the content of the courses taught and ongoing currency in the field. A determination of qualification by equivalent experience must be supported by evidence, which may include:

- Professional licensure or certification
- Documented excellence in professional practice
- Honors, awards, or special recognition
- Research and publications

### 1B.06   GRADUATE FACULTY (returned to original version 7/09/04; revised 02/09)

**1B.0601 Graduate Faculty** (updated 9/2010; revised by Graduate Council 2/17/2011; approved by Provost 3/11/2011; updated 10/2/2013) FSB 20012 approved by President 5/21/2021.

Full-time faculty as well as adjunct, part-time and emeritus faculty with appropriate credentials at Emporia State University are eligible to instruct graduate courses, to supervise graduate teaching and research, and to direct graduate research, projects, theses, and dissertations.

In considering who will serve these roles within a department, the department faculty should consider the following:

- Faculty's degrees, additional education, and equivalent experience
- Faculty's academic rank
- Faculty's record of graduate engagement, generally in graduate teaching or advising
- Faculty's record of research or creative activity
- Faculty's record of professional service
- Faculty's availability for the role being considered.

### 1B.07   ACADEMIC FREEDOM (FSR 02007 approved by the President 3/25/03)

Emporia State University believes the policies and guidelines developed by the American Association of University Professors, in its *1940 Statement of Principles on Academic Freedom and Faculty Tenure with 1970 Interpretive Comments*, are reasonable and prudent. The University endorses them insofar as they are compatible with the laws of the state of Kansas and the policies of the Kansas Board of Regents in decisions and actions that are pertinent.

### 1B.08   FACULTY PERFORMANCE AND RECOGNITION

**1B.0801  Notification of Faculty Performance and Recognition Policies** (FSB 14108 approved by President 5/01/2015; FSB 18014 approved by President 4/12/2019)

At the time of initial employment (i.e., within 2 weeks of assuming duties), each faculty member who is hired on either a tenure track or a continuous non-tenure track basis shall receive an up- to-date electronic or paper copy of the department's Faculty Recognition Committee document, which explains the policies of the department, school or college (if applicable), and the university regarding faculty evaluation, including retention, promotion, tenure, chronic low performance and corrective faculty development, post tenure review, sabbatical leave, and other policies. Faculty Recognition Committee

At every level in the recognition process a faculty member may withdraw a request for recognition. Such a withdrawal must be in written form.

**1B.0803 Annual Faculty Evaluation** (BOR approved 12/15/94; 3/16/95; FSB 08020 passed by Faculty Senate 4/21/09; approved by President 4/24/09)

It is the Board of Regents policy that the performance of every faculty member is evaluated and that merit increases are based on the annual evaluation of each faculty member's performance. At ESU this process is participatory, cooperative, continuing and meets the following objectives:

1.  To recognize that the education of students is the highest priority of ESU. The education of students occurs in a variety of ways and venues, including the classroom, research laboratories, and libraries. Consequently, individual faculty or units may vary their emphasis on instruction, scholarly activity, and service. Annual evaluations reflect individual faculty assignments.

2.  To involve faculty in the design and evaluation of expectations central to their performance and professional growth.

3.  To provide a documented record of faculty performance to support such personnel decisions.

4.  To recognize special talents, capabilities, and achievements of faculty members.

5.  To develop strategies to link evaluation and its outcomes to assistance and support for growth and development.

Annual faculty evaluations must include but are not limited to: an anonymous rating by students at least once per semester on an instrument that is controlled for initial student bias and other major sources of bias. The instrument measuring student ratings of instruction solicit, at a minimum, students' perspectives on (a) the delivery of instruction, (b) the assessment of learning, (c) the availability of the faculty member to the students, and (d) whether the goals and objectives of the course were met. Printed directions on the rating scale indicate that the information will be used by the faculty member to improve their instruction. Student evaluations of faculty are intended primarily for the faculty members as a means of improving instruction. They are considered only one of a number of factors in the overall evaluation of the faculty.

The department, school or college, and University will use the information to enhance teaching effectiveness. The evaluation instrument is distributed to the classes of the faculty member. Once collected, the instruments are sealed and stored in an appropriate office and not examined by the instructor of record until after grades are reported. After grades are reported, the faculty member and the department chair jointly examine and discuss the

is responsible for initiating the process in the units in the school/college and for ascertaining that all evaluations are conducted appropriately.

5.  Summaries of the findings of the evaluation shall be distributed to (a) the chair being evaluated, (b) the appropriate dean, (c) the Provost and Vice President for Academic Affairs, and (d) the President. Access to the evaluation results of the departmental chairs by parties other than those mentioned above is regulated by KAR 1-13-1a(a)(2); 1-13-1b.

6.  The chair shall be given a copy of the summary before it is finalized and have the prerogative of submitting a written comment which shall become a part of the summary.

7.  Information from the evaluation will be considered in the overall assessment of performance and shall figure in the determination of continuance in the role of chair.

### 1B.0805   Policies and Procedures for Tenure

#### 1B.0805.01   Board of Regents Policy for Tenure (revised 2/05)

1.  After the expiration of a probationary period, teachers or instructors should have permanent or continuous tenure, and their services should be terminated only for adequate cause, except in the case of program or unit discontinuance or under extraordinary circumstances because of financial exigency. (2/19/97)

2.  In the interpretation of the principles contained in paragraph 1 of this policy, the following is applicable:

    a.  The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.

    b.  Beginning with appointment to the rank of full-time instructor or a higher rank, the probationary period should not exceed 7 years, including within this period full-time service in all institutions of higher education; but subject to the proviso that when, after a term of probationary service of more than 3 years in one or more institutions, a teacher is called to another institution it may be agreed in writing that their new appointment is for a probationary period of not more than 4 years, even though thereby the person's total probationary period in the academic profession is extended beyond the normal maximum of 7 years; except when the interests of both parties may best be served by mutual agreement at the time of initial employment, institutions may agree to allow for more than 4 years of probationary service at the employing institution provided the probationary period at that institution does not exceed 7 years. Notices should be given at least 1 year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period. Under unexpected special and extenuating circumstances, prior to the 6th year of service, and at the request of the faculty member and the appropriate dean, the Chief Academic Officer of the University may grant an extension of the tenure clock for a maximum of 1 year. (9-18-97)

    c.  During the probationary period a teacher should have the academic freedom that all other members of the faculty have.

    d.  Termination for cause of a continuous appointment, or the dismissal for cause of a teacher previous to the expiration of a term appointment, shall, if possible, be considered by a faculty committee which will make recommendations to the administration. In all cases where the facts are in dispute, the accused teacher shall be informed before the hearing in writing of the charges against them and should have the opportunity to be heard in their own defense by all bodies that pass judgment upon their case. They may have with them an advisor of their own choosing who may act as counsel. There shall be a full stenographic record of the hearing available to the parties concerned. In the hearing of charges of incompetence, the testimony should include that of teachers and other scholars, either from their own or from other institutions. Teachers on continuous appointment who are dismissed for reasons not involving moral turpitude shall receive their salaries for at least a year from the date of notification of dismissal whether or not they are continued in their duties at the institution.

    e.  Termination of a continuous appointment because of financial exigency should be demonstrably bona fide.

3. Within this general policy, each Regents institution may make such operating regulations as it deems necessary, subject to the approval of the Board.

4. Any tenure approved by the institution shall be limited to tenure for the recommended individual at the institution consistent with the tenure policies of that institution. (Effective 11/14/2002)

5. In exceptional cases, the chief executive officer at a Regents institution may hire a faculty member with tenure without their having completed a probationary period. (6- 29-99)

6. Decisions of the chief executive officer shall be final and are not subject to further administrative review by any officer or committee of the institution or by the Board of Regents. (4-18-47; 2-15-80; 5-15-81; 4-16-82; 1-20-84; 2-16-89; 6-29-95)

**1B.0805.02 University Policies and Procedures for Tenure** (FSB 80004 approved by President12/9/80; FSB 88001 approved by President 10/28/88; FSB 05007 approved by President 5/3/06; FSB 07003 approved by President 2/4/08; FSB 19001 approved by President10/15/2019)

Emporia State University shall award permanent status to faculty members who have been judged, on the basis of academic credentials and systematic annual evaluation as stipulated in this document, worthy of continuous appointment.

<u>Policies for Tenure</u>

To be eligible for tenure a faculty member shall fulfill all the requirements set forth in the sections below:

1. Degree Requirement

The terminal degree or professional certification deemed appropriate by the discipline is the expectation.

2. Professional Expectations

   Expectations for the granting of tenure shall embrace excellence in the areas of teaching, scholarly/creative activity, and service to the University and profession. Such excellence must be demonstratively evident and offered as such by the candidate for tenure.

3. Probationary Period
   a. Probation is a period of annual contract renewal preceding the granting of tenure. The probationary faculty member shall be given every opportunity to demonstrate their suitability for tenure, and shall be judged by the most objective academic standards and processes.

   b. The academic year will be considered the minimal basis for determining a probationary year.

   c. All faculty shall serve a probationary period of 6 years of full-time employment. Normally, this period will consist of 6 regular annual academic year appointments at the rank of assistant professor or higher, plus reappointment for the 7th year.

   In accordance with BOR policy, if an untenured faculty member becomes a parent through birth, adoptive placement, or adoption of a child under the age of 5 prior to May 1st of the fifth year of the probationary period, that faculty member, upon notification to the Vice President for Academic Affairs, shall be granted a one-year delay of the tenure review. Notification must occur within 90 days of the birth, adoptive placement, or adoption. Faculty members retain the right to opt out of this interruption policy.

   Under unexpected special and extenuating circumstances, prior to the sixth year of service, the Vice President for Academic Affairs may grant an extension of the tenure clock for a maximum of one year. Such request shall be routed through the appropriate department chair and dean.

   No more than two extensions of the tenure clock may be granted to a faculty member for any reason. Nothing in this provision shall be construed to guarantee reappointment of an untenured faculty member.

   Systematic evaluations, as set forth later in this document, are conducted each year. The decision to award tenure shall be made during the 6th year of service. In cases where tenure is denied, the 7th year of service is the terminal year of appointment.

   d. Tenure is not granted at the rank of instructor or lecturer or for a temporary or part-time position. Regular annual appointments at the rank of instructor do count, upon promotion, toward meeting the probationary requirements of a higher rank. Service in a part-time position does not count toward the probationary period.

e.  Faculty coming to ESU with prior service at other accredited institutions of higher education at ranks earning tenure at ESU may have some or all of these years of service count toward the probationary period. For persons employed at the rank of assistant professor, no more than 3 years of prior service at another institution may count toward the probationary period. For persons employed at the rank of associate professor, not more than 4 years of service may be counted. For persons employed at the rank of professor, no more than 5 years of service may be counted.

f.  No later than February 1 of each year, the department chair is responsible for informing, in writing, each faculty member of their development, their fitness for their position, and their prospects for attaining tenure.

g.  No later than the 6th year of the probationary period, the department chair shall notify the faculty member in writing either that they will not be recommended for tenure, but that they will be recommended for a 1 year terminal appointment, or that they will be immediately recommended for tenure.

4.  A leave without pay for 1 year will not be regarded as a break in continuous service provided such leave has been taken with prior approval by the President.

5.  Statement of Exception: The minimal expectation for the granting of tenure emphasizes the need for excellence in the areas of teaching, scholarly/creative activity, and service.

To this expectation, there can be no exception. Granting of exception to other eligibility requirements set forth in this document may be made only if the candidate exhibits extraordinary merit, demonstratively beyond the rule of excellence.

<u>Procedures for Granting Tenure</u>

1.  Prior to October 15 of each fall semester, each department shall establish a committee to evaluate candidates who have been identified by the department chair as candidates for tenure. At its discretion a department may utilize a committee already established for matters of faculty recognition (i.e., promotion, merit pay, sabbatical leave) provided that such committee is composed of 3 or more full-time department faculty members. Academic units with multiple departments/divisions may establish one committee that has representation from each department/division (hereinafter "multi-department committee"). A multi-department committee may serve in lieu of a department committee or, at the option of the voting faculty of the academic unit, may review the department committee recommendations on tenure applications.  Subsequent provisions of this policy setting forth the procedures for and obligations of a "department committee" or "committee" shall be interpreted as including any multi-department committee. If the department chooses to establish a specific committee for tenure review, such committee shall be composed of 3 or more full-time department faculty. Whichever the case, the committee utilized shall be formed by democratic procedures. It shall be the responsibility of the committee to make advisory

recommendations, concerning tenure, to the department chair. If a department chair is seeking tenure the recommendations are submitted to the appropriate school/college dean.

2. The committee shall base its recommendation on systematic evaluation of the candidate in the areas of teaching, scholarly/creative activity and service. In addition, the systematic evaluation of the candidate (by the Faculty Recognition Committee and at each additional university level of review) must be aligned with and not violate the terms and conditions of the appointment. The Faculty Recognition Committee document for the department in place at the beginning of faculty employment will be used for tenure and/or first promotion. If a different Faculty Recognition Committee document goes through the approval process and has received final approval by the Chief Academic Officer before tenure and/or first promotion, the faculty member shall have the right to choose which document will be used. The chair of the department will ensure that each newly hired tenure track faculty member will receive the departmental Faculty Recognition Committee document within two weeks of employment.

3. It shall be the responsibility of the candidate to supply the committee with supporting documentation in each of these areas.

    a.  Supporting evidence in the area of teaching may include, but need not to be limited to, self-evaluation, student evaluations, chair evaluations, reports of peer visits and evaluations, and examples of teaching techniques (i.e., tests, syllabi, assignments).

    b.  Supporting evidence in the area of scholarly/creative activity shall include, but may not be limited to, publications relevant to the candidate's discipline, performance or exhibitions, copies of papers presented, reports of research in progress, reports of grants and fellowships, and reports of supervised student research.

    c.  Supporting evidence in the area of service shall include, but need not be limited to, service on academic committees (department, school/college, and University), service to student organizations, recruitment activity, work as a consultant, and service to the profession or community.

    d.  Supporting evidence specifically relevant to each discipline may be requested and/or submitted.

4. The committee recommendation shall be viewed by the department chair. The chair shall notify the candidate in writing of both the committee's and their recommendations no less than 3 working days prior to the deadline set by the dean. The chair also has the responsibility to inform the committee of their recommendation. Before forwarding recommendations, the chair shall give the candidate an opportunity to meet with the committee and/or the chair to resolve any dissatisfaction the candidate may have. After such a meeting, the candidate may request in writing that their candidacy not proceed further.

Such a request shall be honored. If the candidate chooses to proceed with their candidacy, the chair shall keep the committee informed of the response of the dean and the Vice President for Academic Affairs.

5.  If a chair is being reviewed by the department committee their recommendation is submitted to the appropriate school/college dean. The dean shall notify the candidate in writing of both the committee's and their recommendations no less than 3 working days prior to the deadline set by the dean. The dean also has the responsibility to inform the committee of their recommendation. Before forwarding recommendations, the dean shall give the candidate an opportunity to meet with the committee and/or the dean to resolve any dissatisfaction the candidate may have. After such a meeting, the candidate may request in writing that their candidacy not proceed further. Such a request shall be honored. If the candidate chooses to proceed with their candidacy, the dean shall keep the tenure committee informed of the response of the Vice President for Academic Affairs.

6.  The dean of the school/college shall review the recommendations and inform the candidate in writing of their recommendation no less than 3 working days prior to the deadline set by the Vice President for Academic Affairs. The candidate may request in writing that their candidacy not proceed further. Such a request shall be honored. If no such request from the candidate is forthcoming, the dean shall forward their and all previous recommendations to the Vice President for Academic Affairs.

7.  Recommendations concerning the tenure of probationary faculty members will be made to the President by the Vice President for Academic Affairs on recommendations of the dean and of the department, as described in earlier parts of these policies, and in the manner so described.

8.  The Vice President for Academic Affairs shall review the recommendations and inform the candidate in writing of their recommendation before forwarding their recommendation and all previous recommendations to the President of the University.

9.  The President of the University shall make the final decision on a tenure recommendation. If their decision is affirmative, they shall notify the Kansas Board of Regents that tenure be granted.

10. The University's policies and procedures for tenure and reappointment during the probationary period affirm any and all due process rights whether or not such rights are expressly stated.

**1B.0805.03 Reappointment during the Probationary Period** (FSB 75001 approved by President 3/3/76)

The following procedures pertain to relations with individual faculty members during the probationary period and at the time recommendations and decisions are made regarding renewal of term appointments leading to the granting of tenure. These procedures do not apply to special appointments, those clearly designated in writing at the outset as involving only a brief association with the institution for a fixed period of time.

Criteria and Notice of Standards

Faculty members shall be advised, early in their appointments, of the substantive and procedural standards generally employed in decisions affecting reappointment and tenure. Any special standards adopted by a department or school/college shall also be brought to their attention.

Opportunity to Submit Material

A faculty member shall be advised of time when decisions affecting reappointment and tenure are made, and they shall be given the opportunity to submit material which they believes will be helpful to an adequate consideration of their circumstances should such be necessary.

Notice of Nonrenewal

In the event of a recommendation or decision not to renew the appointment, the faculty member shall be so informed in writing, and if requested, shall be advised of the reasons. They shall also have the opportunity to request a reconsideration of the action.

Petition for Review Alleging Inadequate Consideration

The faculty member not being reappointed may expect that any review of their situation, whether through usual grievance procedures or otherwise, shall accomplish the following:

1. Determine whether the decision of the appropriate faculty body was the result of adequate consideration. The term adequate consideration refers essentially to procedural rather than substantive issues. The conscientious judgment of the faculty member's departmental colleagues must be respected if the invaluable tradition of departmental autonomy in professional judgments is to prevail. The committee should not ordinarily substitute its judgment for that emanating from the faculty process.

2. Request reconsideration when the committee believes that adequate consideration was not given. The committee should indicate the respects in which it believes the consideration may have been inadequate.

3. Provide copies of its report and recommendations to the faculty member, the President or other appropriate administrative officers, and others concerned.

Petition for Review Alleging an Academic Freedom Violation

If the faculty member alleges that considerations violative of academic freedom significantly contributed to a decision or recommendation not to reappoint, they should pursue the usual grievance procedures of the University.

<u>Non-Reappointment during Probationary Period</u>

Notice of non-reappointment, or of intention not to recommend reappointment to the governing board, should be given in writing in accordance with the notice of non-reappointment standards.

## 1B.0806   Policies and Procedures for Promotion

**1B.0806.01 Distribution of Promotion Policies and Procedures to Faculty**
All new faculty members employed at Emporia State University shall receive a copy of promotion policies and procedures within 2 weeks of assuming their duties. Criteria are also established by each department/unit.

**1B.0806.02 University Criteria for Promotion** (FSB 82004 approved by President 5/23/85)

Promotion in rank is not a matter of routine, seniority, or time in rank. Rather, it is the recognition of the cumulative professional record of a faculty member as well as their potential for continued growth and contribution. Promotion to the next rank shall be by merit as determined in accordance with the criteria which are presented below.

<u>Assistant Professor</u>

1. Time in Rank: Five years in rank will be regarded as the normal time necessary before an Instructor becomes eligible for promotion to Assistant Professor. At the end of 5 years of professional experience in higher education, promotion will be recommended only on the basis of documented meritorious performance.

2. Degree Requirement: The terminal degree/certification deemed appropriate by the discipline is the minimum expectation for this rank.

3. Exceptions to Above: Early promotions, or promotion in the absence of an appropriate terminal degree, will be considered only when there is acceptable evidence of truly exceptional contributions in teaching, scholarly and/or creative achievements, University service or professional service.

4. Other Criteria: Evaluation for promotion to an assistant professor shall emphasize dedication to and ability for teaching. In addition, the faculty member shall have a scholarly knowledge of disciplines relative to their academic responsibilities and a developing mastery of relevant skills. The candidate shall also show a clear potential for continued professional growth, for making scholarly as well as creative

faculty member may reject an approved plan recommended to aid performance levels, but the faculty member must understand that a sustained overall failure in their professional responsibilities is a basis for dismissal.

VI.  Recommendation for Dismissal

If the chair and either the departmental Evaluation Committee or the school/college/library Performance Review Committee determine that there has been a sustained overall failure in teaching and either scholarly activity or service (i.e., failing in teaching and at least one other area), in 3 consecutive years or 4 out of 6 years, the department chair may recommend to the dean that a tenured faculty member be dismissed, provided the faculty member has had the opportunity for corrective faculty development for the commensurate amount of time (i.e., for 3 consecutive years or 4 out of 6 years). The dean may forward such recommendation to the Vice President for Academic Affairs. In making this determination, the department chair must state the nature of the failure, the reasons for this failure, the number of years that the faculty member has failed, the level of discernible improvement in the faculty member's performance after being notified of any failure in performance, and the extent to which the faculty member has complied with the terms of an approved plan developed to improve the faculty member's performance. If the Vice President for Academic Affairs, upon reviewing the recommendations, agrees with these recommendations, they may recommend to the President that the faculty member be dismissed. If the President agrees and wishes to recommend dismissal, the faculty member may proceed to the dismissal policy.

Should any recommendation to dismiss be brought against a tenured faculty member based on grounds of sustained failure, the reports of the Evaluation Committee(s), Performance Review Committee(s), the annual written evaluations concerning the faculty member, any outside evaluations, and any written response by the faculty member to the charges shall be made available to the faculty committee charged with hearing the dismissal case and any subsequent dismissal or grievance committee.

The finding of failure must neither abuse academic freedom nor be used as a cover for discriminatory, unfair, arbitrary, or capricious dismissal. If a dismissal or grievance committee concludes that such factors were considered in formulating the recommendation to dismiss, the committee shall recommend to the President that the proceeding to dismiss be terminated.

**1B.0906  PROCEDURE FOR FACULTY REVIEW PRIOR TO DISMISSAL FOR CAUSE OF TENURED FACULTY** (FSB 04001 approved by President 11/04/04; FSB 14020 approved by President 5/15/2015; approved as interim policy by President 8/10/20, pursuant to Faculty Senate Bylaws 3AF.02)

A.  Charge

When termination of a tenured member of the faculty is under consideration, a faculty Committee to Hear a Case Regarding the Dismissal for Cause of a Tenured Faculty Member, hereafter referred to as the committee, is established according to the Regents' policy incorporating the 1940 AAUP Statement of Principles of Academic Freedom and Tenure. The formal procedure is commenced by communication to the faculty member by the vice president for academic affairs (VPAA) that termination is under consideration. The VPAA will also inform the faculty member that a hearing will be conducted by the committee, unless the faculty member rejects such a review within ten class days after receiving the statement from the VPAA. The committee shall be constituted and convened by the process indicated below; it represents an independent peer review of the faculty member's case. The charge of the committee shall be to receive evidence at the hearing, to make written findings to fact, and to recommend to the president of the University action concerning the proposed dismissal.

B.    Jurisdiction

The jurisdiction of the committee shall extend to cases involving adequate cause for dismissal of faculty. Adequate causes for dismissal are limited to:

1.    actions that would result in a general condemnation of the faculty member by the U.S. academic community, or

2.    abandonment or substantial and manifest neglect of professional or academic responsibilities, or

3.    chronic low performance as defined in the University Policy Manual, or

4.    causes prescribed by the Kansas Board of Regents.

Adequate cause for dismissal shall be directly and substantially related to the fitness of a faculty member in his or her professional capacity as a teacher or scholar. Dismissal shall not be used to restrain a faculty member in his or her exercise of academic freedom or other rights of American citizens. The jurisdiction of the committee would not extend to financial exigency or program discontinuance unless recommended by a grievance panel.

C.    Composition and Eligibility

The committee shall be composed of six tenured full-time faculty members, none of whom shall be administrators or faculty with administrative responsibilities (e.g., deans, associate deans, department chairs). One of the six shall serve as the non-voting chair. Faculty of the department in which the faculty member holds an appointment shall not be eligible.

D. Nature of Hearing

> The hearing shall be open, unless the faculty member requests it to be closed; however, deliberations of the committee shall be conducted in closed session.

E. Rights of Participants

The effective and equitable discharge of the responsibilities of the committee require the following guidelines to safeguard the rights of principals and committee members and to preserve the autonomy of the process:

1. The charge of the committee and its procedures as defined by action of the Faculty Senate shall not be abridged in any way. Proposed changes in procedures shall require a review of the Faculty Affairs Committee and approval of the Faculty Senate. The committee shall have the right to adopt necessary operational procedures which are not inconsistent with these procedures.

2. The University shall arrange for an outside attorney (which might be an attorney from another Regents' university) to advise the committee as required. Expenses incurred by the committee for the hearing shall be borne by the University.

3. The VPAA will inform the appropriate dean and department chair of each committee member's responsibility for the task of the committee. The VPAA shall confer with the appropriate dean or department chair to discuss how assigned responsibilities for each panel member will be arranged while the panel member is involved with the hearing and committee deliberations. This form of University service must receive positive recognition and shall not jeopardize the faculty member's yearly evaluation for performance, merit pay increase, or promotion.

4. Rights of the parties to the hearing shall include but are not limited to the following:

   a. To be represented by an attorney
   b. To present supporting witnesses
   c. To question opposing witnesses
   d. To make closing statements
   e. To receive written findings and recommendations of the committee and written notice of the President's decision and a full explanation of the reasons
   f. To obtain and/or examine the record of the proceedings

F. Procedures

1. The hearing procedure shall be initiated by a written request submitted by the VPAA to the President of the Faculty within 15 class days of the faculty member's receipt of the statement from the VPAA (i.e., this is only 5 class days beyond the time for the faculty member to reject a hearing). Within 20 class days from the

receipt of such request, the President of the Faculty shall designate a panel of 13 faculty members, by random selection, from a list of eligible faculty. If this random selection does not include at least one member from each college or school, the last name(s) drawn should be removed and replaced with a randomly selected eligible faculty member from the unrepresented school or college. (Although it is recognized they are from separate entities, eligible faculty from the Library will be combined with the School of Library and Information Management in this selection process.) Within 10 class days from the designation of the panel, the President of the Faculty shall call the administration and the faculty member, and/or their respective representatives, together for the purpose of selecting the hearing committee. From the list of 13 names, each party shall remove 3 names, one at a time, in alternating sequence, with the administration striking the first name. From the remaining 7 names, 6 shall be selected by lot; the 7th shall serve as an alternate. Within 5 class days after the committee has been named, the President of the Faculty shall convene the committee and the members shall select one member as the nonvoting chair. Within 2 class days after the selection of the chair, the VPAA shall submit to the chair, a statement of the specific grounds for the dismissal.

2. Within 5 class days from the selection of the chair, the chair shall provide to each party:

      a. a copy of the specific grounds for the dismissal,
      b. a list of the membership of the committee,
      c. a notification of the date, time, and place of the pre-hearing conference.

3. At the pre-hearing conference each party shall provide a list of proposed witnesses to be called and a list of documents to be introduced, with copies available to the other party. The date, time, and place of the hearing shall be determined by the chair and both parties shall be so notified. The hearing shall begin not less than 10, no more than 20, class days after the pre-hearing conference. In a period of time not to exceed 5 class days following the pre-hearing conference, both parties, or their respective representatives, shall confer and assemble a common set of documents, consecutively numbered and with duplications eliminated. An attorney for each party and for the committee may be present at the pre- hearing conference.

4. At the hearing, each party may be accompanied by (1) a representative, who is not an attorney, to serve as an advocate and/or assist in the presentation of evidence, and (2) an attorney who may advise and participate in the proceedings. Both parties, or their representatives, must be present.

5. The chair shall call the hearing to order, summarize the case, establish the order of business, and review the rules. Since the hearing is conducted by peers, the

committee shall not be bound by strict rules of legal evidence; it may admit any evidence it deems to be of value and may exclude evidence judged not pertinent to the case. If the hearing is open, the chair shall have the right to limit the number of observers. Observers shall not participate in any of the proceedings. Witnesses shall be excluded from the hearing room until they testify. Photographs of the hearing room and the participants shall be allowed only when the committee is not in formal session.

a. The administration and the faculty member, in that order, shall make an opening statement and present evidence, which may include testimony by supporting witnesses.

b. The administration and the faculty member shall have the opportunity to question the witnesses and/or present rebuttal.

c. Members of the committee may question the parties and/or witnesses.

d. The parties may be recognized by the chair for the purpose of objecting to any testimony or question on the grounds that it is not pertinent to the case. The chair shall rule on each objection; the chair may consult with the committee and/or its attorney.

e. The administration and the faculty member, in that order, shall be given the opportunity to make closing statements.

f. The administration bears the burden of proof by presenting clear and convincing evidence of the justification for dismissal, unless the justification is the violation of the University Title IX policy.  In that event, the applicable burden of proof is a preponderance of evidence.

6. The chair, may on request of any member of the committee or either party, continue the hearing to a specified date, time, and place. The chair, after consultation with members of the committee, may request the production of additional information and/or invite other witnesses to provide testimony pertinent to the case. Reasonable expenses for outside witnesses, invited by the chair, shall be borne by the University.

7. A sound recording of the hearing shall be available to the parties concerned. A written record shall be made of the hearing. An official copy of the record and supporting documents shall be kept in confidential files in the Office of the President of the University for a period of at least 3 years following these proceedings and may be examined only with the approval of the faculty member, except in the case of a closed hearing for which consent of both parties shall be required. With the consent of both parties a videotape recording shall be made, at the expense of the requesting party.

8. The decision of the committee shall be based upon only testimony and evidence presented at the hearing. The report of the committee shall provide findings of fact regarding the evidence and shall recommend action concerning the proposed dismissal. Its content shall reflect a majority vote of total committee membership. A minority report may be appended.

G. Reports

The decisions of the committee and the President of the University shall be communicated in the following manner: In the case of either an open or a closed hearing, within 20 calendar days from the conclusion of the hearing, the chair shall send the report to the President of the University and to the faculty member; a copy shall be sent to the President of the Faculty, unless the faculty member requests otherwise, in which case only written notice the committee has submitted its report will be sent to the President of the Faculty. Within 20 calendar days from the receipt of the report, the President of the University shall send a written notice of their decision and a full explanation of the reasons to the faculty member; a copy shall be sent to the President of the Faculty, unless the faculty member requests otherwise, in which case only written notice that a decision has been rendered shall be sent to the President of the Faculty. The President of the Faculty shall announce the information received at its next meeting of the Faculty Senate.

H. Class and Calendar Days Defined

As indicated by the academic calendar established by the University, class days include all days that classes are conducted, excluding legal holidays, vacation periods, the period of final examinations, and intersessions; in addition, for the purpose of this policy, summer sessions are also excluded. However, calendar days include any day on an annual calendar excluding days the University is officially closed (e.g., legal holidays); calendar days are used exclusively in the reports section to expedite the conclusion of this process.

## 1B.10   IMPLEMENTATION OF THE KANSAS BOARD OF REGENTS' POLICY ON SOCIAL MEDIA (FSB 14011 approved by President 4/17/2015)

Before any faculty or non-student staff member of the university can be subject to disciplinary action (e.g., suspended without pay or terminated for cause) by the University President of the University President's delegate for being found to have made any improper use of social media under the Kansas Board of Regents' (KBOR) Social Media Policy, it must first be determined that such action is consistent with the First Amendment of the University States Constitution and with principles of academic freedom. This determination is to be made by the University

The percentage of an employee's work time reduction during a furlough shall be matched by an equivalent reduction of the employee's performance expectations for faculty recognition considerations.

Exclusions and Special Circumstances

The following categories of employees are excluded from mandatory furloughs: faculty/staff appointed to less than 50% regular positions, student employees, faculty/staff appointed to temporary positions, and faculty/staff with a visa type of H1-B. In addition, a minimum salary tier shall be established and faculty/staff whose annual base salary is within that minimum salary tier shall be excluded from mandatory furloughs.

Faculty/staff who are 100% grant funded are excluded from mandatory furloughs. Faculty/staff who are funded partially by federal grants, contracts or sponsored projects shall be excluded from mandatory furloughs for that portion of their appointment which is not funded by state funds. (Adjustment shall be made to the split-funded individual's payroll distribution for the furlough impact, reducing state funding charges. The percentage level of effort charged against federally funded projects shall be increased to reflect the appropriate relative effort spent on such sponsored activity, in accordance with OMB Circular A-21 principles.)

## 3C.10 FINANCIAL EXIGENCY (approved by BOR 9/21/79; 5/20/83)

1.  Definition

    Financial exigency is the formal recognition by a Regents institution that known reductions in budget or authorized number of positions have required the elimination of nontenured positions and operating expenditures to such a point that further reductions in these categories would seriously distort the academic programs of the institution; hence, further budget or position reductions would require the nonreappointment of tenured members of the faculty or the failure to meet the standards of notice for nonreappointment of faculty. It is not a requirement of financial exigency that all nontenured positions throughout the University be first eliminated.

2.  Procedure

    It shall be the responsibility of the chief executive officer of each Regents institution, in consultation with appropriate campus groups, to develop a plan for reductions in personnel as necessitated by conditions of financial exigency.

    In the event that financial conditions at a Regents institution may warrant the declaration of financial exigency, the chief executive officer shall notify the Board of that fact and shall provide a complete statement of the circumstances that may warrant the declaration of financial exigency. The statement shall also include a review of all reasonable

alternatives to financial exigency. If the Board and the chief executive officers concur as the existence of a financial exigency, it shall be the responsibility of the chief executive officer to so declare.

It shall be the responsibility of the chief executive officer to review the financially exigent condition with the Board at such times and with such frequency as the Board may specify.

## 3C.11 PERSONNEL RETRENCHMENT POLICY (FSB 76008 approved by President 8/30/77; FSB 79003 approved by President 12/5/79; updated 9/2010; FSB 12010 approved by President 4/26/2013)

Decreases in enrollment, budget reductions, and/or a declaration of financial exigency may lead to personnel retrenchment and the elimination of faculty position at the University.

If it is necessary, for the reasons stated above, for Emporia State University to embark upon personnel retrenchment this action shall be in accordance with the criteria and procedures set forth herein.

For the purposes of this policy, personnel retrenchment may include the following actions:

- Lay-offs: Elimination of non-tenured and/or tenured faculty
- Lay-offs: Voluntary early retirement
- Decreased Appointments: Fractional appointments (e.g., half-time or 75% time)

I.  Preliminary Procedures and Policies

A.  In order for personnel retrenchment to include the elimination of tenured positions, a declaration of financial exigency must be declared in accordance with the Financial Exigency Policy found in the University Policy Manual.

B.  In the event of a declaration of financial exigency or other circumstances warranting a personnel retrenchment, it shall be the responsibility of the President, in consultation with the University Personnel Retrenchment Committee, to develop a plan for reductions in personnel.

C.  General Criteria for Personnel Retrenchment Plan

When it is necessary to eliminate positions and thus terminate faculty, the criteria to be considered follow in order or priority:

1.  The ability of the University to accomplish its stated mission and to continue the quality of its mission and services shall be maintained in making any determination regarding the elimination of faculty.

2.    First, unfunded or vacant positions will be eliminated. Second, positions occupied by individuals holding temporary appointments will be eliminated. (For purposes of this policy, tenured faculty members who participate in a phased retirement program are not considered to be holding a temporary appointment.) Next, graduate teaching assistants in unclassified positions will be eliminated.

3.    When personnel retrenchment decisions affect only individuals in academic probationary positions (i.e., tenure-track faculty), because no declaration of financial exigency has been made, the elimination of positions shall be made in accordance with the following considerations, in order of priority:

    a.    competencies, as defined by AAUP and as needed by the department, and the individual's performance evaluation;

    b.    compliance with the affirmative action/equal opportunity policies of the University;

    c.    length of service at ESU.

4.    When retrenchment decisions may affect all faculty, because a declaration of financial exigency has been made, the elimination of positions shall be made in accordance with the following consideration, in order of priority:

    a.    Contingent faculty (i.e., those neither tenured nor in the tenure track) shall be released before tenure-track faculty.

    b.    Tenure-track faculty shall be released before tenured faculty.

    c.    No termination should be made which would prevent any unit of the University from performing the tasks considered essential.

    d.    Terminations should not be based on the decreasing demand for the services of any unit over less than a 3-year historical period.

    e.    Terminations within a given unit should ordinarily be made according to rank, and within rank according to years of service at ESU.

    f.    Termination should comply with the affirmative action/equal opportunity policies of the University.

D.    Consideration of Alternatives to Elimination of Positions

In developing the personnel retrenchment plan, the President shall minimize the number of positions to be eliminated, to the extent possible, by considering other options including, but not limited to, the implementation of one or more of the following:

1.   Voluntary early retirement or phased retirement options may be developed and/or encouraged by the University.

2.   The Deans of the various schools/colleges and other administrative heads may be encouraged to make genuine efforts to transfer tenured faculty members partially or wholly to other positions in which they can perform competently.

3.   Sabbaticals and leave without pay for retraining should be encouraged to develop new competencies even if they cause temporary weakness (e.g., some essential courses may not be offered for a brief time such as a semester or even a year).

II.   The Initial Personnel Retrenchment Plan

A.   The President shall present to the University Personnel Retrenchment Committee their proposed Initial Personnel Retrenchment Plan (Initial Plan) and the criteria and data upon which it is based. Their Initial Plan shall include the following:

1.   The number of faculty positions to be eliminated from each of the academic schools/college;

2.   The timeline to be followed in processing the cutbacks; and

3.   Such other information as is necessary for the Committee to make a responsible review of the Initial Plan to determine whether it conforms with the personnel retrenchment criteria in this document and serves the best interests of the University.

B.   The standards of due notice of non-appointment stated in the University Policy Manual shall not be violated even during periods of declared financial exigency. Any faculty affected by this policy who so desires may avail themselves of the due process procedures of Emporia State University as set forth in the University Policy Manual.

C.   The University Personnel Retrenchment Committee shall submit in writing to the President any recommendations, along with reasons for those recommendations, the committee may have regarding the Initial Plan.

D.   The President shall respond in writing to the University Personnel Retrenchment Committ4e stating their acceptance or rejection of the committee's recommendations and the reasons for this decision.

III.   Development of the Final Personnel Retrenchment Plan

A.     The President shall present to the Provost and vice presidents of the University, as well as the academic deans, the Final Plan and inform them how it would specifically affect their respective colleges, schools, and/or administrative units.

B.     Each dean shall present to their School/College Retrenchment Committee their proposed plan for personnel retrenchment. The dean's strategy shall include the following:

    1.     The number of positions to be eliminated from each of the departments.

    2.     The timeline to be followed in processing the cutbacks; and

    3.     Such other information as is necessary for the committee to make a responsible review of the plan.

    (The Dean of the School of Library and Information Management shall also present a proposed personnel retrenchment strategy except that, inasmuch as the school does not have separate departments, the dean shall work directly with the school's personnel committee.)

C.     Each School/College personnel Retrenchment Committee shall submit in writing to its dean any recommendations, along with reasons for those recommendations, the committee may have regarding its personnel retrenchment plans.

D.     Each dean shall respond in writing to their School/College Personnel Retrenchment Committee's recommendations, stating the reasons for acceptance or rejection of the committee's plan.

E.     Each dean shall announce to the college's department/division chairs the positions to be eliminated in each department/division and the timeline to be followed n processing the cutbacks.

F.     Each department chair shall do the following:

    1. Consult with the faculty in the department/division, or a representative committee thereof, according to the procedures used in making of recommendations for tenure;

    2. Notify in writing each individual involved of the intention to recommend them for termination, and inform them of the right to be heard before the department committee prior to the forwarding of a recommendation to the dean;

    3. Arrange for each faculty member whose position is to be terminated an opportunity to be heard before the department committee if they so requests; and

4. Finally, send to the dean a written statement of the department's recommendations, setting forth both the names of those individuals involved and the reasons pertaining to each recommendation.

5. A department may propose a plan for fractional appointments and/or voluntary leave without pay as an alternative to the release of any faculty member. Such a plan may be recommended to the President of the University only if all faculty members in the unit who are to participate have agreed to do so. Faculty members who accept a fractional appointment in the event of retrenchment shall retain their full benefits, such as insurance and retirement benefits, and privileges as if they were full-time faculty members.

G. Each dean shall do the following:

1. Consult with the School/College Personnel Retrenchment Committee regarding the recommendations of the departments;

2. Make such revisions in the school/college's personnel retrenchment plan as may be necessary;

3. Provide each faculty member whose position is to be terminated an opportunity to have their case reviewed by the School/College Personnel Retrenchment Committee; and

4. Submit their personnel retrenchment plan to the President of the University.

H. The President shall consult with the University Personnel Retrenchment Committee, review with the Committee the plans of the various schools/colleges, and solicit the Committee's comments and criticisms. The President shall then prepare the Final Personnel Retrenchment Strategic Plan in its final form. The University Personnel Retrenchment Committee shall be given the opportunity to state in writing if it differs with the President's Retrenchment Strategic Plan in any substantial way and the reasons for its disagreement.

I. Any individual affected by modifications in any committee's proposed personnel retrenchment plan has the same right to review at the proper level as those individuals who were affected by recommendations before modifications were made.

J. The President of the University shall respond in writing to the University Personnel Retrenchment Committee regarding its recommendations.

K. The President of the University shall formally announce to the Faculty Senate the Final Personnel Retrenchment Strategic Plan of the University and shall proceed

3-39

to implement the program in accordance with the Personnel Retrenchment Policy and Procedures founds in the University Policy Manual and other relevant operating procedures of the University.

IV.    Retrenchment Committees

A.    The University Retrenchment Committee. This committee shall have the following membership:

1.    The members of the Executive Committee of the Faculty Senate, excluding the President of the University, and any non-faculty employees, shall be members. (The designation of the Executive Committee is only for the purpose of establishing the membership of the University Personnel Retrenchment Committee. The actions of the Personnel Retrenchment Committee shall not be considered actions of the Faculty Senate.)

2.    The Affirmative Action Officer of the University shall be a member.

3.    In addition to the Executive Committee, one elected representative from each of the following, the School of Business; the School of Library and Information Management; the Teachers College; the University Libraries and Archives; and the College of Liberal Arts and Sciences, shall be members.

4.    When the committee is considering actions relating to the potential personnel retrenchment of non-tenured personnel, at least 1 non-tenured, tenure-track faculty shall be a member.

B.    The School/College Personnel Retrenchment Committee(s). The Schools of Business and Library and Information Management; The Teachers College, the University Libraries and Archives, and the College of Liberal Arts and Sciences each shall select a committee of its faculty by a procedure adopted by its faculty. The following stipulations shall apply to the selection procedure:

1.    The dean and associate dean of the school/college and department chairs shall not be a member.

2.    A representative of the Affirmative Action Officer of the University shall be a member.

3.    When the committee is considering action relating to the potential personnel retrenchment of non-tenured, tenure-track faculty, at least 1 non-tenured person shall be a member.

V.      Recall Procedures

Positions added to the University after a period of retrenchment are to be assigned to units on the same basis as other new positions, with the following exceptions:

A.  Special consideration will be given to units which have released tenured faculty members or have adopted a substitute plan to reduce positions by fractional appointments.

B.  The University should make "every effort" to find another suitable position within the institution for the affected faculty member. The position of a tenured affected faculty member "will not be filled by a replacement within a period of 3 years, unless the released faculty member has been offered reinstatement and a reasonable time in which to accept or decline it.

C.  After 3 years, but if within 5 years after termination of tenured faculty an academic unit is granted permission to recruit to fill a new or vacated position, and before the position is advertised, the Provost shall formally invite all former tenured faculty members to apply for the position. Former faculty members who held tenure shall be offered such positions, when qualified. A reasonable time (at least 30 days, but not to exceed 60 days) shall be given in which they may accept or decline the position. It is the faculty member's responsibility to keep the University informed of current contact information in order to receive an invitation to apply.

D.  If an academic unit is reallocated a position after a period of personnel retrenchment and there are no qualified tenured faculty members whom have been released from that unit because of personnel retrenchment, then non-tenured, tenure-track faculty shall have reinstatement rights. If, upon notification, such an individual applies for the reallocated position, and the unit recommends that person for reappointment, the individual shall be offered the position and given up to 2 additional years in building toward tenure if requested by the faculty member. It is the faculty member's responsibility to keep the University informed of current contact information.

E.  Faculty shall be reinstated at their former rank and tenure status and at a salary no less than the existing salary at the time of personnel retrenchment unless salary reductions were implemented across the University.

## 3C.12 TIES BETWEEN CLASSIFIED SERVICE AND UNIVERSITY SUPPORT STAFF (approved by President 11/2013; approved Board of Regents 1/2014)

4-64

**4O.04   GENERAL EDUCATION** (FSR 106 approved 3/21/72; FSB 96004 approved by President 4/16/97; FSB 03003 approved by President 3/30/04; revised 4/10/2015; approved by COCG 1/30/2018)

The General Education Council is charged with the responsibility of formulating and continually reviewing all policies, procedures, and curricula pertaining to the general education program of Emporia State University. Any change in the general education program of the University must be approved by the General Education Council. However, if warranted, the Faculty Senate has the right to consider and override decisions made by the General Education Council.

The Faculty Senate designates the General Education Council as the faculty body responsible for advising the administration concerning policy and procedures affecting the university-wide competency examination requirements.

The General Education Council may direct the Institutional Effectiveness office, or other appropriate agencies, to evaluate the reliability and validity of tests.

The General Education Council designates minimum performance levels.

The General Education Council may establish course performance levels as equivalencies.

The General Education Council may assess the need for competency testing and recommend to the Faculty Senate the expansion, modification, or termination of the program.

**4O.05   CURRICULUM REVIEW PROCEDURES** (FSB 79010 approved by President 6/13/80; FSB 88024 approved by President 5/1/89; FSB 90002 approved by President 3/18/91; FSB 99008 approved by President 2/28/00; FSB 09009 approved by President 2/5/2010; FSB 18020 passed by Faculty Senate 4/16/2019; approved by President 4/26/2019)

The procedure for instituting curricular changes is as follows:

1. The initiator(s) of a curricular change must prepare all recommendations on the University Curricular Change Request form that are available from the office of each school or college dean.

2. Once a proposed change has been approved at all levels and the ESU Curriculum Form has been sent to and processed by the Registrar's office, the process is complete. Until the process is complete, a faculty member, chair, or dean who does not concur with the proposed curricular change may submit a request to the office of the Provost to refer the curricular change request to the Curriculum Review Panel.

4-65

3. If the proposal is for a new degree, a new major, a new program, or a new sub-specialty under an existing degree, it is considered a major curricular or organizational change and must go through Level Two review (see Level Two Curriculum Review Process below). New program proposals may be submitted for an Expedited Program Review (or an Expedited Program Review Package, which would include any new courses or modification to courses that are part of the new program) only if it meets the criteria for an expedited review (see Expedited Review Process below). After the Level Two or Expedited Review process has been completed on campus, the program proposal must then be approved by the Kansas Board of Regents before it goes into effect. The Board requires documentation in accord with the Procedures for Approval of New Programs or Academic Units, copies of which are available from the office of the Provost. Those initiating such requests must provide the full required documentation required when they submit their request to the dean of the initiating school or college. The office of the Provost will coordinate the documentation and submission of any curricular changes requiring Kansas Board of Regents approval. It is the responsibility of the University's representative on COCAO to present the proposal to COCAO, after which it is sent to the Council of Presidents and on to the Board of Regents. All other curricular changes are handled on campus.

4. Other changes not listed above are considered course and program changes. If a proposed course change also affects a degree program, concentration, minor, or certificate program, a separate curricular change form will need to be submitted for each change (1 curricular change request form for the new course and another curricular change request form for the revised program will need to be submitted). However, these changes may be submitted at the same time. Proposed changes encompass two levels of review. Level One curriculum changes encompass any modification of a course that affects only the department where the course is housed and does not require review by the Council on Teacher Education, the General Education Council, the Graduate Council, or the Committee on Advanced Programs. These changes are minor modifications where the course description and course content (including the syllabus) remain essentially the same as when originally approved. These changes do not significantly alter the intent and purpose of the course and do not have implications for another department. They include the following:

- Changing a course number within the same level: lower division, upper division, or graduate. (Must check with Registrar's office to make sure an appropriate number is selected prior to submitting the curriculum change.)
- Changing a course title.
- Changing a prerequisite that exists only within that department. (Must check with the Registrar's office to make sure that the change is compliant with the course management system prior to submitting the curriculum change.)
- Changing the number of hours.
- Deleting a course.

4-66

Only the course identification section (Part I) and the general statement proposal (Part II, A) on the Curricular Change Request form need to be completed.

5. All other curriculum changes belong to Level Two (or possibly Expedited Review), including changing a course number to a different level, changing a course or degree program/concentration/minor/certificate that affects another department, adding a new course (courses that were previously taught under umbrella numbers are considered new courses), an extensive course change is being requested, or the change requires review by either the Council on Teacher Education, the General Education Council, the Graduate Council, or the Committee on Advanced Programs, then full details must be supplied on the Curricular Change Request form (Part II, B). Before any course can be required of any students, full details of the course must be provided on the Curricular Change Request form and that course must have been approved via the curriculum review process.

6. Level One Curriculum Review Process

   All curriculum changes are initiated at the department level (the School of Library and Information Management acts as a department for curriculum review procedures). When the department approves the curriculum proposal, it forwards the proposal to the office of the dean, which in turn directs the proposal through the respective college's or school's internal approval process. If the proposal is approved by the school/college and dean, it will be electronically distributed by the office of the Provost to all deans and department chairs for a review period of 10 working days. The academic deans and department chairs are expected to inform faculty of the proposed curricular changes.

   a. If the office of the Provost receives no written objections to the proposal during the 10 working day review period, the proposal is considered approved. The office of the Provost informs the Registrar's office and the originating dean of the approval. The department completes the ESU Curriculum Form and returns it to the Registrar's office. This form must be received and processed by the Registrar's office before changes can be implemented.

   b. If the office of the Provost receives written objections to the proposal(s) during the 10 day working day review period, the office of the Provost forwards objections to the originating academic unit and the respective dean. Objections are resolved by consensus among the interested parties. Objections that cannot be resolved by consensus are submitted by the office of the Provost to the Curriculum Review Panel for resolution (see #9).

7. Level Two Curriculum Review Process

4-67

All curriculum changes are initiated at the department level (the School of Library and Information Management acts as a department for curriculum review procedures). When the department approves the curriculum proposal, it forwards the proposal to the office of the dean, which in turn directs the proposal through the respective college's or school's internal review process. If 2 or more schools or colleges are involved with initiating the proposed change, then the proposal must be submitted to all deans of the units involved for review by the college/school's curricular review process. For a Level Two proposal, the office of the dean also forwards the proposal to the applicable review body(ies) (e.g., the General Education Council, Graduate Council, Council on Teacher Education, Committee on Advanced Programs) to initiate its review. If the proposal is approved by the school/college, respective dean, and all additional review committees or councils, it will then be electronically distributed by the office of the Provost to all deans and department chairs for a review period of 10 working days. The academic deans and department chairs are expected to inform faculty of the proposed curricular changes.

a. If the office of the Provost receives no written objections to the proposal during the 10 working day review period, the proposal is considered approved. The office of the Provost informs the Registrar's office and the originating dean of the approval. The department completes the ESU Curriculum Form and returns it to the Registrar's office. This form must be received and processed by the Registrar's office before changes can be implemented.

b. If the office of the Provost receives written objections to the proposal(s) during the 10 day working day review period, the office of the Provost forwards objections to the originating academic unit and the respective dean. Objections are resolved by consensus among the interested parties. Objections that cannot be resolved by consensus are submitted by the office of the Provost to the Curriculum Review Panel for resolution (see #9).

8. If a department has final approval to change a course that is required in the program(s) of another department and the second department is substituting the new course for the old course, the second department can submit one curriculum change request that covers all affected programs within that department and that change would be considered a Level One change.

9. If objections cannot be resolved by the two parties, the office of the Provost, the chair, and members of the Curriculum Review Panel will be notified. In addition, the dean(s) and chair(s) of the initiating unit, as well as the initiator(s) will be notified. The chair of the Curriculum Review Panel shall contact the initiator(s) of the curricular change and the group(s) objecting to the change. The chair shall engage all groups involved to attempt to resolve the issue. The Curriculum Review Panel will serve as mediator in the matter.

10. If a resolution is not possible, the matter along with the recommendation from the Curriculum Review Panel will be sent back to the office of the Provost. The President or a designee in the office of the Provost becomes the final authority on the matter.

Deadlines: In order for courses to be listed in the printed class schedule, proposals must be approved and submitted to the office of the provost by April 1 for the change to be effective in the academic year that starts the following July 1.

11. <u>Expedited Review Process</u>

Under rare circumstances a department may need to expedite a new program review to respond quickly to distinct opportunities to meet workforce, economic or other special needs. An expedited review process is designed to allow ESU to review new programs (and any new courses or modification to courses that are part of the new program) within a shorter timeframe, thereby allowing ESU to request an Expedited Program Review with the Kansas Board of Regents.

a. The criteria for an expedited program review are:

   • has a direct and immediate impact on meeting workforce, economic, or other special needs and/or has been directly requested by a corporate, industrial or public entity;
   • is unique within the Kansas Board of Regents university system, or if not unique, that duplication is appropriate; and
   • meets all the requirements of Kansas Board of Regents policy on delivery of academic courses and programs.

b. If a department and their dean believe that their new program meets the criteria for an expedited program review, the department chair should contract the Provost and Vice President for Academic Affairs to confirm that the criteria for an expedited program review are met. Once the Provost and Vice President for Academic Affairs confirms that the proposed program meets the criteria for an expedited program review, the office of the Provost and Vice President for Academic Affairs will initiate a campus-wide curricular review. The campus-wide curricular review process will be as follows:

   • The Office of the Provost and Vice President for Academic Affairs will electronically distribute the proposed program (or program package) campus-wide. The campus community will have 5 class days to pose objections to the proposed program (and/or the new courses or modified courses that are part of the new program). Formal objections should be presented in writing to the Provost and Vice President for Academic

Affairs. On the 4th day of the review period, the Office of the Provost and Vice President for Academic Affairs will hold an open forum to allow entities to voice any objections. Objections raised in the forum must also be submitted in writing to be considered as a formal objection to the proposed program (or its new or modified courses).

· If any formal objections are presented in writing within the 5 day review period, the Office of the Provost will forward objections to the originating department. The opposing entities have an additional 5 days to resolve the conflict. If the 2 entities cannot resolve the conflict within 5 class days, the Curriculum Review Panel will be convened to resolve the dispute. The Curriculum Review Panel will serve as mediator in the conflict, and if a resolution is not possible, the recommendation of the Curriculum Review Panel will be forwarded to the Provost and Vice President for Academic Affairs. The President or designee in the office of the Provost becomes the final authority on the matter.

c. Deadlines for Expedited Program Review: The expedited review procedure can only be initiated when the traditional fall and spring semesters are in session. The 5 class-day review period does not include any breaks in the academic calendar.

**4O.0501   CURRICULUM REVIEW PANEL** (FSB 88025 approved by President 5/1/89)

1. The Academic Affairs Committee of the Faculty Senate shall appoint members to vacancies on the Curriculum Review Panel (hereafter CRP) at its penultimate meeting of the academic year.

2. The CRP shall consist of a faculty chair, 6 teaching faculty, and 2 students. The faculty and student members shall be appointed as follows:

a. One faculty member each from the School of Business, The Teachers College, College of Liberal Arts and Sciences, the School of Library and Information Management.

b. Two members from the teaching faculty at large.

c. At least 4 of the faculty members must be members of the graduate faculty.

d. The President of the Associated Student Government shall submit the names of 2 students for membership on the CRP. The students shall be from different schools/colleges. One student member should be a graduate student. The Academic Affairs Committee will either approve these nominations or ask for additional names.

4-70

e. The chair shall be chosen from the membership of the Academic Affairs Committee, if possible. If this is not possible, any member of the teaching faculty may be appointed chair.

3. All members of the CRP represent the entire University and not just their respective schools/colleges.

4. The 6 faculty members of the CRP shall serve 3 year terms that expire in rotation.

5. The 2 students shall serve 1 year terms.

6. The chair of the CRP shall be appointed for a 1 year term.

7. The chair and all members of the CRP shall be eligible for reappointment.

8. The chair of the CRP shall also serve as secretary.

9. The function of the CRP shall be to provide a University-wide review of objections raised to curricular changes. The CRP, when acting as mediator in disputes over curricular changes, shall be cognizant of the function(s) of the proposing unit(s) and school(s)/college(s), shall determine if there is unnecessary duplication of courses already in existence, and shall be cognizant of the academic standards of the University.

10. The CRP, after serving as mediator in disputes over curricular changes, shall forward a recommendation for approval or disapproval of the proposed curricular change to the Vice President for Academic Affairs.

## 4P.   PROGRAM DISCONTINUANCE POLICY (FSB 84004 approved by President, 3/4/85; updated 9/2010)

The search for knowledge is in itself the means by which such knowledge shall be acquired. The very nature of a University demands that its quest for knowledge constantly directs it to adopt, adapt, or terminate the means (hereinafter termed programs of study) that sustain the mission of the University. Moreover, fluctuations in enrollment, bringing increasing or declining levels of financial support, together with a variety of changing technological, sociological, and other economic pressures underscore the need for program review and adjustment. When such review indicates that an established program of study should be abridged or terminated, it should be recognized that such a decision profoundly affects 1) the mission of the University; 2) the commitment of the University to students enrolled in said program of study; and, 3) the responsibility of the University to those faculty and staff who may be dismissed by program abridgment or discontinuance.

The purpose of the following policy and procedures statement, therefore, is to fulfill ESU's responsibility to the Kansas Board of Regents that each Regents' institution shall have a policy and procedures whereby it may discontinue academic programs of study. ESU's statement shall reflect its commitment to its students and faculty, and its determination to maintain educationally-sound programs of study.

Furthermore, it should be understood, at the outset, that the policy and procedures set forth herein do not affect the Kansas Board of Regents' prerogative to exercise its Program Review and/or Program Discontinuance policies – policies which may take precedence over or mandate the initiation of the policies and procedures established by this document.

Section II. Procedures

A.    Definitions

1.   The Board of Regents Degree and Certificate Program Inventory for Regents Institutions is the basis for defining programs of study at Emporia University.

2.   Program discontinuance may involve the abolition of any academic unit (department, school, or college) in which the degree or certificate is offered. It may also involve the abolition of a particular degree or certificate without otherwise effecting changes in the academic unit.

3.   The determination that a program shall be discontinued is the decision of the President of Emporia State University, upon recommendation from the Vice President for Academic Affairs, that the University shall for bona fide educational considerations, (considerations distinct from and unrelated to those based on financial exigency) discontinue such a program.

B.    Discontinuance Procedures

1.   A recommendation for Program Discontinuance may be initiated by the academic unit, the dean of the college or school in which the program is offered, the Dean of the Graduate School in the case of a graduate program only, or the Vice President for Academic Affairs. Recommendations shall not be submitted nor considered during summer session.

2.   A recommendation for Program Discontinuance must be made in writing to the Vice President for Academic Affairs (if the Vice President for Academic Affairs initiates the recommendation, it shall be made in writing to the President of the University). All such recommendations shall include position statements by the academic units affected. (See Section II.A.2. Any so-designated academic unit may submit a position statement).

4-72

3. Receipt of a recommendation for Program Discontinuance by either the Vice President for Academic Affairs or the President of the University shall mandate on the recipient the following actions:

    a. The recommendation and academic unit position statement shall immediately be transmitted to the President of the Faculty Senate, who, in consultation with the Faculty Senate Executive Committee, shall assign the recommendation to 1 or more of the Faculty Senate's standing committees.

    b. The recommendation shall be given immediate public notice to the University community. A committee of the Faculty Senate shall be convened within 14 days of said notice to hear any faculty, staff, or student testimony or evidence. After hearing such evidence or testimony, the committee shall provide reasonable additional time for commentary and/or discussion.

    c. Within 30 days of the conclusion of the hearing in (b) above, the Faculty Senate, upon advice from its designated committees, shall submit to the President of the University its recommendation for or against the proposed Program Discontinuance. The Faculty Senate recommendation shall speak directly but not exclusively, to the issues of mission, and to responsibilities to students, faculty, and staff, detailing, wherever applicable, the effect in both long range and short range terms of its recommendations. The Faculty Senate shall concurrently transmit its recommendation to the appropriate faculty, chair, dean, and to the Vice President for Academic Affairs.

    d. The Vice President for Academic Affairs shall, within 30 days of the conclusion of the hearing in (b) above, submit a recommendation for or against the proposal to the President of the University. The recommendation shall be in writing and shall speak directly, but not exclusively, to issues of mission, and to responsibilities to students, faculty and staff, detailing wherever applicable, the effect in both long range and short range terms. The Vice President for Academic Affairs shall concurrently transmit the recommendation to the appropriate faculty, chair, dean, and Faculty Senate committees.

    e. The President of Emporia State University, after evaluating all recommendations, shall, within 30 days, make a final decision regarding the recommendation. If the President decides for program discontinuance, their written statement, transmitted to all affected, shall include a date for the program's discontinuance and a statement setting forth initial actions to be

taken in respect to students and faculty affected by the program's discontinuance.

C.   Rights of Students

1.   A decision to discontinue a program shall normally carry a 3 year phase-out period. That period shall begin with the date announced by the President of the University (Section II.B.3.e.)

2.   Students in the program shall be notified to complete their programs within the phase-out period. If it becomes impossible for students to complete their degree programs within the phase-out period, the University shall make every reasonable effort to assist the students. Such efforts may include but are not limited to 1) permitting the student to take work in related departments; 2) assisting, if possible, the student in completing his program at another institution; and 3) permitting special graduate-level supervision, administration, and examinations by qualified faculty at other institutions.

D.   Rights of Faculty

1.   Termination of an appointment with continuous tenure, or of a probationary or term appointment before the end of the specified term, may occur as a result of Program Discontinuance.

2.   The Vice President for Academic Affairs, upon recommendation of the appropriate dean, shall recommend to the President of the University which faculty members within the discontinued program shall be dismissed.

3.   Termination of appointments under provisions of Program Discontinuance shall involve consideration including but not necessarily limited to those listed below:

   a.   Reasonable efforts shall be made to fulfill contractual term agreements with temporary or probationary faculty.

   b.   The University shall make every reasonable effort to offer each tenured faculty member another suitable position. The offering of another suitable position, under provisions of Program Discontinuance, which may or may not involve matters of transfer of tenure and/or rank shall be determined by consultation among the faculty member, the academic unit or units involved, and administrative heads at the unit, school, college, and University levels. Such transfers, however, shall not displace other tenured or probationary faculty in the unit receiving the transfer.

   c.   Tenured faculty scheduled for dismissal shall be retained as long as

program needs dictate during the phase-out period. Faculty so retained shall be accorded the same rights and privileges (e.g., salary adjustment) as other faculty.

   d. Tenured faculty shall be retained in favor of probationary faculty unless program needs dictate preferential treatment of probationary faculty.

Section III. Appeals

A.   An academic unit which has a program under consideration for discontinuance may appeal to the President of the University for a reconsideration of a decision to discontinue or not discontinue a program. Such an appeal must be made in writing no later than 15 days after the President issues the statement noted in Section II.B.3.e. The President shall respond in writing to the appeal within 15 days after receiving it.

B.   Due process must be scrupulously followed during Program Discontinuance. All of the rights and privileges of the faculty member to seek remedy for an alleged infringement of academic freedom or violation of established University tenure policies and procedures that now provide faculty access to the University grievance procedures shall also apply to such allegations regarding actions taken by the University under Program Discontinuance. A faculty member may appeal the President's decision to dismiss through utilizing the University's grievance procedures. Such appeal shall be made in writing, and shall be filed within 30 days of the date of notification. The appeal may be based only on the grounds that 1) the dismissal was based on a statutory or constitutionally impermissible reason, or 2) the procedure surrounding the dismissal was improper. Improper procedure includes (but is not limited to):

   a. Violation of the procedures outlined in this document for arriving at the recommendation of discontinuance of the program in question. Such appeal, however, shall not address the substance of the recommendation.

   b. A violation of the procedures outlined in this document for arriving at the recommendation of non-reappointment of the individual.

   c. Use of incomplete or erroneous data or information in the decision-making process by the President that led to the dismissal; that is, that the President had no basis in fact for selecting the appellant for dismissal.

   d. Lack of a reasonable effort to place the faculty member in another suitable position in the University before the notice of intent to dismiss. Where the

4-75

basis of the appeal is statutory or constitutional impermissibility, the burden of proof is on the faculty member; where the basis of appeal is improper procedure, the burden of proof is on the President. The faculty member shall have access to all relevant information in the possession of the administration to aid in preparing the case based on any of the grounds listed above.

Exhibit 3

# KANSAS BOARD OF REGENTS
## MINUTES
### January 20, 2021

The January 20, 2021, meeting of the Kansas Board of Regents was called to order by Chair Bill Feuerborn at 1:00 p.m. This was a virtual-only meeting, and proper notice was given according to law.

MEMBERS PRESENT:              Bill Feuerborn, Chair
                             Cheryl Harrison-Lee, Vice Chair
                             Shane Bangerter
                             Ann Brandau-Murguia
                             Mark Hutton
                             Shelly Kiblinger
                             Jon Rolph
                             Allen Schmidt
                             Helen Van Etten

## ANNOUNCEMENT
Chair Feuerborn stated that due to the Shawnee County emergency order issued November 12 [and extended January 14], the Board meeting is being conducted pursuant to the Attorney General's regulation for virtual-only meetings. He asked all participants to place their microphones on mute when they are not speaking to allow listeners and observers to hear the meeting unimpeded. Chair Feuerborn stated that participants should ask to be recognized if they have a question or comment and when recognized, the participant should state their name and title so he or she can be identified by the audience. Chair Feuerborn noted for each action item a roll call vote would be taken to be clear how each Regent has voted. However, a roll call vote will not be taken for the approval of the minutes and no motion is needed to adjourn the meeting. It was also noted that there will be no opportunity for public comment during this meeting and no executive session is scheduled.

## PLEDGE OF ALLEGIANCE
The Pledge of Allegiance was recited.

## APPROVAL OF MINUTES
Regent Kiblinger moved that the minutes of the December 16, 2020 meeting be approved. Following the second of Regent Harrison-Lee, the motion carried.

## PRESENTATION

### PRESENTATION ON GEORGIA STATE UNIVERSITY'S STUDENT SUCCESS INITIATIVE THAT HAS ELIMINATED ACHIEVEMENT GAPS BASED ON RACE, ETHNICITY, AND INCOME
Dr. Mark Becker, President of Georgia State University, presented information on Georgia State's student success program. Georgia State University comprises six campuses with its main campus located in downtown Atlanta. The five suburban campuses offer associate degrees and its main campus, which is classified as a R1 research university, offers bachelor's degrees and advanced

degrees. Over 54,000 students are enrolled at Georgia State, and the University has one of the most diverse student bodies in the country. President Becker noted the racial mix within the student body is balanced with no majority group and is similar to the racial mix of the State of Georgia. Dr. Becker also noted that 60 percent of the University's students are Pell-eligible.

Dr. Becker stated Georgia State has implemented a model, as part of its strategic plan, that has been successful in helping students from all backgrounds succeed and graduate in record numbers. The model is student centered and data driven. However, President Becker noted the success of the model only occurred because the University made significant shifts in academics, advising, and student services.

Under academics, the University realized that freshmen were feeling overwhelmed on a large campus, so strategies were introduced to connect students to each other and to the University. Dr. Becker stated when students register, they are required to enroll in one of seven meta majors: STEM (science, technology, engineering and math), Arts & Humanities, Health, Education, Policy & Social Science, and Exploratory. Once students have selected their meta-major, they are given a choice of several block schedules, which are pre-populated course timetables including courses relevant to their first year of study. On the basis of their timetable selection, students are assigned to Freshman Learning Communities consisting of 25 students who are in the same meta major and take classes according to the same block schedules. Dr. Becker noted the curriculum in these pathways helps students decide what degree path they want to pursue. He also stated that the University uses predictive analytics to identify students admitted to the fall freshman class who are academically at risk and require these students to attend their Summer Success Academy, which includes many different student support services. President Becker reported that students who have gone through the Academy are better academically prepared and have a high retention rate. Dr. Becker also discussed the University's academic coaching and peer tutoring efforts.

When it comes to academic advising, Dr. Becker stated the University moved to centralized advising for the freshman and sophomore years because under the old system, the data showed that students were not getting the advice they needed to make good decisions, resulting in students taking classes they did not need or staying in a major that was not a good fit for them. Georgia State University's Advising Center employs professional advisors who are specialized in the different academic pathways. Their advising system uses predictive analytics and contains more than 800 alerts to track student activities and identify at-risk behaviors. When an alert is flagged by the system, both the advisor and student will get a message, which allows the advisor to contact the student in a timely manner. The advisor and student can then discuss any issues and determine the best course of action to help the student.

President Becker then discussed changes that Georgia State has implemented in its student services. Based on its data, the University noticed that hundreds of students who were admitted to the University were not showing up to the campuses. The University discovered that barriers like completing the FAFSA were preventing some students from starting college. To address these issues, the University began using an AI communication system. The system integrates university data with required tasks that students need to complete. Dr. Becker stated the system sends a text to students if the data indicated that they have not completed a required task such as submitting their FAFSA. The AI system then sends those students information about applying for financial

aid and a step-by-step process on how to complete the form. Dr. Becker noted that students who have completed a task would not receive any notification. He also stated that the AI system is built to address a large range of issues, challenges, and questions that students may have, and it can answer an inquiry within seconds of receiving it. However, if the student asks a question that the system does not recognize, the system forwards it to a person for follow up. President Becker stated another student service that the University implemented was retention grants. These grants are provided to junior or senior students who are facing financial difficulties that may prevent them from graduating.

President Becker stated that over the last twelve years, the University has dramatically increased graduation rates and eliminated disparities because of the changes it implemented. He spoke about the importance of having strong leadership and noted that Georgia State has a Senior Vice President who is charged to deliver the Student Success Initiative. He also stated that the model can and has been replicated at other institutions and that institutional leaders can reach out to the University's National Institute for Student Success for more information on Georgia State's model.

Regent Harrison-Lee thanked Dr. Becker for his presentation and asked whether the University had difficulty scaling the programs that were either implemented or changed. Dr. Becker stated that in order for a university to be successful with this model, the president needs to be personally involved and committed to the process because there will be push back. Regent Hutton asked about Georgia State's admission policy and level of academic support that students require. Dr. Becker stated that Georgia State admits almost all students who apply because they are either enrolled at its main campus or at Perimeter College, which offers associate degrees. He also noted that the University successfully replicated its model at Perimeter College after the two entities were consolidated four years ago, which resulted in higher graduation rates and the elimination of achievement gaps based on race, ethnicity and income at the College. President Becker stated the Summer Success Academy is a valuable intervention tool, but the University is only able to enroll the bottom five percent of the freshman class because of financial constraints. The Board also discussed the advising system and how Georgia State coordinates with local high schools. Chair Feuerborn thanked Dr. Becker for his presentation on Georgia State's student success model.

(PowerPoint filed with Official Minutes)

## GENERAL REPORTS

### REPORT FROM CHAIR
Chair Feuerborn welcomed everyone back from their holiday break. He stated that as the spring semester begins, the higher education system will still face challenges related to the COVID-19 pandemic. However, he is optimistic that the vaccine, which is being distributed in phases, will reduce the number of COVID cases in Kansas over time.

### REPORT FROM PRESIDENT AND CEO
President Flanders reported that Board staff has begun compiling data for the first *Building a Future* report, which will be presented to the Board next month. He stated that since this is the first year of the strategic plan, the report will contain baseline data for most of the metrics. He

also noted that under Pillar II the institutions are selecting three to five programs that meet the sustaining wage and high demand criteria, and those programs will be listed in the first report.

REPORT FROM SYSTEM COUNCIL OF PRESIDENTS
President Rittle reported that the System Council of Presidents received an update from the System Council of Chief Academic Officers regarding systemwide transfer, the Ad Astra Micro-Internship Program, and the College Board CLEP report.  President Flanders then reminded the CEOs that each institution must submit three to five programs that meet the sustaining wage, high demand criteria for the Talent Pipeline metric in the new strategic plan, *Building a Future*, and noted the first report of the new plan will be presented to the Board in February. The Council also received an update from colleges on their progress to align spring breaks.  President Genandt reported the technical colleges will align with the university spring break schedules that were approved last month.  President Rittle stated that the majority of community colleges will be in alignment by 2023.

REPORT FROM COUNCIL OF PRESIDENTS
Interim President Muma presented the Council of Presidents report.  The Council received reports from the Council of Chief Academic Officers, Council of Business Officers, Council of Student Affairs Officers, Council of Government Relations Officers, and the Council of Chief Diversity Officers.  The Academic Officers reviewed several programs and approved multiple program consolidations requested by Pittsburg State University.  The Business Officers continue to monitor funds associated with the COVID-19 pandemic and reported that the leave provision in the Families First Coronavirus Response Act expired on December 31, 2020 and was not extended. The Government Relations Officers reported on the start of the legislative session, and the Student Affairs Officers discussed student programs that have been eliminated because of the pandemic and the impact of the Governor's proposed budget for higher education.  The Diversity Officers will discuss their strategic initiatives during a roundtable discussion on February 10.  They also reported that the Michael Tilford Conference will be held at the University of Kansas this year. The Council then discussed the state's vaccine distribution phases and expressed their disappointment that faculty and staff at the higher education institutions were not included as a priority group.

The Council of Presidents approved the following degree programs: 1) Emporia State University's Bachelor of Arts in interdisciplinary Entrepreneurship, and 2) Pittsburg State University's Associate of Applied Sciences in Career & Technical Education.  These programs will be forwarded to the Board for consideration at a future meeting.

REPORT FROM COUNCIL OF FACULTY SENATE PRESIDENTS
Aleks Sternfeld-Dunn reported that the Council of Faculty Senate Presidents discussed the proposed temporary amendments to the Suspensions, Terminations, and Dismissals policy, which was discussed at the Governance Committee meeting.  The Faculty are deeply concerned with the language in the policy and are unanimously against its adoption.  They believe the proposed amendments will essentially suspend tenure for a year and will set a dangerous precedent moving forward.  The Council stated that the policy will bring unwanted national attention and may negatively impact recruitment efforts at the universities.  They believe implementing the policy will damage faculty morale and lead to numerous lawsuits.  Dr. Sternfeld-Dunn reported even

though this is a temporary policy amendment, the Council is concerned that it may become a permanent policy in the future. The Faculty also believe there are other options the Board and universities could deploy to address the financial issues at the universities. Dr. Sternfeld-Dunn noted that each of the universities already have a financial exigency policy and a chronic low performance of faculty policy. The Council asked the Board to either table the proposed policy amendments so that more discussion can take place or vote against its implementation.

## REPORT FROM STUDENTS' ADVISORY COMMITTEE

Rija Khan presented the report for the Students' Advisory Committee. The Committee discussed its legislative items for the students' Higher Education Day at the Statehouse and the Board's draft freedom of expression statement. The Committee reported that it would like the freedom of expression statement to apply to all individuals on the campuses and not just the students. The students feel it is important to have one statement for everyone and plan to submit their recommendations to Board staff.

## REPORT FROM THE COMMUNITY COLLEGES

President Rittle stated that as the community colleges begin the spring semester, they will be implementing many of the same COVID-19 procedures that were used during the fall semester. Some of the colleges will offer COVID-19 testing to students when they return to campus including the students who will be staying in the dorms, and many are implementing mask requirements. Regarding vaccine distribution, President Rittle reported that the colleges are working with their local county officials to help determine when their faculty and staff will be eligible to receive the vaccine. President Rittle also reported that the Kansas Jayhawk Community College Conference moved the majority of the fall sports to the spring semester. Competitions will begin on February 5 and the colleges are working to accommodate the student athletes' academic needs.

## REPORT FROM THE TECHNICAL COLLEGES

President Genandt reported that the technical colleges have started their spring semester and the majority of their classes are being taught in-person. Some colleges are offering online and hybrid options specifically for general education courses or lectures. President Genandt stated that secondary student enrollments are slightly down because of scheduling changes at the high schools and because of restrictions on in-person recruiting. Some of the colleges were able to conduct virtual recruiting events but those were not as effective as in-person events. Additionally, President Genandt reported that the same safety and COVID testing procedures are being used this semester.

## REPORTS FROM THE UNIVERSITY CEOS

Chancellor Girod reported that classes began at the KU Medical Center on January 19 and will begin at the Lawrence and Edwards campuses on February 2. Spring break was incorporated into the winter break schedule for the two campuses, which is why they are starting later. The Chancellor stated that the processes and protocols related to COVID will be the same as last semester's including mask mandates and social distancing requirements. Regarding COVID testing, all the campuses are requiring entry testing for anyone returning to campus so that positive cases can be identified. Testing has already taken place at the Medical Center and will be completed by February 9 for the other campuses. Dr. Girod stated that at the end of last semester,

the University sent test kits home with the students who will be returning to the dormitories and Greek housing facilities.  With regard to class offerings, the University will continue to have a mix of in-person, hybrid, and remote learning options.  Chancellor Girod reported that the University is prepared to help with the distribution of the COVID-19 vaccine and noted that several hundred of the University's pharmaceutical students are certified to give vaccinations.  The University will continue to work with the Douglas County Health Department and will offer to assist if needed.  Additionally, Chancellor Girod reported that earlier this month the University launched the Center for Certification & Competency-Based Education.  The Center will develop a framework to gather information about the knowledge, skills and dispositions that employers desire from workers in particular fields, assess the competencies that learners gain, and validate that learners have mastered certain competencies so businesses can be confident that employees will be successful in their jobs.  Dr. Girod stated Diane DeBacker and Neal Kingston will lead this new Center.  Chancellor Girod also acknowledged the work of Dr. Barney Graham, who is the NIAID Deputy Director of the Vaccine Research Center and led the design team of the COVID-19 vaccine.

Emporia State University will begin its spring semester on January 25.  President Garrett stated like many of the other universities, ESU adjusted its academic calendar to eliminate the traditional spring break week in March.  Instead the University extended the students' winter break and incorporated a few short breaks during the spring semester.  President Garrett expressed her disappointment that the State did not prioritize higher educations' faculty and staff in the early vaccine distribution phases and noted that employees who do qualify for the early stages are encouraged to get the vaccine.  President Garrett reported that ESU will operate in the same manner as it did last semester regarding safety protocols and COVID-19 testing.  The teaching formats will also be similar with 74 percent of classes being taught in-person, 20 percent being taught in a hybrid format, and six percent being taught completely online.  President Garrett also announced that ESU's Provost, David Cordle, is retiring and that the University is conducting a national search to fill the position.

President Myers reported that students at Kansas State University will start the spring semester on January 25.  Classes will be conducted entirely online for two weeks to help mitigate the spread of COVID-19 in the community.  President Myers stated that student services such as on-campus housing, libraries, recreation centers and the Lafene Health Center will be operational on January 25, and that the University plans to return to the hybrid and in-person teaching modalities used in the fall semester after the two-week period on February 8.  He also reported that KSU has expanded its symptomatic and asymptomatic testing procedures.  This semester the University will set up testing sites in the Student Union and dormitories including Greek housing, which are more convenient locations for students.  KSU has also offered to help the county with vaccine distribution if it is needed.  Additionally, President Myers announced that in 2020 the University's School of Engineering graduated a record-setting 782 students.  President Myers stated the increased number of graduates over the years is a direct result of the state's Engineering Initiative, and he hopes the Legislature will renew the Initiative, which is set to expire in 2022.

Pittsburg State University began its spring semester this week. President Scott noted that the University decided to adjust its academic calendar to move the traditional March spring break to the end of the semester.  With this adjustment, the PSU will end its semester early on May 7.  President Scott spoke about the impact of COVID-19 including the loss of life within the campus

community. PSU continues to work with its local health department on safety protocols for the campus. President Scott noted that the health department supports its plan for in-person instruction, which will be 57 percent of its classes. He also announced that his President Council meetings are in-person because he believes that if the students, faculty, and staff are meeting in-person then the leadership of the University needs to do the same.

Interim President Muma reported that Wichita State University developed its COVID-19 protocols last summer for the fall and spring semester. In order to mitigate the spread of the virus, WSU will begin classes on February 1, and courses will be offered in several formats: in-person, online, and hybrid. Dr. Muma stated out of an abundance of caution and concern for the health, safety, and well-being of the entire campus community, the University has eliminated its traditional spring break in March. The last day of the semester will be May 6 with finals taking place the following week. Dr. Muma noted that WSU has scheduled its May commencement ceremony for May 15, but the date and format are subject to change. Dr Muma reported that the University's Student Government Association has designated two weeks during the semester as wellness weeks. During this time, information and resources will be promoted, such as counseling, testing, and staying connected with friends and classmates. Regarding COVID testing, WSU's Molecular Diagnostic Laboratory is able to process 3,000 specimens a day from individuals on the WSU campus and from the community at large. The Lab is able to produce results within 24-hours or less.

President Mason reported that Fort Hays State University did not adjust its academic calendar for the spring semester and noted that classes started earlier this week. She stated that when the University returned from its fall semester break there were two weeks left in the semester and only three students were in isolation and one student was in quarantine. The testing protocols for the spring semester include voluntary re-entry testing, surveillance testing, and symptomatic testing. Dr. Mason stated that the University worked with its local county health administrator to gain access to vaccines for its student health employees, nurses, and allied health students who will be in clinicals. She reported that the Fort Hays State Student Health Center is applying to become an approved vaccination site. President Mason also reported that the University's internal critical incident group and external medical advisory group continue to be active.

<u>BREAK</u>
The Chair called for a ten-minute break at 3:18 p.m. and resumed the meeting at 3:28 p.m.

## **STANDING COMMITTEE AND OTHER REPORTS**

<u>ACADEMIC AFFAIRS</u>
Regent Kiblinger presented the Board Academic Affairs Standing Committee report. The Committee approved the University of Kansas' request to seek accreditation for its Bachelor of Science in Interior Architecture, which is on the Board's consent agenda. Board staff presented the Qualified Admissions report, which contained data from the 2019-2020 academic year. Fort Hays State University and the University of Kansas presented information on their low enrollment programs. These programs will be placed on the Board's February agenda for discussion and action. The Committee also discussed revising Board policy to address cases when a university wants to offer an associate degree. The proposed revision would allow the two-year colleges the

Kansas Board of Regents                     - 8 -                     January 20, 2021

opportunity to provide written feedback during the approval process.  Regent Kiblinger noted the Committee will continue to discuss the approval process at a future meeting.

FISCAL AFFAIRS AND AUDIT
Regent Rolph presented the Fiscal Affairs and Audit Standing Committee report.  The Committee received its annual update on the state's investment in the following research programs:  Kansas State University's Veterinary Medical Center, Kansas State University's Global Food Systems, Wichita State University's Aviation Research, and the University of Kansas Medical Center's Cancer Center.  Representatives from each university discussed how the state's investment has impacted their programs.  Each of the internal auditors at the state universities presented an annual report to the Committee.  The auditors explained how they are functioning under current circumstances, reviewed their university's transactional financial activity and internal controls, and discussed how their staff are being trained to reduce findings.  The auditors are also looking at ways to keep IT systems secure and are monitoring Title IX processes.  Regent Rolph noted the Committee encouraged the auditors to contact them directly about any concerns on their campuses.  Director Bristow then provided the Committee with an overview of the biennial facilities report, which is on today's Board agenda, and the Committee heard from Fort Hays State University, Wichita State University, Kansas State University, and the KU Medical Center on how the campuses plan to correct their audit findings in this year's state financial audit.

GOVERNANCE
Regent Feuerborn reported the Governance Committee reviewed a new Board policy that outlines the Board's involvement when a state university changes from one athletic conference to another.  The policy will be placed on the Board's February agenda for consideration.  The Committee also reviewed and approved a new temporary COVID-19 related policy that will provide an additional tool for addressing financial difficulties and low enrollment on the state university campuses.  Regent Feuerborn then amended the agenda to place the proposed policy on today's agenda immediately before the Wichita State University Presidential Profile item, which will make the proposed policy the new item D.1. of the Discussion Agenda.  Regent Feuerborn then reported that the Committee discussed changes to the annual CEO assessment tool.  Data related to the Board's new strategic plan, *Building a Future*, will be incorporated into the tool, and each CEO is being asked to address their university's data in their self-assessments.  The Committee also received the annual campus safety and security reports from Pittsburg State University, the University of Kansas, and the University of Kansas Medical Center and approved a new restricted access area for KU's Lawrence campus.

**APPROVAL OF CONSENT AGENDA**
Regent Kiblinger moved, with the second of Regent Van Etten, that the Consent Agenda be approved.  On a roll call vote, the following Regents voted affirmatively to adopt the motion:  Regent Feuerborn, Regent Harrison-Lee, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Bangerter.  The motion carried.

*Academic Affairs*

> ### ACCREDITATION FOR BACHELOR OF SCIENCE IN INTERIOR ARCHITECTURE – KU
> The University of Kansas received approval to seek accreditation for its Bachelor of Science in Interior Architecture with the Council for Interior Design Accreditation. The estimated cost for accreditation is between $4,400 to $7,300 with an annual accreditation fee of $2,200.

## CONSIDERATION OF DISCUSSION AGENDA

*Presentation*

### UPDATE FROM THE KANSAS INDEPENDENT COLLEGE ASSOCIATION
Matt Lindsey, President of the Kansas Independent College Association, presented an update on the Kansas independent colleges. The independent colleges are private institutions that are exempted from the Kansas Private and Out-of-State Postsecondary Educational Institution Act, which the Board administers. All the independent colleges offer undergraduate degrees, have open admissions, and are domiciled in Kansas. The institutions receive no state support, but students are eligible for some state-based student aid funds. Mr. Lindsey reviewed enrollments, student demographics, the number of degrees and certificates awarded, and student debt rates for these institutions.

(PowerPoint filed with Official Minutes)

*Academic Affairs*

### LOW ENROLLMENT PROGRAMS REVIEWED UNDER STRATEGIC PROGRAM ALIGNMENT – KSU & WSU
Daniel Archer, Vice President for Academic Affairs, stated that in June 2020, the Board endorsed a plan to review low-enrollment programs under its strategic program alignment policy. A low-enrollment undergraduate program is defined as a program with less than 25 juniors and seniors majoring in it. He noted that 60 programs at the state universities were identified as low-enrollment and the Board directed the universities to assess these programs based on the following criteria: essentiality, productivity, and cost effectiveness. Dr. Archer stated that Kansas State University and Wichita State University have completed their internal review of their programs and will present their recommendations. Dr. Archer noted that under the strategic program alignment policy, the Board decides the final outcome of these programs.

Provost Taber reported that Kansas State University reviewed seven programs under the strategic program alignment: Associates in Applied Business, Bachelors in Humanities, Bachelors in Physical Sciences, Bachelors in Medical Laboratory Science, Bachelors in Statistics, Bachelors in American Ethnic Studies, and Bachelors in Gender, Women, & Sexuality Studies. Through its review, the University considered the Board's minima for majors and graduates, the interdisciplinary nature of each program, its contribution to general education, its contribution to KSU's mission, and its financial impact (student credit hours produced). He also noted that over

the last five years, KSU has eliminated 15 programs through its program review process. Provost Taber then reviewed each of the University's recommendations for the programs currently under review.

The Bachelors in Humanities and Bachelors in Physical Sciences are both interdisciplinary courses that do not have faculty solely dedicated to them. Neither of the programs cost the University additional funds to operate and both bring in tuition revenue. Provost Taber stated the strength of these programs is that they offer a pathway to graduation for students who are undecided on a major, which is why KSU recommends continuing both of programs. The Bachelors in Medical Laboratory Science is another interdisciplinary course that has a slight cost associated with it because it has a part-time student advisor. Provost Taber stated that students who graduate from this program have 100 percent placement with excellent salaries. The University believes with enhanced marketing, it can grow enrollment in this degree program and therefore KSU recommends continuing the program. The Associates Degree in Applied Business started in 2019 and is a pathway course to the University's Bachelors in Applied Business and Technology Management. All the courses in the Associates Degree count toward the bachelors program, and the program adds no additional cost to the University. KSU recommends continuing this program. The Bachelors in Statistics is a revenue earner for the University because it is part of the general education curriculum that nearly every major uses. Provost Taber noted that students also have a variety of job opportunities upon completion of the program, which is why KSU recommends continuing the program. Provost Taber reported that the Bachelors in American Ethnic Studies and Bachelors in Gender, Women and Sexuality Studies are both are interdisciplinary programs. He stated that both departments offer their own courses, but other departments can offer courses in each major. The two Departments contribute to the general education mission for diversity and supports the University's mission on diversity and inclusion. Regarding costs, both departments are small and have a slight net gain revenue. Provost Taber stated that KSU believes these programs enrich the University even though their graduation rates are low and because of those reasons, the University is considering combining the two programs. Provost Taber stated faculty will begin the process of looking at the two degrees and the options for combining the departments. He stated that fall 2022 is the estimated timeframe to complete the process.

Regent Kiblinger thanked Provost Taber for including the financial and enrollment information in his presentation. She then expressed her concern that the recommendation language on the Bachelors in American Ethnic Studies and Bachelors in Gender, Women and Sexuality Studies is vague on whether KSU is going to merge these two programs. She is also concerned about the long timeline. Provost Tabor stated that the faculty are looking at the plan now, but it does take time to combine two departments because programs will need to be discontinued and new programs will need to be approved. He also noted that KSU wanted to hear from its faculty before committing to the merger, but he believes the merger will take place after the review process. Regent Hutton asked Provost Taber to provide more information to the Board on the 15 programs that were eliminated. He wants information on any changes in faculty and the overall cost savings. Regents Harrison-Lee and Van Etten also expressed their concerns with the vague language and long timeline for the merger. Regent Harrison-Lee noted that the pandemic has shown that university leaders can make important impactful decisions very quickly that produce immediate change. President Myers stated he understands the Regents concerns but noted the internal processes at the University are important especially when combining departments. Regent

Kansas Board of Regents                    - 11 -                    January 20, 2021

Harrison-Lee stated she believes the faculty review is a critical part of the process and that it should not be overlooked but would like KSU to bring a tighter timeline on this process back to the Board this fall. Regent Kiblinger then moved to accept KSU recommendations with the following amendment: the University will move forward with merging the Bachelors in American Ethnic Studies and Bachelors in Gender, Women and Sexuality Studies. KSU will also provide the Board, in the fall of 2021, with a tighter timeline on the merger. Regent Harrison-Lee seconded. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Feuerborn, Regent Harrison-Lee, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Bangerter. The motion carried.

Interim Provost Lefever stated that Wichita State University reviewed three programs under this process: Manufacturing Engineering, which was renamed Product Design and Manufacturing Engineering; Honors Baccalaureate/Multi-Interdisciplinary Studies; and Philosophy. The Product Design and Manufacturing Engineering Bachelor of Science program was created in 1994 because of the importance of manufacturing to the economy in the region. Five year ago, WSU began the process of revamping this program because manufacturing was evolving. Dr. Lefever stated that the changes in the program have increased enrollments and graduation rates, and noted that WSU recommends continuing this program. The Honors Baccalaureate is an Interdisciplinary program that is the only program of its kind in the region. To grow enrollments, new courses and pathways are being developed. Dr. Lefever stated WSU recommends continuing this program. Provost Lefever reported that the Department of Philosophy plays a central role in WSU's mission, strategic plan, and goals. It supports many of the courses offered at the University and currently has nine faculty dedicated solely to its BA program. Dr. Lefever stated the overall quality of the Philosophy Bachelor of Arts program is excellent, and the Department's goal is to steadily increase the number of majors and graduates. Therefore, the University recommends continuing the program.

Regent Kiblinger moved to accept Wichita State University's recommendations. Regent Van Etten seconded. Regent Hutton stated he is concerned with the recommendation for the Philosophy program because WSU has not explained how it is going to increase enrollments and graduation rates. He noted he is fine with continuing the program for now but believes the University should provide a progress report on the program next year. Regent Harrison-Lee concurred with Regent Hutton. Following discussion, Regent Hutton offered an amended motion to accept WSU's recommendations and directed WSU to report to the Board next year on the progress of its Philosophy program. Regent Kiblinger seconded. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Feuerborn, Regent Harrison-Lee, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Bangerter. The motion carried.

(PowerPoints filed with Official Minutes)

COURSES FOR SYSTEMWIDE TRANSFER
Vice President Archer reported that the Transfer and Articulation Council reviewed the Kansas Core Outcomes Groups report and approved outcomes for eight additional courses to be recognized for transfer across the Kansas Board of Regents System. Regent Bangerter, who is the Board's liaison on the Transfer Council, expressed his appreciation for the work that the Council

and the Core Outcome Groups continue to do on transfer.  He stated the next step and a priority for the Board is to begin the process of transferring courses into programs, which will benefit students.  Regent Bangerter then moved to approve the eight new transfer courses.  Regent Schmidt seconded.  On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Feuerborn, Regent Harrison-Lee, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Bangerter.  The motion carried. The following courses are approved for systemwide transfer effective summer 2021:

- BUS1030 Principles of Marketing
- CRJ2010 Criminal Law
- EDU2010 Children's Literature
- MAT0990 Intermediate Algebra
- PSI2010 Meteorology Lecture and Lab (combined)
- PSI2011 Meteorology Lecture
- PSI2012 Meteorology Lab
- REL1020 Old Testament

AMEND AGENDA
Due to time restrictions, Chair Feuerborn tabled the report on the FAFSA completion initiatives to the February Board agenda.

*Fiscal Affairs and Audit*

REPORT ON STATE UNIVERSITY BUILDING INVENTORY, SPACE UTILIZATION AND FACILITIES CONDITION
Chad Bristow, Director of Facilities, stated the Board of Regents is required by statute to submit biennial reports to the Legislature that include an inventory of buildings and space utilization information as well as a report on deferred and annual maintenance.  This report was submitted to the Legislature on January 14 and contains information from the Facility Condition Assessment Report and the Space Utilization Study.

*Other Matters*

TEMPORARY PANDEMIC-RELATED AMENDMENTS TO THE SUSPENSIONS, TERMINATIONS AND DISMISSALS POLICY
General Counsel Julene Miller presented the proposed temporary amendments to the Suspensions, Terminations, and Dismissal policy.  She stated that since the beginning of the pandemic, the Board has expedited temporary COVID-related adjustments to several policies.  The proposed amendments on today's agenda are being forwarded because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support.  General Counsel Miller stated the proposed amendments would create an additional tool for the CEOs to use as they deal with the financial challenges at the universities and noted that the provisions in the amendment would be effective only through December 31, 2021.  She then reviewed the new language in the policy, which applies to all university employees, and highlighted that any university CEO who chooses to implement the policy would have 45 days after the Board's approval to submit a framework for

the university's decision-making process.  The Board would then approve the framework before it can be utilized on the campus.

Regent Schmidt wanted clarification on what actions would cease on the expiration date specifically when dealing with an appeal process.  He also stated that this policy requires the CEO to develop a framework that the Board will approve, and he wanted to know whether there is an expectation that faculty will be involved in the framework development process.  General Counsel Miller stated that the expiration date halts the actions of the CEO utilizing the policy and has no effect on appeals submitted in accordance with the policy process.  As far as developing the framework, the policy only states that the CEO will develop a framework.  It does not specify how a university will develop the framework.  She also clarified that the policy is not directed solely at faculty.  It applies to all categories of employees on the campuses.  Regent Kiblinger stated that it is her understanding that the provisions in the policy cannot supersede any contractual agreements or bargaining unit agreements that are in place.  General Counsel Miller stated that it would depend on how each agreement is written but noted that contractual obligations would need to be honored.  Regent Kiblinger thanked the faculty for their comments and noted that the proposed policy seems to fill a gap in process for some employee groups who may not currently have an appeal process through other university policies.  Regent Bangerter stated that he understands that the proposed policy is very extreme, but it is needed because the universities are facing extreme financial challenges, including the Governor's current recommendation to cut approximately $13 million in state funding.  He stated that he and the other Board members understand the gravity of this decision and noted that no one wants to let valuable employees go.  He knows that if a university chooses to implement this process, that the CEO will do it judiciously and through as much process as possible.  His hope is that the universities will receive additional state or federal funding or that enrollment will begin to grow so that the policy is not needed.  Regent Bangerter concluded by stating that the Board is trying to set the universities on a course so that they not only survive but also thrive in the future.  Regent Hutton stated he appreciated the comments by the Chair of the Council of Faculty Senate Presidents, Dr. Sternfeld-Dunn, regarding the other options for collaboration at the universities.  He noted that this policy does not eliminate the use of those other options but instead provides the CEOs with an additional tool to deploy to ensure the financial strength of the university.  Regent Hutton stated the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances.  Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose.  Regent Hutton stated that he believes that the financial challenges are going to continue beyond 2021, and he suggested changing the expiration date in the policy to December 31, 2022, which will allow the Board and the universities additional time to evaluate financial ramifications related to the pandemic.  Regent Harrison-Lee stated that she was pleased that the policy includes a process for the Board to approve the framework, which will ensure that there is transparency and equity.  She noted that she values all the contributions that faculty and staff provide to the universities, but the universities are in a position where they need to be leaner, more efficient, and more effective.  Regent Harrison-Lee stated that she sees this policy as another option for the CEOs during these unprecedented times.  Regent Schmidt stated he appreciated the faculty's comments and noted that if a university decides to implement this process, he believes it is important for a university to gather feedback from its faculty when developing its framework.  Following discussion, Regent Hutton moved to approve the policy amendments as proposed but

with the expiration date changed to December 31, 2022.  Regent Van Etten seconded.  On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Feuerborn, Regent Harrison-Lee, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Bangerter.  The motion carried.  The following policy amendments were approved:

**CHAPTER II: GOVERNANCE - STATE UNIVERSITIES**
\*\*\*
**C.   CHIEF EXECUTIVE OFFICER, FACULTY AND STAFF**
\*\*\*
**6.   SUSPENSIONS, TERMINATIONS AND DISMISSALS**

a   Felony Offenses

   i.   Felony Conviction. The chief executive officer of a state university has the authority to discharge any employee, including a tenured faculty member, immediately upon conviction of any felony.

   ii.   Felony Charge. The chief executive officer of a state university has the authority to discharge or place on leave without pay any employee, including a tenured faculty member, who has been charged with a felony offense. Prior to any such determination, the employee shall be given notice of the proposed action and an opportunity to respond.

b   Other

   i.   Faculty and staff may also be suspended, dismissed or terminated from employment for reasons of significant reduction in or elimination of the funding source supporting the position, program discontinuance, financial exigency, or for just cause related to the performance of or failure to perform the individual's duties or for violation of the reasonable directives, rules and regulations, and laws of the institution, the Board and the State of Kansas or the United States.

   ii.   In light of the extreme financial pressures placed on the state universities due to the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, effective immediately through December 31, 2022 and notwithstanding any other Board or institutional policy, any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university.   Such terminations, suspensions, or dismissals shall follow the procedure set forth below.  Declaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions.

Kansas Board of Regents                - 15 -                January 20, 2021

The chief executive officer of any state university, before making any suspensions, dismissals or terminations under this provision and within 45 days of the effective date of this provision, shall present to the Board for approval a framework for the university's decision-making under this provision. Once approved, that framework shall be used for any suspension, dismissal, or termination under this provision. Frameworks for decision-making shall be determined by each state university's chief executive officer and may be based on factors such as, but not limited to, performance evaluations, teaching and research productivity, low service productivity, low enrollment, cost of operations, or reduction in revenues for specific departments or schools.

(1)  The university chief executive officer shall provide no less than 30 days' written notice of the suspension, dismissal, or termination to the affected employee, including the reasons for the action.

(2)  Any employee given notice of a suspension, dismissal, or termination that expressly invokes the authorization of this provision may submit an appeal of the action of the university chief executive officer, through the Board of Regents office as provided below, to the Office of Administrative Hearings. Suspension, dismissal, or termination not invoking this policy shall have solely those appeal rights provided by existing university policy or other applicable existing procedures.

(3)  The employee must submit the appeal to the Board office within 30 days of receiving notice of the employment action. The initial submission must include a copy of the notice of the action being appealed and a written statement, including any relevant supporting evidence or documentation, setting forth the reasons the employee believes the decision to suspend, dismiss, or terminate the employee (a) is substantially inconsistent with the university's decision-making framework approved by the Board, (b) was the result of unlawful bias or discrimination; or (c) was otherwise unreasonable, arbitrary or capricious. These shall be the only grounds for reversing the state university chief executive officer's decision. The employee shall provide a copy of the appeal and supporting evidence and documentation to the university's chief executive officer at the time the appeal is submitted.

(4)  The university chief executive officer shall have 30 days from receipt to respond in writing to the appeal, including any supporting evidence or documentation, and shall provide a copy of the response and any supporting evidence and documentation to the employee at the time the response is submitted. This 30-day period may be extended for good cause as determined by the Board President and Chief Executive Officer.

(5)  Within 10 days of receiving the university chief executive officer's response, the Board office shall refer the appeal to the Office of Administrative Hearings, which shall provide a hearing and decide the case based on the

standards stated in this policy and in the university's Board-approved framework. The Board shall provide a copy of the submissions to the Office of Administrative Hearings, along with a copy of this policy and the decision-making framework approved by the Board. The state university shall be responsible for fees charged by the Office of Administrative Hearings.

(6)  The burden of proof in any appeal shall be on the employee. There shall be no right of discovery. The review shall be based on the written submissions, and the hearing shall allow oral presentation to the administrative hearing officer by the employee and the university, each of whom may be represented by counsel.

(7)  Decisions of the administrative hearing officer shall be final and are not subject to further administrative review by any officer or committee of the university or by the Board of Regents.

(8)  An appeal under this policy will not stay the effective date of the suspension, dismissal, or termination. Employees who prevail in their appeal under this policy shall be entitled to reinstatement, back pay and restoration of other lost benefits.

**c.   Grievance Procedure**

i.   Each state university shall establish and publish grievance procedures for use by faculty and staff in appealing employment decisions of the institution. The procedures shall provide the employee with notice of the action to be taken, the reasons for the action where appropriate, and an opportunity to be heard. A copy of all institutional grievance procedures shall be provided to the institution's general counsel for review prior to becoming effective.

ii.  The decision of the chief executive officer, or the chief executive officer's designee, concerning any grievance appealing employment decisions of the university shall be final and is not subject to further administrative review by any officer or committee of the university or by the Board of Regents.

WICHITA STATE UNIVERSITY PRESIDENTIAL PROFILE

Regent Schmidt introduced the draft Wichita State University Presidential Profile. The Presidential Profile is a recruitment document that contains information about the University and the City of Wichita. It describes the responsibilities of the WSU president and lists the desired presidential attributes. Regent Schmidt stated that the WSU Presidential Search Committee provided its feedback on the proposed Profile at its first meeting and noted that the target submission date for anyone who is interested in the position is March 8, 2021. He noted that once the Board approves the profile, the search consultants will begin the recruitment phase. Regent Schmidt then moved to approve the WSU Presidential Profile. Regent Harrison-Lee seconded. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent

Kansas Board of Regents       - 17 -       January 20, 2021

Feuerborn, Regent Harrison-Lee, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Bangerter.  The motion carried.

(WSU Presidential Profile filed with Official Minutes)

LEGISLATIVE UPDATE
Matt Casey, Director of Government Relations, reported that the Legislative session began on January 11, 2021.  Director Casey stated that the Board's non-budgetary legislative items have been introduced and hearings have already been scheduled for the Private Postsecondary bill, the concurrent enrollment bill, and the Promise Act.  He noted that the Engineering Reauthorization bill was introduced in the House Appropriations Committee and is awaiting a hearing date.  Vice President Frisbie then gave an overview of the Governor's proposed budget, which cuts the higher education system by $37 million.  Under this budget, the universities would receive a 5.5 percent cut, the Board office would be reduced by 5 percent, and the coordinated institutions would be cut by two percent.  Vice President Frisbie noted that the Governor's budget does include a $10.2 million operating grant appropriation to the Board.

**ADJOURNMENT**
Chair Feuerborn adjourned the meeting at 5:40 p.m.

_____     _____
Blake Flanders, President and CEO        Bill Feuerborn, Chair

# KANSAS BOARD OF REGENTS
## MINUTES
### February 17, 2021

The February 17, 2021, meeting of the Kansas Board of Regents was called to order by Chair Bill Feuerborn at 1:01 p.m. This was a virtual-only meeting, and proper notice was given according to law.

| | |
|---|---|
| MEMBERS PRESENT: | Bill Feuerborn, Chair |
| | Cheryl Harrison-Lee, Vice Chair |
| | Shane Bangerter |
| | Ann Brandau-Murguia |
| | Mark Hutton |
| | Shelly Kiblinger |
| | Jon Rolph |
| | Allen Schmidt |
| | Helen Van Etten |

## ANNOUNCEMENT
Chair Feuerborn stated that due to the Shawnee County emergency order issued November 12 and extended January 14, the Board meeting is being conducted pursuant to the Attorney General's regulation for virtual-only meetings. He asked all participants to place their microphones on mute when they are not speaking to allow listeners and observers to hear the meeting unimpeded. Chair Feuerborn stated that participants should ask to be recognized if they have a question or comment and when recognized, the participant should state their name and title so he or she can be identified by the audience. Chair Feuerborn noted for each action item a roll call vote would be taken to be clear how each Regent has voted. However, a roll call vote will not be taken for the approval of the minutes and no motion is needed to adjourn the meeting. It was also noted that there will be no opportunity for public comment during this meeting and no executive session is scheduled.

## PLEDGE OF ALLEGIANCE
The Pledge of Allegiance was recited.

## APPROVAL OF MINUTES
Regent Schmidt moved that the minutes of the January 20, 2021 meeting be approved. Following the second of Regent Rolph, the motion carried.

## GENERAL REPORTS

### REPORT FROM CHAIR
Chair Feuerborn reported that the format of future Board meetings will continue to be dictated by local health orders. However, with the COVID numbers trending downward in Shawnee County, he is hopeful that the Board can move to a hybrid format in the future. As for the April Board meeting, the Chair announced he is canceling the Fort Hays State University campus visit. Instead the Board will conduct either a virtual or hybrid meeting depending on what health restrictions are

Kansas Board of Regents                    - 2 -                    February 17, 2021

in place in Topeka.  Chair Feuerborn then encouraged next year's Board chair to consider implementing the same campus visit schedule that was planned for this year.

REPORT FROM PRESIDENT AND CEO
President Flanders reported that he attended a University of Kansas Student Senate meeting. Topics discussed included the Board's COVID-19 emergency policy and the program review process.  He thought the meeting was productive and thanked the students for inviting him. President Flanders stated Chancellor Girod contacted him requesting an extension to July 1 of the 45-day timeline for submitting a framework for implementation of the temporary, COVID-related policy the Board adopted in January.  The Chancellor indicated that the additional time will enable KU to continue pursuing other avenues for addressing their financial challenges before determining whether use of this policy will be necessary.  Because the policy was adopted with a December 31, 2022 end date, President Flanders believes it makes sense to push this initial timeline out another four months.  He then asked the Chair to consider amending today's agenda to add this as the next agenda item.

AMEND AGENDA
Chair Feuerborn amended the agenda to add the proposed amendment of the Board's COVID-19 emergency policy as the next item.

TEMPORARY PANDEMIC-RELATED AMENDMENT TO THE SUSPENSIONS, TERMINATIONS AND DISMISSALS POLICY
Regent Bangerter moved to approve the University of Kansas's request to extend the timeline for a university to submit a framework to implement the temporary policy.  Regent Van Etten seconded.  It was clarified that the motion includes extending the framework submission deadline to July 1, 2021.  On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Bangerter, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Feuerborn.  The motion carried. The following policy amendments were approved:

**CHAPTER II: GOVERNANCE - STATE UNIVERSITIES**
. . .
C.    CHIEF EXECUTIVE OFFICER, FACULTY AND STAFF
. . .
      6.    SUSPENSIONS, TERMINATIONS AND DISMISSALS
. . .

          b    Other
. . .

               ii. In light of the extreme financial pressures placed on the state universities due to the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, effective immediately through December 31, 2022 and notwithstanding any other Board or institutional policy, any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university.  Such

terminations, suspensions, or dismissals shall follow the procedure set forth below.  Declaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions.

The chief executive officer of any state university, before making any suspensions, dismissals or terminations under this provision and ~~within 45 days of the effective date of this provision~~ before July 1, 2021, shall present to the Board for approval a framework for the university's decision-making under this provision.  Once approved, that framework shall be used for any suspension, dismissal, or termination under this provision.  Frameworks for decision-making shall be determined by each state university's chief executive officer and may be based on factors such as, but not limited to, performance evaluations, teaching and research productivity, low service productivity, low enrollment, cost of operations, or reduction in revenues for specific departments or schools.

## REPORT FROM SYSTEM COUNCIL OF PRESIDENTS

President Rittle reported that the System Council of Presidents received an update on the progress of the group working on the systemwide general education transfer package.  The working group surveyed the institutions and identified sixteen Association of American Colleges and Universities (AAC&U) knowledge and skill areas that will be reviewed for inclusion in the general education package.  After the general education package is established, the next steps will be to develop a conceptual framework for a systemwide associate-to-baccalaureate transfer initiative; and identify the potential programs for a systemwide associate-to-baccalaureate transfer initiative.  The System Council of Chief Academic officers updated the CEOs on the Board's FAFSA completion initiatives, the progress of the online proctoring workgroup, and the progress of the Transfer and Articulation Council.  The Council then discussed last month's presentation by Dr. Mark Becker on Georgia State University's student success program.  Interim President Muma summarized the presentation and noted that representatives from the universities, community and technical colleges, and Board staff will be communicating with Georgia State's National Institute for Student Success to gather more information on Georgia State's model.  President Rittle noted that the colleges and universities will be developing their own internal plans, which will include best practices and metrics, to address the equity gaps in Kansas.

## REPORT FROM COUNCIL OF PRESIDENTS

Interim President Muma presented the report for the Council of Presidents.  The Council received reports from the Council of Chief Academic Officers, Council of Business Officers, Council of Student Affairs Officers, Council of Government Relations Officers, and the Council of Chief Diversity Officers.  The Academic Officers approved Emporia State University's Master of Arts in Applied Sociology and approved a program name change at the University of Kansas.  The Business Officers reviewed the system's cybersecurity liability premium level and determined that the $20 million coverage limit is sufficient.  They continue to monitor the federal funding related to the pandemic and noted this is one-time funding that does not replace the loss of State General Fund appropriations.  The Government Relations Officers reported on the legislative budget

progress and the bills they are monitoring.  It was noted that in the House Appropriations Committee there was discussion centered around state universities refunding student tuition and fees for any day during the current academic year where classes were canceled due to the pandemic and refunding half of student tuition and fees for each day their classes were online.  The CEOs are concerned about this language, but they will have an opportunity to present testimony on this topic later in the session.  The Council is also concerned about House Bill 2188 related to IT project management changes, which will impact the timing and cost of IT projects at the universities.  The Student Affairs Officers discussed how the CARES Act funds are helping students and noted they are monitoring the vaccination distribution around the state.  The Chief Diversity Officers held a roundtable discussion with the community colleges earlier this month.  The group discussed diversity strategies and potential initiatives that the colleges can deploy on their campuses to engage with students.  It was also reported that the annual Tilford Conference will be held in a virtual format October 18-21, 2021.  The Council of Presidents then received an update from President Flanders on the status of the Board's draft Freedom of Expression Statement.

### REPORT FROM COUNCIL OF FACULTY SENATE PRESIDENTS
Aleks Sternfeld-Dunn reported that the Council of Faculty Senate Presidents discussed the COVID related amendment to the Suspensions, Terminations, and Dismissals policy.  He stated that the faculty understand that the policy applies to all university employees, but since the Council represents the faculty on the campuses, his report is going to center on the faculty's concerns.  Dr. Sternfeld-Dunn spoke about the importance of tenure and how difficult it is for a faculty member to obtain tenure status, which is a peer-review process.  Tenure status allows a faculty member the academic freedom to conduct research without fear of retaliation.  Tenure research also helps universities bring in grant funding.  Dr. Sternfeld-Dunn also spoke about the importance of shared governance within the university structure.  Shared governance allows campus constituents to participate in discussions on issues that affect the university.  He noted universities that embrace shared governance tend to adapt more quickly when change is needed, which was demonstrated across the nation when the pandemic started.  He stated when the Board adopted its temporary COVID-19 Suspensions, Terminations, and Dismissals policy, faculty across the university system expressed their disappointment that shared governance was not part of the process.  The amendments were provided to the Council less than 24 hours before the Board took action because the amendments were deemed critical.  Dr. Sternfeld-Dunn stated that faculty do not understand why the amendments were deemed critical when five of the universities stated they were not going to implement the policy provision and the sixth university just received an extension to the framework deadline to July 1.  The faculty want to understand why policy amendments did not go through the normal policy review process and asked the Board to consider temporarily suspending the policy amendments that were adopted in January.  The faculty would like the Board to form an ad hoc committee to review the policy amendments and other policies related to university finances.  The Council recommended that the committee membership include the following: a Regent who serves on the Governance Committee, a faculty member from the Council, a university CEO, a university provost, a university human resource officer, a university staff representative, and legal counsel from the Board office and the universities.

### REPORT FROM STUDENTS' ADVISORY COMMITTEE
Rija Khan presented the report for the Students' Advisory Committee.  The Committee members updated each other on their legislative efforts to secure state funding to increase student counseling

services on the campuses.  The Committee is also tracking legislation that they believe negatively impact the universities, and it was noted that each student senate may act to oppose certain bills by passing internal resolutions that could then be shared with legislators.  The Committee discussed designating national election dates as holidays on the university academic calendars and plan to work with the Board office on how to move their request forward.  Additionally, the Committee discussed tuition and fees and recommends that the Board hold next year's tuition and fees flat at the state universities.  The Committee does not believe the burden to increase revenues at the universities should fall on the students because students are still struggling financially due to the pandemic.  The universities and Board should find alternative ways to increase revenues The Committee also expressed their disappointment with the Governor's proposed budget, which reduces state funding for higher education.  Regent Murguia thanked Rija for her report and noted that if students need additional services including mental health, there may be community-based services available along with resources on different websites.  She noted this may be helpful for students while the Committee continues to pursue its initiative to increase the number of mental health counselors on the campuses.

REPORT FROM THE COMMUNITY COLLEGES
President Rittle presented the report for the community colleges.  This month he highlighted Dodge City Community College, Garden City Community College, Highland Community College, Hutchison Community College, Fort Scott Community College, and Independence Community College.  The colleges noted that one of the major challenges that they have faced during the pandemic was making sure isolated students were receiving all the resources they needed to continue their education.  The colleges reported that the pandemic has also negatively impacted their high school student enrollments especially in technical education.  On a positive note, the colleges believe that the pandemic has strengthened many of their partnerships within their local communities and school districts.  President Rittle stated that student recruitment efforts are underway for the fall semester.  The colleges will be using traditional in-person methods with the proper COVID safety guidelines in place and technology-based tours.  President Rittle also thanked the Chief Diversity Officers at the universities for hosting a roundtable discussion with the community colleges earlier this month.

REPORT FROM THE TECHNICAL COLLEGES
President Genandt presented the report for the technical colleges.  The technical colleges have continued to offer in person and online courses to students.  The colleges have found that students like having the option of listening to online lectures and recorded classes.  All of the colleges will be holding either in person or virtual commencement ceremonies at the end of the semester. Regarding COVID cases on the campuses, President Genandt stated that many of the colleges are dealing more frequently with students who have been exposed to the virus rather than positive cases.  All of the campuses have used the federal stimulus funds to purchase protective gear and are conducting campus wide deep cleaning every week.  President Genandt believes that the COVID procedures on the campuses have contributed to their low positivity rates.  President Genandt reported that in the fall some of the technical colleges saw a decrease in high school student enrollments, which was a concern for them.  However, the data for the spring semester indicate those enrollments are bouncing back.

REPORTS FROM THE UNIVERSITY CEOS

President Mason reported that because of the extremely cold weather the state has been experiencing, Midwest Energy requested that Fort Hays State reduce its electrical and gas consumption. The University was able to use its energy management system to convert its boilers from natural gas to diesel and also relied upon wind generation. As a result, the University was able to assist in the efforts to reduce electric and gas energy usage, which helped to prevent rolling electrical blackouts in the region. President Mason stated that the University's spring intersession enrollment was up 23 percent. The current spring enrollment numbers show a slight increase for incoming freshman, and a slight decrease for online and transfer students. President Mason stated one of the biggest challenges for the University's fall 2021 enrollments is that it will graduate a class in spring that is as large as its current on-campus student population. The University's strategic enrollment management initiative has helped mitigate the loss of enrollment due to COVID. This initiative includes the University's new online scholarship program, targeted program enrollment growth, and short course offerings. Regarding COVID, President Mason reported that the University continues to use its procedures that were put in place last fall. Currently, there are no students in isolation or quarantine. President Mason noted that at the beginning of the semester a student-athlete tested positive for the UK variant of the virus. The Kansas Department of Health and Environment did COVID surveillance testing at the University and did not find anyone else who was positive with the variant.

Interim President Muma reported that Wichita State University's enrollment management team continues to work on strategies to increase the University's enrollment. Currently, the data indicates that the spring enrollment will be down one or two percent. Dr. Muma stated this decline is mainly associated with concurrent enrollment offerings, which are not high revenue producing courses. The enrollment for traditional degree-seeking students and graduate students continue to hold steady. Dr. Muma reported that applications for the fall semester are strong and admissions for high school seniors and transfer students have increased. He also noted that scholarship and housing applications are up for the fall. Interim President Muma is hopeful that these trends will hold. Regarding recruitment efforts, WSU continues to hold in person campus visits with the appropriate safety protocols in place. The University has also conducted over 70 virtual events for interested students. Dr. Muma noted that many of the recruitment strategies put in place to mitigate the impact of the pandemic will continue to be utilized even after the pandemic is over because they have proven to be successful tools.

President Garrett reported that Emporia State University is expecting the spring headcount enrollment to be flat. ESU's graduate programs continue to grow in enrollment and are expected to be up seven percent in the spring. President Garrett stated that recruitment strategies have changed some because of the pandemic. Recruitment officers are traveling less but are utilizing different technologies to reach prospective students. ESU has also decided to waive some application fees for students who are struggling financially. Regarding international enrollment, ESU is working to build several international partnerships. International enrollments were down in the fall, but President Garrett believes these new partnerships will positively impact future enrollments. President Garrett concluded by noting that the University continues to emphasize the importance of in person learning. Last fall, 74 percent of classes were taught in person and that percentage will remain the same for the spring semester.

President Myers reported that Kansas State University closed campus earlier this week because the extreme cold caused electrical blackouts in the Manhattan region.  The campus is now back open and fully operational.  President Myers presented an overview of the University's COVID data since the beginning of the pandemic. KSU has tested over 22,000 individuals and the overall positivity rate is 7.31 percent.  Since the start of the spring semester in January, KSU's positivity rate was 10.25 percent but has since decreased to 1.9 percent.  This past week the Manhattan and Salina campuses had a total of 107 students in isolation and 39 in quarantine.  President Myers stated that KSU has implemented communication and recruitment strategies to respond to the impact of the pandemic.  KSU has changed recruitment strategies to include more virtual options for students; however, the campus will continue to offer limited in-person tours.  KSU continues to expand its marketing and communication efforts on different social media platforms to reach more students.  The University has also extended scholarship deadlines and expanded its need-based aid to address affordability issues.  Additionally, President Myers spoke about KSU's new strategic enrollment management system.  He noted that the fall 2021 applications and admissions to the University are currently up, and he is hopeful that the trend holds.

President Scott stated that it is important for everyone to understand that the universities did not shorten last year's fall semester or this year's spring semester because of COVID.  Many of the universities adjusted their academic calendars, but students received or will receive the required amount of instructional days.  Looking at the spring semester, President Scott reported that Pittsburg State University did not experience a surge in the virus when the students returned to the campus, and noted that the University's Bicknell Center is being used as a testing and vaccination site for the Pittsburg community.  Regarding enrollment, President Scott expects the University to be down around three percent for the spring and fall semesters.  Like the other universities, PSU is implementing new recruitment strategies to attract students.  The University recently announced a new $1,000 scholarship for any Crawford County high school senior who graduated in May 2020.  President Scott stated this reward will help students and the community.  Additional strategies that the University has implemented to increase enrollments include hiring a full-time student recruiter who is responsible for responding to website inquiries, eliminating application fees, and adjusting the PSU's marketing strategies to target the University's top 15 programs.  President Scott stated that the 15 programs identified are the ones that drive enrollment on the campus.

Vice Chancellor Cook reported the spring semester at the University of Kansas campuses will include the same safety measures and course offering formats that were offered last semester.  He noted the safety measures implemented proved effective because last semester there was no evidence that COVID was being transmitted in the classrooms or labs.  Looking at this semester, KU tested over 16,000 individuals before they returned to campus and the overall positivity rate was .05 percent.  Throughout the semester, the University will continue prevalence and symptomatic testing.  Vice Chancellor Cook reviewed KU's COVID-19 dashboard, which provides data on overall testing and positivity rates for the different cohorts on the campus.  He also discussed the University's financial losses associated with the pandemic.  For FY 2020 and FY 2021, the University's Lawrence and Medical Center campuses lost $71.7 million in revenues associated with enrollments, housing, dining, parking, and events.  To address the FY 2021 budget short fall, the University cut $34 million by eliminating jobs, furloughing employees, reducing salaries in executive leadership positions, offering a retirement incentive program, and reducing

services.  Vice Chancellor Cook stated that the projected budgetary shortfall for FY 2022 is $74.6 million.  To address this shortfall, KU may need to implement large scale furloughs and layoffs. Vice Chancellor Cook reported that KU spent $44 million on pandemic related expenses, and these expenses were covered by the federal relief funds.  However, it was noted that currently the federal funds are restricted and cannot be used to make up for the losses associated with the University's general operations.  Regarding enrollment, Vice Chancellor Cook stated that the University experienced a decrease of 2.8 percent in overall enrollment last semester.  The spring enrollment seems to be holding steady with graduate student enrollments slightly increasing.

**STANDING COMMITTEE AND OTHER REPORTS**

ACADEMIC AFFAIRS
Regent Kiblinger presented the Board Academic Affairs Standing Committee report.  The Committee received an update on the Kansas Health Science Center, which is a new private Osteopathic Medical Institution located in Wichita. The Institution will begin teaching students in August 2022.  Emporia State University and Pittsburg State University presented their recommendations on their low-enrollment programs.  These recommendations will be presented to the Board at the March meeting.  The Committee also received an update on the progress of the General Education Working Group, the Direct Support Professionals Work, and the Coordinating Council.

FISCAL AFFAIRS AND AUDIT
Regent Rolph reported that the Fiscal Affairs and Audit Standing Committee reviewed the fiscal items on today's Board agenda and the Committee commended Wichita State on its Clinton Hall project that will consolidate student services into one location on campus and improve the building's condition. Fort Hays State University, Emporia State University, and Pittsburg State University provided updates on their financial outlooks.  They discussed expenditure trends, their Composite Financial Index data, revenues tied to student enrollment and their federal CARES Act funding.  All three state universities compare favorably to their peers on students' cost for tuition. The Committee heard an update from Board staff on the accomplishments that have occurred thus far on the Board's deferred maintenance initiative.  Regent Hutton then discussed committing the $10.3 million in the Governor's budget toward payment of debt to be incurred for a deferred maintenance initiative beginning in FY 2022 and for no less than 20 years.  The Committee concurred with Regent Hutton's request.  Regent Rolph requested that the Board Chair add Regent Hutton's request to the Board's agenda for consideration and noted that Regent Hutton also plans to present another motion related to the deferred maintenance initiative at that time.

AMEND AGENDA
Chair Feuerborn amended the agenda to add the deferred maintenance initiative as the first item under Other Matters.

Regent Bangerter stated that the Board just approved the University of Kansas' request to extend the timeline for submitting a framework related to the temporary COVID policy amendments that the Board adopted last month.  He stated that KU is looking at the policy because it is facing a budget shortfall of $75 million.  Regent Bangerter asked KU to provide an update on where they are in the process and how the faculty and staff are involved in the University's processes.  Provost

Bichelmeyer stated that KU's financial challenges are centered around its Lawrence campus, which has a $400 million annual operating budget. The Chancellor requested the policy extension so that the University can continue to work on multiple options to address the $75 million shortfall. Some of the cost saving measures that the University either has implemented or is reviewing include discontinuing or consolidating low-enrollment programs, implementing a new travel policy and travel system that may save a few million dollars a year, reviewing procurement processes to find more efficiencies, and determining if there are buildings that can be taken offline. KU is also looking at strategies to increase revenues, which would include increasing student enrollments, helping students persist and graduate, and improving research administration. Provost Bichelmeyer noted that the University is updating its university academic workload policy and academic unit workload guidelines. Regarding shared governance issues, KU has been engaged with its faculty and staff representatives.

Regent Rolph thanked Provost Bichelmeyer for her remarks and noted that he would like to see the academic workload policy and the standards used for all six universities. Dr. Sternfeld-Dunn stated the faculty are still concerned that the Board's policy does not require a shared governance structure, and they would like shared governance officials to be part of the decision-making process when it comes to terminating faculty and staff, which is the process used when a university declares financial exigency. Provost Bichelmeyer stated that KU's shared governance leaders have been engaged and have provided feedback on the work being done.

BREAK
Chair Feuerborn called for a 15-minute break at 3:00 p.m. and resumed the meeting at 3:15 p.m.

GOVERNANCE
Regent Feuerborn reported that the Governance Committee reviewed three Board contracts related to online proctoring services and the adult education programs. The Committee authorized the Board President to execute the contracts. The Committee reviewed the Student Advisory Committee's comments and suggestions on the Board's Freedom of Expression Statement and adopted the Statement as revised. The Statement and its companion policies will be placed on the Board's March agenda for consideration. Fort Hays State University and Kansas State University then presented their annual campus safety and security reports.

**APPROVAL OF CONSENT AGENDA**
Regent Van Etten moved, with the second of Regent Harrison-Lee, that the Consent Agenda be approved. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Bangerter, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Feuerborn. The motion carried.

*Academic Affairs*

BACHELOR OF ARTS IN INTERDISCIPLINARY ENTREPRENEURSHIP –
ESU
Emporia State University received approval to offer a Bachelor of Arts in Interdisciplinary Entrepreneurship. This program will total 120 semester credit hours. The estimated cost of the program for the first three years is as follows: year

Kansas Board of Regents                    - 10 -                    February 17, 2021

one - $81,927, year two - $290,858, and year three - $406,622.  Student tuition and fees will finance the program.

<u>AY 2019 PERFORMANCE REPORTS</u>
The AY 2019 Performance Reports were approved.  Below are the approved funding levels for each institution.

| Institution | Funding Recommendation |
|---|---|
|  |  |
| Emporia State University | 100% funding |
| Fort Hays State University | 100% funding |
| Kansas State University | 100% funding |
| Pittsburg State University | 100% funding |
| University of Kansas | 100% funding |
| University of Kansas Medical Center | 100% funding |
| Wichita State University | 100% funding |
| Washburn University/Washburn Tech | 100% funding |
|  |  |
| Allen County Community College | 100% funding |
| Barton Community College | 100% funding |
| Butler Community College | 100% funding |
| Cloud County Community College | 100% funding |
| Coffeyville Community College | 100% funding |
| Colby Community College | 100% funding |
| Cowley Community College | 100% funding |
| Dodge City Community College | 100% funding |
| Fort Scott Community College | 100% funding |
| Garden City Community College | 100% funding |
| Highland Community College | 100% funding |
| Hutchinson Community College | 100% funding |
| Independence Community College | 100% funding |
| Johnson County Community College | 100% funding |
| Kansas City Kansas Community College | 100% funding |
| Labette Community College | 100% funding |
| Neosho County Community College | 100% funding |
| Pratt Community College | 100% funding |
| Seward County Community College | 100% funding |
|  |  |
| Flint Hills Technical College | 100% funding |
| Manhattan Area Technical College | 100% funding |
| North Central Kansas Technical College | 100% funding |
| Northwest Kansas Technical College | 100% funding |
| Salina Area Technical College | 100% funding |

| Wichita State University Campus of Applied Science and Technology | 100% funding |
|---|---|

### *Fiscal Affairs & Audit*

#### AMENDMENT TO THE FY 2021 CAPITAL IMPROVEMENTS REQUEST AND REVISED PROGRAM STATEMENT FOR THE CAMPUS INFRASTRUCTURE IMPROVEMENTS PROJECT – KSU

Kansas State University received approval to amend its FY 2021 Capital Improvement Plan to revise the campus infrastructure improvement project. The scope of the project will now include King Hall and the Chemistry/Bio-Chemistry building. The estimated revised project cost is $3.5 million. The project will be implemented in two phases. The cost of the first phase, estimated at $2,155,000, will be funded from the University's allocation of the Educational Building Fund, restricted fees and the deferred maintenance interest fund. Construction is expected to begin April 2021 and be completed December 2021. Phase two will begin once additional university funds are identified. The revised project is expected to reduce the deferred maintenance amount for the Chemistry/Bio-Chemistry building by $3.2 million and adjust the FCI from .41 to .31.

### *Technical Education Authority*

#### EXCEL IN CAREER TECHNICAL EDUCATION FEES FOR THE COLLEGES

The 2022 Excel in Career Technical Education fees for the following colleges were approved: Butler Community College, Cloud County Community College, Flint Hills Technical College, Hutchinson Community College, Independence Community College, Kansas City Kansas Community College, Labette Community College, Neosho Community College, North Central Kansas Technical College, Northwest Kansas Technical College, Salina Area Technical College, and Seward County Community College. A complete list of fees for each career technical education course and program at each institution is maintained at the Board office and is available for public inspection.

## CONSIDERATION OF DISCUSSION AGENDA

### *Presentation*

#### REPORT ON THE BOARD'S STRATEGIC PLAN, *BUILDING A FUTURE*

President Flanders presented the first annual report of the Board's strategic plan, *Building a Future*. The plan contains the following three messaging pillars: 1) Kansas families, 2) Kansas businesses, and 3) Kansas economic prosperity. President Flanders reviewed the structure of the plan, which contains areas of focus, dashboard metrics (lagging indicators), progress metrics (leading indicators), and promising practices. He noted that this first report establishes the baseline numbers for the metrics in the plan.

Kansas Board of Regents                  - 12 -                  February 17, 2021

President Flanders highlighted some of the metrics under Pillar One. In the Affordability category, President Flanders shared data on graduation rates, student loan default rates, students taking 30 credit hours per year, and retention rates. Under graduation rates, it was noted that the universities and community colleges have increased their percentage points over the past five years and that over 50 percent of students at the community and technical colleges complete on-time. The data associated with the student loan default rates shows that Kansas two-year institutions have lower default rates when compared to other states. In the Access category, President Flanders highlighted the enrollment equity gaps and college going rate metrics. The enrollment equity gaps are measured by looking at the 18 to 24-year-old Kansas population and comparing it to resident enrollment in the same age group in the categories of race/ethnicity and rural/non-rural. The data shows the system has enrollment gaps in the Hispanic and Black or African American populations along with the rural population. The college going rate is measured by looking at the number of Kansas high school students who enroll in a public postsecondary institution in the state after graduating from high school. President Flanders stated the college going rate continues to decline in the state, which is concerning and the Board office is partnering with the Kansas State Department of Education on several initiatives that will hopefully increase the rate. Under the Success category, President Flanders reviewed the percentage of graduates in jobs with sustaining wages and the number of degrees and certificates awarded. He reminded everyone that the benchmark for sustaining wages is set at 250 percent of the federal poverty level, meaning that in 2020, a graduate must earn at least $31,900 to be in a job with a sustaining wage. Regarding degrees and certificates awarded, President Flanders noted that in the Board's last strategic plan, *Foresight 2020*, the Board set a systemwide attainment goal of 60 percent. He stated the Board may want to consider setting an attainment goal for *Building a Future* and noted that the Governor's Council on Education recently adopted a more aggressive attainment goal of 71 percent by 2030, which includes credentials from postsecondary institutions and industry recognized credentials such as apprenticeships.

President Flanders stated that Pillar Two focuses on the crucial role that the colleges and universities play in developing a workforce. Under the Talent Pipeline category, special initiatives and enrollment and graduation rates in programs that lead to high demand, sustaining wage jobs will be measured. President Flanders noted each institution selected its own programs under the high demand, sustaining wage jobs metric and stated that each will be responsible for increasing enrollments and graduation rates in their selected programs. Regarding special initiatives, *Building a Future* will continue to track the University Engineering Initiative and the Excel in CTE Initiative. President Flanders stated that under the Innovation category, funding for the university research enterprises will be tracked.

President Flanders reported the third Pillar, Economic Prosperity, demonstrates how the higher education system supports economic growth in Kansas. This pillar emphasizes the intentional economic development activities of the institutions. Each institution will focus on a mix of its existing strengths and emerging capabilities that together uniquely position the higher education system to partner with business and industry to create jobs and grow the economy.

Regent Schmidt thanked President Flanders for the report and noted that last year the Board received a presentation on Purdue University's income share agreement program and wanted to know if that type of program should be incorporated into the plan. President Flanders stated that

Kansas Board of Regents                    - 13 -                    February 17, 2021

an institution would need to bring forward a plan if it wanted to implement an income share agreement program. Regent Harrison-Lee highlighted the importance of growing partnerships with business and industry to advance the Economic Prosperity Pillar. Regent Kiblinger stated that the Board should adopt an attainment goal for the system and believes it should be reviewed.

(PowerPoint filed with Official Minutes)

*Academic Affairs*

ASSOCIATE OF APPLIED SCIENCE IN CAREER & TECHNICAL EDUCATION – PSU
Daniel Archer, Vice President for Academic Affairs, introduced Pittsburg State University's request to offer an Associate of Applied Science in Career and Technical Education. Dr. Archer stated the program will be taught using online and hybrid formats, which will allow the University to recruit out-of-state students. It was noted that several states require Career and Technical Education (CTE) teachers to have an associate degree to meet their certification requirements and that this program will fulfill that need. Vice President Archer stated that the Board's Academic Affairs Committee reviewed the proposal and the colleges were able to provide their feedback to the Committee, all of which was positive. Regent Hutton stated that he supports the proposed program but also expressed his concern that this opens up the possibility for institutions to begin bringing forward requests to offer degrees that they do not traditionally offer. He also believes there needs to be a fair process when evaluating program requests that fall within this category. Regent Kiblinger stated that the Academic Affairs Committee discussed this issue and decided to recommend that the Board's policy be revised to outline the process for these types of requests. She also noted that Committee members support this specific degree request because they believe it will benefit students and the state. President Scott clarified that PSU currently offers other associate degrees so this would not be a first for the University. Following discussion, Regent Rolph moved to approve PSU's Associate of Applied Science in Career and Technical Education. Regent Kiblinger seconded. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Bangerter, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Feuerborn. The motion carried.

LOW-ENROLLMENT PROGRAMS REVIEW – FHSU AND KU
Vice President Archer stated that Fort Hays State University and the University of Kansas have completed their internal reviews of their low-enrollment programs. He introduced Provost Arensdorf and Provost Bichelmeyer to present each university's recommendations. He also reminded the Board that under the strategic program alignment policy, the Board decides the final outcome of these programs.

Provost Arensdorf stated that Fort Hays State University reviewed six programs under the strategic program alignment policy: Art Teacher Education, General Art/Art Studies, General Foreign Languages and Literatures, General Physics, Philosophy, and General Music. The Art Teacher Education program prepares aspiring artist educators with pedagogical and content skills necessary to provide quality fine arts instruction within K-12 education. Students graduating with the art teacher education degree are afforded extremely high employment opportunities largely due to extreme teacher shortages in Kansas and other Midwest states. Provost Arensdorf noted that 80

percent of graduates are employed in the region.  The General Art/Art Studies program is an interdisciplinary course that does not have any faculty solely dedicated to it.  It offers pathways in both Art History and Studio Art and prepares students for careers as fine artists and craftsmen, archivists, curators, museum technicians, and conservators.  Provost Arensdorf stated that the University recommends merging the Art Teacher Education program with the General Art/Art Studies program and that a concentration in Art Education be developed within that degree program to serve students desiring to become licensed art educators.  General Foreign Languages and Literatures offers language and culture courses tailored to student career goals and designed for traditional and non-traditional students.  The program aligns with the University's mission in its commitment to the development of engaged global citizen leaders and is often a second major for students.  Provost Arensdorf noted that the department initiated the Spanish for Specific Purposes in the fall semester of the academic year 2017-2018; therefore, five-year enrollment data is not yet available.  She also noted the University is seeing some growth in its Spanish major.  The program's revenues also exceed its expenses.  Provost Arensdorf stated the University recommends additional review of this program to allow the department chair and faculty to discuss what the program will look like in the future.  The General Physics program produces graduates with the skills necessary to attend and successfully complete a range of different graduate and professional programs.  It supports the University's KAMS/AMS program and stands out from area schools based on its affordability and small class size.  Provost Arensdorf stated the University recommends continuing the program and noted that FHSU is working to create an entirely online physics degree option, which would be one of only a few in the country.  The Philosophy program has a growing number of students in the online program.  It heavily supports General Education and FHSU's programs in China.  Dr. Arensdorf stated that the Department is focusing on updating their senior capstone experience that will lead to more graduates from the program, and therefore, the University recommends continuing the program.  The General Music program is an interdisciplinary course that does not have any faculty solely dedicated to it.  The program aligns with the mission of the University and supports General Education.  Provost Arensdorf stated the University recommends additional review of this program to allow the Department time to increase enrollments and graduations.

Provost Bichelmeyer reported that the University of Kansas reviewed 15 programs and is recommending that seven programs be merged, two be discontinued, and six continue.  She also noted that while outside the scope of the review, KU is also recommending merging two departments and discontinuing one department.  Latin American & Caribbean Studies and European Studies are recommended to merge as concentrations within the existing Global & International Studies degree.  Both programs slated for merger have no assigned tenure/tenure-track faculty.  They are interdisciplinary, and use faculty from other departments.  The Classics Department is recommending merging its two degrees (Classical Languages and Classical Antiquity) to form one Classics major.  The University is recommending merging its German Studies, Russian, East European & Eurasian Studies, and the Slavic and Eurasian Languages & Literature Studies, which will form one-degree program.  Provost Bichelmeyer noted that KU is recommending that the German Studies Department be merged with the Slavic and Eurasian Languages & Literature Department.  There will be minimal savings for the University with this merger because many of the programs are interdisciplinary, but it will streamline options for students.  Provost Bichelmeyer stated that KU is recommending discontinuing its Visual Art Education undergraduate program and its Humanities program.  Both programs have had

challenges growing enrollments and majors. She also noted that the University recommends closing the Humanities department. Provost Bichelmeyer stated that the elimination of the Visual Art Education program will produce $100,000 in savings, and it is estimated that the closure of the Humanities department will have an annual savings of $400,000. Provost Bichelmeyer reported that KU recommends continuing the following degrees because they are critical to the University's mission, run efficiently, and the departments have viable plans for increasing enrollments and graduation rates: Dance, American Studies, Religious Studies, African & African-American Studies, Astronomy, and Physical Education Plus. Provost Bichelmeyer then reviewed other programs that KU has eliminated, which resulted in annual savings, and discussed KU's new strategic plan, *Jayhawks Rising*.

The Regents thanked the Provosts for their presentations. Regent Bangerter stated *The Chronicle of Higher Education* published an article titled "The Great Contraction," which talks about the budget and enrollment issues that higher education institutions are facing. He believes many higher education institutions, including the ones located in Kansas, will need to make tough decisions that will shape the future of higher education. Regent Hutton asked Provost Bichelmeyer about the University's timeline for completing its academic workload policy. Provost Bichelmeyer stated that KU is working to create a University-wide policy that will set the baselines for faculty workloads, and anticipates providing an update on the policy later this spring. Regent Harrison-Lee thanked KU's staff and Provost for all their work on the program review. Following discussion, Regent Van Etten moved to approve the recommendations from Fort Hays State University and the University of Kansas. Regent Schmidt seconded. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Bangerter, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Feuerborn. The motion carried.

(PowerPoint filed with Official Minutes)

FAFSA COMPLETION INITIATIVES
Vice President Archer stated that one of the recommendations that came out of the Future of Higher Education Council was for the Board to identify strategies to increase completions of the Free Application for Federal Student Aid (FAFSA) form. In 2020, less than half of Kansas high school graduates completed the FAFSA, which placed Kansas at 36th in the nation on completions. Dr. Archer noted that the FAFSA completion rate is an important indicator for the higher education system because it is linked to higher college going rates. FAFSA completion studies have indicated that completers are 63 percent more likely to enroll in college immediately after high school compared to non-completers. Vice President Archer reported that over the last several months Board staff and the Kansas State Department of Education (KSDE) identified two strategies to help boost FAFSA completion around the state: the FAFSA recognition program and FAFSA completion events.

The FAFSA recognition program will be a competition between high schools to see which ones can increase the number of students who complete the form. The program will start in the fall of 2021, and two high schools from each of the six Kansas State High School Activities Association divisions will be recognized as the winning schools in either September or October. Dr. Archer noted that the high school with the highest FAFSA completion percentage will be named the state

Kansas Board of Regents                           - 16 -                         February 17, 2021

champion and the high school with the most significant increase in FAFSA completion from the last year will be recognized as the most improved.

The FAFSA completion events will be scheduled between September and December either during or after school.  The events will provide information to seniors and their parents on what FAFSA is and financial aid representatives will be available at the event to answer any questions.  Dr. Archer noted that the Board office and KSDE will be sending guidance out on how a school or community can conduct one of these events.

*Fiscal Affairs and Audit*

DISTRIBUTION OF FY 2021 STATE FUNDS FOR TECHNICAL EDUCATION (EXCEL IN CTE, AO-K PROVISO) AND RECONCILE FY 2020 GED ACCELERATOR PAYMENT
Elaine Frisbie, Vice President for Finance and Administration, presented the proposed FY 2021 distribution of state funds for Technical Education (Excel in Career Technical Education and the Accelerating Opportunity-Kansas proviso).  She noted the amounts are based on current FY 2021 enrollment data submitted by the colleges and appropriations available to finance the program. The distribution amounts are also contingent upon the Board's assessment of each institution's performance pursuant to the performance agreement process.  Vice President Frisbie noted that after the AY 2020 data collection was closed, a process that requires each college president to certify the college's data, Allen County Community College identified an error in its high school data from the spring 2020 semester and requested that the collection be re-opened to allow them to correct their data error.  Vice President Frisbie described the process that the Board office used to assess this specific situation and request.  The Technical Education Authority reviewed all the information surrounding the request and decided that granting the request was not clearly allowable by state law, and would open the door for other institutions to make similar requests without any clear guideposts for analyzing those requests. The TEA therefore recommended against re-opening the collection.  Additionally, Vice President Frisbie presented the FY 2020 GED Accelerator payments that need to be reconciled.  Regent Rolph moved to approve the distributions and reconciliation.  Regent Van Etten seconded.  On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Bangerter, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Feuerborn.  The motion carried.  The following amounts were approved:

**Excel in CTE**

| Institution | FY 2021 Distribution for Fall 2020 Enrollment | FY 2020 (Prior Year) Reconciliation | FY 2021 Proposed Net January Distribution |
|---|---|---|---|
| Allen County Community College | $323,224 | ($486,014) | ($162,790) |
| Barton County Community College | $112,085 | ($44,839) | $67,246 |
| Butler Community College | $338,556 | ($47,406) | $291,150 |
| Cloud County Community College | $102,796 | $75,573 | $178,369 |
| Coffeyville Community College | $489,258 | ($80,934) | $408,324 |
| Colby Community College | $88,331 | ($72,063) | $16,268 |

Kansas Board of Regents                    - 17 -                    February 17, 2021

| | | | |
|---|---|---|---|
| Cowley County Community College | $389,137 | $38,260 | $427,397 |
| Dodge City Community College | $244,665 | ($79,678) | $164,987 |
| Flint Hills Technical College | $855,260 | $435,777 | $1,291,037 |
| Fort Scott Community College | $440,123 | $110,453 | $550,576 |
| Garden City Community College | $206,427 | $103,750 | $310,177 |
| Highland Community College | $628,722 | ($277,944) | $350,778 |
| Hutchinson Community College | $1,154,731 | ($506,304) | $648,427 |
| Independence Community College | $79,038 | ($9,282) | $69,756 |
| Johnson County Community College | $805,023 | ($82,942) | $722,081 |
| Kansas City Kansas Community College | $1,203,258 | ($58,959) | $1,144,299 |
| Labette Community College | $256,021 | ($4,835) | $251,186 |
| Manhattan Area Technical College | $247,906 | $168,749 | $416,655 |
| Neosho County Community College | $691,101 | $188,334 | $879,435 |
| North Central Kansas Technical College | $235,268 | $26,986 | $262,254 |
| Northwest Kansas Technical College | $495,697 | ($105,023) | $390,674 |
| Pratt Community College | $170,657 | ($90,063) | $80,594 |
| Salina Area Technical College | $527,200 | $10,343 | $537,543 |
| Seward County Community College | $386,644 | $234,855 | $621,499 |
| Washburn Institute of Technology | $2,186,369 | $339,885 | $2,526,254 |
| WSU Campus of Applied Sciences & Technology | $2,795,504 | $213,321 | $3,008,825 |
| **Total** | **$15,453,001** | **$    --** | **$15,453,001** |

### Accelerating Opportunity: Kansas

| Institution | FY 2021 Distribution for Fall 2020 Enrollment | FY 2020 (Prior Year) Reconciliation | FY 2021 Proposed Net January Distribution |
|---|---|---|---|
| Allen County Community College | $    -- | $    -- | $    -- |
| Barton County Community College | $32,256 | $16,667 | $48,923 |
| Butler Community College | $916 | ($5,017) | ($4,101) |
| Cloud County Community College | -- | -- | -- |
| Coffeyville Community College | -- | -- | -- |
| Colby Community College | $38,536 | $0 | $38,536 |
| Cowley County Community College | $43,110 | $3,606 | $46,716 |
| Dodge City Community College | -- | ($964) | ($964) |
| Flint Hills Technical College | -- | -- | -- |
| Fort Scott Community College | $3,456 | ($12,874) | ($9,418) |
| Garden City Community College | -- | $1,655 | $1,655 |
| Highland Community College | $15,881 | $43,686 | $59,567 |
| Hutchinson Community College | -- | ($7,072) | ($7,072) |

Kansas Board of Regents                    - 18 -                    February 17, 2021

| | | | |
|---|---|---|---|
| Independence Community College | -- | -- | -- |
| Johnson County Community College | $2,830 | ($7,566) | ($4,736) |
| Kansas City Kansas Community College | -- | $12,352 | $12,352 |
| Labette Community College | -- | -- | -- |
| Manhattan Area Technical College | -- | -- | -- |
| Neosho County Community College | -- | ($4,409) | ($4,409) |
| North Central Kansas Technical College | -- | -- | -- |
| Northwest Kansas Technical College | -- | -- | -- |
| Pratt Community College | -- | -- | -- |
| Salina Area Technical College | -- | ($9,366) | ($9,366) |
| Seward County Community College | -- | ($29,673) | ($29,673) |
| Washburn Institute of Technology | $64,160 | ($48,860) | $15,300 |
| WSU Campus of Applied Sciences & Technology | $45,738 | ($73,869) | ($28,131) |
| **Total** | **$246,883** | **($121,704)** | **$125,179** |

### GED Accelerator

| Institution | (For Reference) FY 2020 Distributions | Prior Year Reconciliation |
|---|---|---|
| Allen County Community College | $       -- | $       -- |
| Barton County Community College | $3,700 | $12,850 |
| Butler Community College | -- | $3,782 |
| Cloud County Community College | -- | -- |
| Coffeyville Community College | -- | |
| Colby Community College | -- | $13,360 |
| Cowley County Community College | $670 | $3,340 |
| Dodge City Community College | -- | -- |
| Flint Hills Technical College | -- | -- |
| Fort Scott Community College | -- | $1,282 |
| Garden City Community College | $2,840 | $840 |
| Highland Community College | -- | -- |
| Hutchinson Community College | -- | -- |
| Independence Community College | -- | -- |
| Johnson County Community College | -- | $5,180 |
| Kansas City Kansas Community College | -- | -- |
| Labette Community College | -- | -- |
| Manhattan Area Technical College | -- | -- |
| Neosho County Community College | -- | ($143) |
| North Central Kansas Technical College | -- | -- |
| Northwest Kansas Technical College | -- | -- |

| Pratt Community College | -- | -- |
|---|---|---|
| Salina Area Technical College | $3,000 | $7,340 |
| Seward County Community College | $840 | $4,510 |
| Washburn Institute of Technology | $15,530 | $10,380 |
| WSU Campus of Applied Sciences & Technology | -- | $6,180 |
| **Total** | **$26,580** | **$68,901** |

## AMENDMENT TO THE FY 2021 CAPITAL IMPROVEMENT PLAN AND PROGRAM STATEMENT FOR THE CLINTON HALL STUDENT SUCCESS CENTER - WSU

Chad Bristow, Director of Facilities, introduced Wichita State University's request to amend its FY 2021 Capital Improvement Plan to add the Clinton Hall project. With the construction of Woolsey Hall for the W. Frank Barton School of Business, Clinton Hall will be vacated. WSU wants to house all its student services in Clinton Hall, which will require the building to be renovated along with adding a new addition to the south side. The anticipated cost of the project is approximately $16.4 million, which will be funded by a combination of private funds, student fees, and revenue bond funds. Director Bristow stated that Clinton Hall has a Facilities Condition Index (FCI) in the "Fair" category and the renovation will resolve approximately $5.65 million of deferred maintenance costs in the building. WSU also anticipates that this project will allow for programs and building occupants in five university buildings (Brennan I, Brennan II, Brennan III, Intensive English Language Center, and the Intensive English Annex) to relocate into space vacated by the departments and centers moving into Clinton Hall. Demolishing these five buildings would reduce the overall campus footprint by 62,403 gross square feet and remove an additional $2.49 million of deferred maintenance backlog from the system. Director Bristow noted that WSU plans to use the University's general funds for the future operation and maintenance of the building. Regent Rolph moved to approve, and Regent Hutton seconded. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Bangerter, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Feuerborn. The motion carried.

## AMEND AGENDA

Due to time restrictions, Chair Feuerborn tabled the proposed policy on Athletic Conference Changes to the March Board meeting.

### *Other Matters*

## DEFERRED MAINTENANCE INITIATIVE

Regent Rolph stated the Board set its budget request back in September and asked for full funding of the higher education system. The Governor's budget was presented in January, which included a $37 million cut to the higher education system and an approximately $10.3 million operating grant appropriation to the Board. The Board would have the discretion to use this money as it sees fit and after speaking with several legislators the Fiscal Affairs and Audit Committee members believe it would be in the best interest of the Board to clearly state how it intends to use the discretionary operating grant. Regent Rolph noted that the Fiscal Affairs and Audit Committee discussed using the funds to address deferred maintenance instead of for operating expenses. He noted that deferred maintenance at the state universities is an ongoing issue that needs to be

addressed in a meaningful way.  Regent Hutton moved that the Board commit, beginning FY 2022 and for no less than 20 years, the $10,292,230 in the Governor's FY 2022 budget for the exclusive use toward payment of debt incurred as part of the Deferred Maintenance Initiative.  Regent Van Etten seconded.  Regent Schmidt asked why the timeframe was set at 20 years and whether this will be built in as annual state funding.  Regent Hutton noted that 20 years is a common timeline for bonding, but it could be shorter.  He also noted that the proposed funds would continue annually unless the Legislature goes in and removes it.  Vice President Frisbie stated the premise of the motion means the Board would need to seek bonding authority from the Legislature, which would then be back for a timeframe by a State General Fund appropriation.  She noted in the Governor's budget, Governor Kelly included a 2.5 percent salary increase for state employees, but excluded the university employees.  Instead the Governor recommended appropriating the $10.3 million to the Board, which would be annual funding.  President Scott stated that he understands the Board has discretion to use these funds, but he believes it will be hard for the faculty and staff on the campuses to understand why the funds are not being tied to salaries when the Governor arrived at the $10.3 million by calculating the proposed salary increases for other state employees.  President Scott also noted that the Governor's budget includes cuts to the universities that will not get backfilled.  Regent Bangerter stated that he understands that deferred maintenance is a large problem that needs to be addressed; however, with the fiscal challenges facing the universities at this time, he believes the funds should go to other priorities rather than deferred maintenance. Regent Feuerborn concurred.  On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, and Regent Van Etten.  The motion carried.  Regent Bangerter and Regent Feuerborn voted against the motion.

Regent Hutton then moved, with the second of Regent Rolph, that the Board instruct the staff to work with the universities to study, analyze, and bring back to the Board for consideration the following action items and policies:

1.  That, for a period of time deemed appropriate by the Board, the Board consider an amount up to $5 million be withheld from universities operating funds for the exclusive use toward payment of debt incurred as part of the Deferred Maintenance Initiative and that the report includes a proposed formula that incorporates the Facilities Condition Index for each campus when determining a Universities assessed portion of the $5 million.

2.  That, for a period of time deemed appropriate by the Board, the Board consider committing 50% of the annual proceeds from the Educational Building Fund (EBF) be dedicated for the exclusive use towards payment of debt incurred as part of the deferred maintenance initiative, with the balance of the funds reserved for the annual maintenance of qualifying facilities.

3.  The formation of a "Maintenance Assessment" policy that would establish the basis for assessing the amount of funds that a University would be charged annually for the maintenance of their facilities and what facilities, if any, would be exempt.  This report should include a proposed formula that takes into account each Universities Facility Condition Index, the gross area of their buildings, and an industry recognized method of

Kansas Board of Regents                    - 21 -                    February 17, 2021

estimating the annual cost to adequately maintain their buildings as the method of establishing a Universities charge for their Maintenance Assessment.

4. Formation of a "Classroom Efficiency" policy that would require each University to obtain the goal of bringing their campus facility utilization in line with the standards established in the Efficiency Report. This should include a proposed method for establishing the metrics that will drive the policy and for a reasonable transition time frame to allow for compliance with a policy, and what, if any, ramifications there are if compliance is not met.

5. Begin negotiations with a single qualified consultant to work with our universities to create a system wide master plan for the consolidation and demolition of facilities necessary to comply with the "Classroom Efficiency" policy and to bring a proposal to the board for consideration.

6. A "Maintenance Reserve" policy that requires any new proposed facility to establish a funding mechanism that provides for the annual maintenance of the new building for a period of no less than 50 years, with the amount established by an independent industry recognized consultant. This report should also include what buildings would be exempt as well as acceptable alternative methods.

The Board discussed the elements of the motion and some Regents were concerned about the language and scope of the motion. It was clarified that Board and university staff are being charged with analyzing the six items, which does not mean the Board is going to move forward with the proposed items. President Myers stated that the space utilization study did not include research areas and he believes those spaces should be included and the Regents concurred. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Bangerter, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Feuerborn. The motion carried. It was noted that the Board will continue to discuss its deferred maintenance initiative at the March meeting.

<u>LEGISLATIVE AND BUDGET UPDATE</u>
Matt Casey, Director of Government Relations, presented the legislative and budget update. The budget process is moving quickly through both Chambers. Earlier today the House Appropriations Committee received the higher education budget sub-committee report. During the Committee meeting, Representative Tarwater made an amendment to the budget to refund students 50 percent of their tuition for all virtual days that they were not in person in the classroom and 100 percent of the tuition for the days where the academic calendar was cut short during the semester. This amendment was adopted but the Committee Chair requested to have the Board and the university CEO's present information on how classes were offered during the pandemic, and how the federal funds have been utilized to help with the financial impact due to COVID-19. These presentations will be scheduled in early March after turnaround. The Committee will then work its mega budget bill. Director Casey also provided an update on the progress of the Board's non-budgetary legislative items.

Kansas Board of Regents                    - 22 -                    February 17, 2021

**<u>ADJOURNMENT</u>**
The Chair adjourned the meeting at 5:28 p.m.


_____          _____
Blake Flanders, President and CEO          Bill Feuerborn, Chair

**Exhibit 5**

**KANSAS BOARD OF REGENTS**
MINUTES
March 17-18, 2021

The March 17, 2021, meeting of the Kansas Board of Regents was called to order by Chair Bill Feuerborn at 1:30 p.m.  The meeting was held in the Board Office located in the Curtis State Office Building, 1000 S.W. Jackson, Suite 520, Topeka.  Proper notice was given according to law.

MEMBERS PRESENT:        Bill Feuerborn, Chair
                        Cheryl Harrison-Lee, Vice Chair
                        Shane Bangerter
                        Ann Brandau-Murguia
                        Mark Hutton
                        Shelly Kiblinger
                        Jon Rolph
                        Allen Schmidt
                        Helen Van Etten

**ANNOUNCEMENT**
Chair Feuerborn stated that due to the Shawnee County emergency order issued March 8 and its limitations on mass gatherings of more than 25 people, today's meeting is being conducted in a quasi-virtual format, with members of the Board, a few Board staff, and university and college CEOs attending in person. Other Board staff and all university staff are participating remotely, and the public is accessing the meeting via live broadcast on YouTube. The Board meeting is being conducted pursuant to the Attorney General's regulation for quasi-virtual meetings.  He asked all participants to place their microphones on mute when they are not speaking to allow listeners and observers to hear the meeting unimpeded.  Chair Feuerborn stated that participants should ask to be recognized if they have a question or comment and when recognized, the participant should state their name and title so he or she can be identified by the audience.  Chair Feuerborn noted for each action item, a roll call vote would be taken to be clear how each Regent has voted.  However, a roll call vote will not be taken for the approval of the minutes and no motion is needed to adjourn the meeting.  It was also noted that there will be no opportunity for public comment during this meeting and there will be an executive session toward the end of the meeting.  Chair Feuerborn explained the process to be used for the executive session.

**PLEDGE OF ALLEGIANCE**
The Pledge of Allegiance was recited.

**APPROVAL OF MINUTES**
Regent Van Etten moved that the minutes of the February 17, 2021 meeting be approved. Following the second of Regent Rolph, the motion carried.

**GENERAL REPORTS**

Kansas Board of Regents        - 2 -        March 17-18, 2021

## REPORT FROM CHAIR

Chair Feuerborn welcomed everyone and noted that the restrictions related to the pandemic have loosened, which has allowed the majority of the Board to meet in-person in Topeka. He hopes the virus count continues to decline so that future Board meetings can return to a normal format. Chair Feuerborn then announced that the President and CEO report will be presented by President Flanders later in the agenda because he is currently presenting testimony to a legislative committee.

## REPORT FROM SYSTEM COUNCIL OF PRESIDENTS

President Rittle presented the report for the System Council of Presidents. The Council received information on strategies to increase the College Going Rate, which has declined for recent years in Kansas. One initiative that is being implemented is increasing the number of students who complete the Free Application for Federal Student Aid (FAFSA) form. The Board received information on the strategies tied to this initiative last month, which included the FAFSA recognition program and FAFSA completion events. President Rittle noted that the Council asked for the FAFSA completion data to be broken down by ethnicity and/or subpopulations so that they have a better understanding of the environment in Kansas. The Council then received a report from the System Council of Chief Academic Officers on Advanced Placement Exams and transfer and articulation. The last item the Council discussed was the initiative to close the equity gaps in the higher education system. The initiative is a part of the Board's strategic plan, *Building a Future*. The Council is interested in identifying best practices to reduce the equity gaps, and it was noted that President Flanders along with several other institutional leaders have reached out to Georgia State University's National Institute for Student Success for more information on how we might implement best practices learned at Georgia State University..

## INTRODUCTIONS

Chancellor Girod introduced the University of Kansas's new Chief Financial Officer, Jeff DeWitt, and Interim Athletic Director, Kurt Watson.

## REPORT FROM PRESIDENT AND CEO

President Flanders reported that the Board received a Grant Award Notification from the U.S. Department of Education under the Governor's Emergency Education Relief (GEER) Fund round two program in the amount of $11.7 million. President Flanders is recommending these funds be spent on targeted initiatives tied to the Board's strategic plan - $5 million to address equity gaps, $4.5 million to address student well-being, $2 million to address the College Going Rate, and $30,000 to increase open educational resources (OER). However, President Flanders noted the Board office is still waiting on guidance to determine exactly how the funds can be spent. Additionally, President Flanders reported that in the FY 2021 budget, the Board was appropriated $20,000 for the "Governor's Scholars Program." Last year, these funds were awarded to the four community colleges with the highest student success index. This year, the funds will be awarded to the four technical colleges with the highest student success index – Salina Area Technical College, Flint Hills Technical College, North Central Kansas Technical College, and Washburn Tech. Each college will receive $5,000 to award five Governor's Scholarships to students with financial need who are enrolled at the colleges. He noted this award is a great opportunity to provide some students with financial assistance.

RAZE BUILDING – KSU
Kansas State University received approval to raze a storage shed located at 2209 Agronomy Field Road (building #36700-00555) and a farm equipment storage shed located at 2305 Agronomy Central Road (building #36700-00529). The buildings are on the Agronomy farm north of Kimball Avenue and tearing them down will allow the City of Manhattan to construct a new access road, which was recommended by a Traffic Improvement Study conducted by the City of Manhattan in 2014. The cost to raze the two buildings, the replacement value of the existing buildings and the new access road will be funded from the City's road improvement project.

*Technical Authority*

REALIGNMENT OF WELDING PROGRAM
The revisions to the Welding Technology program alignment were approved.

(New Alignment Map filed with Official Minutes)

EXCEL IN CTE FEES FOR DODGE CITY COMMUNITY COLLEGE
The Excel in CTE Fees for Dodge City Community College's Home Health Aide program were approved.

(Fees filed with Official Minutes)

**CONSIDERATION OF DISCUSSION AGENDA**

*Academic Affairs*

LOW ENROLLMENT PROGRAMS – PSU AND ESU
Vice President Archer stated that Emporia State University and Pittsburg State University have completed their internal reviews of their low-enrollment programs. He introduced Provost Cordle and Provost Smith to present their respective university's recommendations. He also reminded the Board that under the strategic program alignment policy, the Board decides the final outcome of these programs.

Provost Cordle stated that Emporia State University reviewed 13 programs under this process. He noted that Music Education was discontinued as a separate program several years ago but is currently on the list because ESU is teaching out the remainder of the students who are enrolled in it. The Biochemistry and Molecular Biology program has no costs associated with it because its courses are offered by the Biology and Chemistry programs. Provost Cordle stated the program does not attract a lot of students, but it's a great option for the ones who choose it, which is why ESU recommends continuing it. Physical Sciences is another program that does not cost the University anything to offer because all of its required courses are offered by other programs. ESU recommends continuing the program. Health Education is a second licensure option for Physical Education majors. It does have some instructional costs, but the courses generate enough tuition and fee revenue to cover all but $200 of the cost. Provost Cordle stated that ESU recommends

merging Health Education with the Physical Education program, which should gain some efficiencies. Business Education is a teacher licensure program that does generate some revenue for the University. ESU recommends continuing the program. Provost Cordle then reviewed the following six programs: 1) Chemistry, 2) Economics, 3) Modern Languages, 4) Earth Science, 5) History, and 6) Political Science. Each of these programs have a small number of majors but they are productive programs that generate net revenue for the University because they teach a lot of general education courses. The University recommends continuing all six programs. Theatre is a big part of the cultural life of the campus and the community, but it is expensive to offer. Provost Cordle stated he has never been associated with a Theatre program anywhere that generated net revenue, but private donors do give to the program. ESU recommends continuing the program and will continue to review its costs and funding as a part of ESU's comprehensive budget reduction process. Physics does not attract many majors, but it is an important degree for society. Provost Cordle stated that the University wants to continue to review this program as part of its comprehensive budget reduction process. Provost Cordle stated that ESU's comprehensive budget reduction process is currently underway and that the University must achieve $4,700,000 in permanent budget savings. Significant cuts will take place in academic programs, but most of those savings will come from programs that are not being reviewed under this process.

Provost Smith reported that since 2009, Pittsburg State University has discontinued 52 programs, certificates, minors, and emphases. Under the Board's program review process, PSU looked at 25 programs. Pittsburg State is recommending the following programs be discontinued: Graphic Design; French Language Teacher Education; Psychology Teacher Education; Spanish Language and Literature; Spanish Language Teacher Education; Biology Teacher Education; Chemistry Teacher Education, Physics Teacher Education; Family and Consumer Science/Home Economics Teacher Education; Mathematics Teacher Education; Teacher Education and Professional Development, Specific Subject Areas, Other; and Clinical Laboratory Science/Medical Technology/Technologist. Provost Smith stated that many of these programs have already been discontinued or are currently in the process of elimination. He also noted that students enrolled in these programs will be allowed to finish their degrees. PSU recommends continuing the following academic support programs: General Economics, General Foreign Languages and Literatures, Geography, General Music Performance, General Physics, General Political Science and Government, and General Sociology. For General Mathematics and General History, PSU recommends discontinuing the Bachelor of Arts degrees and continuing the Bachelor of Science degrees. PSU recommends continuing its two interdisciplinary and coordinating programs - Multi-/Interdisciplinary Studies and Polymer Chemistry. Provost Smith stated that PSU's Interior Design program was started in 2016 and has been growing in enrollment each year. Since this is a new program, PSU recommends continuing it. The International Business program allows students to develop and understand business tactics and strategies as they relate to a changing international marketing place. Provost Smith stated that the faculty are evaluating this program and therefore, PSU recommends monitoring it.

Regent Kiblinger moved to approve the recommendations from Emporia State University and Pittsburg State University. Regent Schmidt seconded. Regent Hutton stated that there seems to be a lot of programs that feed the core curriculum and wants to know if the universities need that many options to satisfy the credit hour requirements. President Flanders stated that the Board may want to discuss how to make the review process at the Board level more efficient and believes this

could be a Board retreat topic. He noted that Vice President Archer and the Provosts are the subject matter experts and need to be part of the discussion. Regent Hutton stated that under program costs, the universities are only listing the total salaries and benefits attached to the program and noted the full cost of a program would also include the facility operational expenses. He wanted to know if those costs could be calculated into the total cost of the program. Regent Harrison-Lee believes this would be a good retreat topic. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Bangerter, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Feuerborn. The motion carried.

(Reports filed with Official Minutes)

AMENDMENTS TO NEW ACADEMIC UNITY AND ACADEMIC PROGRAMS POLICY
Vice President Archer presented the proposed amendments to the New Academic Units and Academic Programs policy. The Board Academic Affairs Standing Committee determined it was necessary to amend the policy to ensure the colleges have an opportunity to provide comments when a university wants to offer an associate degree. Regent Van Etten moved to approve the policy amendments. Regent Kiblinger seconded. On a roll call vote, the following Regents voted affirmatively to adopt the motion: Regent Harrison-Lee, Regent Bangerter, Regent Murguia, Regent Hutton, Regent Kiblinger, Regent Rolph, Regent Schmidt, Regent Van Etten, and Regent Feuerborn. The motion carried. The following amendments were adopted:

**Chapter II**

**A. ACADEMIC AFFAIRS**

7. NEW ACADEMIC UNITS AND ACADEMIC PROGRAMS
. . .
    d. Approval of New Academic Program Proposals

    i. Overview

        (1) When the Board considers the establishment of a new degree program or major, information regarding its need, quality, cost and means of assessment become paramount. The minimization of unnecessary program duplication is a high priority of the Kansas Board of Regents.

        (2) State universities must submit a complete program proposal to ~~board~~ Board staff and enter the proposed program into the Program Inventory Database. Once ~~board~~ Board staff receives a complete program proposal and the program is entered into the Program Inventory Database, the proposal will be available electronically for institutions to view. All institutions shall be automatically notified of the proposed program by email through the Program Inventory Database. If a state university wishes to express concerns about a proposed associate, baccalaureate, masters, or doctoral degree, the president or chief academic officer shall address such concerns in writing to the Board staff within 45 calendar days of notification of the proposed

program. ~~Institutions with concerns, comments or objections to the program must state those in writing to Board Staff within 45 calendar days of notification of the proposed program.~~ If a community or technical college wishes to express concerns about a proposed associate degree, the president or chief academic officer shall address such concerns in writing to the Board staff within 45 calendar days of notification of the proposed program. During the 45 calendar day ~~calendar~~ comment period, the list of concerns, comments and objections will be compiled by Board staff and forwarded to the state university for follow-up. The state university proposing the program is expected to communicate with other institutions filing concerns, comments or objections to minimize or eliminate the identified issues. Final proposals must include evidence that concerns, comments or objections have been addressed. This process is designed to make the approval process more transparent, improve proposals and reduce potential conflict related to unnecessary duplication. The 45 calendar day ~~calendar~~ comment period shall run concurrently with the approval procedures for new academic program proposals.

The Board President and Chief Executive Officer, or designee, shall determine if each proposed program is similar to others in the state and may serve the same potential student population. A similar program is one that has a like CIP code, title, content or competencies. If the President and Chief Executive Officer, or designee, determines that one or more similar programs exist, the following information included in the program proposal narrative shall be taken into account: the ability/inability to offer the program collaboratively, the level of student interest in the program, existing and future labor market demand, and availability of clinical sites, if applicable.

Board staff shall compile, analyze and make recommendations to the Board on the information provided in the program proposal narrative. The recommendations and information provided shall be reviewed by the Board Academic Affairs Standing Committee to determine whether the program represents unnecessary program duplication before forwarding the proposal to the full Board for action.

<u>CHANGES TO ADMISSION REQUIREMENTS – KU</u>

Jean Redeker, KU's Assistant Vice Provost for Academic Affairs, introduced the University of Kansas' proposed changes to its qualified admission requirements. Dr. Redeker stated that KU currently offers two guaranteed admission options for freshmen applications received by February 1st: 1) applicants with at least a score of 21 on the ACT and a minimum 3.25 cumulative high school GPA, or 2) applicants with at least a score of 24 on the ACT and a minimum 3.0 cumulative high school GPA. Both options require that a high school student achieve at least a 2.5 GPA on any college courses taken in high school. Dr. Redeker noted that last spring, the pandemic caused ACT/SAT testing sites to close and all in-person ACT/SAT testing appointments were cancelled. Because of KU's admission requirements, the University was only able to admit freshmen without test scores through an existing option outlined in current regulations. That option allows applicants with no test scores to be admitted through a special review but does not guarantee admission. Dr. Redeker stated that KU is proposing two options (listed below) that will accommodate applicants

Kansas Board of Regents                    - 21 -                    March 17-18, 2021

**ADJOURNMENT**
The Chair adjourned the meeting at 12:22 p.m.

_____        _____
Blake Flanders, President and CEO        Bill Feuerborn, Chair

Exhibit 6

*March 17-18, 2021*                                                                                           *Agenda*

# MEETING AGENDA

The Kansas Board of Regents will meet in the Board Room located in the Curtis State Office Building at 1000 SW Jackson, Suite 520, Topeka, Kansas, 66612.

### Wednesday, March 17, 2021

| | | |
|---|---|---|
| **I.** | **Call To Order** | Regent Feuerborn, Chair |
| **II.** | **The Pledge of Allegiance** | |
| **III.** | **Approval of Minutes** | |
| | *A.*   February 17, 2021 Board Minutes | *p. 6* |
| **IV.** | **Introductions and Reports** | |
| | *A.*   *Introductions* | |
| | *B.*   *Report from the Chair* | Regent Feuerborn, Chair |
| | *C.*   *Report from the President & CEO* | Blake Flanders, President & CEO |
| | *D.*   *Report from System Council of Presidents* | President Rittle |
| | *E.*   *Report from Council of Presidents* | Interim President Muma |
| | *F.*   *Report from Council of Faculty Senate Presidents* | Aleks Sternfeld-Dunn |
| | *G.*   *Report from Students' Advisory Committee* | Rija Khan |
| | *H.*   *Report from the Community Colleges* | President Rittle |
| | *I.*   *Report from the Technical Colleges* | President Genandt |
| | *J.*   *Report from the University CEOs* | |
| **V.** | **Standing Committee Reports** | |
| | *A.*   *Academic Affairs* | Regent Kiblinger |
| | *B.*   *Fiscal Affairs & Audit* | Regent Rolph |
| | *C.*   *Governance* | Regent Feuerborn |
| | *D.*   *Retirement Plan* | Regent Bangerter |
| **VI.** | **Approval of Consent Agenda** | |
| | *A.*   *Academic Affairs* | |

**VI. A.**
1. Act on Request to Seek Accreditation for its Master of Engineering and its Master of Science in Project Management – KU — Daniel Archer, VP, Academic Affairs — *p. 24*

2. Act on Request to Offer a Master of Arts in Applied Sociology – ESU — *p. 26*

*B.*   *Fiscal Affairs & Audit*
1. Amend the FY 2022 Capital Improvement Plan and Approve Program Plan for Weede Physical Education Building – PSU — Chad Bristow, Director of Facilities — *p. 36*

*March 17-18, 2021*                                                      *Agenda*

    2.   Act on Request to Raze Buildings – KSU                                *p. 36*

  C.  *Technical Authority*
    1.   Act on Realignment of Welding Program          Scott Smathers,      *p. 37*
                                              VP, Workforce Development

    2.   Act on Excel in CTE Fees for Dodge City Community      *p. 39*
        College

**VII.**  **Consideration of Discussion Agenda**
  A.  *Academic Affairs*                                Regent Kiblinger
    1.   Review Low Enrollment Programs Under Strategic    Daniel Archer,      *p. 41*
        Program Alignment                           VP, Academic Affairs
          &bull;  Pittsburg State University – Provost Smith
          &bull;  Emporia State University – Provost Cordle

    2.   Act on Proposed Revisions to the New Academic Units   Daniel Archer,      *p. 44*
        and Academic Programs Policy                VP, Academic Affairs

    3.   Act on Request to Change Freshman Admission                  *p. 46*
        Requirements – KU

  B.  *Fiscal Affairs & Audit*                           Regent Rolph
    1.   Act on Request to Extend Suspension of Board Policy   Elaine Frisbie      *p. 48*
        Related to Payment of Tuition and Fees        VP, Finance & Administration

  C.  *Governance*                                   Regent Feuerborn
    1.   Act on Proposed Board Policy; Change of Athletic    Julene Miller,      *p. 49*
        Conferences                               General Counsel

    2.   Act on Proposed Free Expression Statement and              *p. 50*
        Companion Policies

  D.  *Other Matters*
    1.   Act on Request to Approve Granting of Honorary     Chancellor Girod     *p. 55*
        Degree – KU

    2.   Receive Legislative Update                   Matt Casey,       *p. 55*
                                              Director, Government
                                              Relations

**VIII.**  **Executive Session**
    Board of Regents – Personnel Matters Relating to Non-Elected
    Personnel

*March 17-18, 2021*                                                                 *Agenda*

<u>**Thursday, March 18, 2021**</u>

**IX.**     **Consideration of Discussion Agenda**
    *A.   Fiscal Affairs & Audit*                          Regent Rolph
        1.   Discuss Facility Renewal Initiative                                    *p. 56*

**X.**      **Adjournment**

*March 17-18, 2021*                                         *Discussion Agenda | Wednesday*

# DISCUSSION AGENDA

VII.   **Consideration of Discussion Agenda**
    A.   *Academic Affairs*                                   Regent Kiblinger
        **1.**   **Review Low Enrollment Programs Under Strategic**   **Daniel Archer,**
           **Program Alignment**                              **VP, Academic Affairs**
            • **Pittsburg State University – Provost Smith**
            • **Emporia State University – Provost Cordle**

**Summary**

*In June 2020, the Board endorsed a plan to review low-enrollment programs under strategic program alignment in FY 21. This was subsequently articulated as an FY 21 Board Goal in October 2020. Today, Pittsburg State University (PSU) and Emporia State University (ESU) will present their findings and recommendations.*

**Background**

A low-enrollment undergraduate program is defined as a program with less than 25 juniors and seniors majoring in the program. A summary of the active low-enrollment undergraduate programs that are at least 5-years old are detailed below by each average major range.

| University | # of Programs Averaging 17-24 Majors | # of Programs Averaging 8-16 Majors | # of Programs Averaging 1-7 Majors | Totals |
|---|---|---|---|---|
| Emporia State University | 6 | 5 | 2 | 13 |
| Fort Hays State University | 1 | 4 | 1 | 6 |
| Kansas State University | 1 | 6 | 0 | 7 |
| Pittsburg State University | 6 | 7 | 3 | 16 |
| University of Kansas | 5 | 6 | 4 | 15 |
| Wichita State University | 1 | 1 | 1 | 3 |
| Totals | 20 | 29 | 11 | 60 |

These data were intended to provide foundational information about these programs. Given that this review was limited, the Board determined that more detailed analysis is needed to gauge the breadth and depth of these programs. As such, the Board concluded that the state universities would review all their low-enrollment programs under strategic program alignment.

*Board Goal*

On October 14, 2020, the Board established that this review would be an FY 21 Board goal. This goal was articulated as follows:
    "Review the 60 low-enrollment programs at the six state universities to assess program viability and strengthen the efficiency of degree program inventories."

*Scope of the Review*

This review will primarily be based on assessing three core areas: essentiality, productivity, and cost effectiveness. For each program reviewed, at minimum, the university will include the following:
    1.   Faculty profile, which includes:
        • number of faculty dedicated solely to the program; and
        • number of department faculty teaching:

*March 17-18, 2021*                                    *Discussion Agenda | Wednesday*

- core courses in the program;
- elective courses in the program; and
- general education courses.

2.   A written narrative with supporting data to address:
   - the date in which the program was founded;
   - the degree to which the program supports the university's mission, strategic plan, or goals;
   - program productivity beyond number of majors;
   - cost effectiveness;
   - employment demand (current and future); and
   - program strengths and weaknesses.
3.   A recommendation to:
   - continue the program;
   - discontinue the program;
   - additionally review the program; or
   - merge the program.

4.   A written narrative to justify the recommendation.

At the December 1, 2020, the Board of Academic Affairs Standing Committee (BAASC) agreed that specific cost-related information be added to the review.  This includes:

Direct Instructional Expenditures

| Source | FY 2020 |
|---|---|
| Salaries[1] | |
| Benefits[2] | |
| Other Personnel Expenditures[3] | |
| Total | |

Sources that Support the Program

| Source | FY 2020 |
|---|---|
| Tuition[4] | |
| Fees[5] | |
| State Funds | |
| Other Sources If this applies, please specify each source and its amount. | |

---

[1] Report all wages paid to support the instructional function in a given department or program during the fiscal year. While these will largely be faculty salaries, be sure to include clerical (e.g., department secretary), professionals (e.g., lab technicians), graduate student stipends (but not tuition waivers), and any other personnel who support the teaching function and whose salaries and wages are paid from the department's/program's instructional budget.

[2] Report expenditures for benefits associated with the personnel for whom salaries and wages were reported on the previous entry.

[3] This category includes non-personnel items such as travel, supplies and expenses (e.g. printing, search expenses), non-capital equipment purchases (lab supplies, office equipment and software), etc., that are typically part of a department or program's cost of doing business.

[4] Report all tuition generated from student credit hours taught by faculty in a given department or program during the fiscal year.

[5] Report all fees generated from enrollment in courses taught by faculty in a given department or program during the fiscal year.

*March 17-18, 2021*                                    *Discussion Agenda | Wednesday*

| For example:<br>$50,000 from Private Gifts<br>$50,000 from a Federal Grant<br>$100,000 Total | |
|---|---|
| Total | |

*Review Process and Final Outcome*

While the university will issue a recommendation, the Board will have the final decision on determining the outcome of each respective program reviewed.  The findings and recommendations from PSU and ESU are detailed in the attachments.

## ESU Strategic Program Alignment Reviews

### Business and Innovation Teacher Education

**Average number of majors:**  8
**Average number of graduates:**  4

**Faculty Profile**

*Number of faculty dedicated solely to the program:*  None.  The Business Education (BSBE) program, housed in the Department of Business Administration, requires only two courses of its own: BE344 Office System Applications and BE573 Business Curriculum & Teaching Methods.  These two courses are taught by an adjunct faculty member.  All other required courses are offered through the Bachelor of Science in Business program and taught by that program's faculty.

*Number of department faculty teaching core courses in the program:*  8
*Number of department faculty teaching elective courses in the program:*  0 (no electives offered)
*Number of department faculty teaching general education courses:*  5

**Program Narrative**

*Program founded:*  The Business Education program was founded in the 1930s to address the need for secondary education teachers to provide instruction on business, industry, and the economy, and to teach students to manage their own business endeavors. Over time the program evolved to meet the needs of the state in preparing professional educators to teach courses in accounting, computer technologies, personal finance, entrepreneurship, and economics.

*The degree to which the program supports the university's mission, strategic plan, or goals:*  The BSBE program aligns directly with the university's mission of preparing students for lifelong learning, rewarding careers, and adaptive leadership. ESU was founded as the Kansas State Normal School, and teacher education has remained central to the university's mission. The program supports Goal 3 of the university's Strategic Plan (*Enhance the competitive role of Kansas by enrolling, retaining, and graduating students ready for life and career*) by preparing highly qualified, classroom-ready business education teachers.

*Program productivity beyond number of majors:*  Emporia State University is one of the few universities in the state to offer a Business Education program.  While small, the program meets a need in Kansas school districts for licensed business teachers trained to offer courses in Accounting, Financial Management, Entrepreneurship, Economics, Computer and Technology Applications, and other business subjects at the middle and secondary school levels.  Business Education graduates also advise student organizations such as the Future Business Leaders of America (FBLA).

*Cost effectiveness:*  With only two dedicated courses, both taught by an adjunct faculty member, the program is very cost effective.

Direct Instructional Expenditures

| Source | FY 2020 |
|---|---|
| Salaries[1] | $ 5,999.98 |
| Benefits[2] | $ 525.30 |
| Other Personnel Expenditures[3] | |
| Total | $ 6,525.28 |

| Sources that Support the Program | |
|---|---|
| Source | FY 2020 |
| Tuition[1] | $ 7,579.80 |
| Fees[2] | $ 720.00 |
| State Funds | |
| Other Sources | |
| Total | $ 8,299.80 |

| Net Revenue (Loss) | $ 1,774.52 |
|---|---|

***Employment demand (current and future):***  There is a strong demand for the program's graduates, due to state and nationwide shortages of teachers who are credentialed in the Business teaching field.

***Program strengths and weaknesses:***  The Business Education program benefits from ESU's reputation as one of the premier educator preparation programs in the nation. The strong demand for business teachers, coupled with the program's history of placing successful teachers in Kansas school districts, ensures excellent job prospects for program graduates.  This is a program that meets a real need in the State of Kansas.

Weaknesses include a curriculum that, while solid and effective, is limited by the small size of the program. Environmental factors create headwinds to student recruitment: Fewer high school graduates are choosing teacher education as a college major than in the past, and business teachers' salaries are lower than those of business graduates who choose other careers.

**Recommendation:**  Continue the program.

**Justification for Recommendation:**  The Business Education program operates at very low cost and addresses a real need for middle and secondary business teachers in Kansas schools.

Emporia State University                                                                                                    2

## Health Teacher Education

**Average number of majors:**  6
**Average number of graduates:**  6

**Faculty Profile**

*Number of faculty dedicated solely to the program:*  None.  The Health Education program, housed in the Department of Health, Physical Education & Recreation, is available only as a 24-credit second teaching field; it is not a stand-alone major and has no faculty of its own.  All nine required courses are taught by faculty members assigned to the department's other programs, and all except three of those courses are requirements in other programs.  One course is also a university general education course.

**Program Narrative**

*Program founded:*  The Health Education program was initiated in 2003, when the State of Kansas enabled and regulated the Health Education teaching license.  The program is accredited by the Kansas State Department of Education (KSDE). Upon degree completion and completion of the Health Education program, students are eligible to become licensed health education teachers in the state of Kansas.

*The degree to which the program supports the university's mission, strategic plan, or goals:*  Emporia State University's institutional vision is "changing lives for the common good"—an acknowledgment of the university's role in improving the lives of Kansans.  ESU was founded as the Kansas State Normal School, and teacher education has remained central to the university's mission. The program supports Goal 3 of the university's Strategic Plan (*Enhance the competitive role of Kansas by enrolling, retaining, and graduating students ready for life and career*) by preparing highly qualified, classroom-ready health education teachers who advance the well-being of today's youth and the development of tomorrow's citizenry.

*Program productivity beyond number of majors:*  Emporia State University is one of the few universities in the state to offer licensure in Health Education.  While small, the program meets a need in Kansas school districts for licensed health education teachers.  Just as important, the program offers teacher education students the opportunity to supplement their first teaching field (usually Physical Education) with a second teaching field, thereby enhancing their employability and their career prospects.

*Cost effectiveness:*  The Health Education program is highly cost effective.  Of the 24 program credit hours, 14 are shared among two of the other undergraduate programs in the department (Physical Education and Health & Human Performance). The ten hours that are specific to the Health Education program consist of three courses, split between semesters (two courses in the Fall and one course in the Spring). These three dedicated courses are taught by faculty members assigned to the department's other programs.

Direct Instructional Expenditures

| Source | FY 2020 |
|---|---|
| Salaries[1] | $ 16,062.82 |
| Benefits[2] | $ 6,293.39 |

| Other Personnel Expenditures[3] | |
|---|---|
| Total | $ 22,356.21 |

| Sources that Support the Program | |
|---|---|
| Source | FY 2020 |
| Tuition[1] | $ 14,689.72 |
| Fees[2] | $ 7,457.90 |
| State Funds | |
| Other Sources | |
| Total | $ 22,147.62 |

| Net Revenue (Loss) | $ (208.59) |
|---|---|

*Employment demand (current and future):*  Kansas school districts face a significant and worsening shortage of teachers licensed in Health Education, which creates a high demand for the program's graduates. At the elementary and middle school levels, the State of Kansas requires that physical education include instruction in health and human sexuality. At the high school level, Kansas requires a minimum of one unit of physical education, which must include health education.  While some Physical Educators also have licensure in Health Education, many do not. As a result, Health Education classes in Kansas schools have been increasingly taught by teachers who lack licensure in Health Education.  The percentage of Health Education classes taught by Physical Educators has risen from approximately 56% in 2014 to nearly 70% currently.

*Program strengths and weaknesses:*  The Health Education program addresses the Kansas Health Education Standards and ensures that our students possess strong content knowledge, making them valuable assets for Kansas schools. The program also benefits from ESU's reputation as one of the premier educator preparation programs in the nation. The high demand for Health Education teachers, coupled with the department's history of placing successful teachers in Kansas school districts, ensures excellent job prospects for program graduates.  This is a program that meets a real need in the State of Kansas.

An obstacle to higher enrollment is that acquiring Health Education as a second teaching field does require additional college credit beyond what is needed for a BSE in a single teaching field. This additional time and cost can be a disincentive for some students.

**Recommendation:**  Merge the program with the Physical Education program, resulting in a single program that prepares students for licensure in both areas.

Emporia State University                                                                                                          4

**Justification for Recommendation**

As noted above, an increasing majority of Health Education classes in Kansas schools are being taught by Physical Educators. The Department of Health, Physical Education & Recreation believes that by combining the Health Education program with our Physical Education program, we can retain the most viable components of Health Education and ensure that our Physical Education students meet all expectations set forth by the State of Kansas for teaching Health Education.

## Music Teacher Education

Music Teacher Education was discontinued several years ago and merged with Music, General. Five-year average enrollment and graduation numbers still show some students who had not yet either completed Music Teacher Education and graduated, or transitioned to Music, General.

## Foreign Languages and Literatures, General

**Average number of majors:** 19
**Average number of graduates:** 6

**Faculty Profile**

*Number of faculty dedicated solely to the program:* Two faculty members in the Department of English, Modern Languages & Journalism are assigned to the Modern Languages program, with responsibility for teaching Core, Elective, and General Education courses. In addition, four Program Assistants assist in delivering instruction in Spanish, French, and German.

*Number of department faculty teaching core courses in the program:* 2
*Number of department faculty teaching elective courses in the program:* 2
*Number of department faculty teaching general education courses:* 10

**Program Narrative**

The Modern Languages Program awards two undergraduate degrees: the Bachelor of Science in Education and the Bachelor of Arts in Modern Languages with a concentration in Spanish. The program also offers a Minor in Modern Languages with a concentration in Spanish, German or French; and a Minor in Latin American Studies.

*Program founded:* The Modern Languages program was founded around 1921.

*The degree to which the program supports the university's mission, strategic plan, or goals:*
The program aligns directly with ESU's mission of *"preparing students for lifelong learning, rewarding careers, and adaptive leadership"* by producing bilingual professionals who are capable of leading in our bilingual country, both professionally and in their personal relationships. Our BSE prepares Spanish teachers who will teach in PK-12 Kansas schools. The BA prepares students for bilingual needs in business, economics, politics, non-profits and social services for our nation's multilingual workforce. The program supports ESU's strategic goal to *"become a model for diversity, equity, and inclusion"* by cultivating intercultural competencies, and by enrolling students from the Hispanic communities that comprise 27% of the Emporia population. ESU's vision is *"changing lives for the common good."* The program's

Emporia State University                                                                                     5

importance in actualizing this vision is underscored by the fact that the U.S. is the second largest Spanish speaking country. Demographics indicate that Spanish will be spoken by at least 30% of the U.S. population by 2050.

***Program productivity beyond number of majors:***  The Modern Languages program recently updated its curriculum, adding a Spanish Heritage Language course and adapting the placement test to correspond to curricular changes. By placing students at the appropriate intermediate level, they are able to complete the program in (8) eight semesters, taking only one Spanish course per semester. Hybrid and completely online sections of the Business and Medical Spanish courses are offered at all levels. In this way, the program supports nursing students who double major and are working to meet the unprecedented need for bilinguals in the healthcare field. The program offers high-impact leaning opportunities such as domestic and international study abroad experiences (e.g., New Mexico and Colombia), faculty-mentored research, and contract courses through the Honors College. A number or recent publications were co-authored by students, demonstrating the program's commitment to high-impact applied learning.

***Cost effectiveness:***  The Modern Languages program operates efficiently and cost-effectively, generating significant net revenue for the university.

Direct Instructional Expenditures



| Source | FY 2020 |
|---|---|
| Salaries[1] | $ 213,230.53 |
| Benefits[2] | $ 49,561.24 |
| Other Personnel Expenditures[3] | $ 8,100.00 |
| Total | $ 270,891.77 |

Sources that Support the Program



| Source | FY 2020 |
|---|---|
| Tuition[1] | $ 382,027.26 |
| Fees[2] | $ 122,532.80 |
| State Funds | |
| Other Sources | |
| Total | $ 504,560.06 |

| | |
|---|---|
| Net Revenue (Loss) | $  233,668.29 |

***Employment demand (current and future):***  Current economic realities are such that "American employers are operating in an increasingly multilingual and multicultural economy in which 65 million U.S. residents

speak a language other than English (40 percent with limited or no English proficiency), and 96 percent of the world's consumers and two-thirds of its purchasing power reside outside of the U.S. borders." Significantly, "Eighty-five percent of U.S. employers say they're reliant on Spanish, making it by the far the most sought-after language."[1] Importantly, Spanish is the second most spoken language in the U.S., with over 50 million Spanish speakers; Spanish is the fourth most spoken language in the world with over 600 million speakers. ESU's Modern Languages program prepares future Kansas teachers, who are in critical demand in the State of Kansas and across the nation.

***Program strengths and weaknesses:***   The Modern Languages program's main strength lies in its adaptability and innovation, as demonstrated by the use of Program Assistants to facilitate online and hybrid instruction, by the revision of the curriculum, and by the development of new programming.  Learning objectives have been aligned with the ACTFL proficiency standards, and students' results are measurable and reportable. These innovations demonstrate the program's distinctiveness and have produced results. The program's main weakness is its small size and limited staffing, which restricts opportunities for student recruitment, programming, and growth.

**Recommendation:**  Continue the program.

**Justification for Recommendation**
Modern Languages' enrollment has trended upward in recent years, increasing from 16 majors (juniors and seniors only) in Fall 2016 to 20 in Fall 2020, with 8 graduated in AY20.  With an efficient instructional model, a popular minor (5-year average enrollment of 54), and healthy general education registrations, the program delivers good value and is a net revenue generator for the university.

**Biochemistry and Molecular Biology**

**Average number of majors:**  20
**Average number of graduates:**  7

**Faculty Profile**

***Number of faculty dedicated solely to the program***:  None.  The Biochemistry and Molecular Biology program is offered jointly by the Department of Physical Sciences and the Department of Biological Sciences, with 17 faculty members from the two departments contributing.  All courses included in the curriculum are already taught for other programs, and all faculty who contribute to the interdisciplinary BMB have their primary assignments with other programs (e.g., undergraduate majors in Biology and Chemistry; graduate majors in Biology, Forensic Science, and the Chemistry Concentration in the Physical Sciences MS program; general education).  In addition, some of these faculty contribute to coursework and advising essential for pre-professional programs such as pre-pharmacy, pre-physical therapy, and pre-medicine.
***Number of department faculty teaching core courses in the program:***  11
***Number of department faculty teaching elective courses in the program:***  9

---

[1] American Council on the Teaching of Foreign Languages with the support of Pearson LLC and Language Testing International. (2019). "Making Languages Our Business: Addressing the Foreign Language Demand Among U.S. Employers." Retrieved from
https://www.scribd.com/document/411004208/Making-Languages-Our-Business#from_embed

*Number of department faculty teaching general education courses:* 20

**Program Narrative**

The interdisciplinary Biochemistry and Molecular Biology (BMB) program provides a curriculum designed to prepare students to pursue additional graduate study or employment in fields such as biotechnology, bioengineering, or biomedical research. It also represents an excellent choice of major for preparation for health-related professional programs such as medical school.

*Program founded:* The major was approved as a new program in 2003.

*The degree to which the program supports the university's mission, strategic plan, or goals:* The BMB program has helped attract faculty who are excellent teachers, committed mentors and skilled researchers to the Department of Biological Sciences and the Department of Physical Sciences at Emporia State University. The program and its excellent faculty and facilities have in turn helped recruit excellent students to Emporia State University who have gone on to be doctors, dentists, pharmacists, laboratory researchers, and scholars at other universities. The program has thus fulfilled the University Mission to prepare students to be lifelong learners who attain rewarding careers and participate in adaptive leadership. These faculty and students have also exhibited the University's core values of excellence, respect, responsibility and service to Emporia State University, the City of Emporia and the State of Kansas. As a distinctive interdisciplinary program, the BMB has trained many young scientists who have entered the Kansas workforce in a number of important capacities. The program has contributed significantly to ESU's strategic goal of "*enhancing the competitive role of Kansas by enrolling, retaining, and graduating students ready for life and career.*"

*Program productivity beyond number of majors:* Beyond just the numbers of high-achieving students and faculty that the program has helped bring to campus, it is important to note the impact graduates of the program's graduates. Two specific examples are Ryan and Jeff Kohlmeier. Ryan was a BMB major who graduated from ESU in 2007 and is now a dentist in Emporia. His younger brother Jeff was a BMB major who graduated from ESU in 2008 and is now an orthodontist with a practice in Manhattan. The faculty contributing to the program have active research programs that provide opportunities for students to engage in research. In AY2020 there were 13 publications and presentations deriving from faculty-led research. Nine of these included BMB majors as the primary presenter. BMB faculty also acquired $55,862 in new research grants and managed continuing grants totaling $473,085.

*Cost effectiveness:* There are no faculty with primary assignment to the BMB program, and it has no direct instructional costs of its own. The program does, however, provide a key recruitment area into a high demand field of study. It also provides participating departments opportunities to seek and obtain external funding through sources such as K-INBRE (Kansas Idea Network of Biomedical Research) and NASA, just to name two that have subsidized our efforts to encourage undergraduate research.

Direct Instructional Expenditures

| Source | FY 2020 |
|---|---|
| Salaries[1] | $ 0 |
| Benefits[2] | $ 0 |
| Other Personnel Expenditures[3] | $ 0 |
| Total | $ 0 |

Sources that Support the Program

| Source | FY 2020 |
|---|---|
| Tuition[1] | $ 0 |
| Fees[2] | $ 0 |
| State Funds | |
| Other Sources | |
| Total | $ 0 |

| Net Revenue (Loss) | $ 0 |
|---|---|



***Employment demand (current and future):*** The demand for graduates from the program has in most years exceeded our ability to produce graduates. Data from the most recent Career Outcomes Survey of ESU BMB graduates (2018-2019) indicated a career outcome rate (employment + education) of 75%.

***Program strengths and weaknesses:*** One strength is that the program is truly interdisciplinary, allowing students to merge training and experiences from biology, microbiology, cell biology, immunology, chemistry, and biochemistry into a program that can be customized for their career goals. Another strength is the personal attention from faculty that provides mentorship and allows students in the program to participate in meaningful research while they are still undergraduates.

**Recommendation:** Continue the program.

**Justification for Recommendation**
The primary justification for continuing the program was mentioned earlier under cost-effectiveness. Since the faculty and facilities are already in place for other programs, there are no direct costs. Enhanced ability to recruit high-achieving students and to gain access to external funds to support these students' research projects are added benefits beyond cost-effectiveness.

**Physical Sciences General**

**Average number of majors:** 5
**Average number of graduates:** 4

**Faculty Profile**

*Number of faculty dedicated solely to the program:* None. The Physical Sciences (Science Grades 5-8) program, housed in the Department of Physical Sciences, is not a program or major in the usual sense. It has no faculty or courses of its own; all required courses are offered by other programs and taught by faculty members assigned to those programs. Its sole purpose is to provide secondary teacher education students majoring in Chemistry, Physics, and Earth Science an opportunity to obtain a second teaching licensure in Science Grades 5-8.
*Number of department faculty teaching core courses in the program:* Variable
*Number of department faculty teaching elective courses in the program:* No electives offered
*Number of department faculty teaching general education courses:* 14

**Program Narrative**
The Department of Physical Sciences offers three majors—Chemistry, Earth Science, and Physics. Secondary teaching licensure is offered in those three major areas, plus a fourth licensure in Science Grades 5-8 which is available only as an additional licensure option, not as a free-standing major. The department's teacher education students are required to earn two of the four licensures. Their first licensure area will be the field of their major (Chemistry, Earth Science, or Physics); some will choose Science Grades 5-8 as their second licensure. All four available licensure areas require a common core of physical sciences courses, the general education requirements common to all ESU secondary teacher preparation programs, and the education-specific curriculum of The Teachers College including student teaching. No courses or faculty are assigned to the program because the courses required for Sciences Grades 5-8 licensure are offered in other programs.

*Program founded:* Science Grades 5-8 teaching licensure was established by the Kansas Board of Education in 2001.

*The degree to which the program supports the university's mission, strategic plan, or goals:* Emporia State University's institutional vision is "changing lives for the common good"—an acknowledgment of the university's role in improving the lives of Kansans. ESU was founded as the Kansas State Normal School, and teacher education has remained central to the university's mission. The program supports Goal 3 of the university's Strategic Plan (*Enhance the competitive role of Kansas by enrolling, retaining, and*

*graduating students ready for life and career*) by preparing highly qualified, career-ready middle school science teachers who advance the well-being of today's youth and the development of tomorrow's citizenry.

***Program productivity beyond number of majors:*** While small, the program meets a need in Kansas school districts for licensed middle school science teachers. Just as important, the program offers science education students the opportunity to supplement their primary teaching field with a second licensure, thereby enhancing their employability and their career prospects.

***Cost effectiveness:*** The Physical Sciences (Science Grades 5-8) licensure program is highly cost effective. In fact, it is offered with no direct instructional costs of its own, since its requirements consist entirely of courses offered by other programs and taught by those programs' faculty members.

Direct Instructional Expenditures



| Source | FY 2020 |
|---|---|
| Salaries[1] | $ 0 |
| Benefits[2] | $ 0 |
| Other Personnel Expenditures[3] | $ 0 |
| Total | $ 0 |

Sources that Support the Program



| Source | FY 2020 |
|---|---|
| Tuition[1] | $ 0 |
| Fees[2] | $ 0 |
| State Funds | |
| Other Sources | |
| Total | $ 0 |

Emporia State University                                                                 11

| Net Revenue (Loss) | $ 0 |
|---|---|

***Employment demand (current and future):***  Kansas school districts face a significant and worsening shortage of teachers licensed in Science Grades 5-8, which creates a high demand for the program's graduates.  Middle school science classes are often taught by teachers who lack licensure in that teaching field.

***Program strengths and weaknesses:***  The Physical Sciences (Science Grades 5-8) licensure program ensures that our students possess strong content knowledge, making them valuable assets for Kansas schools.  The program also benefits from ESU's reputation as one of the premier education preparation programs in the nation.  The high demand for middle school science teachers, coupled with the department's history of placing successful teachers in Kansas school districts, ensures excellent job prospects for program graduates.  This is a program that meets a real need in the State of Kansas.

An obstacle to higher enrollment is that earning licensure in a second teaching field requires a demanding and inflexible curriculum, a fact that can be a disincentive for some students.

**Recommendation:**  Continue the program.

**Justification for Recommendation**
Since its curriculum consists entirely of courses offered in other programs, there are no resources associated with Physical Sciences (Science Grades 5-8), and its discontinuance would result in no efficiencies.  While relatively few students pursue Science Grades 5-8 licensure, it should continue to be available as a valuable career option for science education students, and as an important service to school districts that struggle to find and hire qualified middle school science teachers.

### Chemistry, General

**Average number of majors:**  18
**Average number of graduates:**  9

**Faculty Profile**

***Number of faculty dedicated solely to the program***:  Eight faculty members in the Department of Physical Sciences have their primary assignment with the Chemistry program, but they also teach general education courses, courses for students in other undergraduate programs (Earth Science, Physics, Biochemistry & Molecular Biology, Biology, Nursing), and courses for graduate programs (Forensic Science, the Chemistry concentration for the MS in Physical Sciences).  Some of the Chemistry program faculty also provide coursework and advising for pre-professional programs such as pre-pharmacy, pre-medicine, pre-physical therapy, pre-dentistry, pre-chiropractic, and pre-engineering.
***Number of department faculty teaching core courses in the program:***  8
***Number of department faculty teaching elective courses in the program:***  8
***Number of department faculty teaching general education courses:***  14

**Program Narrative**

Emporia State University                                                                                                          12

Chemistry is the science of understanding the structure of matter and the transformations that matter undergoes. Persons involved in chemistry-related professions are interested in discovering how they can help society fulfill its traditional material needs for improved clothing, shelter, and food, or how they can diagnose and treat physical ailments and afflictions associated with our technical age. Chemistry majors can complete the Bachelor of Arts (BA) degree, the Bachelor of Science (BS) degree, or the Bachelor of Science in Education (BSE) degree. Majors completing the BA can choose concentrations in Biochemistry or Environmental Chemistry. Majors completing a BS can choose to complete a curriculum approved by the Committee for Professional Training of the American Chemical Society. BSE students earn secondary education licensure in Chemistry. In addition, specific Pre-Med and Other Pre-Professional Programs curricular plans are available for students interested in careers in medicine, pharmacy, optometry, and engineering. Emporia State chemistry students have the opportunity and are encouraged to become members of the American Chemical Society (ACS).

*Program founded:* The major has existed in one form or another for more than 50 years.

*The degree to which the program supports the university's mission, strategic plan, or goals:* The Chemistry program has helped attract faculty who are excellent teachers, committed mentors and skilled researchers to the Department of Physical Sciences at Emporia State University. The program and its excellent faculty and facilities have in turn helped recruit excellent students to Emporia State University who have gone on to be doctors, dentists, pharmacists, laboratory researchers, and scholars at other universities. The program has thus fulfilled the University Mission to prepare students to be lifelong learners who attain rewarding careers and participate in adaptive leadership. These faculty and students have also exhibited the university's core values of excellence, respect, responsibility and service to Emporia State University, the City of Emporia and the State of Kansas. The Chemistry program has trained many young scientists who have entered the Kansas workforce in a number of important capacities. It has contributed significantly to our goal of "Enhancing the competitive role of Kansas by enrolling, retaining, and graduating students ready for life and career."

*Program productivity beyond number of majors:* Beyond just the numbers of high-achieving students and faculty that the program has helped bring to campus, it is important to note the impact of the program's faculty and graduates. The faculty have active research programs that attract external funding and provide opportunities for students in the program to engage in research. They have also been instrumental in the development of other collaborative programs such as our master's in Forensic Science. The impact of our graduates can be illustrated by the accomplishments of two of our recent chemistry graduates, Amber Harrouf and Claudia Jaimes. Both students were admitted to pharmacy school, graduated, and have returned to serve as pharmacists in Emporia or nearby communities.

*Cost effectiveness:* The Chemistry program is particularly cost effective for two reasons: 1) No Chemistry faculty members are devoted entirely to the Chemistry program. All faculty who participate in delivering the Chemistry curriculum also serve general education and other programs. 2) The Chemistry program has made it possible for the Department of Physical Sciences to seek and obtain external funding through sources such as K-INBRE (Kansas Idea Network of Biomedical Research) and NASA, just to name two that have subsidized our efforts to encourage undergraduate and graduate student research.

Direct Instructional Expenditures

| Source | FY 2020 |
|--------|---------|

| Salaries[1] | $ 328,114.84 |
| Benefits[2] | $ 113,847.21 |
| Other Personnel Expenditures[3] | $ 16,400.00 |
| Total | $ 458,362.05 |

Sources that Support the Program

| Source | FY 2020 |
| Tuition[1] | $ 306,835.71 |
| Fees[2] | $ 146,514.50 |
| State Funds | |
| Other Sources | |
| NASA Space Grant Program | $ 11,000.00 |
| Revenues from Private Donors Endowed Funds (Non-Scholarship) | $ 3,633.00 |
| K-INBRE Grant | $ 28,000.00 |
| Total | $ 495,983.21 |

| Net Revenue (Loss) | $ 37,621.16 |

***Employment demand (current and future):***  The demand for graduates from the program has in most years exceeded our ability to produce graduates. According to the U.S. Bureau of Labor Statistics, "Overall employment of chemists and materials scientists is projected to grow 5 percent from 2019 to 2029, faster than the average for all occupations." The results from the most recent Career Outcomes Survey of ESU chemistry program graduates indicates a career outcome rate (employment + education) of 85.7%.

***Program strengths and weaknesses:***  One strength of the program is that it allows students to either focus on Chemistry and complete an American Chemical Society certified major program, or to pursue a more flexible curriculum with concentrations in environmental chemistry or biochemistry, or to earn secondary education licensure in Chemistry.  Another strength is the personal attention from faculty that provides mentorship and allows students in the program to participate in meaningful research while they are still undergraduates.

**Recommendation:**  Continue the program.

**Justification for Recommendation**

The Chemistry program is cost-effective, generating net revenue for the university. The Chemistry faculty and facilities support many other programs (general education, Pre-Med, Biology, Biochemistry & Molecular Biology, Earth Science, Nursing, Pre-Pharmacy, Forensic Science, Pre-Chiropractic, Pre-Physical Therapy, Pre-Engineering, etc.). In addition, no other program in the sciences supports such a breadth of study options, and few programs at the university are more successful in attracting high-achieving students and producing high-demand graduates.

**Geology/Earth Science General**

**Average number of majors:** 17
**Average number of graduates:** 9

**Faculty Profile**

***Number of faculty dedicated solely to the program***: Four faculty members in the Department of Physical Sciences have their primary assignment with the Earth Science program, but they also teach courses for the M.S. in Physical Science, the M.S. in Informatics, the dual-degree Earth Science/Engineering Program, the Paleontology minor, and the Geospatial Analysis minor and graduate certificate, as well as general education courses. In addition, one of the four faculty members serves as chair of the Department of Physical Sciences, and another directs the Johnston Geology Museum.

***Number of department faculty teaching core courses in the program:*** 4
***Number of department faculty teaching elective courses in the program:*** 4
***Number of department faculty teaching general education courses:*** 14

**Program Narrative**

The Earth Science program emphasizes geology, but students also take coursework in specific sub-fields of the Earth Sciences. The BA/BS curriculum was revised last academic year to create more flexibility, with a core focused on geology and concentrations that allow students to select electives in areas of interest or for career preparation. Current available concentrations are: Atmospheric Science, Environmental Geology, Physical Geology and Soil Science. The BA/BS curriculum also requires either coursework in an allied discipline (e.g., statistics, biology, chemistry, computer science, geography, geoinformatics, mathematics, physics, physical sciences) or a minor approved by the student's advisor (e.g., biology, chemistry, geography, geospatial analysis, mathematics, paleontology, physics). Students completing the BSE (Bachelor of Science in Education) curriculum earn secondary education licensure in Earth-Space Science.

***Program Founded:*** The earth science major was founded around 1973.

***The degree to which the program supports the university's mission, strategic plan, or goals:*** The Earth Science program and its excellent faculty and facilities (e.g., Johnston Geology Museum, Aber Geospatial Analysis Computer Lab) have helped recruit high-achieving students to Emporia State University who have gone on to be professional geologists, environmental scientists, high school science teachers, private consultants, business owners, and private sector scientists working in fields ranging from the petroleum industry to geospatial analysis to investment banking. Earth Science program graduates contribute to the

Kansas science workforce through their employment with the Kansas Department of Health and Environment, the Kansas Corporation Commission, the Kansas Department of Transportation, the Kansas Water Office, the Kansas Geological Survey, the U.S. Department of Agriculture, the U.S. Geological Survey, and the U.S. Environmental Protection Agency (EPA). Our graduates also work for, and in some cases own, private environmental consulting and oil exploration businesses in Kansas. The Earth Science program has thus fulfilled the University Mission to prepare students to be lifelong learners who attain rewarding careers and participate in adaptive leadership. These faculty and students have also exhibited the University's core values of excellence, respect, responsibility and service to Emporia State University, the City of Emporia, the State of Kansas, and beyond. The Earth Science program has trained many young scientists who have entered the Kansas workforce in a number of important capacities. It has contributed significantly to the university's strategic goal of *"enhancing the competitive role of Kansas by enrolling, retaining, and graduating students ready for life and career."*

***Program productivity beyond number of majors:*** The Earth Science program's graduates have had a significant impact on the scientific workforce at the community, state of Kansas, and national levels. Examples include: 1) Kyle Halverson, who is a professional geologist serving as the Chief Geologist at the Kansas Department of Transportation; 2) Elizabeth Hagenmaier (Coffey) who works as a Project Manager for the Environmental Protection Agency (EPA) Region 7 Office in Olathe, Kansas. Liz was recently recognized as the EPA National Project Manager of the year for 2019 and as a 2020 Outstanding Recent Graduate for Emporia State University; 3) Justin Abel, who works at the U.S. Geological Survey office in Lawrence, Kansas as a hydrologist; 4) Logan Smith, Jesse Higginbotham, Katy Schwinghamer, Everett Spellman, Dane Boring, Brian Madeira, Kevin Faurot, and Lacey Laird work in various capacities at the Kansas Department of Health and Environment. They are all graduates of our undergraduate Earth Science program and are just a few of the more than 15 scientists who work for that agency and earned academic credentials from Emporia State University.

***Cost effectiveness:*** The Earth Science program is efficient, operating with only three full-time faculty members plus one half of the Department Chair's work assignment. With those limited resources, the program delivers the undergraduate major (including the teaching licensure option), the Geospatial Analysis minor and graduate certificate, the Geoinformatics concentration in the M.S. Informatics program, and the Earth Science concentration in the M.S. Physical Science program, as well as physical science general education courses—all while generating net revenue for the university.

Direct Instructional Expenditures



| Source | FY 2020 |
| --- | --- |
| Salaries[1] | $ 230,687.97 |
| Benefits[2] | $ 86,205.33 |
| Other Personnel Expenditures[3] | $ 8,200.00 |
| Total | $ 325,093.30 |

| Sources that Support the Program | |
| --- | --- |
| Source | FY 2020 |
| Tuition[1] | $ 361,349.02 |
| Fees[2] | $ 152,914.90 |



| | | |
|---|---|---|
| State Funds | | |
| Other Sources | | |
| NASA Space Grant Program | $ | 4,000.00 |
| Revenues from Private Donors Endowed Funds (Non-Scholarship) | $ | 4,033.00 |
| Total | | $ 522,296.92 |

Net Revenue (Loss) | $ 197,203.62 |

***Employment demand (current and future):*** The U.S. Bureau of Labor Statistics projects that the demand for geoscientists will grow five percent faster than the average for all occupations from 2019 to 2029, with a median annual pay rate of $92,040 in 2019. Data from the most recent Career Outcomes Survey of ESU graduates (2018-2019) indicated a career outcome rate for Earth Science program graduates (employment + education) of 75%.

**Recommendation:** Continue the program.

**Justification for Recommendation:**
Strengths of the Earth Science program include its cost-effectiveness (as evidenced by the net revenue generated), the strong job outlook for its graduates, and the recent changes that have made the program's curriculum more flexible and thus more appealing to students with varied career goals. These three factors should increase the potential for enrollment growth and support the continued production of career-ready geoscience graduates.

### Physics, General

**Average number of majors:** 12
**Average number of graduates:** 7

**Faculty Profile**

***Number of Faculty Dedicated Solely to the Program***: Three faculty members in the Department of Physical Sciences have their primary assignment with the Physics program, but they also teach general education courses as well as courses for students in other undergraduate programs (Chemistry, Earth Science, Biochemistry & Molecular Biology, Biology). In addition, Physics program faculty teach courses for our Pre-Engineering and dual-degree Engineering programs and contribute to the University Honors College.

***Number of Faculty Teaching Core Courses: 4***
***Number of Faculty Teaching Elective Courses in the Program: 4***

*Number of Faculty Teaching General Education Courses: 14*

**Program Narrative**

*Description***:** The Physics program of study is flexible, permitting students to achieve a certain degree of specialization, but also requiring significant experience in theory, experimentation and computation. Students are required to complete an experimental capstone project in the final year of the program. In addition to the physics courses, students develop a solid background in mathematics, computer science, and chemistry, which provides many career options. Physics majors can complete the Bachelor of Arts (BA) degree, the Bachelor of Science (BS) degree, or the Bachelor of Science in Education (BSE) degree. The BA and BS in Physics provide an excellent foundation for physics-based careers such as medical physics or computational science, and also prepare students for graduate study in one of the many areas of experimental or theoretical physics. BSE students earn secondary education licensure in Physics. Specific recommended curricular plans are available for students who wish to obtain a baccalaureate degree in physics while simultaneously preparing for employment or further education in an allied field, e.g., engineering, geophysics, medicine, or computer science.

*Program founded:* The major has existed in one form or another for more than 50 years.

*The degree to which the program supports the university's mission, strategic plan, or goals:* The Physics program has helped attract faculty who are excellent teachers, committed mentors and skilled researchers to the Department of Physical Sciences at Emporia State University. The program and its excellent faculty and facilities have in turn helped recruit excellent students to Emporia State University who have gone on to be engineers, doctors, laboratory researchers, medical physicists, and Ph.D.-level scholars at other universities. The program has thus fulfilled the University Mission to prepare students to be lifelong learners who attain rewarding careers and participate in adaptive leadership. These faculty and students have also demonstrated the University's core values of excellence, respect, responsibility and service to Emporia State University, the City of Emporia and the State of Kansas. The Physics program has trained many young scientists who have entered the Kansas workforce in a number of important capacities. It has contributed significantly to our goal of "Enhancing the competitive role of Kansas by enrolling, retaining, and graduating students ready for life and career."

*Program productivity beyond number of majors:* Beyond just the numbers of high-achieving students and faculty that the program has helped bring to campus, it is important to note the impact of the program's graduates on the scientific workforce at the community, state of Kansas, and national levels. Examples include: 1) Josh Unruh, who graduated with a BS in Physics major in 2014 and now works for ValueNet, a telecommunications company in Emporia, Kansas. Josh was also recently accepted into an online M.S. in Computer Science program at Georgia Tech University; 2) Isaac Hall, who graduated from Emporia State in 2018 with a Physics major and from Kansas State University in 2019 with a degree in Mechanical Engineering. Isaac now works as an engineer at the Wolf Creek Nuclear Operating Corporation facility in Burlington, Kansas; 3) Lizeth Magana, who graduated from Emporia State University with a Physics major in 2016. Lizeth is now in a Ph.D. program at the University of Texas at San Antonio's Southwest Research Institute.

*Cost effectiveness:* While the Physics program does not generate net revenue for the university, it does operate efficiently. No Physics faculty members are devoted entirely to the Physics program. All faculty who participate in delivering the Physics curriculum also serve general education and other programs. The

Physics program has also made it possible for the Department of Physical Sciences to seek and obtain external funding through sources such as the U.S. Department of Agriculture and NASA, just to name two that have subsidized our efforts to encourage undergraduate and graduate student research.

Direct Instructional Expenditures

| Source | FY 2020 |
| --- | --- |
| Salaries[1] | $ 171,929.98 |
| Benefits[2] | $ 57,802.38 |
| Other Personnel Expenditures[3] | $ 7,850.00 |
| Total | $ 237,582.36 |

| Sources that Support the Program | |
| --- | --- |
| Source | FY 2020 |
| Tuition[1] | $ 96,405.12 |
| Fees[2] | $ 47,567.40 |
| State Funds | |
| Other Sources | |
| NASA Space Grant Program | $ 4,000.00 |
| Revenues from Private Donors Endowed Funds (Non-Scholarship) | $ 933.00 |
| Total | $ 148,905.52 |

| Net Revenue (Loss) | $ (88,676.84) |
| --- | --- |

***Employment demand (current and future):***  The demand for graduates from the Physics program has in most years exceeded our ability to produce graduates. According to the U.S. Bureau of Labor Statistics, "Overall employment of physicists and astronomers is projected to grow 7 percent from 2019 to 2029, faster than the average for all occupations."  Data from the most recent ESU Career Outcomes Survey (2018-2019) indicates a career outcome rate for physics majors (employment + education) of 100%.

***Program strengths and weaknesses:*** One strength of the program is that it allows students to study Physics in a flexible program that can focus on theoretical physics, robotics, or on preparation for a teaching career or for a professional engineering program.  Another strength is the personal attention from faculty that provides mentorship and allows students in the program to participate in meaningful research while they are still undergraduates.  The Physics faculty and facilities (e.g., the Peterson Planetarium) support many other university programs (general education, Biology, Biochemistry & Molecular Biology, Earth Science, Pre-Engineering, dual-degree Engineering).  The program produces graduates in engineering in partnership with Kansas State University, the University of Kansas and Wichita State University.

Emporia State University                                                                                                    19

**Recommendation:**  Additional review in Spring 2021, as ESU undertakes a comprehensive budget reduction process.

**Justification for Recommendation**
Although the Physics program operates at low cost, supports many other university programs, and contributes to the science workforce in Kansas, its viability must also be assessed in the broader context of limited institutional resources.

### Econometrics and Quantitative Economics

**Average number of majors:**  16
**Average number of graduates:**  9

**Faculty Profile**

*Number of faculty dedicated solely to the program:*  Two faculty members in the Department of Mathematics and Economics are assigned to the Economics program; for one the program is the primary assignment, and for the other it is a secondary assignment.  Both teach core and elective courses in the program, plus general education courses.  Additional core and elective courses are taught by faculty members in the Department of Mathematics and Economics and the Department of Business Administration whose primary assignments are with other programs.

*Number of department faculty members teaching core courses in the program:*  4
*Number of department faculty members teaching elective courses in the program:*  4
*Number of department faculty members teaching general education courses:*  4

**Program Narrative**
The Economics program offers the Bachelor of Science degree through a curriculum designed to develop critical and analytical thinking in a focused program of study. The core of the program includes a broad-based exposure to economics followed by courses in intermediate microeconomics, intermediate macroeconomics, and statistics. Beyond the core, students take additional advisor-approved electives in economics and related areas.  High-impact, active learning opportunities are common, with a special focus on applied mentored research relevant to Kansas.

*Program founded:*  Economics was established as a department in 1908 (*ESU Archives*).

*The degree to which the program supports the university's mission, strategic plan, or goals:*  The Economics program aligns with ESU's mission by embedding Kansas Leadership Center principles and competencies throughout the program starting in the first year.  The program supports the university's strategic plan through its distinctiveness and through its commitment to diversity, equity & inclusion.  The Economics program's distinctiveness lies in the fact that it is the only Kansas economics program designated as a STEM program by the U.S. Department of Education. This distinctiveness seems attractive to economists; more than 180 candidates applied for a faculty opening four years ago, and all five of the finalists were from underrepresented groups.  The Economics program is a model of diversity, equity & inclusion. Between 2010 and 2019 the program graduated exactly 100 students; 48 were white and 37 were female, which illustrates greater diversity than is typical.
*Program productivity beyond numbers of majors:*  Economics courses are a key component of general education at ESU, and they also serve as support courses for other majors. Economics faculty members are

highly productive scholars. Economics-related books, academic journal articles, presentations at professional conferences, and the like average over 5 per year per department economics faculty member. The ResearchGate score of 28.67 for the program's senior faculty member is higher than that of 87.5% of all ResearchGate members worldwide. The Economics program is highly engaged both on campus and externally. The program's faculty-directed ESU Center for Economic Education is the preeminent leader in Kansas, and ranks highly nationally, in training K-12 educators to teach economics and personal finance. The national Council for Economic Education (CEE) reports that over the past 5 years, the Center offered 108 Econ Ed activities involving 3,068 participants. ESU Economics heads the American Democracy Project (ADP) and helped ESU achieve the highest registration & voting rates in Kansas in the 2016 and 2018 elections. The program collaborates with many external partners in government, industry, and the community; for example, the Federal Reserve Bank of St. Louis invited ESU to replace the University of Colorado-Boulder as their exclusive provider of economics courses for professional development. Other partners include the Federal Reserve Bank of Kansas City, KCEE, national CEE, KSDE, Healthier Lyon County, ALL-IN Campus Democracy Challenge, and Money $mart Kansas.

*Cost effectiveness:* The program is highly cost effective and is a net revenue generator for ESU.

Direct Instructional Expenditures



| Source | FY 2020 |
|---|---|
| Salaries[1] | $ 76,894.87 |
| Benefits[2] | $ 48,448.82 |
| Other Personnel Expenditures[3] | $ 2,000.00 |
| Total | $ 127,343.69 |

Sources that Support the Program



| Source | FY 2020 |
|---|---|
| Tuition[1] | $ 183,687.08 |
| Fees[2] | $ 53,738.15 |
| State Funds | |
| Other Sources | |
| Total | $ 237,425.23 |

| Net Revenue (Loss) | $ 110,081.54 |
|---|---|

*Employment demand (current and future):* Demand for economists in the job market is very strong. Over the past three years, approximately 58% of reporting graduates from the Economics program accepted professional jobs related to economics, while 37% pursued additional education (i.e., 95% placement rate).

Many graduates have served in the Kansas public sector in high-demand technical jobs (e.g., analysts at the KCC-*Utility Rates*, KS Departments of Revenue and Aging).

***Program strengths and weaknesses:***  The Economics program's greatest strength is its ability to attract capable and motivated students, graduate them on time, and place them in high-quality jobs.  ACT linkage studies indicate that 14% of ESU Economics majors came with ACT math and quantitative reasoning scores in the top 10%; by their junior/senior year at ESU, 46% were in the top 10% in the nation on the ACT-CAAP (i.e., the advanced ACT test for college juniors).  Average time to completion for Economics majors is 3.9 years, despite the fact that some progress more slowly after accepting attractive job offers prior to graduation.  According to KBOR data, ESU Economics starting salaries are the highest among economics graduates of all Kansas public universities.  After graduation 82% of ESU economics graduates are employed in the region, which is also the highest in Kansas.  Over $82,000 came to the ESU Center for Economic Education in external grant funding since 2017 (from the Kansas Council for Economic Education and the national CEE).

The program's primary weakness is its small size, which limits the scope of its curricular offerings and programming.

**Recommendation:**  Continue the program.

**Justification for Recommendation:**  The Economics program has high student success rates, externally documented high-level outcomes, and is highly diverse. It aligns exceedingly well with the university's mission and strategic plan and adds value beyond the major and the ESU campus (e.g., graduates stay and serve in Kansas; the Center for Economics Education, which is the preeminent leader in training Kansas K-12 educators to teach economics and personal finance). In addition to high quality, the program offers good value and generates net revenue, due in part to the prevalence of general education courses in the faculty's teaching assignments.  While the program's 5-year average upper-division headcount does not meet the minimum threshold, its most recent 5-year average for completions (54 graduates in 5 years = 10.8 graduates/year) does meet the KBOR minimum.

## Political Science and Government, General

**Average number of majors:**  16
**Average number of graduates:**  7

### Faculty Profile

***Number of Faculty Dedicated Solely to the Program:***  Three full-time faculty members are assigned exclusively to the Political Science program in the Department of Social Sciences, one of whom teaches a reduced load as department chair.  In addition to teaching core and elective courses in the program, the three faculty members teach courses for general education, for the Interdisciplinary Studies program, for the MA in History, and for minors including Legal Studies, National Security, and Public Administration. Political Science faculty also support the BSE in Social Sciences Education, which serves Political Science and History majors seeking teacher licensure.
***Number of department faculty teaching core courses in the program:***  3
***Number of department faculty teaching elective courses in the program:***  3
***Number of department faculty teaching general education courses:***  18

### Program Narrative

**Program founded:** The Political Science program has been at ESU since 1947, according to ESU Libraries and Archives.

**The degree to which the program supports the university's mission, strategic plan, or goals:** The program exemplifies the University's vision of "*changing lives for the common good*" through its emphasis on applied learning and high-impact learning experiences for students. The Political Science program advances Goal 2 of the university's strategic plan to "enrich the student experience with opportunities for leadership development and practice" through its emphasis on internships and practicums.

**Program productivity beyond number of majors:** The five-year (2014-2018) average number of Political Science majors is 37, including **16** juniors and seniors, while the five-year average number of graduates is **7**. Student recruitment and retention efforts have resulted in a significant increase in program graduates, from 5 in 2016 to 15 in 2019. For the last two years (2018 and 2019), the number of political science graduates has met the KBOR target. It is important to note that 80-90 additional Political Science and History students are typically enrolled in the BSE program in Social Sciences Education, and while technically they do not count as enrollees in either content program, for all practical purposes they are Political Science or History majors.

**Cost effectiveness:** The program is efficient and cost-effective, generating net revenue for the university.

Direct Instructional Expenditures

| Source | FY 2020 |
|---|---|
| Salaries[1] | $ 193,762.60 |
| Benefits[2] | $ 59,445.94 |
| Other Personnel Expenditures[3] | $ 1,929.00 |
| Total | $ 255,137.54 |

Sources that Support the Program

| Source | FY 2020 |
|---|---|
| Tuition[1] | $ 228,494.82 |
| Fees[2] | $ 80,709.85 |
| State Funds | |
| Other Sources | |

Emporia State University                                                                                            23



| Total | $ 309,204.67 |
|---|---|

| Net Revenue (Loss) | $ 54,067.13 |
|---|---|

***Employment demand (current and future):***  Structured around career tracks, the BA and BS in Political Science serve both professional needs and the needs of a liberal arts education.  While the program is designed to meet a variety of specific employment goals, including those in teaching, business, and government agencies, its graduates are not limited to a specific kind of work.  They are broadly employable due to the program's emphasis on the development of critical thinking, communication, and problem-solving skills.  The program also serves as excellent preparation for graduate and professional training in such fields as law, public administration, and government relations.

***Program strengths and weaknesses:***  The Political Science program fosters leadership development and the application of knowledge through meaningful internship experiences.  Specific examples include three interns in Washington, DC since 2015, with two in Congress and one at the Organization of American States.  Political Science students also intern regularly at the Kansas Legislature (including one for Senate President Susan Wagle in 2018) and in the Emporia City Manager's Office.  Political Science faculty members are highly productive scholars. Dr. Phil Kelly's most recent book, *Classical Geopolitics,* was published by Stanford in 2016. Dr. Kelly has won a summer research grant to conduct research with students every year since 2014, resulting in numerous co-authored publications.  Dr. John Barnett has won two Fulbright awards to support his research on Vietnamese agriculture, and he serves as a Fulbright reviewer for grant applications.  Dr. Michael Smith served as lead author for the 2019 book *Low Taxes and Small Government*, co-authored with two ESU colleagues.  He also served as lead author for the 2014 book *State Voting Laws in America*.  He is also co-chair of KBOR's TAAC Core Outcomes for political science.  Faculty members are also deeply involved in civic engagement activities such as Dr. Kelly's service on the Mackinder Forum and Drs. Barnett and Smith's service on the Advisory Board of the Olathe School District's Civic Leadership Academy.

**Recommendation:**  Continue the program.

**Justification for the Recommendation**
With only three full time faculty members, one of whom also serves as the chair of a large interdisciplinary department, the Political Science program operates at low cost and generates net revenue for the university.  Approximately one half of the faculty's teaching assignments comprise general education courses.  The program's upper-division core and elective courses serve not only Political Science majors, but also BSE-Social Sciences Education majors, Interdisciplinary Studies majors, numerous minors, and graduate students.  If the major in Political Science were discontinued, most of these courses would still have to be offered.
As noted above, enrollment in the Political Science program is actually quite healthy if BSE students, counted separately for technical reasons, are taken into account.

### Drama and Dramatics/Theatre Arts, General

**Average number of majors:**  24
**Average number of graduates:**  7

**Faculty Profile**

***Number of faculty dedicated solely to the program:***  Five full-time faculty members in the Department of Communication & Theatre are assigned primarily to the Theatre program, plus two full-time staff members (costume shop manager & technical director) who also serve as part-time faculty. All Theatre faculty members teach the program's core and elective courses, which also support the Speech/Theatre BSE option for theatre and communication students seeking teacher licensure. All five regular faculty members also teach the program's general education course.
***Number of department faculty teaching core courses in the program:***  7
***Number of department faculty teaching elective courses in the program:***  7
***Number of department faculty teaching general education courses:***  5

**Program Narrative**
The Theatre program offers two degree options.  The Bachelor of Arts curriculum provides a broad liberal arts experience and an introduction to major facets of theatre performance, production, design, history and literature.  The BA is applicable to a wide array of careers and prepares students for graduate study in theatre and related fields.  The Bachelor of Fine Arts curriculum provides intense preparation for students desiring to become competent and knowledgeable professionals in all areas of theatre.  All Theatre majors are required to audition for productions and to contribute to all productions, either as cast members or as production crew.

***Program founded:***  Theatre productions were part of Kansas State Normal School as early as 1913, making this one of the oldest theatre programs in the country. The department was reorganized as the Department of Speech in 1926. Currently the Theatre program is part of the Department of Communication and Theatre.

***The degree to which the program supports the university's mission, strategic plan, or goals:*** The Theatre program supports ESU's mission's emphasis on lifelong learning and rewarding careers through its commitment to the liberal arts as an expression of culture and a pathway to personal growth, and through its development of knowledge and skills required for the professional practice of theatre.  The Theatre program supports the goals of ESU's strategic plan in multiple ways:  1) The goal of distinctive initiatives in curricula is supported by unique, specialized paths within the BFA.  2) The goal of graduating students ready for life and career is supported by the program's success in preparing the next generation of theatre scholars, artist-educators, performers, and designers.  3) The goal of diversity, equity, and inclusion is supported by the program's emphasis on programming that confronts the complex dynamics of contemporary culture and helps spectator, practitioner, and student better appreciate our similarities and respect our differences.

***Program productivity beyond number of majors:***  ESU Theatre is one of the most visible and valued aspects of the university's outreach to the community.  The program's productions attract audience members from the local community, from across the state of Kansas, and from more than a dozen different states.  During the truncated 2019-2020 season, 2356 people attended productions, more than half of whom were non-students.

***Cost effectiveness:***  The Theatre program is relatively expensive due to the non-standard instructional modes and high overhead typical of Theatre instruction.  However, the program generates revenue through

ticket sales, sales of advertisements in programs, and costume rentals. The program also actively solicits Theatre Guild members, alumni, and friends of the program to support student scholarships. This academic year, 24 students, both majors and non-majors, are being provided scholarships through these donations.

Direct Instructional Expenditures

| Source | FY 2020 |
|---|---|
| Salaries[1] | $ 364,632.39 |
| Benefits[2] | $ 150,233.48 |
| Other Personnel Expenditures[3] | $ 17,261.00 |
| Total | $ 532,126.87 |

| Sources that Support the Program | |
|---|---|
| Source | FY 2020 |
| Tuition[1] | $ 164,784.99 |
| Fees[2] | $ 73,396.65 |
| State Funds | |
| Other Sources | |
| Productions - Ticket Sales | $ 42,859.00 |
| Performing Arts Board | $ 50,180.00 |
| Revenues from Private Donors Endowed Funds (Non-Scholarship) | $ 9,400.00 |
| Total | $ 340,620.64 |

| Net Revenue (Loss) | $ (191,506.23) |
|---|---|

***Employment demand (current and future):***  The Theatre program trains students for various careers, including as actors, directors, set designers, lighting and sound designers, and stage managers. Greater diversity of entertainment media and venues and the rise of internet-only platforms have increased employment demand for many of these careers. According to the US Bureau of Labor Statistics, the demand for actors is projected to grow 3% from 2019 to 2029, which is on par with all other occupations.

Employment of producers and directors is expected to grow 10%, which is "much faster than the average for all occupations." The outlook for broadcast and sound engineering technicians is expected to grow 9%.

***Program strengths and weaknesses:***  The Theatre program is known for its high-quality productions, excellent student performances, and successful alumni. The seven-state regional Kennedy Center American College Theatre Festival offers examples as evidence: This past year, eight ESU Theatre students were selected to participate in the Irene Ryan acting auditions, seven won awards at the final awards ceremony, and costumes from *Romeo & Juliet* were selected to participate in the costume parade. ESU Theatre alumni work at a variety of professional companies, attend(ed) graduate schools, and teach at universities and secondary schools around the country. As recently as 2019, alumnus Robbie Young received ESU's Distinguished Alumni Award.

The program's primary weaknesses are related to resources and staffing, with the current lack of a faculty costume designer as a particular limitation. Post-graduation tracking of alumni needs to improve in order to more effectively recruit students and build the program's brand.

**Recommendation:**  Continue the program, but with additional review of its costs and funding as a part of ESU's comprehensive budget reduction process in Spring 2021.

**Justification for Recommendation**
The Theatre program's 5-year average enrollment of 24 juniors and seniors is only one student short of the KBOR minimum of 25. But the program's enrollment is actually higher than that; theatre students pursuing the Speech/Theatre BSE for teacher licensure are counted as Communication majors for the purposes of Program Review. The Theatre program also plays a central role in the university's outreach mission and supplies a key component of the campus's and community's cultural life. While the program's quality and contributions are well established, its expense prompts further assessment in the broader context of the university's budget challenges.


### History, General

**Average number of majors:**  24
**Average number of graduates:**  12


**Faculty Profile**

***Number of faculty dedicated solely to the program:***  Five full-time faculty members are assigned to the History program in the Department of Social Sciences. The five faculty members generally teach two general education courses per semester, which also serve as core courses for the major. Each of them teaches one upper-division course each semester, which counts as a core or elective course for the major and for the BSE in Social Sciences Education, which serves History and Political Science majors seeking teacher licensure. Finally, each faculty member teaches one online graduate course per semester to support the growing, online MA in History program.  Several undergraduate course sections are available online each semester, which serves not only History and BSE-Social Sciences Education majors but also students in the Interdisciplinary Studies and Ethnic & Gender Studies programs.

***Number of department faculty teaching core courses in the program:***  5

Emporia State University                                                                                      27

*Number of department faculty teaching elective courses in the program:*  5
*Number of department faculty teaching general education courses:*  18

**Program Narrative**

*Program founded:*  The History program has been at ESU since 1947, according to ESU Libraries and Archives.

*The degree to which the program supports the university's mission, strategic plan, or goals:*
Consistent with the university's mission of "*preparing students for lifelong learning, rewarding careers, and adaptive leadership,*" the History program offers an education that is practical and widely applicable due to its emphasis on the development of critical thinking, communication, and problem-solving skills. The wide availability of high-impact learning opportunities such as internships and faculty-mentored student research supports Goal 1 of ESU's Strategic Plan, "*Pursue distinctive initiatives in curricula and programs.*"

*Program productivity beyond number of majors:*  The five-year (2014-2018) average number of undergraduate History majors was **40**, including **24** juniors and seniors, one student short of the KBOR headcount minima. *However, the AY 2020 headcount was 25, which meets the minimum standard.*  The 2014-2018 average number of graduates was **13**, which exceeded the KBOR target.  It is important to note that 80-90 additional History and Political Science students are typically enrolled in the BSE program in Social Sciences Education, and while technically they do not count as enrollees in either content program, for all practical purposes they are History or Political Science majors.

*Cost effectiveness:*  The History program operates efficiently and cost-effectively, generating significant net revenue for the university**.**

Direct Instructional Expenditures



| Source | FY 2020 |
|---|---|
| Salaries[1] | $ 297,627.97 |
| Benefits[2] | $  82,467.81 |
| Other Personnel Expenditures[3] | $   2,571.00 |
| Total | $ 382,666.78 |

Sources that Support the Program

| Source | FY 2020 |
|---|---|
| Tuition[1] | $ 702,713.86 |
| Fees[2] | $ 273,084.60 |
| State Funds | |



| | |
|---|---|
| Other Sources | |
| Total | $ 975,798.46 |

| Net Revenue (Loss) | $ 593,131.68 |
|---|---|

***Employment demand (current and future):*** The BA and BS in History prepare students for a wide variety of careers in which a broad liberal arts background is essential, including many within private business and government agencies. Since graduates are not limited to a specific kind of work, they are broadly employable, with good career prospects in any healthy economy. The program also serves as excellent preparation for graduate and professional training in such fields as law, history, museum and archival studies, library science, and journalism.

***Program strengths and weaknesses:*** The History program's curriculum emphasizes not only book-based learning, but also the use, care, and interpretation of primary sources and the availability of attractive internships in archival and museum techniques. One student's 2019 internship at the Smithsonian Air and Space Museum is a notable example. Carefully crafted rubrics have been developed to ensure proper measurement of student learning, and the History faculty strongly emphasize writing skills throughout the curriculum. The ESU Office of Institutional Effectiveness recognized the program by awarding it the "With Excellence" designation for student outcomes assessment in 2019. History faculty members are highly productive scholars. Their accolades and honors include the following examples:

- Dr. Chris Lovett won the 2019 Edgar Langsdorf Award for Excellence from the Kansas State Historical Society for his work on Samuel Crumbine.
- Dr. Greg Schneider, ESU's 2019 Roe R. Cross Distinguished Professor, wrote the book *Rock Island Requiem,* positively reviewed in the *Wall Street Journal.* He also served recently as President of the Faculty.
- Dr. Màire Johnson recently served as President of the American Society of Irish Medieval Studies.
- Dr. Amanda Miracle won the Schillinger award for service to ESU women in 2017.

The History program's faculty and students are highly engaged with the university and the broader public. The ESU Veterans' Roundtable is hosted by the History faculty, and at this time the leadership of the Student Veterans Association are all students in the Department of Social Sciences. The Department's annual Constitution Day celebration draws over 500 students from across Kansas, and to our knowledge is one of the largest Constitution Day celebrations in the U.S.

**Recommendation:** Continue the program.

**Justification for Recommendation**

With only five full-time faculty members, the History program operates efficiently and produces net revenue for the university. Approximately one half of the faculty's teaching assignments comprise general education courses. The program's upper-division core and elective courses serve not only History majors, but also BSE-Social Sciences Education majors and Interdisciplinary Studies majors, while graduate courses taught by these same faculty members serve the online MA in History program. If the undergraduate major in History were discontinued, most of these courses would still have to be offered.

As noted above, enrollment in the History program is actually quite healthy if BSE students, counted separately for technical reasons, are taken into account.

Exhibit 7

TO THE

KANSAS OFFICE OF ADMINISTRATIVE HEARINGS

───────────────────────────

EMPORIA STATE UNIVERSITY'S RESPONSE

TO THE ADMINISTRATIVE APPEAL

OF

DR. AMANDA MIRACLE, PROFESSOR

───────────────────────────

PURSUANT TO THE

WORKFORCE MANAGEMENT POLICY

AS APPROVED BY THE KANSAS BOARD OF REGENTS ON

SEPTEMBER 14, 2022

───────────────────────────

SUBMITTED ON

NOVEMBER 10, 2022

0025

# I. INTRODUCTION

On September 15, 2022, Professor, Dr. Amanda Miracle, was provided written notice her employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Miracle was also informed that upon completion of her responsibilities, she would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Miracle was advised that the decision to end her employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Miracle's notice further advised that her lay-off was based "[s]pecifically … but not limited to" low enrollment, cost of operations, the restructuring of a program[3] or department, and other potential considerations.[4]

Thereafter, on or about October 12, 2022, Dr. Miracle filed an administrative appeal of the University's decision, challenging President Hush's decision based on: (1) the quality and sufficiency of her performance as a long-standing faculty member and (2) that her most recent, and previous, Notice(s) of Appointment carries "continuous tenure."[5]

## II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[6] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[7]

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[8] Pursuant to

---

[1] See Exhibit A. Letter to Dr. Miracle, dated September 15, 2022.
[2] Id.
[3] Herein at all times, the term "program" is intended as a holistic, generic description to include, but is not necessarily limited to, major degrees, minor degrees, concentrations, certifications, and academic disciplines of study.
[4] See Exhibit A.
[5] See "Appeal of Emporia State University's Decision Based on the 'Workforce Management Policy'," Miracle, A., October 2022.
[6] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.
[7] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."
[8] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., et al.

this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[9] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[10] This includes the authority to "make all employee appointment decisions" at ESU.[11]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[12] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[13]

---

[9] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[10] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[11] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at her or her institution." President Hush may also, at her discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[12] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[13] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[14] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[15] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[16]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[17]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has broad statutory authority to control and supervise the operation and management of the six state universities and has a fiduciary duty to those institutions to ensure their long-term financial health while maintaining quality and affordability to both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures**. It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the institutions with a short-term workforce management tool that will enable them to address current financial difficulties.[18]*

A year later, during the Board's May 2022 meeting, it was noted that while "the Board was successful in obtaining state funding increases during the current Session, the **enrollment and**

---

S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[14] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[15] Id.

[16] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.

[17] See Exhibit D. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

[18] See Exhibit E. "Meeting Agenda, April 14, 2021" Section VII.C.1. "Consideration of Discussion Agenda: Governance: Receive and Act on Recommendations from Workgroup" p. 66 – 67 (emphasis added).

Dr. Miracle's appeal does not state any claim based on the allegation that President Hush's decision was not reasonable or based on a foundation of fact.[114] Even in the absence of an explicitly stated claim, Dr. Miracle's appeal fails to produce any, or any adequate, evidence that President Hush's decision was arbitrary or capricious. Accordingly, Dr. Miracle has failed to meet her burden of proof.[115]

Dr. Miracle does complain, however, that her most recent, and previous, Notice(s) of Appointment carries "continuous tenure"[116] and therefore she should remain employed at ESU regardless of her discipline's restructuring, loss of revenue, or low enrollment. As noted above, and as a matter of Board policy, "[t]enure is a **privilege** that must be affirmatively granted by the institution in recognition of meritorious performance."[117] Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause.[118] Probationary tenure-track and tenured appointments are annual appointments limited in terms, notably to one academic year, a 12-month period, or summer sessions.[119] All academic appointments are subject to annual review and annual renewal, including those for tenured faculty.[120] As a faculty member, Dr. Miracle has performed in line with expectations and conditions to remain employed (*i.e.*, sufficient teaching, scholarship, and service performance); her performance as an employee does not spontaneously create a property interest or right.

---

[114] See Exhibit H. See also "Appeal of Emporia State University's Decision Based on the 'Workforce Management Policy'," Miracle, M., October 2022.

[115] See Exhibit H. See also, *Country Club Home, Inc. v. Harder*, 228 Kan. 756, 763 (Kan. 1980) ("A rebuttable presumption of validity attaches to actions of administrative agencies; the burden of proof rests with the party or parties challenging the action of an administrative agency") (citations omitted).

[116] See "Appeal of Emporia State University's Decision Based on the 'Workforce Management Policy'," Miracle, A., October 2022. The concept of "continuous," if strictly applied as Dr. Miracle's argument implies, would lead to absurd results, *i.e.*, an employee would forever be employed, regardless of any other intervening or mitigating factor or circumstance. See, *e.g.*, Morton County Hosp. v. Howell, 51 Kan.App.2d 1103, 1106 – 07, 361 P.3d 515, 519 (Kan.App. 2015) (a fundamental rule of statutory interpretation is that "courts should construe statutes to avoid unreasonable or absurd results").

[117] See KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). (emphasis added). See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right ... A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added).

[118] See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[119] See Exhibit S at 1B.01.

[120] See Exhibit S at 1A.0101 and 1A.0102.

To The

Kansas Office of Administrative Hearings

———————————————————

Emporia State University's Response

To The Administrative Appeal

Of

Dr. Lynnette Sievert, Professor

———————————————————

Pursuant To The

Workforce Management Policy

As Approved By The Kansas Board Of Regents On

September 14, 2022

———————————————————

Submitted On

November 10, 2022

# I. INTRODUCTION

On September 15, 2022, Professor, Dr. Lynnette Sievert, was provided written notice her employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Sievert was also informed that upon completion of her responsibilities, she would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Sievert was advised that the decision to end her employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Sievert's notice further advised that her lay-off was based "[s]pecifically … but not limited to" the restructuring of a program[3] or department, realignment of resources, and other potential considerations.[4]

Thereafter, on or about October 12, 2022, Dr. Sievert filed an administrative appeal of the University's decision, challenging President Hush's decision based on: (1) the quality and sufficiency of her performance as a long-standing faculty member; (2) the ongoing need for a physiologist in the Department of Biological Sciences; (3) that her "dismissal is based on age;" and (4) that President Hush's decision is arbitrary and capricious because it "serves no valuable purpose."[5]

# II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[6] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[7]

---

[1] See Exhibit A. Letter to Dr. Sievert, dated September 15, 2022.
[2] Id.
[3] Herein at all times, the term "program" is intended as a holistic, generic description to include, but is not necessarily limited to, major degrees, minor degrees, concentrations, certifications, and academic disciplines of study.
[4] See Exhibit A.
[5] See "Appeal of Emporia State University's Decision Based on the Workforce Management Policy," Sievert, L., October 2022.
[6] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.
[7] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[8] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[9] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[10] This includes the authority to "make all employee appointment decisions" at ESU.[11]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[12] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[13]

---

[8] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al*.

[9] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[10] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[11] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at her or her institution." President Hush may also, at her discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[12] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[13] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[14] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[15] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[16]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[17]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has broad statutory authority to control and supervise the operation and management of the six state universities and has a fiduciary duty to those institutions to ensure their long-term financial health while maintaining quality and affordability to both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures**. It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the*

---

property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[14] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.
[15] Id.
[16] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.
[17] See Exhibit D. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

As a result, Dr. Sievert's appeal fails to produce any, or any adequate, evidence that President Hush's decision was not substantially consistent with ESU's Workforce Management policy. Accordingly, Dr. Sievert has failed to meet her burden of proof.[98]

For the foregoing reasons, *supra*, the Office of Administrative Hearings must find that President Hush's decision to lay-off Dr. Sievert was substantially consistent with ESU's Workforce Management policy and must be affirmed as a matter of controlling law and policy.[99]

### V.B. THE DECISION TO LAY-OFF DR. SIEVERT WAS NOT THE RESULT OF UNLAWFUL BIAS OR UNLAWFUL DISCRIMINATION

Because the decision to lay-off Dr. Sievert was not the result of unlawful bias or unlawful discrimination, said decision is proper and must be affirmed as a matter of controlling law and policy.[100] Indeed, a "rebuttable presumption of validity" attaches to President Hush's decision.[101]

As discussed at length above, *supra*, President Hush's decision to lay-off Dr. Sievert was based entirely on legitimate, non-discriminatory reasons.[102] No part of President Hush's decision, nor the underlying recommendations of ESU's leadership, considered, much less relied on, any unlawful bias or unlawful discrimination.

However, Dr. Sievert's appeal alleges that her "dismissal is an opportunity to hire someone with my skill set who will not be tenured and will be earning a beginning level salary. I conclude that this dismissal is based on age[.]"[103] Apart from this allegation, her appeal offers no other proof or evidence in support of this claim except Dr. Sievert's own observation that "[n]ext year nobody in the department will be 65 or older."[104]

As explained above, it is not the University's intention to hire another Comparative Animal Physiologist, *see supra*. None of the evaluative recommendations which led to, and which

---

[98] See Exhibit H. See also, *Country Club Home, Inc. v. Harder*, 228 Kan. 756, 763 (Kan. 1980) ("A rebuttable presumption of validity attaches to actions of administrative agencies; the burden of proof rests with the party or parties challenging the action of an administrative agency") (citations omitted).

[99] See K.S.A. 76-712. "[S]tate institutions ... shall be controlled by and operated and managed under the supervision of the board of regents. For such control, operation, management or supervision, the board of regents may make ... policies or rules and regulations[.]"

[100] See K.S.A. 76-712. "[S]tate institutions ... shall be controlled by and operated and managed under the supervision of the board of regents. For such control, operation, management or supervision, the board of regents may make ... policies or rules and regulations[.]"

[101] See, *Country Club Home, Inc. v. Harder*, 228 Kan. 756, 763 (Kan. 1980) ("A rebuttable presumption of validity attaches to actions of administrative agencies; the burden of proof rests with the party or parties challenging the action of an administrative agency") (citations omitted).

[102] See Exhibit T. See also Exhibit Q. See also Exhibit L. See also, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 254 (1981). If a claimant creates a sufficient presumption of discrimination, the burden shifts to the defendant to produce evidence that an action was taken for a legitimate, non-discriminatory purpose.

[103] See "Appeal of Emporia State University's Decision Based on the Workforce Management Policy," Sievert, L., October 2022, page 4.

[104] See "Appeal of Emporia State University's Decision Based on the Workforce Management Policy," Sievert, L., October 2022, page 4.

ELECTRONICALLY FILED 11/28/2022 15:40:05 OFFICE OF ADMINISTRATIVE HEARINGS

To The

Kansas Office of Administrative Hearings

---

Emporia State University's Response

To The Administrative Appeal

Of

Dr. Sheryl Lidzy, Associate Professor

---

Pursuant To The

Workforce Management Policy

As Approved By The Kansas Board Of Regents On

September 14, 2022

---

Submitted On

November 22, 2022

# I. INTRODUCTION

On September 15, 2022, Associate Professor, Dr. Sheryl Lidzy, was provided written notice her employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Lidzy was also informed that upon completion of her responsibilities, she would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Lidzy was advised that the decision to end her employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Lidzy's notice further advised that her lay-off was based "[s]pecifically … but not limited to" current or future market considerations, realignment of resources, and other potential considerations.[3]

Thereafter, on or about October 13, 2022,[4] Dr. Lidzy filed an administrative appeal of the University's decision, challenging President Hush's decision alleging that: (1) "[t]he decision-making framework focuses heavily on the need for and enrollment in specific programs;" (2) "[Dr. Lidzy] could easily move into [Leadership Communication or Communication, Emerging Technology & Society] … and cover any of those courses;" (3) "improper bias and discrimination in the selection of which faculty to terminate will be uncovered;" and (4) "[n]either length of service, quality of contributions, number of courses or students taught, or any other objective factor explains why [Dr. Lidzy] … was terminated and other faculty in [Dr. Lidzy's] department and school were not." [5]

# II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[6] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[7]

---

[1] See Exhibit A. Letter to Dr. Lidzy, dated September 15, 2022.

[2] Id.

[3] See Exhibit A.

[4] On Thursday, November 10, 2022, Dr. Blake Flanders, President and CEO of the Kansas Board of Regents, granted an extension of time to the University to submit the instant response, pursuant to KBOR Policy Manual, Chapter II., Chapter II., Section C.6.b.ii.(4).

[5] See "Appeal of Dr. Lidzy Termination," Lidzy, S., October 2022, pages 1 – 2.

[6] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

[7] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[8] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[9] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[10] This includes the authority to "make all employee appointment decisions" at ESU.[11]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[12] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[13]

---

[8] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al.*

[9] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[10] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[11] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at his or her institution." President Hush may also, at his discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[12] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[13] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[14] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[15] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[16]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[17]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has **broad statutory authority** to control and supervise the operation and management of the six state universities and has **a fiduciary duty** to those institutions **to ensure their long-term financial health while maintaining quality and affordability** to both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures**. It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the*

---

property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[14] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[15] Id.

[16] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.

[17] See Exhibit D. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

those categories was irrelevant to the rationale underlying the University's decisions regarding the Communications program—pointedly, there was no comparison between Dr. Lidzy and other faculty members in her department based on any of those categories. The University leadership's recommendations, and the President's decision, depended entirely on those factors permitted to be considered pursuant to ESU's Workforce Management policy as explained above, *see supra*.[120]

Dr. Lidzy's appeal closes with an assertion that she has "fulfilled the terms of [her] contract" and that she "expected to be able to complete [her] career at Emporia State University as promised … in [her] appointment as a tenured professor."[121] However, Dr. Lidzy's assertion and statement are based on an inaccurate characterization of her employment and a flawed impression about the scope and nature of tenure.[122]

For purposes of the instant appeal and the evaluation of President Hush's decision to lay-off Dr. Lidzy, the controlling Board policy specifically states that "any state university employee, **including a tenured faculty member**, may be suspended, dismissed, or terminated from employment by their respective university … and no existing university policy hearing procedures shall apply to such decisions." President Hush's decision and the use of the University's Workforce Management policy was not in contravention to Dr. Lidzy's **status** as a tenured faculty member, nor the tenured status of any other faculty member at ESU. Significantly, as the Board noted, *see supra*, "the proposed policy is not a threat to tenure because **tenure does not mean that a job is guaranteed regardless of financial circumstances**. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is

---

[120] See <u>Exhibit A</u>.

[121] See "Appeal of Dr. Lidzy Termination," Lidzy, S., October 2022, page 3.

[122] While state universities have the authority to enter into contracts (KBOR Policy Manual Chapter II., Section D.13.), including employment contracts, the vast majority of faculty employed by ESU, including Dr. Lidzy, are not employed via contracts. Probationary tenure-track and tenured appointments are annual appointments limited in terms, notably to one academic year, a 12-month period, or summer sessions. See <u>Exhibit S</u> at 1B.01. All academic appointments are subject to annual review and annual renewal. See <u>Exhibit S</u> at 1A.0101 and 1A.0102. Notably, the condition of tenure is specifically characterized by Board policy as a "privilege," not as conveying a contractual right (KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f)). However, even if the status of tenure creates an expectancy of future benefit, it does not automatically confer an enforceable property interest. See *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added).

counter to its purpose."[123] The appointment status[124] of tenure acknowledges a faculty member's achievement of performance requirements[125] and a faculty member's right to additional employment protections in the event of a "for cause" termination based on teaching, scholarship, or service.[126] Indeed, interpreting tenure as compelling indefinite, *i.e.*, "continuous" or assured employment, as Dr. Lidzy's statement implies, would lead to absurd results, *i.e.*, a public employee would forever be employed, regardless of any other intervening or mitigating factor or circumstance, such as the suspension of the academic program(s) in which she teaches or the lack of revenue with which to pay her.[127] In point of fact, neither the University's, nor President Hush's, use of the Workforce Management policy renders tenure status as moot. The status of tenure still exists at ESU. It continues to be held by many faculty and is in the process of being earned by many other "tenure-track" faculty during and after the life of the instant appeal.

Dr. Lidzy's statements notwithstanding, President Hush's decision was based on substantial, competent evidence, was reasonable and based in fact, and was in consistent alignment with the rationale and data supporting a conclusion of the need to reallocate resources within the Department of Communications and Theatre and to suspend certain Communications programs with that department. While Dr. Lidzy may disagree with, or negatively critique, President Hush's decision, or any of the underlying grounds for President Hush's decision, such disagreement does not demonstrate or establish arbitrariness or capriciousness.

---

[123] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 13 (emphasis added). See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).
[124] See Exhibit S at 1B.01.
[125] Although tenure is not automatically awarded simply on this basis.
[126] See Exhibit S at 1A.0102. "Termination of a tenured faculty member must follow appropriate policies and procedures." See also Exhibit S at 1B.0805.01.
[127] See, *e.g.*, *Morton County Hosp. v. Howell*, 51 Kan.App.2d 1103, 1106 – 07, 361 P.3d 515, 519 (Kan.App. 2015) (a fundamental rule of statutory interpretation is that "courts should construe statutes to avoid unreasonable or absurd results").

To The

Kansas Office of Administrative Hearings

_____

Emporia State University's Response

To The Administrative Appeal

Of

Dr. Dan Colson, Associate Professor

_____

Pursuant To The

Workforce Management Policy

As Approved By The Kansas Board Of Regents On

September 14, 2022

_____

Submitted On

October 31, 2022

# I. INTRODUCTION

On September 15, 2022, Associate Professor, Dr. Dan Colson, was provided written notice that his employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Colson was also informed that upon completion of his responsibilities, he would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Colson was advised that the decision to end his employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Colson's notice further advised that his lay-off was based "[s]pecifically … but not limited to" low enrollment, market considerations, the restructuring of a program or department, and other potential considerations.[3]

Thereafter, on or about October 3, 2022, Dr. Colson filed an administrative appeal of the University's decision, alleging: (1) the University's failure to utilize its Workforce Management policy in accordance with Kansas Board of Regent's policy; (2) the University's failure to provide reasons for its decision to lay-off Dr. Colson; (3) the arbitrary nature of the University's decision to lay-off Dr. Colson; and (4) the University's retaliation against Dr. Colson.[4]

# II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[5] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[6]

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[7] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University

---

[1] See Exhibit A. Letter to Dr. Colson, dated September 15, 2022.
[2] Id.
[3] Id.
[4] See "Initial Appeal of Termination," Colson, D., October 2022, "Table of Contents."
[5] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.
[6] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."
[7] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al.*

on June 22, 2022.[8] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[9] This includes the authority to "make all employee appointment decisions" at ESU.[10]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[11] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[12]

---

[8] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[9] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[10] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at his or her institution." President Hush may also, at his discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[11] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[12] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See

ELECTRONICALLY FILED 11/30/2022 15:22:19 OFFICE OF ADMINISTRATIVE HEARINGS

**TO THE**

**KANSAS OFFICE OF ADMINISTRATIVE HEARINGS**

---

**EMPORIA STATE UNIVERSITY'S RESPONSE**

**TO THE ADMINISTRATIVE APPEAL**

**OF**

**DR. BRENDA KOERNER, ASSOCIATE PROFESSOR**

---

**PURSUANT TO THE**

**WORKFORCE MANAGEMENT POLICY**

**AS APPROVED BY THE KANSAS BOARD OF REGENTS ON**

**SEPTEMBER 14, 2022**

---

**SUBMITTED ON**

**NOVEMBER 29, 2022**

# I. INTRODUCTION

On September 15, 2022, Professor, Dr. Brenda Koerner, was provided written notice her employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Koerner was also informed that upon completion of her responsibilities, she would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Koerner was advised that the decision to end her employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Koerner's notice further advised that her lay-off was based "[s]pecifically … but not limited to" the restructuring of a program[3] or department, realignment of resources, and other potential considerations.[4]

Thereafter, on or about October 17, 2022,[5] Dr. Koerner filed an administrative appeal of the University's decision, challenging President Hush's decision generally based on: (1) why the Workforce Management policy "never should have been passed, and how it was used inappropriately;" (2) "the lack of defined criteria to justify [Dr. Koerner's] dismissal;" (3) age discrimination; (4) retaliation as a result of Dr. Koerner's "outspoken views on the draft framework;" and (5) the "disregard of tenure and any associate due process[.]"[6]

## II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[7] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[8]

---

[1] See Exhibit A. Letter to Dr. Koerner, dated September 15, 2022.

[2] Id.

[3] Herein at all times, the term "program" is intended as a holistic, generic description to include, but is not necessarily limited to, major degrees, minor degrees, concentrations, certifications, and academic disciplines of study.

[4] See Exhibit A.

[5] On Thursday, November 10, 2022, Dr. Blake Flanders, President and CEO of the Kansas Board of Regents, granted an extension of time to the University to submit the instant response, pursuant to KBOR Policy Manual, Chapter II., Chapter II., Section C.6.b.ii.(4).

[6] See "Appeal of Emporia State University's Decision Based on the Workforce Management Policy," Koerner, B., October 2022.

[7] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

[8] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[9] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[10] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[11] This includes the authority to "make all employee appointment decisions" at ESU.[12]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[13] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[14]

---

[9] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al.*

[10] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[11] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[12] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at her or her institution." President Hush may also, at her discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[13] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[14] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[15] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[16] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[17]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[18]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has broad statutory authority to control and supervise the operation and management of the six state universities and has a fiduciary duty to those institutions to ensure their long-term financial health while maintaining quality and affordability to both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures**. It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the*

---

property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[15] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[16] Id.

[17] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.

[18] See Exhibit D. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

Simply because Dr. Koerner personally believes the procedures within the University's Workforce Management policy do not provide rightful due process, does not mean they do not.[170]

In addition, if Dr. Koerner's complaint about a lack of due process were to be interpreted to mean she instead should be afforded the procedures required for faculty terminations that occur outside the parameters of the University's Workforce Management policy,[171] such an interpretation would contemplate an *unlawful* action.[172] For Dr. Koerner to be afforded the procedures she implies should be applicable by standard University policy, such action would require the University to intentionally disregard the statutory authority and the policy mandate controlling the instant action, *to-wit*: "Such terminations, suspensions, or dismissals [arising from the Workforce Management policy] **shall** follow the procedure set forth below. … [A]nd **no existing university policy hearing procedures** shall apply to such decisions."[173] This unambiguous mandate is not permissive and must be followed as a matter of law.[174]

Furthermore, President Hush's decision and the use of the University's Workforce Management policy is not in contravention to Dr. Koerner's *status* as a tenured faculty member, nor the tenured status of any other faculty member at ESU. Significantly, as the Board noted, *see supra*, "the proposed policy is not a threat to tenure because **tenure does not mean that a job is guaranteed** regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure

---

[170] See, *e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("[T]he root requirement of the Due Process Clause" is "that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest") (internal quotations omitted).

[171] See Exhibit S at 1B.09 "Policies On Termination Of Employment."

[172] See, *e.g.*, K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

[173] See KBOR Policy Manual, Chapter II., Section C.6.b.ii. (emphasis added).

[174] See K.S.A. 76-712 "Except as otherwise provided by act of the legislature, the state educational institutions … shall be controlled by and operated and managed under the supervision of the board of regents." See also K.S.A. 76-780 "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

financial strength in the name of tenure is counter to its purpose."[175] The appointment status[176] of tenure acknowledges a faculty member's achievement of performance requirements[177] and a tenured faculty member's right to additional employment protections in the event of a "for cause" termination based on teaching, scholarship, or service.[178] To interpret the status of tenure as compelling indefinite, *i.e.*, "continuous" or guaranteed employment, as Dr. Koerner's appeal implies, would lead to absurd results—*i.e.*, a tenured faculty member would be forever employed, regardless of any other intervening or mitigating factor or circumstance, such as the suspension of the academic program in which she teaches, or the lack of revenue with which to pay her, or the decline of student enrollment in the academic program in which she teaches.[179]

Notably, for the purpose of appreciating the limited need for, and nature of, tenure, both Board and University policy do not even treat the *status* of tenure as indispensable for the existence of academic freedom (although that may have been its origin).[180] The protections of academic freedom extend to *all* faculty, *regardless* of tenure status. In point of fact, neither the University's, nor President Hush's, use of the Workforce Management policy renders tenure as a meaningless status. Tenure not only still exists at ESU,[181] it continues to be held by many faculty and is in the process of being earned by many other "tenure-track" faculty during and after the life of the instant appeal.

---

[175] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 13 (emphasis added). See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "**Tenure is a privilege** that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benef**it, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** ... A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).
[176] See Exhibit S at 1B.01.
[177] Although tenure is not automatically awarded simply on this basis.
[178] See Exhibit S at 1A.0102. "Termination of a tenured faculty member must follow appropriate policies and procedures." See also Exhibit S at 1B.0805.01.
[179] See, *e.g.*, *Morton County Hosp. v. Howell*, 51 Kan.App.2d 1103, 1106 – 07, 361 P.3d 515, 519 (Kan.App. 2015) (a fundamental rule of statutory interpretation is that "courts should construe statutes to avoid unreasonable or absurd results").
[180] See, *e.g.*, Exhibit S at 1B.0805.01.(2)c. "During the probationary period a teacher should have the academic freedom that all other members of the faculty have."
[181] See, *e.g.*, Exhibit S.

ELECTRONICALLY FILED 11/28/2022 15:05:44 OFFICE OF ADMINISTRATIVE HEARINGS

TO THE

KANSAS OFFICE OF ADMINISTRATIVE HEARINGS

---

EMPORIA STATE UNIVERSITY'S RESPONSE

TO THE ADMINISTRATIVE APPEAL

OF

MR. ROB CATLETT, ASSOCIATE PROFESSOR

---

PURSUANT TO THE

WORKFORCE MANAGEMENT POLICY

AS APPROVED BY THE KANSAS BOARD OF REGENTS ON

SEPTEMBER 14, 2022

---

SUBMITTED ON

NOVEMBER 22, 2022

# I. INTRODUCTION

On September 15, 2022, Associate Professor, Mr. Rob Catlett, was provided written notice his employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Mr. Catlett was also informed that upon completion of his responsibilities, he would become eligible for an additional three (3) months' severance pay.

In the same notice, Mr. Catlett was advised that the decision to end his employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Mr. Catlett's notice further advised that his lay-off was based "[s]pecifically … but not limited to" low enrollment, current or future market considerations, the restructuring of a program[3] or department, and other potential considerations.[4]

Thereafter, on or about October 14, 2022,[5] Mr. Catlett filed an administrative appeal of the University's decision, challenging President Hush's decision alleging that: (1) President Hush's decision resulted in "… the taking of the property rights afforded by tenure at ESU, without due process, both of which are substantial;" and (2) that President Hush's decision, and the work that led to the enactment and use of the University's Workforce Management policy, abandoned standard practices and the involvement of, or appropriate disclosure to, shared governance.[6]

## II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[7] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[8]

---

[1] See Exhibit A. Letter to Mr. Catlett, dated September 15, 2022.

[2] Id.

[3] Herein at all times, the term "program" is intended as a holistic, generic description to include, but is not necessarily limited to, major degrees, minor degrees, concentrations, certifications, and academic disciplines of study.

[4] See Exhibit A.

[5] On Thursday, November 10, 2022, Dr. Blake Flanders, President and CEO of the Kansas Board of Regents, granted an extension of time to the University to submit the instant response, pursuant to KBOR Policy Manual, Chapter II., Chapter II., Section C.6.b.ii.(4).

[6] See "Appeal of Emporia State University's (ESU) Decision Based on the Workforce Management Policy," Catlett, R., October 2022.

[7] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

[8] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[9] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[10] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[11] This includes the authority to "make all employee appointment decisions" at ESU.[12]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[13] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[14]

---

[9] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al.*

[10] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[11] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[12] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at his or her institution." President Hush may also, at his discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[13] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[14] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[15] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[16] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[17]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[18]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has **broad statutory authority** to control and supervise the operation and management of the six state universities and has **a fiduciary duty** to those institutions **to ensure their long-term financial health while maintaining quality and affordability** to both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures.** It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the*

---

property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[15] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[16] Id.

[17] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.

[18] See Exhibit D. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

property rights afforded by tenure at ESU, without due process, both of which are substantial[.]"[94]

As discussed above, *see supra*, the Board's policy[95] and the University's Workforce Management policy[96] mandate that an affected employee (*i.e.*, an employee whose employment is terminated pursuant to such policies) be afforded adequate procedural due process. These processes include notice, the reasonable opportunity to appeal, a response to the appeal, and a hearing to "decide the appeal based on the standards stated in the Board's policy and in the University's framework approved by the Board."[97] The review of President Hush's decision "shall be based on the written materials submitted, along with any oral presentation to the administrative officer by the employee and the University[,]" during which Mr. Catlett may be represented by legal counsel.[98] Significantly, these requirements of process and review all occur *prior* to the end of Mr. Catlett's employment on May 16, 2023.[99] Up to and until that date, Mr. Catlett may remain fully employed by the University with all attendant benefits and rights, and in return, will be expected to satisfactorily perform all his usual duties and obligations. Indeed, by virtue of the instant administrative appeal and hearing processes, Mr. Catlett is presently availing himself of the fundamental characteristic of procedural due process: a meaningful opportunity to challenge President Hush's decision and the reasons underlying President Hush's decision.[100]

Simply because Mr. Catlett personally believes the procedures within the University's Workforce Management policy do not provide rightful due process, does not mean they do not.[101]

In addition, if Mr. Catlett's complaint about a lack of due process were to be interpreted to mean he instead should be afforded the procedures required for faculty terminations that occur outside the parameters of the University's Workforce Management policy,[102] such an interpretation would contemplate an *unlawful* action. For Mr. Catlett to be afforded the procedures he deems should be applicable by standard University policy, such an action would require the University

---

[94] See "Appeal of Emporia State University's (ESU) Decision Based on the Workforce Management Policy," Catlett, R., October 2022, page 4.

[95] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[96] See Exhibit H.

[97] See Exhibit H.

[98] See id.

[99] See Exhibit A.

[100] See Exhibit A "I regret to inform you that your appointment as Associate Professor, Mathematics and Economics, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures". See, *e.g.*, *Benavidez v. City of Albuquerque*, 101 F.3d 620, 627 (10th Cir. 1996) (adopting a 3-part test to determine the amount and type of procedure required by the Due Process Clause in administrative proceedings). See also, *e.g.*, *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009) ("[a] full evidentiary hearing is not required prior to an adverse employment action"; it suffices that the employee is "given notice and an opportunity to respond" (internal quotation marks omitted).

[101] See, *e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("[T]he root requirement of the Due Process Clause" is "that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest") (internal quotations omitted).

[102] See Exhibit S at 1B.09 "Policies On Termination Of Employment."

to intentionally disregard the statutory authority and the policy mandate controlling the instant action, *to-wit*: "Such terminations, suspensions, or dismissals [arising from the Workforce Management policy] **shall** follow the procedure set forth below. ... [A]nd **no existing university policy hearing procedures** shall apply to such decisions."[103] This unambiguous mandate is not permissive and must be followed as a matter of law.[104]

Furthermore, President Hush's decision and the use of the University's Workforce Management policy is not in contravention to Mr. Catlett's *status* as a tenured faculty member, nor the tenured status of any other faculty member at ESU. Significantly, as the Board noted, *see supra*, "the proposed policy is not a threat to tenure because **tenure does not mean that a job is guaranteed** regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[105] The appointment status[106] of tenure acknowledges a faculty member's achievement of performance requirements[107] and a tenured faculty member's right to additional employment protections in the event of a "for cause" termination based on teaching, scholarship, or service.[108] To interpret the status of tenure as compelling indefinite, *i.e.*, "continuous" or guaranteed employment, as Mr. Catlett's appeal implies, would lead to absurd results—*i.e.*, a tenured faculty member would be forever employed, regardless of any other intervening or mitigating factor or circumstance, such as the

---

[103] See KBOR Policy Manual, Chapter II., Section C.6.b.ii. (emphasis added).

[104] See K.S.A. 76-712 "Except as otherwise provided by act of the legislature, the state educational institutions ... shall be controlled by and operated and managed under the supervision of the board of regents." See also K.S.A. 76-780 "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: ... (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

[105] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 13 (emphasis added). See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "**Tenure is a privilege** that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** ... A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[106] See Exhibit S at 1B.01.

[107] Although tenure is not automatically awarded simply on this basis.

[108] See Exhibit S at 1A.0102. "Termination of a tenured faculty member must follow appropriate policies and procedures." See also Exhibit S at 1B.0805.01.

**2022 KBOR Databook Table B, p. 130**

| | State General Fund ($M) | Tuition ($M) | Restricted Use ($M) | Total Operating Income ($M) |
|---|---|---|---|---|
| 2017 | $30.8M | $28.5M | $30.M | $89.3M |
| 2018 | $31.M | $27.5M | $30.M | $88.5M |
| 2019 | $31.6M | $27.2M | $30.2M | $89.M |
| 2020 | $33.6M | $26.8M | $32.4M | $92.8M |
| 2021 | $32.7M | $23.7M | $43.8M | $100.2M |



Emporia State University Operating Revenues by Source 2017 - 2021
(Source: 2022 KBOR Databook)

**Exhibit 8**



It is the opinion of the State of Kansas Conference of the American Association of University Professors that:

1

# 2. Termination Decision Flawed



## 2.3 Termination Decision is Capricious and Unjustified

### "Low Enrollment" Claim Unsupportable



**Emporia State University Enrollment 2017 - 2021**

| | | | | 7245 +1.2% |
|---|---|---|---|---|
| 7160 | 6987 | 7177 | 7240 | |

Student Head Count (y-axis: 0 – 8000)

Graduate Enrollment
3121   3023   3235   3462   3785

KBOR Databook 2022 p. 126

Undergraduate Enrollment
4039   3964   3942   3778   3460

Academic Year: 2017   2018   2019   2020   2021

Source: 2022 KBOR Databook



It is the opinion of the State of Kansas Conference of the American Association of University Professors that:

# 2. Termination Decision Flawed



**2**

STATE UNIVERSITY
DATA BOOK

January 2022

## 2.3 Termination Decision is Capricious and Unjustified

### "Extreme Financial Pressures" Claim Unsupportable



Emporia State University Operating Revenues by Source 2017 - 2021

$100.2M
+12.2%



It is the opinion of the State of Kansas Conference of the American Association of University Professors that:

3

# 2. Termination Decision Flawed

## 2.3 Termination Decision is Capricious and Unjustified

### "High Cost of Operations" Claim Unsupportable



**Emporia State University Operating Expenditures by Source 2017 - 2021**

**Exhibit 9**

# EMPORIA STATE
## U N I V E R S I T Y
### *Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

September 15, 2022

Michael Behrens
Associate Professor
English/Modern Languages/Journalism, Liberal Arts and Sciences

Dear Dr. Behrens:

I regret to inform you that your appointment as Associate Professor, English/Modern Languages/ Journalism, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Low enrollment.
- Current or future market considerations as to the need for a program or department.
- Restructuring of a program, department, or school as determined to be necessary by the university.

Secondary considerations may include:
- Cost of operations.
- Reduction in revenues for specific departments or schools.
- Realignment of resources.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

Behrens, Michael
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

0006

# EMPORIA STATE
# U N I V E R S I T Y

*Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

September 15, 2022

Robert Catlett
Associate Professor
Mathematics and Economics, Liberal Arts and Sciences

Dear Mr. Catlett:

I regret to inform you that your appointment as Associate Professor, Mathematics and Economics, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
* Low enrollment.
* Current or future market considerations as to the need for a program or department.
* Restructuring of a program, department, or school as determined to be necessary by the university.

Secondary considerations may include:
* Cost of operations.
* Reduction in revenues for specific departments or schools.
* Realignment of resources.
* Performance evaluations.
* Teaching and research productivity.
* Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

Catlett, Robert
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.
- You may be eligible to retire from the university in lieu of being laid off. If you choose to retire, you will still receive three (3) months severance pay.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President


c:      Personnel File

# EMPORIA STATE
# U N I V E R S I T Y

*Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

ELECTRONICALLY FILED 11/03/2022 14:31:59 OFFICE OF ADMINISTRATIVE HEARINGS

September 15, 2022

Daniel Colson
Associate Professor
English/Modern Languages/Journalism, Liberal Arts and Sciences

Dear Dr. Colson:

I regret to inform you that your appointment as Associate Professor, English/Modern Languages/ Journalism, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Low enrollment.
- Current or future market considerations as to the need for a program or department.
- Restructuring of a program, department, or school as determined to be necessary by the university.

Secondary considerations may include:
- Cost of operations.
- Reduction in revenues for specific departments or schools.
- Realignment of resources.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

**Profs 00000822**

Colson, Daniel
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

**Profs 00000823**

# EMPORIA STATE
# U N I V E R S I T Y

### *Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

ELECTRONICALLY FILED 11/15/2022 14:41:05 OFFICE OF ADMINISTRATIVE HEARINGS

September 15, 2022

Charles Emmer
Professor
Social Sciences/Sociology/Criminology, Liberal Arts and Sciences

Dear Dr. Emmer:

I regret to inform you that your appointment as Professor, Social Sciences/Sociology/Criminology, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Restructuring of a program, department, or school as determined to be necessary by the university.

Secondary considerations may include:
- Low enrollment.
- Cost of operations.
- Reduction in revenues for specific departments or schools.
- Current or future market considerations as to the need for a program or department.
- Realignment of resources.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity.

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

Emmer, Charles
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.
- You may be eligible to retire from the university in lieu of being laid off. If you choose to retire, you will still receive three (3) months severance pay.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

# EMPORIA STATE
# U N I V E R S I T Y

*Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

ELECTRONICALLY FILED 11/30/2022 15:22:23 OFFICE OF ADMINSTRATIVE HEARINGS

September 15, 2022

Brenda Koerner
Associate Professor
Biological Sciences, Liberal Arts and Sciences

Dear Dr. Koerner:

I regret to inform you that your appointment as Associate Professor, Biological Sciences, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Low enrollment.
- Current or future market considerations as to the need for a program or department.
- Restructuring of a program, department, or school as determined to be necessary by the university.
- Realignment of resources.

Secondary considerations may include:
- Cost of operations.
- Reduction in revenues for specific departments or schools.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

Koerner, Brenda
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

# EMPORIA STATE
# U N I V E R S I T Y

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

*Office of the* PRESIDENT

September 15, 2022

Sheryl Lidzy
Associate Professor
Communication and Theatre, Liberal Arts and Sciences

Dear Dr. Lidzy:

I regret to inform you that your appointment as Associate Professor, Communication and Theatre, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Current or future market considerations as to the need for a program or department.
- Realignment of resources.

Secondary considerations may include:
- Low enrollment.
- Cost of operations.
- Reduction in revenues for specific departments or schools.
- Restructuring of a program, department, or school as determined to be necessary by the university.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

Lidzy, Sheryl
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.
- You may be eligible to retire from the university in lieu of being laid off. If you choose to retire, you will still receive three (3) months severance pay.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

# EMPORIA STATE
# U N I V E R S I T Y

*Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

September 15, 2022

Christopher Lovett
Professor
Social Sciences/Sociology/Criminology, Liberal Arts and Sciences

Dear Dr. Lovett:

I regret to inform you that your appointment as Professor, Social Sciences/Sociology/Criminology, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Low enrollment.
- Cost of operations.
- Restructuring of a program, department, or school as determined to be necessary by the university.

Secondary considerations may include:
- Reduction in revenues for specific departments or schools.
- Current or future market considerations as to the need for a program or department.
- Realignment of resources.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

Lovett, Christopher
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.
- You may be eligible to retire from the university in lieu of being laid off. If you choose to retire, you will still receive three (3) months severance pay.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

# EMPORIA STATE
## U N I V E R S I T Y

### *Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

September 15, 2022

Max McCoy
ProfessorProfessor
English/Modern Languages/Journalism, Liberal Arts and Sciences

Dear Mr. McCoy:

I regret to inform you that your appointment as Professor, English/Modern Languages/Journalism, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Cost of operations.
- Reduction in revenues for specific departments or schools.
- Current or future market considerations as to the need for a program or department.
- Restructuring of a program, department, or school as determined to be necessary by the university.

Secondary considerations may include:
- Low enrollment.
- Realignment of resources.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

McCoy, Max
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.
- You may be eligible to retire from the university in lieu of being laid off. If you choose to retire, you will still receive three (3) months severance pay.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

# EMPORIA STATE
# U N I V E R S I T Y

*Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

September 15, 2022

Amanda Miracle
Associate Professor
Social Sciences/Sociology/Criminology, Liberal Arts and Sciences

Dear Dr. Miracle:

I regret to inform you that your appointment as Associate Professor, Social Sciences/Sociology/
Criminology, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to
extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university
enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive
changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board)
policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by
the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Low enrollment.
- Cost of operations.
- Restructuring of a program, department, or school as determined to be necessary by the university.

Secondary considerations may include:
- Reduction in revenues for specific departments or schools.
- Current or future market considerations as to the need for a program or department.
- Realignment of resources.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

0006

Miracle, Amanda
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

0007

# EMPORIA STATE
# U N I V E R S I T Y

*Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

September 15, 2022

Michael Morales
Associate Professor
Physical Sciences, Liberal Arts and Sciences

Dear Dr. Morales:

I regret to inform you that your appointment as Associate Professor, Physical Sciences, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Low enrollment.
- Cost of operations.
- Current or future market considerations as to the need for a program or department.
- Restructuring of a program, department, or school as determined to be necessary by the university.

Secondary considerations may include:
- Reduction in revenues for specific departments or schools.
- Realignment of resources.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

Morales, Michael
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.
- You may be eligible to retire from the university in lieu of being laid off. If you choose to retire, you will still receive three (3) months severance pay.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

# EMPORIA STATE
## U N I V E R S I T Y

*Office of the* PRESIDENT

Campus Box 4001
1 Kellogg Circle
Emporia, Kansas 66801-5415
620.341.5551
emporia.edu

ELECTRONICALLY FILED 11/15/2022 16:14:21 OFFICE OF ADMINSTRATIVE HEARINGS

September 15, 2022

Lynnette Sievert
Professor
Biological Sciences, Liberal Arts and Sciences

Dear Dr. Sievert:

I regret to inform you that your appointment as Professor, Biological Sciences, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace. This action is taken under Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board. A copy of this framework is included with this notification letter.

Specifically, this action is based on factors such as, but not limited to:
- Restructuring of a program, department, or school as determined to be necessary by the university.
- Realignment of resources.

Secondary considerations may include:
- Low enrollment.
- Cost of operations.
- Reduction in revenues for specific departments or schools.
- Current or future market considerations as to the need for a program or department.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity

This letter and information packet provides the details of your rights and estimated benefits.

An Equal Opportunity Employer

Sievert, Lynnette
September 15, 2022
Page 2

Per standard ESU procedures, you will be placed on leave without pay on Sunday, May 14, 2023, as you submit your final grades. Upon completion of your responsibilities, as determined by the university, ESU will:

- Pay you three (3) months severance pay.
- The university reserves the right to place you on paid administrative leave through your end date should the university determine that to be in the best of interest of the university.
- You may be eligible to retire from the university in lieu of being laid off. If you choose to retire, you will still receive three (3) months severance pay.

A representative from our Human Resources Office will briefly review benefits, estimated final pay information including qualifying leave payouts, and answer questions you may have, today.

The Human Resources Office will be in contact with you regarding dates, times and locations of three informational sessions to review the information in this packet. I welcome and encourage you to bring your spouse, partner, significant other, or other valued folk to participate in this conversation.

Human Resources will reach out to you again near the end of your appointment. You may contact the Office of Human Resources any time with questions prior to those meetings.

At this time, it is expected that you will receive your final paycheck as normal on June 9, 2023. This paycheck will include vacation leave, comp time, payouts, incentive pay, and any other payroll payments due to you at that time.

You may appeal this action within 30 days of receipt of this notice, in writing, to the Kansas Board of Regents, with a copy to ESU President, Ken Hush. The attached framework outlines what should be included in and with the appeal. Questions regarding this appeal process may be directed to Steven Lovett, Associate General Counsel for Academic Affairs.

We recognize the importance of the work and commitment you have made to our students, university programs, the university itself, and the Emporia and academic communities, and thank you for your service.

Sincerely,

Ken Hush
President

c:      Personnel File

# KANSAS BOARD OF REGENTS
## MINUTES
May 18-19, 2022

The May 18, 2022, meeting of the Kansas Board of Regents was called to order by Chair Cheryl Harrison-Lee at 12:30 p.m. The meeting was held in the Board Office located in the Curtis State Office Building, 1000 S.W. Jackson, Suite 520, Topeka. Proper notice was given according to law.

| | |
|---|---|
| MEMBERS PRESENT: | Cheryl Harrison-Lee, Chair |
| | Jon Rolph, Vice Chair |
| | Bill Feuerborn |
| | Mark Hutton |
| | Carl Ice |
| | Shelly Kiblinger |
| | Cynthia Lane |
| | Allen Schmidt |
| | Wint Winter |

## EXECUTIVE SESSION
At 12:30 p.m., Regent Rolph moved, followed by the second of Regent Kiblinger, to recess into executive session for 45 minutes in the Kathy Rupp Conference Room to discuss personnel matters of non-elected personnel. The subject of this executive session was to prepare for a university CEO evaluation and discuss individual CEO compensation and the purpose was to protect the privacy of the individual Board employees involved. Participating in the executive session were members of the Board, President Flanders (for a portion), and General Counsel Julene Miller. The motion carried. At 1:15 p.m., the meeting returned to open session.

## BREAK
At 1:15 p.m., Chair Harrison-Lee called for a break and resumed the meeting at 1:35 p.m. in the Board Room.

## APPROVAL OF MINUTES
Regent Lane moved that the minutes of the April 8, 2022 special meeting and April 20, 2022 regular meeting be approved. Following the second of Regent Kiblinger, the motion carried.

## INTRODUCTIONS
President Muma stated that during this time of year the leadership for the different university senates changes. He thanked Dr. Whitney Bailey, outgoing Faculty Senate President, for her service and welcomed incoming Faculty Senate President, Dr. Susan Castro. He thanked Gabriel Fonseca, outgoing President of the Staff Senate, and welcomed incoming Staff Senate President, Denise Gimlin. President Muma also introduced the newly elected Student Body President, Olivia Gallegos, and thanked outgoing Student Body President, Rija Khan. Chancellor Girod thanked the University of Kansas' outgoing student Body President, Niya McAdoo, and introduced the new Student Body President, Sadie Williams.

may arise from the Board's fiduciary duties, or may be initiated by the Retirement Plan Committee itself.

(2) The Retirement Plan Committee members will be appointed by the Board and will include one member of the Board; one member of the Council of Presidents, or designee; two members of the Council of Business Officers; ~~three~~ one state university human resource ~~directors~~ director; two at-large members; and two individuals nominated from the state universities who are experts in the subject matter of investments and retirement planning. A staff person from the Board of Regents office who is appointed by the Board President and Chief Executive Officer will serve as a non-voting ex officio member. The chairperson of the Committee will be the appointed Board member. When appointing Retirement Plan Committee members, the Board shall strive for as broad of representation from the state universities as possible.

(3) Members will have ~~staggered~~ three-year terms and may resign at any time, effective when tendered to the Board. A person who is appointed to replace a member who has resigned will serve out the remainder of the term of the resigning member.

## *Other Matters*

### AMENDMENT TO BOARD POLICY ON WORKFORCE MANAGEMENT

General Counsel Miller stated that at the January 2021 meeting the Board adopted a temporary, low enrollment and COVID-related workforce management policy that gave universities another tool for managing institutions that are in significant financial stress, which was exacerbated during the pandemic.  While the Board was successful in obtaining state funding increases during the current Session, the enrollment and financial challenges at the universities are still a concern. General Counsel Miller stated the proposed amendment would eliminate the deadline for universities to propose a framework for its implementation and noted the policy is still set to expire on December 31, 2022.  Under the proposed amendment, a framework would need to be submitted and approved by the Board before the policy's expiration date.  Regent Lane moved to approve, and Regent Schmidt seconded.  The motion carried.  The following amendment was adopted:

**Section II.C.6.b.ii**

    **b.  Other**

    **. . .**

    **ii.**    In light of the extreme financial pressures placed on the state universities due to the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, effective immediately through December 31, 2022 and notwithstanding any other Board or institutional policy, any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university. Such terminations, suspensions, or dismissals shall follow the procedure set forth below. Declaration of financial exigency and the processes associated with declaration of financial exigency shall not be a

prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions.

The chief executive officer of any state university, before making any suspensions, dismissals, or terminations under this provision ~~and before July 1, 2021~~, shall present to the Board for approval a framework for the university's decision-making under this provision. Elected representatives of the university's faculty, staff and student governance groups shall be given an opportunity to provide input, comments, and recommendations on the draft framework prior to the university provost's endorsement and chief executive officer's adoption and submission of the framework to the Board for approval.  Once approved, that framework shall be used for any suspension, dismissal, or termination under this provision. Frameworks for decision-making may be based on factors such as, but not limited to, performance evaluations, teaching and research productivity, low service productivity, low enrollment, cost of operations, or reduction in revenues for specific departments or schools. Prior to the framework being implemented on any campus, the university CEO shall communicate to both the campus community and the Board a rationale for why the framework must be implemented instead of existing suspension, dismissal or termination policies.

(1)    The university chief executive officer shall provide no less than 30 days' written notice of the suspension, dismissal, or termination to the affected employee, including the reasons for the action.

(2)    Any employee given notice of a suspension, dismissal, or termination that expressly invokes the authorization of this provision may submit an appeal of the action of the university chief executive officer, through the Board of Regents office as provided below, to the Office of Administrative Hearings. Suspension, dismissal, or termination not invoking this policy shall have solely those appeal rights provided by existing university policy or other applicable existing procedures.

(3)    The employee must submit the appeal to the Board office within 30 days of receiving notice of the employment action. The initial submission must include a copy of the notice of the action being appealed and a written statement, including any relevant supporting evidence or documentation, setting forth the reasons the employee believes the decision to suspend, dismiss, or terminate the employee (a) is substantially inconsistent with the university's decision-making framework approved by the Board, (b) was the result of unlawful bias or discrimination; or (c) was otherwise unreasonable, arbitrary or capricious. These shall be the only grounds for reversing the state university chief executive officer's decision. The employee shall provide a copy of the appeal and supporting evidence and documentation to the university's chief executive officer at the time the appeal is submitted.

(4)    The university chief executive officer shall have 30 days from receipt to respond in writing to the appeal, including any supporting evidence or documentation, and shall provide a copy of the response and any supporting evidence and documentation to the employee at the time the response is submitted. This 30-day period may be extended for good cause as determined by the Board President and Chief Executive Officer.

(5)    Within 10 days of receiving the university chief executive officer's response, the Board office shall refer the appeal to the Office of Administrative Hearings, which shall provide a hearing and decide the case based on the standards stated in this policy and in the university's Board-approved framework. The Board shall provide a copy of the submissions to the Office of Administrative Hearings, along with a copy of this policy and the decision-making framework

Kansas Board of Regents                  - 21 -                  May 18-19, 2022

approved by the Board. The state university shall be responsible for fees charged by the Office of Administrative Hearings.

(6)     The burden of proof in any appeal shall be on the employee. There shall be no right of discovery. The review shall be based on the written submissions, and the hearing shall allow oral presentation to the administrative hearing officer by the employee and the university, each of whom may be represented by counsel.

(7)     Decisions of the administrative hearing officer shall be final and are not subject to further administrative review by any officer or committee of the university or by the Board of Regents.

(8)     An appeal under this policy will not stay the effective date of the suspension, dismissal, or termination. Employees who prevail in their appeal under this policy shall be entitled to reinstatement, back pay and restoration of other lost benefits.

## BOARD'S UNIFIED FY 2024 BUDGET REQUEST PREPARATIONS

Vice President Frisbie stated the Kansas Higher Education Coordination Act requires the Board of Regents to develop and present to the Governor and Legislature a unified request for state appropriations for postsecondary education each year. The Board's request must be submitted by October 1. Vice President Frisbie reviewed the proposed calendar below. Regent Hutton stated that the Board Fiscal Affairs and Audit Standing Committee wants to be more engaged with the development of the unified budget and suggested that the new chair of the Committee work with Vice President Frisbie.

**Unified Appropriation Request Schedule**

| April 2022 Board Meeting | Board has first read of capital improvement requests |
|---|---|
| May 2022 Board Meeting | Board acts on capital improvement requests for July 1 |
| June 2022 Board Meeting | Board receives institution and sector specific requests. (Proposals are to be submitted to the Board Office by **Friday, June 3**.) |
| Summer 2022 Board Retreat | Board conducts budget workshop to discuss requests from across the System and indicates preference for inclusion in the FY 2024 Budget Request. |
| September 2022 Board Meeting | Board officially approves FY 2024 unified budget request |
| October 1, 2022 | Board's FY 2024 unified budget request submitted |

## CAPITAL IMPROVEMENT REQUEST FOR FY 2024 AND FIVE-YEAR PLANS

Chad Bristow, Director of Facilities, presented the proposed Capital Improvement Requests for FY 2024 and Five-Year Plans for the state universities. He stated that staff is recommending approval of the following: 1) all projects funded by restricted fees generated for relevant business units as submitted; and 2) the university system request for spending authority from the Educational Building Fund (EBF) for planning, construction, renovation, rehabilitation, repair, and razing of mission critical university facilities and infrastructure. Director Bristow noted the FY

Kansas Board of Regents          - 24 -                    May 18-19, 2022

| ESU | Butcher Education Center | 1 | $1,000,000 | 35,765 |
|-----|--------------------------|---|------------|--------|
| **Totals** | | **12** | **$7,228,000** | **299,559** |

* *Space allocation within the KSU Natatorium is 20,600 GSF Mission Critical and 29,650 GSF Non-Mission Critical. The demolition project would be split-financed as follows: $615,000 from this funding source and $885,000 from Educational Building Fund*

FY 2023 BOARD MEETING CALENDAR ADJUSTMENT

President Flanders stated that the spring break calendars for the entire Kansas education system were aligned last year to benefit Kansas students and their families. However, occasionally the March Board meeting lands on the same week as spring break because of how the calendar fluctuates from year to year. To address this issue for next year, President Flanders recommends moving the March 2023 Board meeting from March 15-16 to March 22-23, 2023. He also noted that the Governance Committee approved a change to the Board's By-Laws to address this issue, which will be presented to the Board in June for consideration. Regent Rolph moved to approve moving the March 2023 Board meeting date. Regent Kiblinger seconded, and the motion carried.

FY 2023 BOARD CHAIR AND VICE CHAIR

Regent Harrison-Lee moved to elect Regent Jon Rolph as Chair of the Board for FY 2023. Regent Hutton seconded. The motion carried.

Regent Rolph moved to elect Regent Carl Ice as Vice Chair for FY 2023. Regent Lane seconded, and the motion carried.

**ADJOURNMENT**

Regent Ice moved to adjourn, and Regent Rolph seconded. The motion carried.

_____          _____
Blake Flanders, President and CEO          Cheryl Harrison-Lee, Chair

**Exhibit 11**

# KANSAS BOARD OF REGENTS
## MINUTES
September 14-15, 2022

The September 14, 2022, meeting of the Kansas Board of Regents was called to order by Chair Jon Rolph at 1:30 p.m. The meeting was held in the Board Office located in the Curtis State Office Building, 1000 S.W. Jackson, Suite 520, Topeka. Proper notice was given according to law.

MEMBERS PRESENT:          Jon Rolph, Chair
                                    Carl Ice, Vice Chair
                                    Blake Benson
                                    John Dicus
                                    Cheryl Harrison-Lee
                                    Shelly Kiblinger
                                    Cynthia Lane
                                    Diana Mendoza
                                    Wint Winter

## WELCOME AND INTRODUCTIONS
Chair Rolph welcomed Chair Jim Porter and the State Board of Education members. Members of the Board of Regents and the State Board of Education introduced themselves.

## CONSIDERATION OF DISCUSSION AGENDA

### INFORMATION ON CONCURRENT ENROLLMENT TRENDS
Daniel Archer, Vice President for Academic Affairs, presented concurrent enrollment trend data. Over the last six years, the number of high school students taking college credit courses have increased from 28,217 in 2016 to 34,908 in 2020. Dr. Archer noted in 2021 the system saw a slight dip in concurrent enrollment (32,603 students) due to the COVID-19 pandemic. He then reviewed the concurrent enrollment trends within the different sectors of the higher education system. The majority of high school students taking college credit occurs at the community colleges, followed by the technical colleges and then the public universities. The six-year trend data for all the sectors mirrors the overall system data with increased enrollments from 2016 to 2020 and then a slight decline in 2021. Vice President Archer also displayed the system's six-year trend data broken down by race and ethnicity and noted increasing access to concurrent enrollment courses for minority students is a priority for the system. He then reviewed the Higher Learning Commission (HLC) faculty qualification requirements for teaching concurrent and dual enrollment courses. HLC requires faculty to hold an academic degree relevant to what they are teaching and at least one level above the level at which they teach, and for general education courses, these qualifications may be satisfied by a master's degree in the discipline or subfield. However, if a faculty member holds a master's degree in a discipline or subfield other than that in which she or he is teaching, that faculty member should have completed a minimum of 18 graduate credit hours in the discipline in which they teach. The HLC guidance on qualifications was issued in 2015 and institutions have until September 1, 2025 to meet the requirements. Since 2018, the percentage of HLC qualified faculty teaching courses through concurrent enrollment has increased steadily. Board Member Jones was pleased that more teachers are becoming certified to meet these

Kansas Board of Regents                    - 5 -                    September 14-15, 2022

|  | | | FAFSA Completion | Percent Improvement |
|---|---|---|---|---|
| Virtual/ Academy | Northeast Magnet High School | BEL AIRE, KS | 53% | |

*1A schools tied with 100% FAFSA completion.

| | Most Improved FAFSA Completion Percentage | | FAFSA Completion | Percent Improvement |
|---|---|---|---|---|
| 6A | Wichita High School South | WICHITA, KS | 47% | +69% |
| 5A | Highland Park High School | TOPEKA, KS | 38% | +36% |
| 4A | Chapman High School | CHAPMAN, KS | 64% | +61% |
| 3A | Nickerson High School | NICKERSON, KS | 37% | +64% |
| 2A | McLouth High School | McLOUTH, KS | 46% | +68% |
| 1A | Pretty Prairie High School | PRETTY PRAIRIE, KS | 80% | +167% |
| Virtual/ Academy | Garden City Achieve | GARDEN CITY, KS | 31% | +101% |

## BREAK
Chair Rolph thanked the State Board of Education members for attending and noted that the Board of Regents looks forward partnering with the State Board to move these initiatives forward. Chair Porter adjourned the State Board's meeting, and Chair Rolph called for a break at 2:47 p.m. The Kansas Board of Regents meeting resumed at 3:12 p.m.

## APPROVAL OF MINUTES
Regent Kiblinger stated that in July 25-17, 2022 minutes there is a title in which the word "who" should be changed to "whom." She then moved that the minutes of the June 15-16, 2022 regular meeting, June 21, 2022 special meeting, June 22, 2022 special meeting, June 28, 2022 special meeting, and July 25-27, 2022 retreat and budget workshop meeting, as amended, be approved. Following the second of Regent Ice, the motion carried.

## CONSIDERATION OF DISCUSSION AGENDA

### Other Matters

FRAMEWORK FOR WORKFOCE MANAGEMENT – ESU
Chair Rolph highlighted that the Board received the following handouts: the Emporia State University proposed Framework for Workforce Management, the Board's Suspension, Terminations, and Dismissals policy that outlines the process for developing a framework, a Resolution and response from the ESU Faculty Senate, a document that contains feedback from ESU students along with the administration's responses, a document that contains ESU faculty feedback along with the administration's responses, a statement from the Council of Faculty Senate Presidents, and a petition. Chair Rolph noted that the Board received most of these documents before the meeting and had an opportunity to review all the information provided.

President Hush and Dr. Brent Thomas, Dean of the College of Liberal Arts and Sciences and Interim Provost and Vice President for Academic Affairs, presented Emporia State University's proposed Workforce Management Framework. President Hush stated the Framework is a

necessary tool to help strategically transform the University for a vibrant and sustainable future that is focused on student success.  President Hush reviewed the timeline.  In January 2022, the ESU administration communicated with faculty and staff about its plan to review the University's operations, which included looking at its programs and curriculum offerings.  Faculty and staff were asked to provide feedback on what they would change to create a better experience for students, colleagues, alumni, community or state, and how the University could evolve its programs and curriculum in response to regional economic needs.  The administration held four in-person forums to gather feedback and sent out several campuswide communications reiterating the University's intentions.  In February, President Hush presented testimony to the House Higher Education Budget Committee that outlined ESU's path forward and noted that ESU's priorities were to optimize its existing education platform, grow enrollments, retain and recruit top talent, and review its academic program mix.

President Hush then reviewed ESU's budgetary challenges.  He noted that in the past the University has implemented measures such as hiring freezes, spending restrictions, and voluntary retirement opportunities to address financial challenges.  He stated that these measures have only served to push the problem forward rather than resolve it, and that the University needs a new approach.  Therefore, the University established a data driven process to review its programs, and from this process, the University developed strategic concepts for the programs it is going to invest in for the future.  President Hush noted that the policy the Board approved will enable ESU to align resources and invest into growth areas by doubling down in those programs that will move the University forward.  He then reviewed the ESU's proposed Workforce Management Framework and noted that the Framework is not just another budget cutting tool but rather a mechanism that will allow ESU to fundamentally change what it can offer to students.  President Hush stated that the proposed Framework was submitted to its shared governance groups last week and that they provided feedback.  Some of that feedback was incorporated into the Framework.

Regarding the impact on students and employees, President Hush stated that every student will have the opportunity to complete their current degree program at Emporia State.  Students will continue to receive their current scholarships and financial aid and will have access to counseling should they need it.  President Hush stated that the vast majority of impacted employees will have the opportunity to remain through the end of the academic year in May 2023, and they will have the opportunity to receive an additional three months of severance pay.  Employees will also receive outplacement services and will have access to counselling.

Interim Provost Thomas reported that ESU has repeatedly absorbed budget cuts over the years by reducing its operating budgets, eliminating annual equipment funds, and eliminating positions.  He stated the University must operate differently and make fundamental changes to how it approaches academic offerings because the University cannot continue to expect its faculty to do more with less.  He stated the group that conducted the program review process included many academic leaders and noted the data used to conduct the analysis is available.  Interim Provost Thomas also emphasized that the administration values tenure and understands that it cannot build a successful, long-term program on the backs of adjunct instructors.

Chair Rolph wanted to be clear that there is a plan in place that will allow current impacted students the ability to complete their degree at the University and that those students will continue to receive

their scholarships and financial aid.  Interim Provost Thomas stated that ESU will honor its commitment to its students and that teach out programs are being developed.  It was noted that the proposed Framework was revised to incorporate some of the suggestions made by ESU's shared governance groups.  Regent Winter asked whether ESU received feedback from rpk Group on this process.  President Hush stated that ESU shared its methodology, rationale, and findings with rpk and noted that rpk is continuing its own work, which should be completed by the end of the year.  Regent Ice wanted to know the estimated impact, and President Hush stated that about seven percent of ESU's employees will be impacted.  Regent Lane asked about the projected financial health and strength of programing at the University after the Framework is implemented.  President Hush stated that the impact will not be immediate but over time it is expected to save the University $5 million.  President Hush also spoke about the importance of changing the low enrollment trend and investing in recruitment and marketing strategies.  Following discussion, Regent Lane moved to approve Emporia State University's Framework for Workforce Management as presented.  She noted that the motion includes the proposed Framework's provisions and ESU's intent to modify, suspend, or otherwise change the University's existing program discontinuance policy and policies related to curriculum change as necessary to effectively accomplish its goal of restructuring to meet current demands and to position the University for the future.  Regent Lane also commented that the Framework is a tool that should be used sparingly.  Regent Winter seconded, and the motion carried.  The following Framework was approved:

EMPORIA STATE UNIVERSITY
FRAMEWORK FOR WORKFORCE MANAGEMENT

<u>Rationale for why the Framework must be implemented</u>. Pursuant to the Board of Regent's policy set out at Chapter II, Section C., Paragraph 6.b., "In light of the extreme financial pressures placed on the state universities due to the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, effective immediately through December 31, 2022 and notwithstanding any other Board or institutional policy, any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university. Such terminations, suspensions, or dismissals shall follow the procedure set forth below. Declaration of financial exigency and the processes associated with the declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."

Emporia State University, which is committed to being forward focused and future ready, is placing the needs and expectations of its current and future students at the center of its strategic efforts. Ongoing changes in industry demands, locally and nationally, as well as changes in student demographics and commitments to higher education affect the historical mission of ESU. The University's primary sources of revenue are student tuition and taxpayer dollars provided through the legislature. Increases in student tuition revenue are dependent on increased enrollment, which is very difficult to achieve for any university during these times. Because ESU has experienced extreme financial pressures accelerated by the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, the University continues to face increases in the cost of operations across campus as well as substantive changes in the educational marketplace. These increased costs include higher costs being charged by providers and suppliers, as well as the

necessity to properly maintain and support facilities, equipment, systems, security, and personnel. While the University is not facing financial exigency, the financial and market situations do require a prudent review and restructuring, which will require modification, reorganization, suspension, or elimination of certain operations, programs and curriculum, which may require immediate action notwithstanding any other Board or institutional policy. This framework allows for a more orderly transition to what is best for the University.

<u>The Framework</u>:
*A decision to suspend, dismiss, or terminate any university employee shall be based on factors such as, but not limited to:*
- Low enrollment
- Cost of operations
- Reduction in revenues for specific departments or schools
- Current or future market considerations as to the need for a program or department
- Restructuring of a program, department, or school as determined to be necessary by the university
- Realignment of resources
- Performance evaluations
- Teaching and research productivity
- Low service productivity

*A decision for action must be made in consideration of the following:*
- Relevant accreditation requirements for the program, school, or college
- Course availability to students in order to complete degree requirements. Course availability means students can take necessary courses either at ESU or through another university or community college in Kansas.

<u>The procedure to be followed for taking action, pursuant to Board policy, is described below</u>:

1. <u>Notice</u>. The President shall provide no less than 30 days' written notice of suspension, dismissal, or termination to the affected employee. This notice shall include a statement that this action is being taken pursuant to this policy, the reasons for the action being taken, the effective date of the action, and shall also include any considerations to be provided by the University to the affected employee (such as severance pay, payouts, retirement options, etc.).

2. <u>Appeal</u>. The employee may appeal the action taken pursuant to this policy through the Board of Regents office to the Office of Administrative Hearings. Any action taken that is not being taken pursuant to this policy shall have solely those appeal rights provided by existing university policy or other applicable procedures.

3. <u>Appeal, Time and Content of</u>. The employee must submit an appeal to the Board office within 30 days of receiving notice of the action. The appeal must include a copy of notice of the action received by the employee and a written statement with any relevant supporting evidence describing why the employee believes the decision for the action: (a) is substantially inconsistent with the university's decision-making framework approved by

the Board; (b) was the result of unlawful bias or discrimination; or (c) was otherwise unreasonable, arbitrary or capricious. These are the only grounds for reversing the President's decision. The employee shall provide a copy of their appeal documents to the President at the same time they are submitted to the Board office.

4. <u>Response to Appeal by President</u>. The President shall have 30 days from receipt of the appeal to respond in writing to the appeal. This response shall include any supporting evidence or documentation. This response with supporting evidence or documentation shall be sent to the Board office with a copy sent to the employee at the same time. This 30 day period can be extended for good cause as determined by the Board President and CEO.

5. <u>Submission of Appeal to Office of Administrative Hearings</u>. Within 10 days of receiving the President's response to the appeal, the Board office shall refer the appeal to the Office of Administrative Hearings. The Office of Administrative Hearings shall provide a hearing and decide the appeal based on the standards stated in the Board's policy and in the University's framework approved by the Board. The University shall be responsible for fees charged by the Office of Administrative Hearings.

6. <u>Hearing before the Office of Administrative Hearings</u>. The burden of proof is on the employee. No discovery will be permitted. The review shall be based on the written materials submitted, along with any oral presentation to the administrative hearing officer by the employee and the University. The employee and the University may be represented by counsel.

7. <u>Decision</u>. The decision of the administrative hearing officer is final and not subject to further administrative review by any officer or committee of the university or by the Board of Regents.

8. <u>Action Not Stayed during Appeal</u>. An appeal under this policy will not stay the effective date of the suspension, dismissal, or termination. An employee who wins their appeal will be entitled to reinstatement, back pay and restoration of other lost benefits.

<u>AMEND AGENDA</u>
Chair Rolph amended the agenda to move the next five items to the end of Thursday's agenda – Act on New Institutional and Aspirational Peers - WSU, Act on Request to Approve Granting an Honorary Degree - WSU, Act on Request to Name a Building - FHSU, and Act on Request to Name a Building – KSU.

**<u>RECESS</u>**
Chair Rolph recessed the meeting at 3:54 p.m.

**<u>RECONVENE</u>**
Chair Rolph reconvened the meeting at 9:32 a.m. on Thursday, September 15, 2022.

MEMBERS PRESENT:                    Jon Rolph, Chair

Carl Ice, Vice Chair
Blake Benson
John Dicus
Cheryl Harrison-Lee
Shelly Kiblinger
Cynthia Lane
Diana Mendoza
Wint Winter

## INTRODUCTIONS

President Mason introduced Fort Hays State University's Faculty Senate President, Dr. Sammuel Byer, University Staff Senate President, Robert Duffy, and Student Body President, Ryan Stanley. President Linton announced that Ethan Erickson was named Kansas State University's Vice President for Administration and Finance after a national search.

## GENERAL REPORTS

### REPORT FROM CHAIR

Chair Rolph welcomed Regent Dicus, Regent Benson, and Regent Mendoza to their first Board meeting. He reported that the Board held its annual retreat and budget workshop meeting at the end of July in Wichita. The Board received information on the institutions' budgets, reviewed the state universities' National Institution of Student Success recommendations, and identified potential Board goals for this year, which will be acted on later in the agenda. Chair Rolph noted that the state university CEOs and representatives from the community and technical colleges participated in the discussions on all three days and that the group toured WSU Tech's National Center for Aviation Training and WSU's Deloitte Smart Factory. Chair Rolph noted that next month Wichita State University will host the Board for a two-day campus visit. He also reported that the Board had a productive discussion with the Council of Faculty Senate Presidents this morning at breakfast.

### REPORT FROM PRESIDENT AND CEO

President Flanders reported that the 2022 Legislature created a task force to review state funding for the community and technical colleges. In late August the task force held a hearing that discussed the cost model that is used to calculate the state's share of the cost to deliver courses to students at the colleges. He believes the discussion was helpful and allowed the task force members to better understand how the cost model has been implemented in conjunction with legislative provisos. President Flanders thanked the Governor and Legislature for fully funding the cost model this year. Last week President Flanders attended the Governor's Council of Education meeting, which was held on the Fort Hays State University campus. He thanked President Mason and her team for hosting the group. President Flanders reported that in July the University of Kansas Caner Center announced it had earned comprehensive status, which is the National Cancer Institute's most prestigious status. He congratulated Chancellor Girod, Dr. Simari, and Dr. Roy Jensen and their teams, and noted that the Board will receive an update on the Cancer Center later this year. President Flanders announced that John Yeary was selected as the Board's new General Counsel. General Counsel Yeary previously served as the Chief Counsel for the Kansas Department of Administration and has 25 years of legal experience with the State of

Kansas. He then recognized and thanked Julene Miller for her 15 ½ years of service as the General Counsel. President Flanders noted that she will still be working for the Board Office on a part time basis before fully retiring.

## REPORT FROM COUNCIL OF FACULTY SENATE PRESIDENTS

Nate Brunsell presented the report for the Council of Faculty Senate Presidents. Dr. Brunsell thanked the Board for hosting breakfast this morning and noted the Council looks forward to working together this year. At its meeting yesterday, the Council discussed the Emporia State University's workforce management framework, and the members expressed their concerns for the impacted employees and discussed how it may impact the other campuses. The Council believes any decisions on these matters should involve the different campus constituent groups, and those groups should be given the data and adequate time to respond. The Council also requested that decisions be made in an open and transparent way. Additionally, Dr. Brunsell reported that the Council discussed the Board's initiative with rpk Group. The Council noted that each university has its own mission and urged the Board to consider their unique missions when making decisions on programs. Chair Rolph thanked Dr. Brunsell for the feedback and noted that the Board wants all campus groups to be involved with this process and encouraged faculty members to participate.

## REPORT FROM STUDENTS' ADVISORY COMMITTEE

The Students' Advisory Committee report was presented by Sadie Williams. The Committee held its annual retreat at the University of Kansas in August. Chair Rolph and President Flanders attended the retreat and provided information on what items the Board will be focusing on this year and reviewed the Committee's role. At its meeting yesterday, the Committee began discussing the different student fee proposals on the campuses and spoke with the Emporia State University Student Body President about what actions are being taken to make sure students are involved with the workforce management framework policy. Regent Ice stated the Board's Fiscal Affairs and Audit Standing Committee looks forward to talking with the students about the fee proposals.

## UPDATE ON *BUILDING A FUTURE* DASHBOARD AND CONCURRENT ENROLLMENT COLLABORATION

Regent Lane thanked Regent Kiblinger, President Shipp, President Muma, and Matt Keith for working on the Board's draft *Building a Future* Dashboard. The group has focused on reviewing the metrics and clarifying terminology in Pillar I: Helping Kansas Families. Regent Lane noted that the structure of the Dashboard will contain the plan's Areas of Focus and the different levels of metrics – Foundational Indicators (lagging metrics reported annually), Supporting Indicators (leading metrics reported at least quarterly), and Systemwide Approaches (strategies tied to the metrics). She noted the purpose of the Dashboard is to provide ongoing data to the Board and the institutions, so that they can determine if investments are improving outcomes for students and their families. Regent Lane then reviewed the handout that shows the proposed metrics and believes the next step in the process is for the Board to discuss the proposed concept. Chair Rolph stated he will work with President Flanders to determine when that discussion can occur and expressed his appreciation for the work that the group has done. President Flanders stated that as this work moves forward it will be important to have discussions with the university and Board

Kansas Board of Regents                    - 38 -                    September 14-15, 2022

<u>NAME A BUILDING – KSU</u>
President Linton recommended renaming a street on the Manhattan campus in honor of the late Dr. Jon Wefald, who served as the 12th president of the University.  President Linton stated that President Wefald named Butterfly Lane during his tenure and believes it would be fitting to rename it Wefald's Butterfly Lane to recognize his impact on campus.  Regent Lane moved to approve, and Regent Kiblinger seconded.  The motion carried.

**<u>ADJOURNMENT</u>**
Chair Rolph adjourned the meeting at 12:43 p.m.

_____          _____
Blake Flanders, President and CEO          Jon Rolph, Chair

*September 14-15, 2022*                                        *Discussion Agenda | Wednesday*

# DISCUSSION AGENDA

A.   *Other Matters*
1.   **Act on Framework for Workforce Management –**          **President Hush**
     **ESU**

**Summary and Recommendation**

*Emporia State University is in the process of implementing the Board policy on Workforce Management as part of its effort to prepare and equip the University to meet current and future needs of the institution, its students and the surrounding community. A related part of this effort includes consideration of program discontinuance and curriculum change. ESU requests the Board's approval of the framework.*

**Background**
ESU's Framework for Workforce Management has been prepared pursuant to the Board's policy set out in Chapter II, Section C., Paragraph 6.b, as modified and approved by the Board in June 2022. The rationale for why ESU desires to implement its framework is set out within the language of the framework and is in alignment with the Board's policy requirements. The balance of the framework describes factors on which decisions will be made and the procedure to be followed for taking action. Again, these factors and procedures are in compliance with the Board's policy.

**Recommendation**
ESU is requesting that the Board approve its Framework for Workforce Management, which includes program discontinuance and curriculum change.

Appendix Vol. 1, Pg. 286

**Exhibit 12**

EMPORIA STATE UNIVERSITY
FRAMEWORK FOR WORKFORCE MANAGEMENT

<u>Rationale for why the Framework must be implemented</u>. Pursuant to the Board of Regent's policy set out at Chapter II, Section C., Paragraph 6.b., "In light of the extreme financial pressures placed on the state universities due to the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, effective immediately through December 31, 2022 and notwithstanding any other Board or institutional policy, any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university. Such terminations, suspensions, or dismissals shall follow the procedure set forth below. Declaration of financial exigency and the processes associated with the declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."

Emporia State University, which is committed to being forward focused and future ready, is placing the needs and expectations of its current and future students at the center of its strategic efforts. Ongoing changes in industry demands, locally and nationally, as well as changes in student demographics and commitments to higher education affect the historical mission of ESU. The University's primary sources of revenue are student tuition and taxpayer dollars provided through the legislature. Increases in student tuition revenue are dependent on increased enrollment, which is very difficult to achieve for any university during these times. Because ESU has experienced extreme financial pressures accelerated by the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, the University continues to face increases in the cost of operations across campus as well as substantive changes in the educational marketplace. These increased costs include higher costs being charged by providers and suppliers, as well as the necessity to properly maintain and support facilities, equipment, systems, security, and personnel. While the University is not facing financial exigency, the financial and market situations do require a prudent review and restructuring, which will require modification, reorganization, suspension, or elimination of certain operations, programs and curriculum, which may require immediate action notwithstanding any other Board or institutional policy. This framework allows for a more orderly transition to what is best for the University.

The Framework:

*A decision to suspend, dismiss, or terminate any university employee shall be based on factors such as, but not limited to:*

- Low enrollment.
- Cost of operations.
- Reduction in revenues for specific departments or schools.
- Current or future market considerations as to the need for a program or department.
- Restructuring of a program, department, or school as determined to be necessary by the university.
- Realignment of resources.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity.

*A decision for action must be made in consideration of the following:*
- Relevant accreditation requirements for the program, school, or college.
- Course availability to students in order to complete degree requirements. Course availability means students can take necessary courses either at ESU or through another university or community college in Kansas.

The procedure to be followed for taking action, pursuant to Board policy, is described below:

1. Notice. The President shall provide no less than 30 days' written notice of suspension, dismissal, or termination to the affected employee. This notice shall include a statement that this action is being taken pursuant to this policy, the reasons for the action being taken, the effective date of the action, and shall also include any considerations to be provided by the University to the affected employee (such as severance pay, payouts, retirement options, etc.).

2. Appeal. The employee may appeal the action taken pursuant to this policy through the Board of Regents office to the Office of Administrative Hearings. Any action taken that is not being taken pursuant to this policy shall have solely those appeal rights provided by existing university policy or other applicable procedures.

3. Appeal, Time and Content of. The employee must submit an appeal to the Board office within 30 days of receiving notice of the action. The appeal must include a copy of notice of the action received by the employee and a written statement with any relevant supporting evidence describing why the employee believes the decision for the action: (a) is substantially inconsistent with the university's decision-making framework approved by the Board; (b) was the result of unlawful bias or discrimination; or (c) was otherwise unreasonable, arbitrary or capricious. These are the only grounds for reversing the President's decision. The employee shall provide a copy of their appeal documents to the President at the same time they are submitted to the Board office.

4. Response to Appeal by President. The President shall have 30 days from receipt of the appeal to respond in writing to the appeal. This response shall include any supporting evidence or documentation. This response with supporting evidence or documentation shall be sent to the Board office with a copy sent to the employee at the same time. This 30 day period can be extended for good cause as determined by the Board President and CEO.

5. Submission of Appeal to Office of Administrative Hearings. Within 10 days of receiving the President's response to the appeal, the Board office shall refer the appeal to the Office of Administrative Hearings. The Office of Administrative Hearings shall provide a hearing and decide the appeal based on the standards stated in the Board's policy and in the University's framework approved by the Board. The University shall be responsible for fees charged by the Office of Administrative Hearings.

6. <u>Hearing before the Office of Administrative Hearings</u>. The burden of proof is on the employee.  No discovery will be permitted. The review shall be based on the written materials submitted, along with any oral presentation to the administrative hearing officer by the employee and the University. The employee and the University may be represented by counsel.

7. <u>Decision</u>. The decision of the administrative hearing officer is final and not subject to further administrative review by any officer or committee of the university or by the Board of Regents.

8. <u>Action Not Stayed during Appeal</u>. An appeal under this policy will not stay the effective date of the suspension, dismissal, or termination. An employee who wins their appeal will be entitled to reinstatement, back pay and restoration of other lost benefits.

# CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2025, the foregoing APPELLANTS'
APPENDIX was electronically filed with the Clerk of the Tenth Circuit
Court of Appeals using the CM/ECF system. I certify that the
participants in the case are registered CM/ECF users and that service
will be accomplished by the appellate CM/ECF system.


DATED: May 5, 2025        /s/ Dwight R. Carswell