Case No. 25-3032

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

AMANDA MIRACLE, et al.

*Plaintiffs-Appellees,*

v.

KEN HUSH, et al.

*Defendants-Appellants.*

---

## APPELLEES' RESPONSE BRIEF

---

Appeal from the United States District Court for the District of Kansas
Honorable Julie A. Robinson, Senior District Court Judge

District Court case No. 23-CV-4056-JAR-GEB

HENSON, HUTTON, MUDRICK,
GRAGSON & VOGELSBERG, LLP

J. Phillip Gragson, #16103
Amanda S. Vogelsberg, #23360
John H. Hutton, #16573
Kara Eisenhut #27055
3649 SW Burlingame Rd., Ste. 200
Topeka, KS 66611-2155
(785) 232-2200; (785) 232-3344 (fax)
jpgragson@hhmglaw.com
avogelsberg@hhmglaw.com
jhutton@hhmglaw.com
keisenhut@hhmglaw.com
*Attorneys for Plaintiffs-Appellees*

Oral Argument Is Requested

# TABLE OF CONTENTS

APPELLEES' RESPONSE BRIEF ...................................................... i

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES .......................................................... iii

PRIOR AND RELATED APPEALS .................................................. 1

JURISDICTIONAL STATEMENT .................................................... 1

ISSUES PRESENT FOR REVIEW ................................................... 2

STATEMENT OF THE CASE ........................................................ 3

SUMMARY OF THE ARGUMENT ................................................ 15

STANDARD OF REVIEW ........................................................... 17

ARGUMENT ........................................................................... 18

   I.   The collateral order doctrine does not apply because qualified immunity is not separate from the merits. ................ 18

   II.  Defendants are not entitled to qualified immunity for eliminating the Professors' property interest without due process ................................................................................... 22

      a.   The Professors had a property interest in continued employment because they were tenured ................................... 22

      b.   Kansas law regarding tenure before January 20, 2021, was established, and Defendants knew about it. .................... 33

**III.    The Professors asserted plausible and specific claims against the ESU and KBOR officials.** ............................................... **37**

    **a.    Specificity and acceptable grouping under *Robbins*.** ......**38**

    **b.    The Professors specifically plead their Liberty Interest claims against Hush, Johnson, and Lovett** ...............................**41**

    **c.    The Professors specifically alleged a section 1983 conspiracy by ESU and KBOR officials.** ....................................**47**

        **1. KBOR Officials**.............................................................**51**

        **2. Brent Thomas** ............................................................**55**

        **3. Kevin Johnson and Steve Lovett**....................................**57**

    **d.    ESU and KBOR officials took actions to violate the Professors' equal protection rights under the Constitution.** **59**

    **e.    The Professors specifically plead violation of their freedom of association against ESU and KBOR officials.**.......**61**

**CONCLUSION**........................................................................**61**

**STATEMENT OF REASONS FOR ORAL ARGUEMENT** ............**622**

**CERTIFICATE OF COMPLIANCE**....................................**62**

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011).................................... 18, 19, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................... 1, 16, 30, 38

*Bd. Of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) ............. 46, 47

*Behrens v. Pelletier*, 516 U.S. 299 (1996). ........................................ 16, 20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................ 39

*Bi-Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S. 441

   (1915),  ................................................................ 28, 30, 32, 35

*Brenna v. S. Colo. State Coll.*, 589 F.2d 475 (10th Cir. 1978) …. …. 23, 35

*Brooks v. Gaenzle*, 614 F.3d 1213 (2010) ............................................... 50

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)............ 16, 20

*Cox v. Glanz*, 800 F.3d 1231 (2015) ................................................... 18, 29

*Dixon v. City of Lawton*, 898 F.2d 1443 (10th Cir. 1990) ...................... 50

*Estate of Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016)………………

   ........................................................................ 16, 18, 19, 20

*Estate of Ward v. Pueblo Cnty., Co.*, 2023 WL 4744928 (D. Colo. July 25,

   2023) ................................................................................................ 40

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008)………………..……..17

*Gomez v. Toledo*, 446 U.S. 635 (1980),.....................................................19

*Johnson v. Jones*, 515 U.S. 304 (1995).....................................................37

*Justus v. Maynard*, 943 F.2d 618 (10th Cir. 1994)................................19

*Kosik v. Cloud County Community College*, 250 Kan. 507 (1992) ...........3

*Krotkoff v. Goucher College*, 585 F.2d 675 (1978)..................................22

*McDonald v. Wise*, 769 F.3d 1202 (10th Cir. 2014) ..........................42, 46

*Michaels v. City of McPherson, Kan.*, 71 F.Supp. 3d 1257 (D. Kan. 2014)

.................................................................................................43, 58

*Miller v. City of Mission, Kan.*, 705 F.2d 368 (10th Cir. 1983). .............41

*Onyx Props., LLC v. Bd. of Cty. Comm'rs of Elbert Cty.*, 838 F.3d 1039

(2016) ................................................................... 29, 30, 32, 33

*Randolph v. Bd. of Pub. Util. of Kan. City, Kan.*, 983 F.Supp. 1008 (D.

Kan. 1997) .......................................................................34

*Ray v. Unum Life Ins. Co. of America*, 314 F.3d 482 (2002) ..................36

*Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008) ....................38, 39

*Sanchez v. Dubois*, 291 F.App'x 187 (10th Cir. 2008)............................45

*Schulz v. City of Longmont*, 465 F.3d 433 (10th Cir. 2006) ..................34

*Scribner v. Bd. Of Educ. Of USD No. 492*, 308 Kan. 254 (2018)………….

.....................................................................……….15, 16, 24, 25

iv

*Smith v. Highland Community College*, 2023 WL 372016 (D. Kan., Jan. 24, 2023) ........................................................................ 44

*Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990) ..................................... 50

*Swierkiewicz v. Sorema N.A.*,  534 U.S. 506 (2002) ............................... 39

*Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504 (1998) ............. *passim*

*Twombly* and *Currier v. Duron*, 242 F.3d 905 (10th Cir. 2001) ............. 39

*United States v. Edmonson*, 962 F.2d 1535 (10th Cir. 1992) ................. 50

*Watson v. University of Utah Medical Center*, 75 F.3d 569 (10th Cir. 1996) ........................................................................ 44

*Workman v. Jordan*, 32 F.3d 475 (10th Cir. 1994) ................................. 47

## STATUTES

28 U.S.C. § 1291 ..................................................................... 18

Kan. Stat. Ann. § 72-2259 ....................................................... 25

Kan. Stat. Ann. § 74-3202 ............................................. 28, 30, 36

Kan. Stat. Ann. § 74-3220 ....................................................... 28

Kan. Stat. Ann. § 76-712 ......................................................... 26

Kan. Stat. Ann. § 77-415 ................................................... 26, 28

Kan. Stat. Ann. § 77-421 ......................................................... 27

Kan. Stat. Ann. § 77-436 ......................................................... 27

## OTHER AUTHORITIES

*1940 Statement of Principles on Academic Freedom and Faculty Tenure with 1970 Interpretive Comments* ........................................................... 6

Kan. Const. Art. 6, § 2 ........................................................................ 28, 36

## RULES

Fed. R. App. P. 32 ................................................................................... 62

## PRIOR AND RELATED APPEALS

Plaintiffs agree with Defendants' Prior and Related Appeals statement *except* that the Kansas Court of Appeals have been docketed.

## JURISDICTIONAL STATEMENT

Plaintiffs agree with Defendants' legal citations in the jurisdictional statement *except* for its assertion that this Court has jurisdiction pursuant to the collateral order doctrine pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). The collateral order doctrine does not apply and consequently, this Court does not have jurisdiction.

## ISSUES PRESENT FOR REVIEW

1.      Under the Collateral Order Doctrine, does this Court have jurisdiction to review a denial of qualified immunity where the Tenth Circuit finds that the 'clearly established right' inquiry is not collateral, but an element of the plaintiff's prima facie case?

2.      Despite the district court's repeated rejection of immunity claims, are Defendants shielded by qualified immunity where (a) the law was clearly established; and (b) Plaintiffs plausibly allege the direct role in the unconstitutional due process violations and termination of tenured professors without individualized notice, cause, or process?

## STATEMENT OF THE CASE

Before the Kansas Board of Regents (KBOR) officials created and implemented a modification of its discipline policy which removed due process protections for terminating tenured employees, the clearly established law regarding tenure in Kansas was that it was a property right. In 1992, the Kansas Supreme Court recognized in *Kosik v. Cloud County Community College*, 250 Kan. 507, 512 (1992), that "once the State conferred a property interest [in continued employment], ***the property interest cannot be taken without constitutional, procedural due process.***" An employee who can be discharged only "for cause" has a property interest in continued employment. App. 1, 36.

In 1998, this Court decided *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504 (1998), which found that because the professor was tenured, the law in this Circuit is that he possessed "a property interest deserving of procedural due process protections" and "a property interest deserving of . . . substantive protections of the Fourteenth Amendment." App. 1, 37. KBOR and ESU's sister institution Kansas University, were parties in *Tonkovich* and are charged with actual knowledge of the clearly established law set forth in this case.

### 1. ESU's tenure policy

3

All Professors earned tenure under Emporia State University's (ESU) policies before January 21, 2022, which provided, in part:

> 1.A. 0102 Academic Tenure
>
> An academic tenure appointment is a continuous, full-time, academic position for faculty with tenure. Tenured appointments will be annually renewed. Termination of a tenured faculty member must follow *appropriate* policies and procedures.

Emphasis added. App. 1, 39.

Before and after January 21, 2022, the KBOR had the following policies related to tenure:

> 1B.0805.01 Board of Regents Policy for Tenure (revised 2/05)
>
> 1. After the expiration of a probationary period, teachers or instructors should have permanent or continuous tenure, and their services should be terminated **only for adequate cause, except in the case of program or unit discontinuance or under extraordinary circumstances because of financial exigency**. (2/19/97)
>
> 1B.0805.02 University Policies and Procedures for Tenure (FSB 80004 approved by President 12/9/80; FSB 88001 approved by President 10/28/88; FSB 05007 approved by President 5/3/06; FSB 07003 approved by President 2/4/08; FSB 19001 approved by President 10/15/2019) Emporia State University shall award permanent status to faculty members who have been judged, on the basis of academic credentials and systematic annual evaluation as stipulated in this document, worthy of continuous appointment. . . .

To terminate a tenured professor for cause under ESU's long-standing policy, ESU must organize a faculty committee which is given jurisdiction to determine if there is "adequate cause for dismissal." Adequate cause is limited to four specific categories of unacceptable conduct related to performance. "Adequate cause for dismissal shall be directly and substantially related to the fitness of a faculty member in his or her professional capacity as a teacher or scholar. Dismissal shall not be used to restrain a faculty member in his or her exercise of academic freedom or other rights of American citizens. The jurisdiction of the committee would not extend to *financial exigency or program discontinuance* unless recommended by a grievance panel." Emphasis supplied. App. 1, 111.

ESU's policy provides the following rights, in part, to tenured professors facing dismissal: (a) right to a hearing including: (1.) To be represented by an attorney; (2.) To present supporting witnesses; (3.) To question opposing witnesses; (4.) To make closing statements; (b) To receive written findings and recommendations of the committee and written notice of the President's decision and a full explanation of the

reasons; (c) To obtain and/or examine the record of the proceedings. App. 1, 39, 111-12.

ESU defined "financial exigency" and established a procedure for a chief executive officer to reduce personnel as necessitated by conditions of financial exigency. App. 1, 116. The policy clarifies that a declaration of "financial exigency" must be made. *Id.* No such statement was made leading to the professors' terminations. App. 1, 43; App. 3, 31.

ESU also maintained a policy on Academic Freedom since 2003 which endorsed the *1940 Statement of Principles on Academic Freedom and Faculty Tenure with 1970 Interpretive Comments* as reasonable and prudent. App. 1, 40. This policy was not amended by the WMP. App. 1, 37.

2. **The Conspiracy**

Before January 20, 2021, unknown John Doe defendants and the individual KDOR and ESU officials conspired to undermine tenure without due process through the creation, adoption, and implementation of the Workforce Management Policy (WMP) and eventually ESU's Framework. These officials promoted a belief that tenure should be minimized or eliminated without having to comply with the constraints

of due process mandated because it is a constitutionally protected property right clearly established by law. These individual defendants saw tenure as an impediment to terminating tenured faculty who were problematic because they were current or former Senate Faculty members, they were policy sticklers, liberals, advocates, unionizers, leaders disfavored by university administration and otherwise were in the way of undermining academic freedom by minimizing tenure as a property right. App. 1, 41.

3. **KBOR unlawfully removed due process protection for tenured faculty.**

On January 20, 2021, without prior notice to tenured professors in Kansas (or any previous discussion shown in KBOR minutes), the individual KBOR officials unanimously approved to modify its policy titled "Suspensions, Terminations and Dismissals" (Workforce Management Policy or WMP) to undermine tenure without due process through the vehicle of anti-tenure rhetoric and in the creation, adoption and implementation of the WMP (and eventually ESU's framework). The WMP specifically says that it was adopted "because of extreme financial pressures that the state universities are facing…." The WMP also

declares that a declaration of financial exigency or processes in which to declare such an event are not a prerequisite to termination. App. 1, 42.

KBOR defendants conspired to adopt the WMP under the false guise of a financial issue created by the COVID-19 pandemic, despite the fact that from 2017-2021 overall enrollment had increase, operating revenues had increased (including through millions of COVID Relief funds obtained by all regent universities), and operating expenditures had decreased! App. 1, 55. KBOR General Counsel Jilene Miller said the proposal was due to "extreme financial pressures Regent universities were facing due to the Covid-19 pandemic, decreased program and university enrollments, and the State's declining fiscal support. Miller told KBOR officials that the WMP would provide an additional tool for the CEOs to deal with financial challenges at the universities. App. 1, 38, 43. The WMP applied to all Kansas Regent universities and any CEO who chose to implement the WMP had 45 days after KBOR officials' approval to submit a framework for that university to make decisions under the policy.

On February 17, 2021, with little discussion KBOR officials Bangerter, Van Etten, Feuerborn, Harrison-Lee, Hutton, Kiblinger,

Rolph, Schmidt and Van Etten extended the deadline for universities to submit their framework. One month later, ESU presented to KBOR officials a presentation called "ESU Strategic Program Alignment Reviews" which lauded the history program and specifically Professors Chris Lovett and Amanda Miracle for their excellence. Moreover, ESU recommended that all the academic programs it had reviewed should be continued, including the history program. It was even confirmed that these programs were fiscally profitable for ESU. App. 1, 45. KBOR defendants Lane, Harrison-Lee, Bangerter, Murguia (k/n/a Brandau), Hutton, Kiblinger, Rolph, Schmidt, Van Etten and Feuerborn voted to keep ESU's history program. At the same KBOR meeting, KBOR officials heard a representative from Wichita State University relay concerns that the WMP did not require financial exigency criteria or a "shared governance structure" when it comes to terminating faculty and staff, but they did not address constitutional problems with the WMP. *Id.*

In May 2022, Lane, Schmidt, Harrison-Lee, Rolph, Feuerborn, Hutton, Ice, Kiblinger, and Winter removed the deadline for universities to utilize the WMP even though they knew that the state had funded all

universities for the current Session. App. 1, 46. ESU was fully funded for the 2022-2023 academic year. *Id.*

4. **ESU and KBOR officials' creation, presentation, adoption, and implementation of unlawful policy**

Defendants Hush and Thomas presented ESU's Framework to KBOR and rationalized using the WMP due to ESU's operations and budget. KBOR members Ice, Benson, Dicus, Harrison-Lee, Kiblinger, Lane, Mendoza, Rolph and Winter approved the ESU framework on September 15, 2022. Both the ESU Framework and WMP allow tenured faculty to be terminated based on a list of factors that are non-exclusive and have a negative connotation such as: "performance evaluations, teaching and research productivity, low service productivity." App. 1, 48. The WMP and Framework use language "but not limited to" to incorporate other factors that may be considered for termination, and both fail to eliminate illegal considerations such as race, gender, age, political party affiliation, free speech, rights protected by the National Labor Relations Act, and constitutional rights. The Framework was adopted by votes from defendants Ice, Lane, Winter, Benson, Dicus, Harrison-Lee, Kiblinger, Lane, Mendoza, Rolph and Winter. *Id.*

10

Neither the WMP nor Framework were submitted to the Kansas Secretary of State for adoption or publication. *Id.* No notice about the WMP or Framework were provided to the public before adoption. *Id.*

On the final day of KBOR's September meeting, in which KBOR officials approved ESU's Framework, ESU terminated Amanda Miracle, Christopher Lovett, Michael Behrens, Rob Catlett, Dan Colson, Charles Emmer, Brenda Koerner, Sheryl Lidzy, Max McCoy, Michael Morales, and Lynnette Sievert (the Professors or Plaintiffs) by providing them with a form letter on September 15, 2022, which contained virtually the same reasons for termination, but also expressly told each professor they were being terminated for "factors such as, but not limited to" and secondary considerations which "may include" other reasons. The reasons included "performance evaluations, teaching and research productivity and low service productivity." App. 1, 49. These letters were placed in each professor's personnel files. App. 1, 50. ESU officials gave no notice or pretermination hearing before these terminations. App. 1, 52.

All Professors "appealed" their terminations through an absurd "hearing" before the Kansas Office of Administrative Hearings (OAH)

which violated their constitutional rights. Per the WMP and Framework, Professors could not call witnesses, could not ask questions, could not cross-examine, and could not admit exhibits other than through prehearing appeal briefing. App. 1, 53, 91. Professors could not ask why they were terminated. App. 1, 55. Besides that, Defendants Hush, Johnson and Lovett continued making misleading arguments that ESU and KBOR policy defined tenure as a "privilege" because the policies said, "tenure is a privilege that must be affirmatively granted by the institution in recognition of the meritorious performance." Their arguments claimed tenure was not a protected property interest, but did not address the fact that each professor had already been affirmatively granted the "privilege" of tenure. App. I, 51-2. Even until today, Defendants have refused to tell Professors the reason they were terminated. App. 1, 52, 55.

On February 24, 2023, Professors Miracle and Lovett filed a petition for mandamus against ESU and KBOR, identifying the constitutional rights which were being violated in advance of their so-called hearings before OAH. The mandamus petition identified *Tonkovich* and again put all defendants on notice of the law that tenure,

12

once bestowed, is a property right, as well as the violations of their procedural and substantive due process rights. App. 1, 53-4. ESU and KBOR responded to the mandamus denying that tenure was a property right and arguing that the WMP took that right away.

Through their actions, KBOR and ESU officials drafted, approved and ESU individuals implemented policies which were void of due process procedures or requirements set out under the Kansas Administrative Procedures Act. ESU officials continued to implement their unconstitutional policy in filing petitions for judicial review after seven professors won their OAH hearings and were ordered to be reinstated to employment. ESU officials placed the seven professors on administrative leave with pay and took away their means of maintaining tenure, i.e., use of the library privileges, office privileges to research and publish research which is required to maintain tenure during mandatory and anticipated review periods. App. 1, 56, 123-4, 126; App. 3, 22, 34. All Professors were required to remove their personal materials from their offices, restricted from engaging in the academic requirements to maintain tenure, and restricted from maintaining grants which were awarded under their names on behalf of ESU. App. 1, 56.

The premise that ESU was under some financial pressure was further in question when in December 2022, ESU paid $137,741.00 in bonuses to 68 faculty members, many of whom were not tenured. App. 1, 56-7. KBOR officials, despite having just alleged that there was financial pressure as a basis for implementing the WMP, awarded ESU president Hush a pay increase of 4% in June 2023. In 2023, the Kansas Legislature rewarded ESU with 9 million dollars for implementing its "rightsizing" plan to terminate tenured faculty without due process. Hush was quoted as saying the rightsizing of tenured workforce was "part of the Republican Better Way Plan." App. 1, 57. None of the Professors were allowed to challenge the legitimacy of KBOR's WMP or ESU's Framework, which were based on "extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support." This was because the hearing officer's review was limited by the narrow parameters set in the WMP and Framework, which barred discovery or questioning. *Id.*

## SUMMARY OF THE ARGUMENT

The ESU and KBOR Officials, acting in their role as state actors, ask this Court to upend decades of clearly established constitutional law to immunize their decision to terminate eleven tenured professors—educators who dedicated their lives to teaching, scholarship, and service—without meaningful notice, cause, or process. The district court correctly denied qualified immunity, recognizing that the terminated tenured Professors had a constitutionally protected property interest in their tenured positions, and that the University and KBOR Officials violated clearly established law in arranging their dismissals.

At its core, this appeal is an attempt to rewrite the constitutional status of tenure in Kansas. Defendants rely heavily on *Scribner v. Board of Education*, a K-12 employment case that involved formal legislative action, but *Scribner* cannot be stretched to justify executive actions taken without legislative authority, public input, or individualized process. The Workforce Management Plan (WMP) and its implementation by ESU do not retroactively erase the terminated Professors' property rights—rights that this Court has long recognized in *Tonkovich v. Kansas Board of Regents*, 159 F.3d 504 (10th Cir. 1998). The district court rightly

distinguished *Scribner* as inapplicable and correctly found that the WMP's sweeping and poorly defined framework did not eliminate the clear protections tenured faculty had under existing law.

Defendants also argue that the individuals cannot be liable because the SAC fails to "plausibly allege" their personal involvement. But the district court carefully reviewed the allegations and concluded, consistent with *Iqbal* and Tenth Circuit precedent, that the complaint sufficiently alleged "who is alleged to have done what to whom." The named officials were not distant bureaucrats; they were active participants in the process that targeted and dismantled the professional livelihoods of their tenured faculty members.

Furthermore, Defendants invocation of the collateral order doctrine to halt all proceedings—including discovery—rings hollow under the 10th Circuit's own jurisprudence. As the court recognized in *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016), qualified immunity is now effectively a part of the plaintiff's prima facie burden. And if it is part of the merits, then it is not "completely separate" from the merits as required under the *Cohen* and *Behrens* courts. The appealability of the order itself is in serious question.

These Professors are not political pawns, nor statistical casualties of a policy experiment. They are scholars, mentors, and public servants. Their lives were overturned by a process that ignored the safeguards long associated with academic tenure. Granting immunity here would not only perpetuate the harm already inflicted—it would greenlight a roadmap for stripping other public servants of their constitutional rights without recourse. The district court's decision should be affirmed in full, and this Court should abide by its precedent and deny qualified immunity.

## STANDARD OF REVIEW

This Court reviews the denial of qualified immunity *de novo*, but the legal inquiry is grounded in the facts accepted or assumed by the district court. The district court's factual findings and reasonable assumptions comprise "the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity." *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008). When the district court "concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, … we usually must take them as true—and do so even if our own *de novo* review of the record might

17

suggest otherwise as a matter of law. *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015).

## ARGUMENT

### I. The collateral order doctrine does not apply because qualified immunity is not separate from the merits.

The collateral order doctrine allows for interlocutory appeals under 28 U.S.C. § 1291 only if the issue being appealed is completely separate from the merits of the case. Traditionally, courts have treated qualified immunity as such an issue, permitting immediate appeals when it is denied at the motion to dismiss or summary judgment stage. However, this framework is based on outdated assumptions about the nature of qualified immunity.

Recent Supreme Court and Tenth Circuit precedent—particularly *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011), and *Estate of Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016)—have significantly altered how qualified immunity is treated procedurally. Specifically, the Tenth Circuit now treats qualified immunity as an issue that plaintiffs must plead and prove, rather than an affirmative defense asserted by defendants. This fundamentally undermines the justification for allowing immediate appeals under the collateral order doctrine.

Historically, qualified immunity was treated as an affirmative defense that defendants had the burden of raising. The Supreme Court explicitly recognized this in *Gomez v. Toledo*, 446 U.S. 635, 640 (1980), holding that plaintiffs did not need to anticipate a qualified immunity defense in their pleadings.

Once a defendant raised qualified immunity, however, circuit courts were split on who bore the burden of proof. The Tenth Circuit placed the burden on plaintiffs, requiring them to disprove qualified immunity by showing that the right in question was clearly established. *Justus v. Maynard*, 943 F.2d 618, 619 (10th Cir. 1994).

However, in *Ashcroft v. al-Kidd*, the Supreme Court implied that qualified immunity was not an affirmative defense at all. Instead, it suggested that plaintiffs were required to plead to the lack of qualified immunity as part of their prima facie case in section 1983 lawsuits. The Tenth Circuit later interpreted *al-Kidd* to mean exactly that.

In *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016), the court held:

> "In resolving a motion to dismiss based on qualified immunity, a court must consider whether the facts that a plaintiff has alleged make out a violation of a constitutional

right, and whether the right at issue was clearly established at the time of defendant's alleged misconduct."

This clarifies that qualified immunity is an issue that plaintiffs must plead and establish, rather than a defense that defendants must raise and prove.

To qualify as a collateral order under *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949), an appealable issue must satisfy three conditions: (1) It must be conclusive; (2) It must resolve an important question that is completely separate from the merits; and (3) It must be effectively unreviewable on appeal from a final judgment.

The Supreme Court has previously held that qualified immunity satisfies these criteria in *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996). However, *Behrens* predates *Ashcroft v. al-Kidd* and *Estate of Lockett v. Fallin*. If, under the Tenth Circuit's interpretation, qualified immunity is now part of the plaintiff's prima facie case, then it is no longer "completely separate from the merits." It is part of the merits. Thus, allowing interlocutory appeals based on qualified immunity contradicts the collateral order doctrine's requirements.

If qualified immunity is part of the plaintiff's burden of proof, then disputes over whether the plaintiff has sufficiently alleged a clearly

established right are no different from other threshold questions that courts routinely decide without allowing interlocutory appeals. For example, in section 1983 cases, plaintiffs must establish state action as part of their claim. If a defendant moves to dismiss on the grounds that no state action exists, and the district court denies that motion, there is no interlocutory appeal—because the issue is part of the merits. Likewise, if a defendant moves to dismiss on lack of personal jurisdiction, and the court denies it, there is no immediate appeal because jurisdictional determinations are not considered collateral.

By treating qualified immunity as part of the plaintiff's burden, rather than as an affirmative defense, the Tenth Circuit has foreclosed the justification for treating it as an appealable collateral issue.

If courts continue to allow immediate appeals on qualified immunity, they are effectively treating one element of the plaintiff's case differently from all others. There is no legal basis for this exception. Under the Tenth Circuit's post-*al-Kidd* framework, qualified immunity is not an affirmative defense, but rather an element of the plaintiff's claim that must be pleaded and proven. As a result, it is no longer

21

"completely separate from the merits of the action" and should not be immediately appealable under the collateral order doctrine.

## II.  Defendants are not entitled to qualified immunity for eliminating the Professors' property interest without due process.

### a. The Professors had a property interest in continued employment because they were tenured.

Defendants first argue that the professors did not have a property right in tenure because they could be terminated due to financial exigency. App. Br. at 20. Defendants cite no cases supporting this position nor does this argument comport with the long tradition of cases upholding tenure as a property right. Of course, if a public institution has a ***legitimate financial exigency***, and the public institution presents **evidence of an actual financial exigency,** the opposite of what Defendants did in this case, a public institution could establish a basis for terminating a tenured professor. However, as noted in *Krotkoff v. Goucher College*, 585 F.2d 675 (1978):

> Courts have properly emphasized that dismissals of tenured professors for financial reasons must be demonstrably bona fide. **Otherwise, college administrators could use financial exigency to subvert academic freedom**. The leading case on this aspect of tenure is *American Association of College Professors v. Bloomfield College*, 129 N.J.Super. 249, 322

A.2d 846 (Ch.Div.1974), Aff'd, 136 N.J.Super. 442, 346 A.2d 615 (App.Div.1975). There, the court concluded that Bloomfield College used its genuine financial difficulties as a subterfuge to achieve its goal of abolishing tenure at the institution.

Bold added.

This Court has addressed and clearly held that **even if a legitimate exigent circumstance exists**, substantive due process still requires that the termination of a tenured professor not be "arbitrary, capricious, or without a rational basis." *See Brenna v. S. Colo. State Coll.*, 589 F.2d 475 (10th Cir. 1978). In the instant case, the Court need look no further than the Framework policy adopted by ESU and approved by KBOR to know that Defendants were not facing a "financial exigency." The Framework clearly states in relevant part, "[w]hile the University **is not facing financial exigency**…." App. 1, 281. Further, the Professors were never afforded the opportunity to even make any inquiry into the purported financial situation precipitating the WPM or Framework, or more significantly, how any such financial issues specifically led to their individual terminations. Although there were policies in place for discontinuing whole departments, schools, etc., those did not apply in this situation. No, these terminations were the result of a selection process,

23

the details of which Defendants have yet to provide to the Professors through the date of this filing. Defendants exhibit so little temerity in standing by their process that they essentially suggest the Court should simply trust that it was not arbitrary or capricious. Not disclosing the process by which the Professors were selected for termination, the contents of the selection process, nor providing an opportunity to challenge any finding of the process is by definition, *arbitrary, and capricious*.

Defendants allege that KBOR retained the power to modify its policy and did so, so it did not matter if the Professors had a property interest in their employment (or if federal law requires more procedure). Defendants argue therefore that the Professors did not have a property right at the time they were terminated and thus no "due process" attached. App. O. Br. at 21-6. [Doc. 14, 31-6]. They cite *Scribner v. Bd. Of Educ. Of USD No. 492*, 308 Kan. 254, 258, 267-70 (2018), which is a case that examines the Kansas Legislature's actions and amendment of the Teacher Due Process Act and is not applicable to this case.

Defendants' reliance on *Scribner* is misplaced for several reasons, not the least of which is the terms of "tenure" granted under the Teacher

24

Due Process Act (TDPA) are not the same as that granted to the Professors. Specifically, K.S.A. § 72-2259 said that:

> Nothing in this act shall be construed to create any right, or to authorize the creation of any right, which is not **subject to amendment or nullification by act of the legislature**. Nothing in this act and no amendment or repeal of this act or any part thereof shall be construed to constitute an impairment of any existing contractual right.

Bold added.

When the Kansas Legislature created a property right for K-12 teachers subject to due process protection under the TDPA, it did so with the express provision that it could amend or remove the property right at any time through the legislative process. *No where in the policies of KBOR or ESU under which Plaintiffs earned tenure did the terms of tenure include the ability to nullify tenure anytime through a policy change by KBOR or ESU.* On this basis alone, *Scribner* is inapposite to the instant case.

Moreover, in *Scribner*, the court noted that the public received notice of the legislative change when the Senate adopted amendments to proposed legislation and sent amendments to the House of Representatives for consideration. The Professors alleged that there was no similar notice given when KBOR and ESU amended their policies;

rather, they just amended without adoption or publication by the Kansas Secretary of State. App. 1, 48; and, notably, the WMP was not published as required by K.S.A. 76-712, which restricts KBOR from adopting policies or making rules and regulations which are not "…authorized by law or are appropriate for such purposes." KBOR does not have the authority to take illegal action or modify policies that violate federal law.

Defendants argue that they had a right to enact the WMP and ESU's Framework to comply with K.S.A. 76-712 which says KBOR "may make contracts and adopt orders, policies or rules and regulations and do or perform such other acts as are authorized by law or are appropriate for such purposes …" But under K.S.A. 77-415(b)(1), "…each rule and regulation issued or adopted by a state agency shall comply with the requirements of the rules and regulations filing act." Further, "Except as provided in [77-415], any standard, requirement or other policy of general application may be given binding legal effect *only if it has complied with the requirements of the rules and regulations filing act*." Emphasis supplied. K.S.A. 77-415(b)(1). There is no exception to K.S.A. 77-415 that would allow KBOR to forgo publication before it implemented the WMP. KBOR was required under the Rules and Regulations Filing Act ("Filing

Act") to get the temporary policy approved by the Secretary of Administration, the Attorney General, and the Director of Budget. Then, KBOR should have given at least 60 days' notice of its intended action in the Kansas Register, the Secretary of State and to the Joint Committee on Administrative Rules and Regulations established by K.S.A. 77-436. *See* K.S.A. 77-421.

In *Taylor v. Kansas Department of Health and Environment*, *infra*, the Kansas Court of Appeals found that if a state agency fails to submit a policy that by content and effect is a regulation to the notice and publications requirements of the Filing Act, the policy is void. In considering an internal "no-overtime" policy adopted by KDHE, the *Taylor Court* noted:

> If the disputed overtime policy individually or in conjunction with the rest of the procedures for … the Working Healthy program is, in fact, a regulation, it must be implemented in conformity with the [] Filing Act, K.S.A. 77–415 et seq. The Act requires that proposed regulations go through a public notice and hearing process and then be formally published before taking effect. [ ] Everyone agrees the Department did not adopt the overtime policy as a regulation. If a state agency fails to submit a policy that by content and effect is a regulation to the notice and publication requirements of the Act, the policy is void. (internal citations omitted).

27

The WMP and ESU's Framework are by content and effect regulations required to be submitted to the Kansas Secretary of State pursuant to K.S.A. 77-415(b)(1) and (2)(B), and (2)(E)'s exceptions are not applicable. *See* App. 1, 45. Although ESU officials argue that they do not have to submit every policy change, that argument is contrary to the legislative intent behind the powers authorized to them. *See* K.S.A. Const. Art. 6 § 2 (requiring the legislature to provide a state board of regents for "control and supervision of public institutions of higher education" and conferring no legislative authority); K.S.A. 74-3202c (conveying powers, duties and functions to the appointed board; none of which include legislative authority) and K.S.A. 74-3220 (requiring any agreement entered to be approved by the attorney general and a copy filed in the office of the secretary of state). Because neither KBOR nor ESU complied with the Filing Act, the WMP is void and Defendants' use of the WMP to terminate the Professors was illegal and qualified immunity cannot protect them.

Defendants argue that under *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915), KBOR's policy-making processes provided all the process that was due for KBOR to temporarily

28

eliminate whatever property right tenured university professors may have had. App. O. Brief, 24 [Doc. 14 at 34]. The court found that there was a question of fact about whether the WMP and Framework passed through the legislative process and that neither party engaged in meaningful analysis about whether the WMP or Framework was legislative for purposes of due process analysis. App. 3, 61. Defendants now contend that under *Onyx Props., LLC v. Board of Cty. Comm'rs of Elbert Cty.*, 838 F.3d 1039 (2016) their policy-making actions were legislative and substantive due process was not required. But this argument involves a mixed question of law and fact. The district court already found that there was a question of fact, and it is not this Court's job to second guess that finding. *Cox v. Glanz*, 800 F.3d 1231, 1242 (2015) (involving review of summary judgment decision) ("when the district court 'concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, …we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law.'). Further, the tests involved in analyzing whether any action is legislative or administrative require an examination of the facts. On a motion to dismiss all well-pleaded allegations the plaintiffs'

complaint as true, it need not accept legal conclusions. *Iqbal*, 556 U.S. at 678. The SAC alleges that there was no notice about the WMP or Framework before KBOR officials adopted them. App. 1, 39, 45. The SAC also alleges that neither were submitted to the Kansas Secretary of State for adoption or publication. App. 1, 45. The Professors were terminated without prior notice. *Id.*

Even if this court examines this question of law and fact further, under the *Onyx* tests, KBOR and ESU officials' actions were administrative in nature, and therefore both substantive and procedural due process were required.

First, in both *Bi-Metallic* and *Onyx* this Court was reviewing actions taken by elected officials, not appointed officials as is the case here. K.S.A. 74-3202a (The state board of regents shall be composed of nine members **appointed** by the governor, subject to confirmation by the senate. . . .). KBOR officials were appointed by the governor and ESU officials were either hired by KBOR officials or ESU officials; but neither were elected, which weighs against their action being legislative. The people of Kansas thus have no power over the board officials making any

rules, unlike in other cases where the rules were created by elected officials.

Second, the WMP had a limited focus because it was a temporary modification of the procedural and substantive requirements delineated by KBOR to universities in what they could consider and the process they could take before terminating a tenured professor or eliminating university programs. Further, according to the WMP itself, the WMP was only enacted due to financial pressures faced by universities due to Covid-19 pandemic, decreased enrollment, and state funding. Considering the well-plead allegations of the Professors as true, there is evidence that the basis for the WMP is not true (ESU was fully funded; ESU received millions from the legislature; ESU was spending hundreds of thousands in a 4% raise to Hush and bonuses to 68 employees). While this not only creates an issue of fact for a jury to decide, it also shows that the WMP has a limited focus and does not have general applicability to a wide swath of Kansans. Moreover, unlike the general public, there was at all times an identifiable group of tenured professors within the Regents system. Each could have been easily provided with actual notice of the proposed policy change and given an opportunity to raise questions

before KBOR adopted it. When coupled with the Framework—which applied only to a narrower group of tenured professors at ESU and not to any other Regents institutions—the action is administrative in character. Third, both *Bi-Metallic and Onyx* involved the adoption of, or authority given to general zoning ordinances or mapping. A modification to a discipline policy which takes away a continued expectation in employment is not similar. The WMP and Framework are more akin to a "grant of a variance" since they were temporary amendments to previously formulated policies, that being the granting of tenure or a continued expectation of employment barring some wrongful conduct and a process to terminate that property right.

Further, the WMP/Framework are not "generalizations concerning policy or state affairs" because they were supposed to be "tools" for universities to reduce overhead due to various temporary financial impediments, and KBOR and ESU officials knew that by adopting and implementing the WMP and Framework, tenured professors would be eliminated from employment. App. 1, 45. KBOR officials adopted the Framework and ESU officials implemented it against only 33 individuals

32

based on "greater specificity to the individuals and particular situation"
at ESU. *Onyx*, 838 F.3d at 1046 (internal quotation omitted).

The temporary nature of the WMP and Framework also alludes to
whether its creation and enaction were legislative or administrative.
Because these policies were temporary and not permanent in nature, and
because the policies are restricted to identifiable groups (faculty or
tenured faculty), and because it was to be implemented during a set time
frame and the policies expired, the nature of the action is administrative.
*Id.*

Under any of the standards used, the action of creating, adopting,
and implementing the WMP and Framework is administrative.
Regarding whether Defendants' actions are legislative or administrative,
at worst, defendants are wrong, but at best, their argument is also
premature for this stage of litigation (motion to dismiss).

**b. Kansas law regarding tenure before January 20, 2021, was
established, and Defendants knew about it.**

Defendants argue that the constitutional rights invoked by the
Professors were not clearly established at the time of their terminations,
so Defendants are entitled to qualified immunity. The District Court
found that the Professors sufficiently alleged that they were entitled to

continued employment as defined by Kansas law. App. 1, 31. Under Kansas law, sources for property interests include statutes, municipal ordinances, and express or implied contracts. *Schulz v. City of Longmont*, 465 F.3d 433, 444 (10th Cir. 2006). An employee terminable only for fault or cause possesses a protected property interest. *Randolph v. Bd. of Pub. Util. of Kan. City, Kan.*, 983 F.Supp. 1008, 1015 (D. Kan. 1997). The state-law source for Plaintiff's property interest in continued employment was KBOR's policy and ESU's policy before the WMP and ESU Framework changed the policy. App. 1, 38-40. This policy was in place when the Professors were hired and obtained tenure, and there is no dispute that this was ESU's policy before the WMP and Framework temporarily changed the policy. App. 1, 34-7. Although Defendants continue to argue that tenure was not a property right because there was an exception based on financial exigency, ESU did not qualify for the financial exigency provision because it was fully funded during the academic year in which the Professors were terminated. Moreover, the evidence plead completely contradicts that there was any financial concern, let alone exigency, in that: (1) enrollment had increased, (2) operating revenues had increased, (3) operating expenditures had decreased, (4) Hush

received a raise, and (5) 68 faculty received bonuses in cumulative of $137,741.00. App. 1, 56.

The Defendants also argue that it could change the policy thereby removing the protection of tenure as a property right, which it did through the adoption and implementation of the WMP and Framework, but as argued above, the temporary modifications of their policies could not remove the due process protections and circumvent the United States Constitution.

At the time the Professors were terminated, the clearly established law in the Tenth Circuit was that tenured university faculty "ha[ve] a property interest deserving of the procedural and substantive protections of the Fourteenth Amendment." *Brenna v. S. Colo. State Coll.*, 589 F.2d 475, 476 (10th Cir. 1978); *Tonkovich v. Kan. Bd. of Regents*, 159 F.2d 504, 528 (10th Cir. 1998).

For the first time on appeal, Defendants argue that the question under qualified immunity (i.e. what law was established), "is not whether Plaintiffs can come up with a plausible argument for distinguishing *Bi-Metallic* and *Scribner*; it is whether that distinction was clearly established such that every official would know they were violating the

35

law. And that simply is not the case here." App. O. Brief, p. 31 [Doc.14 at 41].  In other words, Defendants argue that the law was not established regarding KBOR officials' action (in creating and adopting the WMP and adopting the Framework) being either legislative or administrative. We disagree that this is the established law on which qualified immunity hinges.

First, Defendants waived this issue because they did not bring this argument up on their motion to dismiss or motion to reconsider. "Generally, a party's failure to raise an issue in the district court precludes its review on appeal." *Ray v. Unum Life Ins. Co. of America*, 314 F.3d 482, 487 (2002). Second, even if this new argument was not waived, it is not applicable. KBOR officials know that they only have executive functions by way of statutory authority. Their position was created by the Kansas Legislature to supervise higher education in Kansas. Under the statutory authority that created the board, they have no legislative authority. K.S.A. Const. Art. 6 § 2; K.S.A. 74-3202c. They are also appointed official by the governor, not elected. K.S.A. 74-3202a.

The issue of whether KBOR officials' action in adopting the WMP and Framework and ESU officials' action in creating and implementing

the Framework are or are not protected by qualified immunity does not revolve around whether their actions are administrative or legislative, but, rather, whether certain given facts show a violation of "clearly established" law. *See Johnson v. Jones*, 515 U.S. 304, 305 (1995). Even so, the officials violated the U.S. Constitution's protection of liberty, equal protection and due process. The SAC alleges that without notice, cause, or process, the Professors continued employment as tenured faculty was terminated by way of KBOR and ESU officials' actions. The law clearly established that their action in adopting a *temporary* policy was administrative, and that tenure in Kansas was a property right.

### III. The Professors asserted plausible and specific claims against the ESU and KBOR officials.

The Professors alleged specific facts against the individual KBOR defendants and the individual ESU defendants (Brent Thomas, Kevin Johnson, and Steven Lovett) (ESU and KBOR officials) to prevail against the motion to dismiss. Pursuant to section 1983, not only have the Professors shown a violation of their rights secured by the Constitution, but they have shown the violations were committed by the ESU and KBOR officials. They also plead that each defendant, through the

official's own individual actions, have violated the Constitution. *Iqbal*, 556 U.S. at 676.

### a. Specificity and acceptable grouping under *Robbins*.

Unlike the generic use of the party "defendants" without distinction as described in *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008), the Professors identified the actions taken by each ESU and KBOR officials where necessary to plausibly state a claim against each one. Sufficient facts were plead to show that these individual defendants violated the professors' equal protection rights, freedom of association rights under the First Amendment, and engaged in a civil conspiracy to violate their constitutional rights under section 1983. Defendants Lovett, Hush and Johnson violated the Professors' liberty interest pursuant to the Fourteenth Amendment claim. The District Court found that the Professors plead facts adequately to make plausible claims against these defendants, and that decision should not be overturned. App. 3, 16-30.

Defendants rely on *Robbins* to argue that the District Court improperly lumped together these claims in its analysis and should have examined each individual defendant. The relevant issue on a motion to dismiss is not whether the movant will prevail, but whether the movant

is entitled to offer evidence in support of his or her claims. *Swierkiewicz v. Sorema N.A.*,  534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Granting a motion to dismiss is a harsh remedy. As the Supreme Court found, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed. 2d 929 (2007). There is no heightened pleading standard in analyzing cases subject to qualified immunity defenses. *Robbins*, 519 F.3d at 1249 (citing *Twombly* and *Currier v. Duron*, 242 F.3d 905, 916  (10th Cir. 2001).

The District Court distinguished *Robbins* where the roles of each individual defendant were "entirely different in character" and should not have been grouped in a single action, noting that "[a]ll the KBOR Defendants are similar in character. They are members of the body that voted to change the KBOR tenure policy through the WMP, and they voted to approve ESU's framework." App. 3, 19. The SAC categorized KBOR individual defendants' actions versus ESU individual defendants' actions to plead specific enough facts to keep these officials in this case. *See* KBOR allegations at App. 1, 35, 40-8, 54-5, 57-69, 71-3, 75-8.

Pleadings against a collective group of defendants in situations like this are allowed. *See Estate of Ward v. Pueblo Cnty., Co.*, 2023 WL 4744928, at *7 (D. Colo. July 25, 2023). Since the KBOR officials, other than Miller, have the same roles as regents, the SAC allegations about their conduct in conspiring, creating and adopting the WMP and approving ESU's Framework are appropriate.

Where applicable, the Professors delineated actions such as Millers' presentation of the policy and certain regents' questions, who moved to adopt and who seconded the motions which adopted the WMP and later, the Framework. *See* App. 1, 35-79 (Shane Bangerter: 42-46, 65; Blake Benson: 47-8, 65; Ann Brandau: 42, 44-6, 65; John Dicus: 47-8, 65; Bill Feuerborn: 42, 44-6, 65; Cheryl Harrison-Lee: 42, 44-8, 65-6; Mark Hutton: 41-6, 65; Carl Ice: 46-8, 65; Shelly Kiblinger: 42-8, 65-6.; Cynthia Lane: 46-8, 65-6; Diana Mendoza: 47-8, 65; Julene Miller: 41-2, 46, 65; Jon Rolph: 42, 44-6, 65; Allen Schmidt: 42, 44-6, 65; Helen Van Etten: 41-2, 44-6, 65; Wint Winter: 46-8, 65-6).

The Professors divided the Officials by categorizing them as KBOR or ESU Individual Defendants. KBOR Individual Defendants (Officials) are identified in App. 1, 28-32, and are referenced in App. 1, 41-8, 51-76.

ESU Individual Defendants (Officials) are identified in App. 1, 32, and are referenced in App. 1, 44-5, 48-53, 55-76. The Professors also listed ESU Individual Defendants, KBOR Individual Defendants, and John Doe as Conspirators. App. 1, 32, 38, 59, 74. Conspirators are identified as to their actions in App. 1, 38, 59, 66, 69, 74.

### b. The Professors specifically plead their Liberty Interest claims against Hush, Johnson, and Lovett

The Professors' liberty interests were violated because the negative connotations contained in the termination letters injured their good names, reputations, honor, and integrity; and they have been precluded from taking advantage of other employment opportunities. "The [way] a public employee is terminated may deprive him of either or both of these liberty interests. When the termination is accompanied by public dissemination of the dismissal reasons, and those reasons would stigmatize the employee's reputation or foreclose future employment opportunities, due process requires that the employee be provided a hearing at which he may test the validity of the proffered grounds for dismissal." *Miller v. City of Mission, Kan.*, 705 F.2d 368, 373 (10th Cir. 1983).

As alleged, the termination letter issued to all the Professors without a pre-termination hearing clearly state that potential "secondary factors" for their terminations include: (1) Performance evaluations; (2) Teaching and research productivity; and (3) Low service productivity. Yet, as pled repeatedly, the Professors have yet to ever be afforded the opportunity to engage in any process sufficient to determine the actual reasons they were chosen for termination and remove the stain of termination for conduct from their record. They were given no pre-termination hearing. The post-termination hearing did not allow any questioning of witnesses or discovery, and ESU officials did not provide the specific reason for termination.

In *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014), this Court overturned the district court's determination that McDonald failed to plead facts sufficient to satisfy the falsity prong. McDonald alleged that the mayor and another City employee confirmed at a press conference that he was "fired for serious misconduct." This allegation alone was enough, however, the court pressed that "[e]ven if the Mayor only stated that McDonald was fired because of *allegations* of serious misconduct, his termination of McDonald due to the allegations gives the

false impression that McDonald did in fact commit serious misconduct."
This Court explained that "[t]hese statements clearly call McDonald's
good name and reputation into question. *Id.*

In *Michaels v. City of McPherson, Kan.*, 71 F.Supp. 3d 1257, 1260
(D. Kan. 2014), vague and unexplained reasons provided for termination
of a public employee can cast a shadow on a party's professional
reputation. Like the instant case, the City of McPherson gave a list of
reasons for Michaels' termination as a police officer, including that he
had engaged in "conduct unbecoming of an officer" and "numerous other
circumstances where he was no longer viable to be a police officer." The
court found these comments were "sufficiently derogatory to call into
question plaintiff's good name and reputation." *Id.* The court explained
that "unexplained allegation[s]" such as these implied that "plaintiff
engaged in some sort of immoral, dishonest or unseemly behavior. *Id.*

The district court found that the SAC alleged sufficient facts that
Hush, Johnson, and Steven Lovett wrote or helped write the termination
letters. App. 1, 61; App. 3, 20. (Defendant Hush's termination
letter…aided by Defendants Kevin Johnson and Steven Lovett, lacked
specific reasons for termination by including the following as part of

potentially nine criteria for the Professors' terminations: "performance evaluations," "teaching and research productivity," "low service productivity and using the phrase "including but not limited to.") *Id.*

The Professors were given no prior notice of their terminations or reasons, therefore. App. 1, 45. There was no pretermination hearing. *Id.* The court also found these letters are stigmatizing because they indicate the Professors had performance issues in calling into question their fundamental capacity to perform their jobs. *Id.* (citing to the example letter quoted in the SAC providing termination based on "[s]econdary considerations may include," items identified as stigmatizing. *Id.;* App. 1, 46.

The court found that the SAC sufficiently plead the third element of requiring the statement to foreclose other employment opportunities. App. 3, 22. "…[A] loss of all employment opportunities is not required." *Smith v. Highland Community College*, 2023 WL 372016, *9 (D. Kan., Jan. 24, 2023) (unreported); *Watson v. University of Utah Medical Center*, 75 F.3d 569, 579 (10th Cir. 1996). Here, seven professors were placed on administrative leave while ESU appealed their reinstatements, four professors lost their tenured jobs, and all professors were unable to

44

continue their work in their chosen fields or maintain their tenured status. App. 1, 45-7, 53, 55, 68. Each Professor was required by ESU Officials to pack up and remove personal materials from their offices, the seven on leave pending appeal of their reinstatements were restricted from making progress towards promotion, all were denied access to conduct or continue research or other scholarly projects, and several were denied proper notification informing them if their services were required for grants that had been given to ESU on their account. App. 1, 53. Professors McCoy, Lidzy, Koerner and Lovett were unable to find employment in their chosen fields. App. 1, 55. In this Circuit, the Professors have adequately alleged the third element of their liberty interest claim.

The district court found sufficient facts showing publication of the termination letters. App. 3, 23. In relying on *Sanchez v. Dubois*, 291 F.App'x 187, 191 (10th Cir. 2008), the district court used the correct analysis to determine that the termination letters, being part of each Professors' personnel file, may be deemed published if there is a likelihood that the information will be disclosed to prospective employers. The SAC alleges these records are public, and that the termination

letters were published. App. 1, 62. Further, ESU used these letters as exhibits in a public forum before the OAH in defense of each Professors' claim that they were unfairly terminated and in the seven state actions filed in opposition to the reinstatement of seven Professors. *See* App. 1, 45-7, 50. ESU filed seven appeals challenging the "reinstatement" of seven Professors in Kansas state court. App 1, 48-50, 53. As reflected in Defendants' Exhibits A-D and I-K to their Motion to Dismiss, App. 2, 3-243, the termination letters *are attached* to ESU's Petitions for Review filed in Lyon County District Court. Defendants' argument that there was no publication is disingenuous and is contrary to the Supreme Court and this Court's precedent. Public employees are deprived of a liberty interest where the government imposed on them a stigma or other disability, foreclosing their freedom to take advantage of other employment opportunities. *Bd. Of Regents of State Colls. v. Roth*, 408 U.S. 564, 573-4 (1972).

The Professors have successfully pleaded a stigma-plus claim because ESU officials defamed them during termination and foreclosed other employment opportunities. *McDonald*, 769 F.3d at 1212 (citing

*Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994); *Bd. Of Regents of State Colls. v. Roth*, 408 U.S. 564, 573-4 (1972).

### c. The Professors specifically alleged a section 1983 conspiracy by ESU and KBOR officials.

Defendants argue that since there is no clearly established violation of the Professors' due process rights, any conspiracy premise must fail. App. O. Brief, p. 39 [Doc. 14 at 49]. The Defendants' argument fails for the reasons provided above. The law in Kansas is that tenured employees have a property interest in continued employment, and to terminate a tenured employee, that employee must be given procedural and substantive due process. As explained above, the SAC clears this hurdle.

Defendants next contend that the conspiracy allegations are too conclusory to survive their motion to dismiss because the SAC has no allegations showing that KBOR officials had anything to do with determining which specific professors would be terminated as required by the equal protection violation and what would be said about the terminated professors in the process as required for the liberty interest claim. However, defendants' arguments are based on the dismissed section 1985 conspiracy counts (Count five- Liberty Interest Conspiracy; Count seven- Equal Protection Conspiracy; Count nine- freedom of

association conspiracy of the SAC). The conspiracy counts which survived dismissal were the Section 1983 conspiracy claims (Counts three and 10 of the SAC) which are premised on different allegations—those being that the ESU and KBOR officials conspired to violate the Professors' constitutional rights to both procedural **and** substantive due process.

The district court dismissed Counts five, seven, and nine, but counts three and 10 survived because there is sufficient facts plead and plausible claims made that KBOR and ESU conspired to violate section 1983 in the manner alleged in Counts I (procedural due process), II (substantive due process), IV (liberty interest) and VI (equal protection). Defendants still fail to realize there are separate conspiracy counts and that there are constitutional rights to procedural and substantive due process before a property right can be removed. Count three alleges a general claim of conspiracy under section 1983 against the KBOR and ESU officials and John Does for conspiring in a movement to deprive tenured professors employed under the Regents system of their property right in tenure without substantive or procedural due process of law by creating, adopting and implementing the WMP and Framework. App. 1, 59.

48

Although Count 10 incorporates the allegations of the liberty interest and equal protection counts, it still plausibly asserts that defendants were motivated to take the Professors' property right in tenure and reputation in employment and equal protection in tenure without due process. App. 1, 77. KBOR officials did this by creating, adopting, and implementing the WMP and ESU's Framework. Without any notice and extremely limited discussion, they adopted the WMP. App. 1, 35, 38-9. Without any notice and extremely limited discussion, they adopted the Framework. App. 1, 48. Without both temporary policies, the Professors could not have been terminated without due process.

The SAC is replete of facts that could lead a reasonable trier of fact to conclude the KBOR and ESU officials and John Doe defendants conspired to undermine academic freedom by nullifying the protections of tenure, they knew tenured professors would be targeted and terminated, they conspired to deprive tenured faculty of procedural and substantive due process, and knew such modifications of policy would lead to the terminations at issue in this case. At this stage of litigation, the only thing required are facts alleging that two or more persons acting

in concert had a meeting of the minds and there was an agreement among the defendants or a general conspiratorial objective. *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (2010) (abrogated on other grounds). "Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy." *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990).

This Court has held that even with a conspiracy claim, a plaintiff's occasional use of collective references to "the Defendants" or a grouping of defendants does not automatically defeat a claim. *Id.* "Because direct evidence of an agreement to join a conspiracy is rare, . . . a defendant's assent can be inferred from acts furthering the conspiracy's purpose." *Id.* (quoting *United States v. Edmonson*, 962 F.2d 1535, 1548 (10th Cir. 1992). Consequently, an express agreement is not necessary. *Id.* Conspirators must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective. *Id.* (citing *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990).

As identified throughout the SAC, concerted actions have been taken by each ESU and KBOR official to conduct the conspiratorial plan. In the creation, adoption, and extension of the WMP, KBOR officials conducted the plan. In the creation, adoption, and implementation of the Framework, both ESU and KBOR officials conducted the plan. All were aware of the established law and conspired to take away the Professors' property interest in tenure by denying them substantive and procedural due process through the creation, adoption, and implementation of these policies. ESU was awarded $9 million for implementing its "right-sizing" plan to terminated tenured faculty, which its President Hush said was "part of the Republican Better Way Plan." KBOR and ESU Officials and John Doe defendants (in support of the Republican Better Way Plan) concocted the WMP and Framework to erode tenure and academic freedom and used the Covid-19 pandemic as a means of excusing their illegal conduct.

## 1. KBOR Officials

KBOR is the official body of Kansas charged with supervising and administering postsecondary education institutions. K.S.A. §§ 74-3201a –3289. KBOR was a party to *Tonkovich* and therefore the individual

KBOR defendants are charged with direct knowledge that tenured faculty have a property interest in continued employment, which means to terminate tenured faculty, faculty must be provided procedural and substantive due process. Despite knowing this, KBOR officials and John Doe Defendants created and adopted a policy which temporarily modified its discipline policy. The WMP removed due process, and without the modification, ESU could not have utilized their Framework to terminate the Professors. As the district court found, these Professors' terminations "would not have been possible but for the policy change made by KBOR, and the ESU Framework devised by ESU officials and approved by KBOR. App. 3, 14.

KBOR officials modified the policy under the false guise of financial pressures accelerated by the COVID-19 pandemic. This is despite the fact, as reported in their own minutes before even adopting the WMP, that ESU's humanity programs were financially profitable; that from 2017-2021 enrollment had increased, operating revenues had increased, operating expenditures had decreased, and each regent university (including ESU) received millions of dollars from the Federal Government in COVID-Relief funds.  App. 1, 55.

52

During the January 2021 KBOR meeting, general counsel Julene Miller presented the WMP because of so-called extreme financial pressures on state universities and the state's declining fiscal support. She indicated that the WMP would be an "additional financial tool for CEOs to use as they deal with the financial challenges at the universities." App. 1, 276. KBOR officials unanimously approved the WMP. *Id.* Under the amendment, the only way a university could utilize the modification was to present a framework to the KBOR officials for approval. In May 2022, KBOR officials voted to remove a deadline the universities had to submit their framework because so-called enrollment and financial challenges were still a concern. App. 1, 9.

ESU submitted its framework via Defendants Hush and Thomas. Hush told KBOR officials that ESU had asked faculty and staff to provide feedback but showed no evidence of that. He claimed that ESU's prior measures to address financial challenges had not resolved them. A trier of fact could interpret Hush's statement to mean that any so-called financial challenges were not due to COVID-19 (the basis for the WMP) but due to past mismanagement of ESU. Hush claimed that the WMP would allow ESU to "align resources and invest into growth areas by

doubling down in those programs that will move the University forward."

App. 1, 279. KBOR official Ice asked about impact and Hush said that

about seven percent of ESU employees would be impacted, i.e.,

terminated.

ESU presented its framework which contained virtually the same

language that the Hearing Officers found to be incompliant with the

WMP's notice requirements, that is, that it failed to give proper notice

about the reason a person was being terminated because it included the

non-conclusive language: "factors such as but not limited to." App. 1, 45.

KBOR officials approved the faulty framework on September 15, 2023,

knowing that (1) the law in Kansas was that tenured employees had a

continued property interest in employment deserving of procedural and

substantive due process; (2) ESU was under no financial crisis and (3)

tenured faculty would be terminated. App. 1, 282-3. As the district court

noted, ESU's later termination letters parroted the faulty framework

that KBOR individual defendants approved. App. 3, 16. Moreover, even

though Hush promised to find employment opportunities for terminated

ESU professors at other KBOR regent universities, some of the

Professors who applied at other KBOR universities were not hired. App.

1, 55. It is probable that KBOR and ESU officials along with John Does took actions to deny procedural and substantive due process to tenured professors to weaken tenure and destabilize academic freedom in KBOR regent universities. They continued to freeze out the Professors from employment opportunities by not hiring them at other Regent universities and denying them access to the means to maintain their academic work to support their tenured status.

The SAC identifies specific conspirators, time periods, specific meetings (including KBOR meetings), and plausible undisputed evidence showing that an agreement was made to attack academic freedom and erode tenure by terminating problematic tenured professors who were a bur in the ESU and KBOR officials' sides.

## 2. Brent Thomas

Thomas took part in the conspiracy. App. 1, 35, 46, 47, 66, 69 (part of the conspiracy claim). Thomas attended meetings where the Professors organized to discuss the WMP, to declare support for unionization, and these were the Professors who were later targeted and terminated. App. 1, 44. It is plausible that Thomas informed Hush about the Professors and their alignment on issues that were disfavored by administration.

Thomas also took part of the creation, adoption, and implementation of ESU's Framework, which prevented professors from asking which of the nine reasons articulated as "permissible" in the Framework was the reason each Professor was terminated. App. 1, 62, 65, 281-82.

Thomas then supported Hush's presentation to KBOR regents about the so-called financial need to approve the ESU Framework, despite being the university's Dean of the College of Liberal Arts & Sciences, Provost and Vice President for Academic Affairs, and presumably having knowledge of its stable financial position, it being fully funded, and the fact that the history program "operates efficiently and produces net revenue for [ESU]," and it was recommended by ESU to retain its History Program, and KBOR agreed. App. 1, 42-3. Thomas further supported ESU's implementations of the terminations through the OAH appeal process through providing affidavit testimony which provided sham statements on various academic programs. App. 2, 139, 146, 149, 189, 215, which was discredited by several of the hearing officers as evidenced by their orders of reinstatement, e.g., App. 2, 217. His testimony lent credence to ESU's state appeals of the seven

reinstatements, which have continued to delay reinstatement and the opportunity to maintain tenure for seven Professors. App. 2, 230.

### 3. Kevin Johnson and Steven Lovett

Johnson and Lovett are conspirators. App. 1, 32. In 2015, Johnson wrote: "Public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process. . . . Tenured faculty members of any academic rank also have a clear expectation of continued employment based on both university policy and the policies of the university's governing board…. Tenured faculty members. . . do have procedural due process rights in their employment. . . . Once granted, tenure gives a faculty member an expectation of continued employment at the institution that conferred tenure. . . . A tenured faculty member at any institution of higher education clearly has an expectation of continued employment and is entitled to procedural due process rights as a condition of termination of employment. App. 1, 35.

Johnson and Lovett helped in drafting the Framework and implementing it, which denied Professors procedural and substantive due process.

Johnson and Steven Lovett helped Hush prepare the termination letters they sent to the Professors. Because the termination letters failed to provide specific reasons for the terminations and suggested nine criteria which was unlimited but included "performance evaluations," "teaching and research productivity," and "low service productivity," the termination letters suggested that the Professors were terminated for poor job performance, which negatively impacted their reparations. App. 1, 48-9. The letters called into question the Professors' fundamental capacity to perform their job. *See Michaels v City of McPherson*, 71 F.Supp. 3d at 1260. In the post-secondary academic community, being terminated for the reasons such as "performance evaluations," "teaching and research productivity," and "low service productivity," as were identified in the termination letters is a death knell in the industry to the Professors' careers. The Professors were unable to continue their chosen fields of teaching at ESU.

Johnson and Lovett represented ESU in the post-termination hearings before OAH and avoided referencing the law he wrote about in 2015, claiming that tenure was only a privilege, denying there was any property interest inherent to tenure, and leading at least four Hearing

Officers astray. App. 1, 48. Johnson and Steven Lovett made similar false arguments about tenure at the Professors' OAH hearings and continued to claim tenure was a privilege; not a property right once it was granted. Johnson and Lovett continued to perpetuate the violation against procedural and substantive due process by failing to provide a reason to any of the Professors about why they were terminated. App. 1, 48-9.

Even after every Professor appealed and participated in the sham appeals process before the OAH, ESU and its attorneys, Steven Lovett and Johnson, and Thomas, continued fighting the appeals, refused to reinstate several of the Professors who were reinstated by OAH, and denied maintenance of tenure, despite knowing about the established Kansas law and *Tonkovich*. App. 1, 54.

The District Court appropriately relied on these facts for keeping Johnson and Lovett as defendants in the Liberty Interest, Freedom of Association, and Conspiracy Claims. App. 3, 21.

### d. ESU and KBOR officials took actions to violate the Professors' equal protection rights under the Constitution.

The basis of the equal protection claim is that the individual defendants *conspired* to undermine tenure, and thus weaken academic freedom, by eliminating due process through the creation, adoption, and

implementation of the WMP and ESU's Framework. App. 1, 67. All the Professors were known to be tenured and the conspirators, including individual defendants, knew them to be "problematic" for supporting issues disfavored by the ESU administration and various other activities described in the SAC, and individual defendants conspired to eliminate their jobs through the passage and application of these policies. Although Defendants argue that the SAC does not plausibly allege that KBOR defendants played any role in the decision, they are wrong. *See* App. 1, 41 (Defendant Hutton said "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstance. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose.), App. 1, 46-8. (Defendant Ice asked about the estimated impact and Defendant Hush stated that about seven percent of ESU's employees will be impacted). The ESU officials' conduct, and John Doe defendants' actions have been set forth above and sufficiently allege a plausible violation of the Professors' equal protection rights. As such, the district

court's decision that these allegations pass muster under Rules 8(a) and 12(b)(6) should be affirmed.

### e. The Professors specifically plead violation of their freedom of association against ESU and KBOR officials.

Defendants made no specific arguments to the district court that the Professors failed to allege specific allegations against the ESU and KBOR officials to support a violation of freedom of association. Because this argument was not made in the underlying matter, this Court should not hear it now. To the extent the Court does consider it, for the reasons specified above, the Professors plead specific enough facts that ESU and KBOR officials violated their freedom of association.

## CONCLUSION

The Professors respectfully submit that this appeal should be dismissed because this Court lacks jurisdiction under the collateral order doctrine. Alternatively, the district court's decision on the established law and qualified immunity should be affirmed. Should the Court grant Defendants' appeal in full or part, it should remand any surviving issues to the district court without prejudice and withdraw its jurisdiction.

**STATEMENT OF REASONS FOR ORAL ARGUEMENT**

The Professors request oral argument because the Defendants' position challenges the clearly established law in Kansas that tenure is a property right. Overturning Tenth Circuit precedent would impact fundamental constitutional rights.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 11,633 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(b), as calculated by the word-counting function of Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface –14 point Century Schoolbook—using Microsoft Word.

Dated: <u>06/10/2025</u>                    <u>/s/ J. Phillip Gragson</u>